```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                       NORTHERN DIVISION

3     _____
                                    )
4     UNITED STATES OF AMERICA      )
                                    )
5                                   )
                                    )
6        v.                         ) Criminal Docket No. WDQ-08-0444
                                    ) Volume II
7     DAVID BRAXTON,                )
              Defendant             )
8     _____)
                                        Baltimore, Maryland
9                                       March 17, 2009
                                        9:31 AM to 5:26 PM
10
             THE ABOVE-ENTITLED MATTER CONTINUED ON FOR
11                         JURY TRIAL
          BEFORE THE HONORABLE WILLIAM D. QUARLES, JR.
12
                    A P P E A R A N C E S
13
      On behalf of the Government:
14
              George Hazel, Assistant U.S. Attorney
15            James Wallner, Assistant U.S. Attorney

16    On behalf of the Defendant:

17            Gary E. Proctor, Esquire
              Justin Brown, Esquire
18
      Also present:
19
              TFO Edgar Allen
20

21

22                       Reported by:

23            Martin J. Giordano, RMR, CRR, FOCR
              U.S. Courthouse, Room 3318
24            101 West Lombard Street
              Baltimore, Maryland 21201
25            410-962-4504
```

1          __PROCEEDINGS OF MARCH 17, 2009__

2          **THE CLERK:**  Please rise.  The United States District

3     Court for the District of Maryland is now in session, The

4     Honorable William D. Quarles, Jr. presiding.

5          **THE COURT:**  Good morning.  Please be seated.

6     Counsel, are we ready for the jury?

7          **MR. WALLNER:**  We're just trying to get the equipment

8     working, Your Honor, for Defense counsel, so that's the only

9     holdup at this point.

10         **THE COURT:**  And do we have an estimated time for

11    that to be done?

12         **MS. CRAWFORD:**  Just a second, Your Honor.

13         **MR. HAZEL:**  Is that a witness?

14         **MR. PROCTOR:**  I don't know.  That's what I have to

15    check.  Your Honor, could I just have a moment to see if

16    that's my witness?

17         **THE COURT:**  Yes.  Would you get the jury, please.

18         (Jury enters.)

19         **THE COURT:**  Good morning.  Please take your seats.

20    A lot of green this morning.  Is there something special going

21    on?  Government, please call your next witness.

22         **MR. WALLNER:**  Your Honor, Government calls Mr. James

23    Wagster.

24         **THE CLERK:**  Please raise your right hand.

25

1    **JAMES L. WAGSTER**

2    **WAS THEN DULY SWORN TO TELL THE TRUTH**

3        **THE CLERK:**  Please be seated.  Sir, would you please

4    state your name for the record, and spell your last name.

5        **THE WITNESS:**  James L. Wagster, W-A-G-S-T-E-R.

6                        **DIRECT EXAMINATION**

7    **BY MR. WALLNER:**

8    Q.   Mr. Wagster, could you tell the ladies and gentlemen of

9    the jury how you're employed, sir.

10   A.   I'm employed as a firearms examiner by the Baltimore City

11   Police Department.

12   Q.   And how long have you been so employed, sir?

13   A.   Since September of 1972.  '92.  Excuse me.

14   Q.   Excuse me, sir.  Could you tell the ladies and gentlemen

15   of the jury what specialized training or experience you have

16   to hold such a position.

17   A.   At the time, I was a Baltimore County Police detective in

18   their Crime Lab.  I was assigned to the Maryland State Police

19   to train for firearms examiner.  There are other schools that

20   teach that.  I was trained by Mr. Don Floor at the Maryland

21   State Police.

22   Q.   And what goes into learning how to analyze firearms?

23   A.   Basically, it's an apprenticeship type thing.  I sat with

24   Mr. Don Floor for six years over there.  I started out taking

25   apart guns and test firing them and working my way up

1    identifying bullets and cartridge cases.

2    Q.   And have you ever been qualified as an expert in firearms

3    or tool mark examining anywhere in the state?

4    A.   Yes, sir.

5    Q.   And where?

6    A.   Baltimore County, Baltimore City, Harford County, Howard

7    County, U.S. District Court in Baltimore and Greenbelt.

8    Q.   Do you have an estimate or a number of times you've been

9    qualified as an expert?

10   A.   Total, about 410 previous times.

11        **MR. WALLNER:**  Your Honor, I'd ask that Mr. Wagster

12   be recognized as an expert in firearms and tool mark

13   examination.

14        **THE COURT:**  Mr. Proctor, do you wish to *voir dire* on

15   qualifications?

16        **MR. PROCTOR:**  No, sir.

17        **THE COURT:**  Members of the jury, Mr. Wagster is an

18   expert on firearms and tool mark identification, and, as I

19   advised you yesterday with the other expert, you consider an

20   expert's testimony together with all of the other evidence in

21   the case, and you give that testimony and those opinions the

22   weight and value that you believe they should have.

23        **MR. WALLNER:**  Thank you.

24   <u>**BY MR. WALLNER:**</u>

25   Q.   Mr. Wagster, let me show you what's been previously

1    marked as Government's Exhibit Number 4 in evidence, and ask

2    if you recognize that particular item?

3    A.   It is the same serial number, but also has the gun number

4    and my initials scratched on the trigger guard.

5    Q.   You actually etched something into that firearm to make

6    sure we were talking about the same firearm?

7    A.   Yes, sir.

8    Q.   Now, can you explain to the ladies and gentlemen of the

9    what tests or what you did with that firearm once it was

10   submitted to you?

11   A.   First, it's examined to make sure it's safe to fire,

12   there is no obstructions in the barrel, and it works.  Then

13   it's loaded with the correct ammunition, test fired, and the

14   test bullets and cartridge cases are recovered, and then the

15   report is written.  If there would be any fired ammunition

16   components, bullets or cartridge cases, they would then be

17   matched against the gun to see if they were fired with it.

18   Q.   What's the purpose of firing this weapon?  What's the

19   purpose of doing it?

20   A.   Two purposes.  In Baltimore City, it has to test -- it

21   has to work to be a handgun violation, but, also, we need to

22   test bullets and cartridge cases.

23   Q.   Very well.  And did you do that with this firearm?

24   A.   Yes, sir.

25   Q.   And can you explain to the ladies and gentlemen of the

 1    jury what particularly you did with this firearm.

 2    A.   Test fired it with the proper ammunition.  It's a 9mm

 3    Ruger.  The tests were -- one is put in an envelope with the

 4    firearm.  The other two stay in our office.  It's run through

 5    the system to see if it hits to any open cases, and the

 6    report's written.

 7              **MR. WALLNER:**  Madam Clerk, next Government's

 8    exhibit?  I'm sorry.

 9              **THE COURT:**  Government 8.

10              **THE CLERK:**  Yes.

11    **BY MR. WALLNER:**

12    Q.   Mr. Wagster, let me show you what's been marked as

13    Government's Exhibit Number 8.  I'll ask if you recognize the

14    contents of that envelope?

15    A.   It's the test fire envelope.  It has the gun number and

16    the property number on it, and also the evidence was sealed

17    with my name.

18    Q.   So you inspected that information this morning; is that

19    correct?

20    A.   Yes, sir.

21    Q.   Would you open that up and show the ladies and gentlemen

22    of the jury the contents of that envelope, please.

23    A.   It's a fired cartridge case, and the bullet core and the

24    jacket.  They separated when it was test fired in a water

25    tank.

1    Q.    Okay.  And you mentioned a water tank.  Can you explain

2    to the ladies and gentlemen of the jury what you actually do

3    with the firearm, where you fire it, and how you retrieve

4    these particular pieces of evidence in Government's

5    Exhibit Number 8.

6    A.    They're fired into -- all the handguns are fired into a

7    water tank, which is just a big box of water, but the water

8    absorbs the force of the bullet, bullet sinks to the bottom,

9    and it's retrieved with a high-tech piece of putty on a stick,

10   and then one of the test fires goes with the gun.  Like I

11   said, the other two stay in our office.

12   Q.    So you indicated there, in Baltimore City or in the state

13   of Maryland, the firearm has to be operable in order to be a

14   handgun violation; is that correct?

15   A.    Yes, sir.

16   Q.    You are also familiar with the definition of a firearm in

17   the United States Code; is that correct?

18             **MR. PROCTOR:**  Objection, Your Honor.

19             **THE COURT:**  Sustained.

20   **BY MR. WALLNER:**

21   Q.    Based upon your training, knowledge, and experience, sir,

22   do you have an opinion as to a reasonable degree of certainty

23   as to whether or not that firearm meets the definition --

24             **MR. PROCTOR:**  Objection, Your Honor.

25   **BY MR. WALLNER:**

1    Q.   -- in the United States Code?

2          **THE COURT:**  Overruled.  No, no.  Sustained.

3    Sustained.  Sustained.  Next.  I sustained the objection.

4          **MR. WALLNER:**  I understand that, Your Honor.

5    **BY MR. WALLNER:**

6    Q.  Mr. Wagster, you conducted a test of that firearm?

7    A.  Yes, sir.

8    Q.  Did you find it to be operable?

9    A.  Yes, sir.

10   Q.  Based upon your training, knowledge, and experience, does

11   that firearm meet the definition --

12         **MR. PROCTOR:**  Same objection, Judge.

13         **THE COURT:**  Sustained.

14         **MR. WALLNER:**  Your Honor, may we approach?

15         **THE COURT:**  Come up.  Yes.

16         (Whereupon, the following conference was held at the

17   bench.)

18         **MR. WALLNER:**  Your Honor, I fail to see why you're

19   sustaining --

20         **THE COURT:**  He's giving a legal definition.  He's

21   saying yes, this meets the legal definition.  That's a legal

22   opinion.  He's not going to do that.  Now, the jury has to

23   make the decision whether it meets.  He says it's operable.

24         **MR. WALLNER:**  Yes.

25         **THE COURT:**  We're going to define what a gun is for

1    them.  They're going to make that -- he's giving an opinion

2    essentially on guilt or innocence here.

3              **MR. WALLNER:**  My understanding of the Federal Rules,

4    Your Honor, is that an expert can make an opinion as to the

5    ultimate determination whether or not -- except for --

6              **THE COURT:**  He still has to be balancing.

7              **MR. PROCTOR:**  And he's not qualified as an expert in

8    the Federal Code, Your Honor.  He says it's operable.  You're

9    right.

10             **THE COURT:**  I've given the ruling.  You have your

11   objection.  Step back.

12             **MR. PROCTOR:**  Thank you.

13             (Whereupon, the bench conference was concluded.)

14   **BY MR. WALLNER:**

15   Q.   Mr. Wagster, based upon your training, knowledge, and

16   experience, is that firearm capable of expelling a bullet by

17   the action of an explosion?

18   A.   Yes, sir.

19             **MR. PROCTOR:**  Objection.  Asked and answered.

20             **THE COURT:**  Overruled.

21             **THE WITNESS:**  Yes, sir.

22             **MR. WALLNER:**  Nothing further, Your Honor.

23             **THE COURT:**  Cross?

24             **MR. PROCTOR:**  Briefly, Your Honor.  Thank you.

25

1      **CROSS-EXAMINATION**

2      **BY MR. PROCTOR:**

3      Q.   I just don't want the jury, sir, to get a misleading

4      impression.  You're not saying that -- well, first of all,

5      you've never met this man, correct?

6      A.   No, sir.

7      Q.   You probably know his name, but not much else, right?

8      A.   I'm not even sure I know his name.

9      Q.   You're not saying he ever fired this weapon, are you?

10     A.   No, sir.

11     Q.   You're not saying he or anyone else for that matter ever

12     used it in any crimes, are you?

13     A.   No, sir.

14     Q.   You're just saying that, when you fired it, a bullet left

15     the chamber, right?

16     A.   Yes, sir.

17              **MR. PROCTOR:**  That's all I have, Judge.

18              **THE COURT:**  Okay.  Redirect?

19              **MR. WALLNER:**  Nothing, Your Honor.

20              **THE COURT:**  Thank you.  You may be excused.

21              (Witness excused.)

22              **MR. HAZEL:**  Government next calls Patrick Fernandez

23     to the stand.

24              **THE COURT:**  Come up to the witness stand, please.

25              **THE CLERK:**  Please raise your right hand.

1          **PATRICK FERNANDEZ**

2      **WAS THEN DULY SWORN TO TELL THE TRUTH**

3          **THE CLERK:**  Please be seated.  Sir, please state

4      your name for the record, and spell your last name.

5          **THE WITNESS:**  Patrick Fernandez.  It's spelled F as

6      in Frank, E-R-N-A-N-D-E-Z.

7          **DIRECT EXAMINATION**

8      **BY MR. HAZEL:**

9      Q.   Good morning.

10     A.   Good morning.

11     Q.   Could you please tell the ladies and gentlemen of the

12     jury how you're currently employed.

13     A.   I am a Crime Lab Technician Supervisor, Baltimore City

14     Police Department, Lab Division, Mobile Unit.

15     Q.   And what are your official duties in that capacity?

16     A.   I supervise anywhere from eight to twelve people, and I

17     handle crime scenes.  I train new employees, and also

18     administer the breath testing program.

19     Q.   Now, focusing on your work with fingerprints, how long

20     have you done fingerprint work?

21     A.   Approximately, over 37 years.

22     Q.   And do you have any specialized training and education

23     relating to the lifting and taking of fingerprints?

24     A.   Yes, sir.  I was trained by the Baltimore City Police

25     Department and the FBI and in-service training.

Direct Examination of Patrick Fernandez

```
 1    Q.   And --

 2    A.   On-the-job training.

 3    Q.   I apologize.  I didn't mean to interrupt.

 4         Could you give us a ballpark estimate of how many

 5    prints you've attempted to lift?

 6    A.   Thousands.

 7    Q.   Have you been previously declared an expert in any court

 8    in the area of crime scene processing and fingerprint

 9    processing?

10    A.   Yes, sir.  I've testified as an expert in Circuit Court

11    of Baltimore, Juvenile Court of Baltimore, and Federal Court.

12         MR. HAZEL:  Your Honor, at this time, the Government

13    moves Patrick Fernandez as an expert in the field of crime

14    scene and fingerprint processing.

15         MR. PROCTOR:  May we approach briefly, Judge?

16         THE COURT:  Yes.  Come up.

17         (Whereupon, the following conference was held at the

18    bench.)

19         MR. PROCTOR:  Judge, every court that's considered

20    it has denied it other than one Baltimore County Circuit Court

21    Judge, in the Rose case, and so I'm objecting to fingerprints

22    as an area of expertise, and I would note that the National

23    Academy of Sciences issued a pretty scathing report on it a

24    couple weeks ago.

25         THE COURT:  Have you read the report?
```

1          **MR. PROCTOR:**  I have perused the highlights, Your

2    Honor, so I'm --

3          **THE COURT:**  You've read the newspaper accounts of

4    the report?

5          **MR. PROCTOR:**  That's correct.  So I just want to

6    preserve it in case something shakes out down the line.  I

7    don't need to *voir dire* him.

8          **THE COURT:**  You have your objection.  It is

9    overruled.

10          **MR. PROCTOR:**  Thank you.

11          **THE COURT:**  With all respect to Judge Souder.

12          (Whereupon, the bench conference was concluded.)

13          **THE COURT:**  Do you wish to *voir dire* on

14    qualifications, Mr. Proctor?

15          **MR. PROCTOR:**  No, sir, other than the previously

16    stated objection.

17          **THE COURT:**  Okay.  Members of the jury,

18    Mr. Fernandez is an expert in crime scene and fingerprint

19    processing.  Again, his testimony will be subject to the rules

20    I gave you before.  You consider his testimony and opinions

21    together with all of the other evidence in the case, giving

22    those opinions the weight and value that you believe they

23    should have.  He is an expert, and is qualified as such.

24    **BY MR. HAZEL:**

25    Q.   Officer Fernandez, could you just tell the ladies and

1  gentlemen of the jury what is meant by --

2  A.   Civilian.  Civilian.  Civilian.

3  Q.   I'm sorry?

4  A.   I'm a civilian.

5  Q.   I'm sorry.  I apologize.  Mr. Fernandez.  What is meant

6  by a latent print?

7  A.   A latent print is that object that is left on a surface

8  that's composed of oil and water that can be processed and

9  developed into a visible print.

10  Q.   Now, I'd like to show you what has been previously marked

11  as Government's Exhibit 4 and 5.  Turning your attention in

12  particular to the CC numbers indicated on Government's 4, I

13  would ask you:  Have you seen that firearm before?

14  A.   According to the CC number, yes, sir.

15  Q.   And how are you able to discern that?

16  A.   The complaint number matches the req. of the complaint

17  number on the firearms -- or request form for latent

18  processing.

19  Q.   Now, who actually processed that gun?

20  A.   Crime Lab Technician I Asha Layne.

21  Q.   And what was your involvement in the processing of that

22  gun?

23  A.   At the time, Ms. Layne had just arrived on the job, and

24  she had less than 30 days' experience on the job, and I was

25  assigned to supervise her training and watch her and observe

 1    her in her work as her immediate supervisor, and we were
 2    assigned a group of guns to process for firearms, and this was
 3    one of them, and she processed the guns under my direct
 4    supervision.
 5    Q.   And, as she processed that gun under your direct
 6    supervision, was she able to lift a print from that gun?
 7    A.   No, sir.
 8    Q.   Now, what kind of surfaces can a person leave his or her
 9    fingerprints on?
10    A.   Okay.  You can get a fingerprint off, generally speaking,
11    of a smooth, clean, dry surface.
12    Q.   Is it possible for a person to touch a surface and not
13    leave his or her fingerprint?
14    A.   Yes, sir.
15    Q.   Could you explain how that's possible.
16    A.   The person may not be sweating at the time.  Their hand
17    may be moving.  They may be -- the surface may be wet.  It may
18    be a windy day, because a fingerprint is a very sensitive
19    item, because it's composed of oil and water, and any
20    inadvertent force can possibly destroy it or make it
21    unsuitable for identification.
22    Q.   Turning your attention specifically to guns -- and,
23    actually, I meant to ask this before.  There are two other
24    items along with Government's Exhibit 4.  There is
25    Government's Exhibit 5, which is the magazine and the

1    cartridge.  Were those tested as well?

2    A.   Yes, sir.

3    Q.   Okay.  And same result?

4    A.   Same result.

5    Q.   Now, in particular, as it relates to guns, are guns

6    particularly easy or difficult to fingerprint?

7    A.   They're rather difficult to get positive results off of.

8    Q.   And why is that?

9    A.   A gun is -- first of all, it has oil -- natural -- I

10   mean, not natural, but oils, gun oils to keep it lubricated.

11   There are -- it's handled a lot, which can rub off any prints.

12   It may have been tossed.  It may have been subject to weather

13   conditions, or, in this particular instance, this gun looks a

14   little rusty here, which would make a less-than-perfect

15   surface for prints.

16           **MR. HAZEL:**  No further questions.

17           **THE COURT:**  Cross?

18           **MR. PROCTOR:**  Yes.  Thank you, Your Honor.  If I

19   could ask that the Government just retrieve the firearm.

20           **MR. HAZEL:**  Ah!  Certainly.

21                   **CROSS-EXAMINATION**

22   **BY MR. PROCTOR:**

23   Q.   Good morning --

24   A.   Good morning --

25   Q.   -- Mr. Fernandez.  How are you?

1    A.   -- sir.  All right.

2    Q.   You mentioned several factors that have bearing on the

3    ability to recover fingerprints; is that correct?

4    A.   Yes, sir.

5    Q.   And one of those is the temperature, right?

6    A.   Temperature is a possibility.

7    Q.   Okay.

8    A.   It could strain.

9    Q.   And that being, if it's too hot, the fingerprint is

10   likely to evaporate, correct?

11   A.   It's got to be really hot for them to evaporate.  Put it

12   that way.  Now, if it's cold, it could freeze.  They can

13   freeze.  They're made up of mostly water, moisture.

14   Q.   Right.  So, if it's cold, it could freeze, and, if it's

15   too hot, like the height of a midday in summer, it could

16   evaporate, correct?

17   A.   Or the firing of the gun.  The temperatures just firing

18   of a gun could cause a fingerprint to evaporate.

19   Q.   Okay.  Would you agree with me that the middle of May is

20   neither typically too hot or too cold?

21           **MR. HAZEL:**  Objection.

22           **THE WITNESS:**  Yes, sir.

23           **THE COURT:**  He's answered.  Overruled.

24   **BY MR. PROCTOR:**

25   Q.   I'm sorry.  What was your answer?

Cross-Examination of Patrick Fernandez

1   A.   Normally, yes, sir.

2   Q.   Okay.  The other thing you mentioned is oils.

3   A.   Yes, sir.

4   Q.   Well, one of the other things, I should say, you

5   mentioned.  And what that means is, if the gun has been

6   recently fired, there is more likely to be oil that would

7   diminish the ability to get fingerprints, correct?

8   A.   I can't say that about when the oil would affect --

9   exactly when it would affect the fingerprint.

10  Q.   Okay.  Then I guess why did you mention it if you can't

11  say directly?

12  A.   Well, guns oil have -- I said it's one of the factors.

13  They are oiled.  They are -- that's one of the main reasons

14  the particular gun operates, especially a automatic such as

15  that pistol.

16  Q.   Okay.  One of the other things you mentioned was handled,

17  correct?

18  A.   Yes, sir.

19  Q.   If a gun is put directly in an evidence bag, that's more

20  likely to preserve fingerprints than if it's passed from hand

21  to hand to hand to hand, correct?

22  A.   Yes, sir.

23  Q.   The other thing I want to --

24          **MR. PROCTOR:**  May I have a second, please, Judge?

25          **THE COURT:**  Yes.

1   **BY MR. PROCTOR:**

2   Q.   Lastly, isn't it true that where the gun is recovered

3   from has a marked ability on whether you can recover

4   fingerprints?

5   A.   Yes, sir.

6   Q.   I mean, typically, the study that's cited is one by

7   Clive Barnum and Darrell Klasey.  You're familiar with that

8   one; are you not?

9   A.   No, sir.

10  Q.   It's the study of firearms recovered in San Francisco in

11  the 1970s.

12  A.   No, sir.

13  Q.   Okay.  Well, would you agree with me that, if a gun is

14  recovered from the waistband of an individual who is, by the

15  police account, grasping it, he's more likely to have

16  fingerprints than one found at the bottom of the Chesapeake

17  Bay?

18  A.   Of course.

19  Q.   And, in terms of your thinking of a hypothesis to the gun

20  that's most likely to have fingerprints, one in which the

21  Defendant was handling it directly prior to it being removed

22  and one which was promptly placed in a evidence bag thereafter

23  on a mid-May day is optimum for the ability to recover

24  fingerprints?

25  A.   Could you repeat that again?

1    Q.   Okay.  If you were trying to envisage an ideal set of

2    circumstances in which a fingerprint would be available,

3    right, if the Defendant had it in his hand directly

4    beforehand, that would help, right?

5    A.   Yes, sir.

6    Q.   If it went straight into an evidence bag, that would

7    help, right?

8    A.   Yes, sir.

9    Q.   And, if it was the middle of May, so it was neither too

10   hot nor too cold --

11   A.   Not raining.

12   Q.   And not raining, right.  That would all help, correct?

13   A.   Uh-huh.

14          **MR. PROCTOR:**  That's all I have, Judge.

15          **THE REPORTER:**  If you would say "yes" and "no" so I

16   can get a clear answer.

17          **THE WITNESS:**  Oh!  Yes.

18          **THE COURT:**  Redirect?

19          **MR. HAZEL:**  Just briefly.

20                  **REDIRECT EXAMINATION**

21   **BY MR. HAZEL:**

22   Q.   Defense mentioned a few hypotheticals, including if a

23   defendant had just previously handled it.  In that situation,

24   would that, each and every time, mean that you would get a

25   print?

```
 1    A.   No, sir.

 2    Q.   And, lastly, if multiple people touched the gun in a

 3    short time frame, would that make it more or less difficult to

 4    obtain a fingerprint?

 5    A.   It would be very difficult.

 6              MR. HAZEL:  Thank you.  Nothing further.

 7              THE COURT:  Recross?

 8              MR. PROCTOR:  No, sir.

 9              THE COURT:  Thank you.  You may step down,

10    Mr. Fernandez.

11              (Witness excused.)

12              THE COURT:  Government?

13              MR. HAZEL:  Your Honor, may we approach?

14              THE COURT:  Yes.  Come up.

15              (Whereupon, the following conference was held at the

16    bench.)

17              MR. HAZEL:  Only thing the Government has left, I

18    guess, is our dueling stipulations, Your Honor.

19              THE COURT:  In other words, you don't have a

20    stipulation?

21              MR. HAZEL:  Well, in theory, we do.  I think it's a

22    matter of I prefer one; the Defense prefers another, and so

23    the first one --

24              THE COURT:  The one that you jointly prefer is, of

25    course, a stipulation.  Until you jointly prefer one, then
```

1    it's just disputed facts, I suppose.

2         **MR. HAZEL:**  Well, I think we each agreed to both --

3    well, let me just tell you what the issue is.

4         **THE COURT:**  You understand I can't force you into a

5    stipulation?

6         **MR. HAZEL:**  I understand that.  Well, can counsel

7    have a moment to discuss this?

8         **THE COURT:**  Yes.

9         (Whereupon, the bench conference was concluded.)

10        (Counsel conferring.)

11        **THE COURT:**  A short pause for station

12   identification, which is a really old reference that I know

13   that not all of you on the jury get that reference.

14        **MR. HAZEL:**  Your Honor, the Government and the

15   Defense have been able to reach stipulations.

16        **THE COURT:**  Okay.  Members of the jury, the

17   Government will now present a stipulation.  A stipulation is

18   an agreement between the parties.  If, for example, they agree

19   or stipulate that the sky is blue, then you don't have to

20   determine in your deliberations whether the sky is blue.  They

21   agree that, for purposes of this case, it is.

22        This is what they have agreed on.

23        **MR. HAZEL:**  Your Honor, it is hereby stipulated and

24   agreed by and between the United States of America, by its

25   attorneys, and Defendant, David Braxton, by his attorney, as

1      follows:  The Defendant, David Braxton, was legally prohibited

2      from possessing a firearm prior to the time that the Defendant

3      is alleged to have possessed the firearm charged in the

4      Indictment.  It's signed by counsel for the Government and

5      counsel for the Defendant.

6              **THE COURT:**  Thank you.  Anything else?

7              **MR. HAZEL:**  At this point, the Government rests,

8      Your Honor.

9              **THE COURT:**  Okay.

10             **MR. PROCTOR:**  Can we approach?

11             **THE COURT:**  Yes.  Come up.

12             (Whereupon, the following conference was held at the

13     bench.)

14             **MR. PROCTOR:**  Since the Government has rested, I

15     have one witness who is outside.  I told him he can go grab a

16     cup of coffee and be back in 10.  Lisa Parrott, who Your Honor

17     heard yesterday --

18             **THE COURT:**  Yes.

19             **MR. PROCTOR:**  I called her yesterday --

20             **THE COURT:**  I assume you want to do a formal motion,

21     so I will give the jury a brief recess while you move for a

22     judgment of acquittal.

23             **MR. PROCTOR:**  Mr. Brown will move for the judgment

24     of acquittal, and I will try and round up the witnesses.

25             **THE COURT:**  Very good.  Step back, please.

1      (Whereupon, the bench conference was concluded.)

2      **THE COURT:**  Members of the jury, we're going to take

3  a brief recess.  I should call for you by about 20 minutes

4  after 10:00.  Please remember, don't discuss the case among

5  yourselves or with anybody else.  I will see you at 10:10.

6  Sorry.  10:20.  10:20.  I'll see you at twenty minutes after

7  10:00.

8      (Jury excused.)

9      **THE COURT:**  Government has rested.

10     **MR. HAZEL:**  Yes, Your Honor.

11     **MR. BROWN:**  Your Honor, we move for a Motion of

12 Judgment of Acquittal.

13     **THE COURT:**  Yes, Mr. Brown?  Do you wish to be

14 heard?

15     **MR. BROWN:**  Yes.  Very briefly, Your Honor.  This

16 would largely be based on insufficiency of the evidence, the

17 failure to prove that Mr. Braxton actually had possession of

18 the weapon.  As we just heard, there were no fingerprints

19 recovered from the weapon, and we submit on the rest of the

20 evidence presented.

21     **THE COURT:**  Okay.  Very good.

22     Government wish to be heard?

23     **MR. HAZEL:**  Not unless the Court has questions.

24     **THE COURT:**  No.  Mr. Brown, you are correct that the

25 evidence would permit, of course, a jury to acquit Mr. Braxton

1    on its finding of the evidence; however, it does not require

2    that result.  It is arguable, and there is a sufficient basis

3    to permit the case to go to the jury, so your motion is

4    denied.

5             Let's see.  I will see you all at 10:20.  We're in

6    recess until then.

7             **THE CLERK:**  Please rise.  This Honorable Court now

8    stands in recess.

9             **THE COURT:**  By the way, it appears the --

10            **MR. WALLNER:**  ELMO is working?

11            **THE COURT:**  -- camera is working.

12            **MR. PROCTOR:**  Judge, if you could ask maybe

13   Ms. Taylor to come out and advise me as to the status of the

14   witness, because he might be our first one.

15            **THE COURT:**  Okay.

16            (Telephone interruption.)

17            **THE COURT:**  Is that Nora?

18            **THE CLERK:**  This is about the machine.

19            **THE COURT:**  Okay.  I'll find out for you.

20            **MR. PROCTOR:**  Thank you.

21            (Recess taken, 9:58 a.m. - 11:01 a.m.)

22            **THE CLERK:**  Please rise.  This Honorable Court will

23   resume in session.

24            **THE COURT:**  Please be seated.

25            Mr. Proctor, where are we?

1          **MR. PROCTOR:**  Judge, we have three witnesses, and,

2     actually, maybe I should -- Mr. Steppe, would you step out.

3     Excuse the pun.  One of which is --

4          **THE COURT:**  Ask him to step out.

5          **MR. PROCTOR:**  Go right outside the door, right

6     outside in that seat, please.  That's obviously the first one,

7     Judge.  The second one, they're going to text the Marshals

8     when he arrives.  He should be here momentarily, I believe.

9          **THE MARSHAL:**  I wasn't told that.

10          **MR. PROCTOR:**  Well, he should be here.  They went to

11     get him around --

12          **THE COURT:**  You shouldn't depend on "momentarily."

13          **MR. PROCTOR:**  And the third --

14          **THE COURT:**  You should back way away from

15     momentarily.

16          **MR. PROCTOR:**  He will be here when he gets here,

17     Your Honor.

18          **THE COURT:**  Yes.

19          **MR. PROCTOR:**  And the third witness will be

20     Ms. Parrott, who you know testified yesterday.  After she

21     testified, I asked her for a cell phone number.  She gave it

22     to me.  She said -- I asked, "When you're at work, do you turn

23     it off?"

24          She said, "No, it's always on."  I called her last

25     night and told her to get here at 10:15.  Mr. Hazel was kind

1   enough to call her and say, "Where are you?  Are you on your

2   way?"  I tried her again, and it went straight to voice mail

3   again ten minutes ago, so the case agent is now calling the --

4   in case she's lost her cell phone or -- although it rings, so

5   clearly there is a battery in it -- to try and figure out with

6   her supervisor where she's at.  Hopefully she will also be

7   here in a short period of time.

8          **THE COURT:**  Okay.  Now, let me give you a choice.

9   If you want, we can put on your one witness now, and then sort

10  of wait around, or I can give them an early lunch, resume at

11  2:00, and then you can present your case coherently, one

12  witness after the other.  I leave it up to you.

13         **MR. HAZEL:**  Your Honor, can I just throw something

14  in the pot so we can resolve it all at once?

15         **THE COURT:**  Yes.

16         **MR. HAZEL:**  Mr. CitaraManis -- remember we have this

17  ineffective assistance issue.  He said he could be here at

18  2:00, so I just throw that out for everyone to be aware.

19         **MR. PROCTOR:**  And, to further complicate things,

20  Your Honor, because this isn't nearly complicated enough,

21  Mr. Hazel and I, on a completely different case, have a really

22  short hearing in front of Judge Grimm at 1:30.  We agree on

23  the disposition.  Assuming there is not a delay because three

24  cases are ahead of us, we'll be in and out of Judge Grimm's

25  courtroom in less than ten minutes.

 1          **THE COURT:**  Okay.  Well, again, I leave it to you.

 2     If you want to get started, if you want to put on -- how long

 3     will Mr. Steppe be in direct?

 4          **MR. PROCTOR:**  Ten minutes.

 5          **THE COURT:**  Okay.  If you want to present ten

 6     minutes of evidence, and then a break, and then resume at some

 7     time this afternoon, or if you wish to present your defense as

 8     a coherent whole, one witness following another, you may.  I

 9     leave that up to you.

10          **MR. PROCTOR:**  The only issue I have is Mr. Steppe

11     has a job, and I think he may be scheduled to go there this

12     afternoon.  I lent him my cell phone so he can call.  Can I

13     just go check with him?  I'll be back in 90 seconds or less.

14          **THE COURT:**  Very good.

15          (Pause.)

16          **MR. PROCTOR:**  We will present Mr. Steppe at this

17     time, Your Honor.

18          **THE COURT:**  Okay.  Please send for the jury.

19          **THE CLERK:**  All right.

20          **THE COURT:**  You're going to ask him to step in as it

21     were.

22          **MR. PROCTOR:**  Excuse the pun, Your Honor?

23          (Jury enters.)

24          **THE COURT:**  Members of the jury, please be seated.

25          Members of the jury, the Government has rested its

1    case.  We now turn to the Defense case.

2           Mr. Proctor, please call your first witness.

3           **MR. PROCTOR:**  At this time, Your Honor, Mr. Braxton

4    will call Demetrius Steppe, Jr.

5           **THE CLERK:**  Sir, would you please raise your right

6    hand.

7                    **DEMETRIUS STEPPE, JR.**

8           **WAS THEN DULY SWORN TO TELL THE TRUTH**

9           **THE CLERK:**  Please be seated.  Sir, would you please

10   state your name for the record, and spell your last name.

11          **THE WITNESS:**  Demetrius Steppe, Jr., S-T-E-P-P-E.

12          **THE COURT:**  Mr. Steppe, if you would, face the

13   members of the jury.  That also will make you talk directly

14   into the microphone.  Please pull up to the microphone.  You

15   can raise it so that it's pointed right at your mouth.  Again,

16   it's very important for them to hear every word that you say.

17          Counsel?

18                    **DIRECT EXAMINATION**

19   **BY MR. PROCTOR:**

20   Q.   Good morning, Mr. Steppe, or, as it's St. Patrick's Day,

21   perhaps I should say top of the morning to you.

22   A.   Same to you.

23   Q.   How are you today?

24   A.   Fine.

25   Q.   Do you work?

 1    A.    Yes.

 2    Q.    Where?

 3    A.    At the McCormick Company.

 4    Q.    And what do you do at McCormick?

 5          THE COURT:  Keep your voice up as loud as you can,

 6    sir.

 7          THE WITNESS:  I run --

 8          THE COURT:  Talk into the microphone.

 9          THE WITNESS:  I run an assembly line.

10    BY MR. PROCTOR:

11    Q.    Okay.  If you could, as the Judge mentioned, the court

12    reporter has to pick it up, and I want the members of the jury

13    to hear it, so pretend like your outside voice.

14          How long have you held that job?

15    A.    I just recently started.

16    Q.    Okay.  Do you know this man seated to my left?

17    A.    No.

18    Q.    Seen him before?

19    A.    Once before.

20    Q.    Okay.  Was that back in May of 2006?

21    A.    Yes.

22    Q.    What were you doing that day?

23    A.    I had just got out of school, and I needed some money at

24    the time, so I hacked, and I picked this young man up, and

25    some police pulled us over, whatever.

```
 1    Q.   Hang on a second.  We'll get to that in a minute.  You

 2    just got out of school.  Where were you studying at the time?

 3    A.   I was in high school.

 4    Q.   Okay.  Which high school?

 5    A.   Harbor City.

 6    Q.   Okay.  And you said you just picked this man up?

 7    A.   Yes.

 8    Q.   Let me ask:  How many people were in your car when you

 9    picked Mr. Braxton up?

10    A.   Two, three.

11    Q.   Okay.  Tell me about the other -- yourself, and did I

12    hear you say two others?

13    A.   Yes.

14    Q.   Tell me about those other two people.

15    A.   One of them was my cousin, and the other one I think

16    might have been somebody he knew.

17    Q.   Okay.  And what's your cousin's name?

18    A.   Davon Harris.

19    Q.   Okay.  And where did you start off your journey?

20    A.   I think I picked my cousin up -- I was down Bentalou.  I

21    think on Bentalou Street, or I was at one of my aunt's houses

22    when I picked them up, I think, and then, from there, I left

23    to go to my mother's house.  On the way, like I said, I picked

24    him up -- picked this young man up, and that's when I -- when

25    I was on my way to drive him off to his destination, that's
```

1    when I got pulled over.

2    Q.   Okay.  You say you picked him up.  Are you familiar with

3    the term "hacking"?

4    A.   Yes.

5    Q.   What does "hacking" mean?

6    A.   Basically, a cab, I think.  I mean, a cab.  I mean, I'm

7    not for sure.  I'm not for sure.

8    Q.   It's like an unlicensed cab?

9    A.   Right.

10   Q.   So, people who do that, they get a few bucks for gas

11   money, and they drop someone off?

12   A.   Right.

13   Q.   Is that what you were doing with Mr. Braxton?

14   A.   Yes.

15   Q.   Had you ever seen him before that day?

16   A.   No.

17   Q.   Have you seen him since --

18   A.   No.

19   Q.   -- other than when you walked in the courtroom this

20   morning?

21   A.   Right.

22   Q.   Okay.  When Mr. Braxton got in your vehicle, do you

23   recall which seat he sat in?

24   A.   The front seat.

25   Q.   Okay.  Describe for the jury what your car looks like.

Direct Examination of Demetrius Steppe, Jr.                    T-II-282

1    A.    It was a two-door 1988 Cadillac El Dorado.

2    Q.    Okay.  Do you recall the license tag you had on it?

3    A.    They were the wrong tags.  I don't remember the tag

4    number.  I know they were the wrong tags.

5    Q.    Well, tell the jury how you came to have the wrong tags

6    on your vehicle.

7    A.    That was my first car.  I had just got that car back from

8    my uncle in Virginia.  The day before, I had just got off

9    school, was going to switch my tags and the insurance

10   information, and, like I say, I had to go pick up some money

11   from my mother, and then ended up hacking somebody to get some

12   gas money to make it to my mother, and then that situation

13   happened.

14   Q.    Okay.  So the tags that were on the vehicle, do you know:

15   Did they belong to you?

16   A.    Yes.

17   Q.    To another vehicle you owned?

18   A.    Yes.

19   Q.    Okay.  Did you agree a fee with Mr. Braxton to take him

20   somewhere?

21   A.    Yes.

22   Q.    How much was that?

23   A.    I think it was -- I think $10, something -- I think it

24   was $10, I think.

25   Q.    Do you recall where you were taking him to?

1   A.   No.

2   Q.   Do you recall, when Mr. Braxton got into the vehicle,

3   what clothing he was wearing?

4   A.   No.

5   Q.   Do you recall if it was baggy or tight fitting?

6   A.   I'm not for sure.  I think it was tight, I think.  I'm

7   not for sure.

8   Q.   Did he appear to have any bulges in his clothing?

9   A.   No.

10  Q.   Did he appear to be holding his waistband?

11  A.   No.

12  Q.   Okay.  I'm showing you -- and I'm just going to show it

13  to you.  I'm not going to hand it to you -- what's been marked

14  as Government's Exhibit --

15        **MR. HAZEL:**  4.

16  Q.   -- 4, and ask you if you've ever seen this before?

17  A.   At the police station when they showed it to me, I think.

18  Q.   Okay.  We'll get to that in a minute, but let me ask you:

19  Did Mr. Braxton appear to have anything that would make a

20  bulge in his clothing when he got in your vehicle?

21  A.   Not that I saw.

22  Q.   And he was sitting right next to you, correct?

23  A.   Right.

24  Q.   Did he appear to have any bulges as he was sitting down?

25  A.   No.

1    Q.   Did he appear to be holding any particular area of his

2    body?

3    A.   No.

4    Q.   Okay.  I apologize if I've already asked this, but do you

5    recall where you were taking Mr. Braxton?

6    A.   No.

7    Q.   When was the first time you learned that there was a

8    police car in the vicinity of your vehicle?

9    A.   When they boxed us in.

10   Q.   Okay.  You hadn't noticed one in your rearview mirror

11   before that?

12   A.   No.

13   Q.   Okay.  Tell the jury about being boxed in.

14   A.   They just swarmed from everywhere, boxed us in from both

15   sides at the median, and then told us to get out the car.

16   When they took us out the car first --

17   Q.   Hang on one second.  It works better if I ask questions

18   and you answer them.  It's difficult for the court reporter to

19   pick it up otherwise.

20        You say they boxed you in.  Did an officer approach

21   your vehicle?

22   A.   When they -- I think when they got out the car, they had

23   their guns drawn, whatever.  They told us to all get out the

24   car.

25   Q.   Did anyone ask for your license and registration or

Direct Examination of Demetrius Steppe, Jr.

1    anything like that before you got out of the vehicle?

2    A.   I -- they might have did.  I think so.  I'm not for sure.

3    Q.   Okay.  So did I hear you say you got out of the vehicle?

4    A.   Yes.

5    Q.   Did you see Mr. Braxton get out of the vehicle?

6    A.   Yes.  He was the first one to get out.

7    Q.   He was the first one to get out?

8    A.   Uh-huh.

9    Q.   Let me ask you this:  Before he got out of the vehicle,

10   what was his demeanor?  How was he acting?

11   A.   I mean, he was calm.  I mean, it wasn't -- I mean, I

12   didn't see him acting no different than how he was when he got

13   in there.  He just looked around just like I did.  I mean, we

14   was surprised.  It was out of nowhere.

15   Q.   Okay.  So, when Mr. Braxton -- he's the first one to get

16   out of the vehicle; is that what you said?

17   A.   Yes.

18   Q.   What happened next?

19   A.   When he got out, they slammed him down, whatever, grabbed

20   him, like they slammed him down, whatever, and, I mean, the

21   rest of us, they grabbed us, whatever.  We got out, and, I

22   mean, made us sit on the curb.

23   Q.   Okay.  Did you hear any officers yell, "Gun"?

24   A.   No.  I don't remember no -- anybody yelling, "Gun."

25   Q.   Let me put it a different way.  Did Mr. Braxton tussle

1    with the officers, or did the officers tussle with

2    Mr. Braxton?

3    A.   I don't remember him tussling with them.  I think the way

4    how they grabbed him, it looked like they were tussling with

5    him, the way how they grabbed him.

6    Q.   Okay.  You mentioned that you've seen this gun at some

7    point?

8    A.   Yes.

9    Q.   Tell me about the first time you saw it.

10   A.   I'm not for sure.  I do not remember them showing it to

11   me at the scene.  They might have, but I don't remember, but I

12   for sure enough remember them showing it to us at the station.

13   Q.   Okay.  Did you see a gun recovered from Mr. Braxton?

14   A.   No.  I didn't see them grab no gun.

15   Q.   Where you were sitting, how well could you see

16   Mr. Braxton?

17   A.   I could see him very well.

18   Q.   Okay.  Do you think, if a gun had been pulled from him,

19   you would have seen it?

20   A.   I should have, yes.

21   Q.   What was the attitude of the officers on the scene?

22             **MR. WALLNER:**  Objection.

23             **THE COURT:**  I'll sustain as to form.

24             **MR. PROCTOR:**  Okay.

25   **BY MR. PROCTOR:**

1    Q.   Describe -- how, if at all, were the officers acting?

2    A.   I mean, some of them aggressive; some of them, I mean,

3    not real aggressive, but, I mean, like an aggressive way.

4    Q.   Okay.  Did you get charged with any crimes as a result of

5    this?

6    A.   No.  Just some tickets.

7    Q.   Okay.  What kind of tickets?

8    A.   I think moving violations, like for not having the

9    correct tags, and failure to show my registration, and I think

10   it was another one.

11   Q.   Okay.  Open container maybe?

12   A.   I might have had -- I think there was one.

13   Q.   Did your car get impounded?

14   A.   Yes.

15   Q.   Did you subsequently get it back?

16   A.   After like a month, I did.

17   Q.   Okay.  And, just so I'm clear, when you got pulled over

18   by the police, Mr. Braxton didn't try to hide anything, didn't

19   grab his waist?

20   A.   No.

21           MR. PROCTOR:  Can I have a second, please, Judge?

22           THE COURT:  Yes.

23           MR. PROCTOR:  That's all I have at this time, Judge.

24           THE COURT:  Cross?

25           MR. WALLNER:  Briefly, Your Honor.

Case 1:08-cr-00444-WDQ   Document 97   Filed 04/06/10   Page 39 of 226
Cross-Examination of Demetrius Steppe, Jr.

T-II-288

1              **<u>CROSS-EXAMINATION</u>**

2     **BY MR. WALLNER:**

3     Q.   Mr. Braxton, how old are you, sir?

4              **MR. PROCTOR:**  Objection, Your Honor.  He would be

5     Mr. Steppe.

6              **MR. WALLNER:**  I mean, Mr. Steppe.  Excuse me.

7     **BY MR. WALLNER:**

8     Q.   How old are you, sir?

9     A.   Twenty.

10    Q.   You're 20.  So how old were you the date of this

11    incident, 2006?

12    A.   I think 17.

13    Q.   Seventeen?  And you had a learner's permit at that time;

14    is that correct?

15    A.   Yes.

16    Q.   And you were driving that vehicle without anybody else in

17    the car licensed to drive or that you knew; is that right?

18    A.   Right.

19    Q.   Okay.  And you know that hacking is a crime; is that

20    correct?

21    A.   All right.  I'm guessing so.  I didn't know.

22    Q.   You didn't know?  You don't know that running an

23    unlicensed taxicab is a crime?

24    A.   I didn't know that until --

25    Q.   Did you know that switching tags from one registered

1    vehicle to another registered vehicle is a crime?

2    A.   I didn't know that.  That was my first vehicle.

3    Q.   You didn't -- so where did the other tags come from if

4    they were yours?

5    A.   They were from another car.

6    Q.   The tags are registered to you?

7    A.   Yes.

8    Q.   But you said this was your first car?

9    A.   That was my first car.  That car was a car that was given

10   to me --

11   Q.   Which car?  I'm sorry.

12   A.   The car that I had from my uncle.

13   Q.   The Cadillac?

14   A.   Yes.

15   Q.   Okay.  But you had tags from another vehicle that were

16   registered in your name; is that correct?

17   A.   Yes.

18   Q.   But that wasn't your first car?

19   A.   Which one?  The one that I was driving?

20   Q.   Just so we're clear, you were driving a Cadillac.

21   A.   Right.

22   Q.   Two-door Cadillac El Dorado.  You're telling the ladies

23   and gentlemen of the jury that that was your first car; is

24   that correct?

25   A.   Yes.

1    Q.   But, yet, prior to that, you had --

2    A.   That was -- all right.  That was the car I was supposed

3    to be going to get.  Something was wrong with that car, so my

4    uncle gave me another car.

5    Q.   I'm sorry.  You have to repeat that for me.  I apologize.

6    What happened?

7    A.   That first car I had, something was wrong with it.  I

8    never got to bring that car back.  I went to Virginia, and he

9    ended up giving me that car, because that was my only way to

10   get back home.

11   Q.   Which car?

12   A.   The Cadillac.

13          **THE COURT:**  Don't block the jury, Mr. Wallner.

14          **MR. WALLNER:**  I'm sorry, Your Honor.

15   **BY MR. WALLNER:**

16   Q.   Okay.  So I'm a little confused.  You have Maryland

17   tags --

18   A.   Yes.

19   Q.   -- for a vehicle?

20   A.   Yes.

21   Q.   Registered in your name?

22   A.   Yes.

23   Q.   That you took from one vehicle and put on your Cadillac;

24   is that correct?

25   A.   Correct.

1   Q.   So the vehicle that you took the tags off of that were

2   registered in your name, where is that vehicle?

3   A.   I still have it in Virginia.  I had never got to put the

4   tags on it.  I bought the car from one of my other uncles, and

5   I never got to put the tags on it, because something was wrong

6   with it, so my uncle gave me -- my other uncle gave me another

7   car.

8   Q.   From Virginia?

9   A.   Yes.

10  Q.   And then, so you took your tags --

11  A.   Yes.  To get the --

12  Q.   -- off the car that you never had --

13  A.   Yes.

14  Q.   -- and put on the Cadillac?

15  A.   Yes.

16  Q.   And you didn't know that was a crime?

17  A.   No.

18  Q.   Okay.  You claimed that you had never seen Mr. Braxton

19  before; is that correct?

20  A.   Correct.

21  Q.   What about the other occupants of the vehicle?

22  A.   One of them was my cousin.

23  Q.   Who was that?

24  A.   Davon Harris.

25  Q.   Davon Harris?

1    A.   Yes.

2    Q.   And the other individual?

3    A.   I don't remember.

4    Q.   Where did you pick Mr. Braxton up, sir?

5    A.   I don't -- I don't remember.

6    Q.   You don't remember where you picked Mr. Braxton up?

7    A.   No.

8    Q.   Where were you taking him?

9    A.   I don't remember.

10   Q.   Okay.  So -- correct me if I'm wrong -- you were driving

11   on Pennsylvania Avenue, is that correct, at some point?

12   A.   Yes.

13   Q.   And you turned off Pennsylvania Avenue, Martin Luther

14   King Boulevard; is that correct?

15   A.   Yes.

16   Q.   And the police officers pulled you over on Martin Luther

17   King Boulevard; is that correct?

18   A.   Yes.

19   Q.   There was a marked unit and an unmarked unit; is that

20   correct?  What I mean, one police with lights and sirens, and

21   one police officer that blocked you in; is that correct?

22   A.   I don't remember the marked unit, but it might have been.

23   I remember some being there afterwards, after we got pulled

24   out the car.

25   Q.   All right.  So, when the unit comes up, the first person

1  that comes to the car, did anybody come to your side of the

2  vehicle?

3  A.   I don't remember.  I remember a guy on the passenger

4  side -- on the car that blocked us in from the passenger

5  side --

6       **THE REPORTER:**  I'm sorry.  I didn't hear you.

7       **THE WITNESS:**  I remember the car from the passenger

8  side that blocked us in from the passenger side, someone

9  getting out the car and telling us to all get out the car.  I

10  remember that.

11  **BY MR. WALLNER:**

12  Q.   So a uniformed officer never came to your side of the

13  vehicle; is that right?

14  A.   I don't remember.

15  Q.   You don't remember a uniformed officer speaking to you?

16  You told Mr. Proctor that you may have been asked for your

17  license and registration.

18  A.   I may have -- I don't remember.

19  Q.   You don't remember being asked for your license and

20  registration, or you don't remember the officer coming to the

21  side of the car?

22  A.   I don't remember.

23  Q.   Okay.  So, at some point, then, all of you are asked to

24  exit the vehicle; is that correct?

25  A.   Correct.

1  Q.   How long had Mr. Braxton been in the vehicle before that

2  occurred?

3  A.   I'm not for sure.

4  Q.   Was it a minute?  Was it an hour?

5  A.   I'm not for sure.  I don't remember.

6  Q.   So an individual that you don't know is seated next to

7  you in a vehicle; is that correct?

8  A.   Correct.

9  Q.   And how often do you hack, sir?

10  A.   That was -- I had just got that car.  It was my first

11  car.  I mean, that was my first time.

12  Q.   That was the first time you ever hacked before?

13  A.   Right.

14  Q.   But you know that you can drive around and pick people up

15  on the side of the road and take them places for money; is

16  that correct?

17  A.   Yes.

18  Q.   And Mr. Braxton did that; is that correct?

19  A.   He was supposed to, but we never got to the destination.

20  Q.   To the location, that's right.

21  A.   Right.

22  Q.   Okay.  So explain to the ladies and gentlemen of the jury

23  how you know how to pick somebody up if they're hacking, as

24  opposed to hailing a regular cab?

25  A.   My cousin said, if I needed some money, why don't I hack

 1   somebody.  I didn't know what it was at first, though.

 2   Q.   Okay.  So that's fine.  But how do you know who to pick

 3   up?

 4   A.   I don't know.  I mean, it was the first person I saw, so

 5   I picked him up.  I needed the money at the time for some gas,

 6   so I did that.  I mean --

 7   Q.   How did Mr. Braxton let you know that he needed a ride?

 8   A.   I think I seen him standing on the corner flagging for a

 9   hack, I think.

10   Q.   I'm sorry.  Flagging for a hack.  Explain to the ladies

11   and gentlemen of the jury what that means.

12   A.   Put your finger out, flagging for a hack.

13   Q.   So you stand on the side of the corner and go like this;

14   is that right?

15   A.   Yes.

16   Q.   Like hailing a regular cab?

17   A.   Yes.

18   Q.   And you pull over and pick Mr. Braxton up?

19   A.   Yes.

20   Q.   Never seen him before?

21   A.   No.

22   Q.   He gets in the car, and he sits down; is that correct?

23   A.   Right.

24   Q.   You don't know how long he was in the car?

25   A.   I don't remember.

Case 1:08-cr-00444-WDQ   Document 97   Filed 04/06/10   Page 47 of 226
Cross-Examination of Demetrius Steppe, Jr.

T-II-296

1    Q.   Eventually you're pulled over.  You're asked to exit the

2    vehicle.  This is the first time you had been driving now and

3    hacking; is that correct?

4    A.   Yes.

5    Q.   You're confronted by law enforcement officers.  You have

6    bad tags on the car.  You're hacking.  Mr. Braxton gets out.

7    You get out.  Is that correct?

8    A.   Correct.

9    Q.   You say you never saw the gun at the scene; is that

10   right?

11   A.   Right.  I think I never saw it.  I don't remember seeing

12   this -- seeing it.

13   Q.   Which side of the vehicle are you on?

14   A.   The driver's side.

15   Q.   When you were asked to exit the vehicle, which side of

16   the vehicle did you get out of?

17   A.   The driver's side.

18   Q.   Okay.  So you're on the opposite side of your Cadillac

19   El Dorado when the incident occurred; is that right?

20   A.   Correct.

21   Q.   All right.  And you see what you claim to be a tussle

22   between Mr. Braxton and the officers; is that correct?

23   A.   Yes.

24   Q.   You were asked to get out of the vehicle first?

25   A.   They told all of us to get out.

1   Q.   And so you all got out simultaneously?

2   A.   I mean, I guess so.

3   Q.   Well, see, normally, sir, what would happen would be you

4   would have to get out first, because, if you were going to

5   flee, you would be the one most capable of fleeing, isn't that

6   correct, because you're the one behind the wheel?

7              **MR. PROCTOR:**  Objection, Your Honor.

8              **THE COURT:**  Overruled.

9   **BY MR. WALLNER:**

10  Q.   Isn't that right?

11  A.   I guess so.

12  Q.   I mean, you're driving the car.  You have control of the

13  vehicle.  They would ask you to get out first, isn't that

14  right, or all together; is that right?

15  A.   I guess so.  That was my first time, so I didn't know.

16  Q.   First time --

17  A.   Driving, so I didn't know.

18  Q.   Okay.  So either you're asked to get out first, or you

19  all get out simultaneously; is that correct?

20  A.   Correct.

21  Q.   Tell the ladies and gentlemen of the jury when you first

22  observed this tussle.

23  A.   When they first -- when we all -- when we first got out

24  of the car -- the first two got out of the car, seemed like

25  how they grabbed him or whatever and slammed him around.

1    Q.   Seemed like how they grabbed him, so you didn't see the

2    officers grab him; is that correct?

3    A.   I saw them when they grabbed him.  It seemed like they

4    was tussling.  I mean --

5    Q.   You're getting out of the car on the driver's side of the

6    vehicle?

7    A.   Correct.

8    Q.   There is an officer there on that side of the car; is

9    that correct?

10   A.   Correct.

11   Q.   Was the officer in uniform, or in plain clothes?

12   A.   I don't remember.  He might -- I think he was in uniform.

13   I think --

14   Q.   Oh!  You think he was in uniform.  So the officer that's

15   getting out of the vehicle on your side of the car, he's

16   asking you to get out at the same time Mr. Braxton getting

17   out, so you're actually getting out on opposite sides of the

18   vehicle?

19          **MR. PROCTOR:**  Objection, Your Honor.  This is all --

20   Q.   Is that correct?

21          **THE COURT:**  I didn't hear you.

22          **MR. PROCTOR:**  Asked and answered.

23          **THE COURT:**  Well, it's been asked.  I'm not sure

24   it's been answered.  Overruled.

25   **BY MR. WALLNER:**

1    Q.   Is that correct?

2    A.   Right.

3    Q.   And, as you're getting out of the vehicle instructed by

4    the officer, on the opposite side of the Cadillac El Dorado,

5    you can see that the way these law enforcement officers grab

6    Mr. Braxton, that they created the tussle; is that correct?

7    Is that what you're telling the ladies and gentlemen of the

8    jury?

9    A.   Yes, because, when they told me to get out the car, I was

10   facing the car.

11   Q.   You were facing the car.  Were you thrown to the ground?

12   A.   No.

13   Q.   Okay.  So the only person thrown to the ground was

14   Mr. Braxton; is that correct?

15   A.   Yes.

16   Q.   Two-door or four-door car?

17   A.   Two door.

18   Q.   Okay.  So, in order for the back seat passengers to get

19   out, you actually have to move the front seats forward in

20   order for them to get out; is that right?

21   A.   Exactly.

22   Q.   So that means everybody couldn't have got out

23   simultaneously; is that correct?

24   A.   Right.

25   Q.   Because you would have to get out first, Mr. Braxton

Case 1:08-cr-00444-WDQ   Document 97   Filed 04/06/10   Page 51 of 226
Cross-Examination of Demetrius Steppe, Jr.

T-II-300

1    would have to get out, then you'd have to move the front seats

2    forward, and then the back seat passengers would have to get

3    out; is that right?

4    A.   Correct.

5    Q.   You mentioned one of the individuals in the vehicle was

6    your cousin.  Where was he seated?

7    A.   Behind me, I think.

8    Q.   Directly behind you?

9    A.   Yes.

10   Q.   So he would be in the left side, rear seat of the

11   vehicle; is that correct?

12   A.   Yes.

13   Q.   So, in the process of getting out of the vehicle, with an

14   officer on your side of the vehicle, Mr. Braxton getting out

15   of the other side, you never saw the gun; is that right?

16   A.   Right.

17   Q.   You weren't thrown to the ground?

18   A.   No.

19   Q.   What about the other back seat passengers when they were

20   asked to exit?

21   A.   I don't remember them getting --

22   Q.   You don't remember them being thrown to the ground

23   either, do you?  So the only person who was thrown to the

24   ground was Mr. Braxton, and you said you don't recall seeing

25   the gun at the scene; is that correct?

1    A.   Correct.

2    Q.   You don't recall anything being said?

3    A.   Correct.

4    Q.   Do you recall Mr. Braxton saying anything?

5    A.   No.

6    Q.   But you do recall seeing the firearm at the police

7    station after you were taken there; is that correct?

8    A.   Correct.

9    Q.   Did the police officer show it to you?

10   A.   Yes.  I think they did show it to us.  That's how I saw

11   it.

12   Q.   Do you know anything about guns?

13   A.   No.

14   Q.   Do you know whether it was an automatic or a revolver

15   that you saw?

16   A.   No.

17   Q.   Okay.  Did the gun that Mr. Proctor showed you,

18   Government's Exhibit Number 4, look familiar to you?

19   A.   I think so.  I remember it was silver, so I don't know.

20   Q.   You just remember that it was silver?

21   A.   Yeah.

22   Q.   And this was three years ago; is that right?

23   A.   I think so, yes.

24   Q.   Okay.  So, during that process, then, you were never

25   charged with a firearm crime; is that correct?

1   A.   Right.

2   Q.   You were never thrown to the ground?

3   A.   Right.

4   Q.   You were issued citations for the moving violations that

5   you were hacking -- well, I don't know whether you were

6   hacking.  You were issued citations for the open containers

7   which are in the back of your car; is that correct?

8   A.   Correct.

9   Q.   You were issued citations for -- what else?

10  A.   I think for -- I'm not for sure.  I don't remember.

11  Q.   Did you pay the fines?

12  A.   Yes.

13  Q.   Did you get the car back?

14  A.   Yes.

15  Q.   So nothing else happened to you except for the moving

16  violations that you committed; is that correct?

17  A.   Correct.

18  Q.   Do you know anything that happened to the other rear seat

19  passengers of the vehicle?

20           **MR. PROCTOR:**  Objection, Your Honor.

21           **THE COURT:**  Overruled.

22           **MR. WALLNER:**  If he knows.

23           **THE WITNESS:**  No.

24  **BY MR. WALLNER:**

25  Q.   You don't know what happened with those?

1    A.    No.

2    Q.    You don't know if they were issued citations?

3    A.    I don't remember.

4    Q.    Do you know if they were charged with committing a crime

5    for possession of a firearm?

6    A.    I don't remember.

7    Q.    So you don't know?  So, the best of your knowledge, the

8    only person that was thrown to the ground and then ultimately

9    charged with having a firearm is Mr. Braxton; is that correct?

10   A.    Correct.

11              **MR. WALLNER:**  Nothing further.

12              **THE COURT:**  Redirect?

13              **MR. PROCTOR:**  Briefly, Your Honor.

14                        **REDIRECT EXAMINATION**

15   **BY MR. PROCTOR:**

16   Q.    Do you recall those questions about how the tag from one

17   vehicle came to be on the Cadillac?

18   A.    Uh-huh.

19   Q.    Did I understand it that the Cadillac -- what type of

20   vehicle did the tags belong to?

21   A.    A 1989 Ford Crown Victoria.

22   Q.    Okay.  Did I hear you say that that Crown Vic never

23   worked?

24   A.    Right.

25   Q.    And is your uncle in the car business?

1    A.    No.

2    Q.    But he has cars?

3    A.    Yes.

4    Q.    Did I hear you say it was just an exchange?  One car

5    didn't work, so he gave you another car?

6    A.    Right.

7    Q.    So that's how the tags came to be on from a Crown Vic on

8    a Dorado?

9    A.    Correct.

10   Q.    Do you remember the questions about who got out of the

11   car and what sequence and that sort of thing?

12   A.    Correct.

13   Q.    Who got out of the car first?

14            **MR. WALLNER:**  Objection.

15            **THE COURT:**  Overruled.

16            **THE WITNESS:**  I'm not for sure.  I think he got out

17   the car first.

18   **BY MR. PROCTOR:**

19   Q.    When Mr. Braxton got out of the vehicle, did he close the

20   door behind him?

21   A.    No.

22   Q.    So you could see straight through the open door?

23            **MR. WALLNER:**  Objection.

24            **THE WITNESS:**  Correct.

25            **THE COURT:**  Sustained as to leading.

Case 1:08-cr-00444-WDQ  Document 97  Filed 04/06/10  Page 56 of 226
Redirect Examination of Demetrius Steppe, Jr.

T-II-305

1        **MR. PROCTOR:**  Okay.

2     **BY MR. PROCTOR:**

3     Q.   So what was impeding your view of Mr. Braxton, if

4     anything?

5     A.   Nothing.

6     Q.   Do you recall the questions about the rear seat

7     passengers getting out of the vehicle?

8     A.   Correct.

9     Q.   When Mr. Braxton was, as you put it, thrown to the

10    ground, were the passengers still in the vehicle, or they got

11    out?

12    A.   I think they were still in the vehicle.

13    Q.   Okay.  When they got out of the vehicle, do you recall if

14    they got out the driver's side or the passenger's side?

15    A.   I think one got out the driver's side, and one got out

16    the passenger's side.

17    Q.   Do you recall the questions about how you weren't thrown

18    to the ground?

19    A.   Yes.

20    Q.   Were the same officers that were talking to you the same

21    ones that were on Mr. Braxton's side of the vehicle?

22    A.   No.

23    Q.   So it's your testimony here today, is it not, that the

24    officers that you encountered didn't harm you, did they?

25    A.   No.

```
1              MR. PROCTOR:  That's all I have, Judge.

2              THE COURT:  Okay.  Redirect?  Recross, rather?

3              MR. WALLNER:  No, Your Honor.  Thank you.

4              THE COURT:  Thank you.  You may step down.

5              (Witness excused.)

6              MR. PROCTOR:  Can we approach, Judge?

7              THE COURT:  Yes.  Come up.

8              (Whereupon, the following conference was held at the

9      bench.)

10             THE COURT:  Yes?

11             MR. PROCTOR:  Judge, this other witness is here.  In

12     all candor --

13             THE COURT:  Do you want him brought in in chains, or

14     do you want me to send them out so he can be brought in and

15     unshackled?

16             MR. PROCTOR:  I'd rather call him at 2:00, because,

17     frankly, with the problems getting him here, I haven't said

18     but three words to the man.

19             THE COURT:  Okay.

20             MR. PROCTOR:  So let's do 2:00, and then hopefully

21     by then Ms. Parrott will be here.

22             MR. HAZEL:  And we'll help you track her down.

23             MR. PROCTOR:  And we'll be ready to rest at 2:30.

24             THE COURT:  Okay.  Very good.

25             MR. PROCTOR:  We have a little discussion on jury
```

1    instructions.  We can do that now if you want so we can use

2    the time.

3              THE COURT:  Yes.  We can do that actually at noon,

4    okay?

5              MR. PROCTOR:  Sure.

6              THE COURT:  Very good.  Step back, please.

7              (Whereupon, the bench conference was concluded.)

8              THE COURT:  Members of the jury, we're going to take

9    an early and long lunch break.  It will work for your benefit,

10   however.  Please be back in the jury room at five minutes

11   before 2:00, and we do anticipate actually wrapping the

12   evidence today.

13             Please remember, do not discuss the case among

14   yourselves or with anyone else.  Please be back in the jury

15   room at five minutes before 2:00, and we will try our best,

16   counsel, to get started at 2:00 p.m.  You may leave your note

17   pads here.

18             (Jury excused.)

19             THE COURT:  Okay.  Counsel, see you at noon.

20   Stephanie has copies of instructions for you.

21             MR. PROCTOR:  Thank you, Judge.

22             THE COURT:  Very good.

23             THE REPORTER:  All rise.

24             MR. PROCTOR:  Judge, I'm sorry to interrupt.  This

25   doesn't need to be on the record if you don't want to.

```
1    Mr. CitaraManis is coming at noon, which is the same time the

2    jury or our witnesses -- or 2:00.  Should we tell him to get

3    here about 3:00, or you don't mind keeping him waiting?

4              THE COURT:  2:00 is the earliest he can get here?

5              MR. PROCTOR:  Yes.

6              THE COURT:  Why don't you ask him to show up at

7    4:00.

8              MR. PROCTOR:  Certainly.

9              THE COURT:  Thank you.

10             (Recess taken, 11:33 a.m. - 12:00 p.m.)

11             THE CLERK:  Please rise.  This Honorable Court

12   resumes its session.

13             THE COURT:  Please be seated.

14             Mr. Brown, are you carrying the flag?

15             MR. BROWN:  Yes, I am, Your Honor.  Regarding the

16   jury instructions, we have a few objections.

17             THE COURT:  Why don't you hold them until we get to

18   them, okay?

19             MR. BROWN:  Okay.

20             THE COURT:  First instruction, any objections from

21   the Government?

22             MR. HAZEL:  No, Your Honor.

23             THE COURT:  Any objection from the Defense?

24             MR. BROWN:  No, Your Honor.

25             THE COURT:  Court's 2, any objection from the
```

```
 1    Defense?

 2              MR. BROWN:  No, Your Honor.

 3              THE COURT:  Any objection from the Government?

 4              MR. HAZEL:  No, Your Honor.

 5              THE COURT:  Court's 3, Defense?

 6              MR. BROWN:  No, Your Honor.

 7              THE COURT:  Government?

 8              MR. HAZEL:  No, Your Honor.

 9              THE COURT:  Court's 4, Government?

10              MR. HAZEL:  No, Your Honor.

11              THE COURT:  Defense?

12              MR. BROWN:  No, Your Honor.

13              THE COURT:  Court's 5, Defense?

14              MR. BROWN:  No, Your Honor.

15              THE COURT:  Government?

16              MR. HAZEL:  No, Your Honor.

17              THE COURT:  Court's 6, Government?

18              MR. HAZEL:  No, Your Honor.

19              THE COURT:  Defense?

20              MR. BROWN:  No, Your Honor.

21              THE COURT:  Court's 7, Defense?

22              MR. BROWN:  No, Your Honor.

23              THE COURT:  Government?

24              MR. HAZEL:  No, Your Honor.

25              THE COURT:  Court's 8, Government?
```

```
 1              MR. HAZEL:  No, Your Honor.

 2              THE COURT:  Defense?

 3              MR. BROWN:  No, Your Honor.

 4              THE COURT:  Court's 9, Defense?

 5              MR. BROWN:  No, Your Honor.

 6              THE COURT:  Government?

 7              MR. HAZEL:  No, Your Honor.

 8              THE COURT:  Court's 10, Government.

 9              MR. HAZEL:  No, Your Honor.

10              THE COURT:  Defense?

11              MR. BROWN:  No, Your Honor.

12              THE COURT:  Court's 11, do you know yet, Defense,

13     whether the Defendant will testify?

14              MR. BROWN:  I believe he will not be testifying,

15     Your Honor.

16              THE COURT:  Okay.  Any objection to 11, Defense?

17              MR. BROWN:  No, Your Honor.

18              THE COURT:  Government?

19              MR. HAZEL:  No, Your Honor.

20              THE COURT:  12, Government?

21              MR. HAZEL:  No, Your Honor.

22              THE COURT:  12, Defense?

23              MR. BROWN:  No, Your Honor.

24              THE COURT:  13, Defense?

25              MR. BROWN:  No, Your Honor.
```

```
 1              THE COURT:  Government?

 2              MR. HAZEL:  No, Your Honor.

 3              THE COURT:  14, Government?

 4              MR. HAZEL:  No, Your Honor.

 5              THE COURT:  Defense?

 6              MR. BROWN:  No, Your Honor.

 7              THE COURT:  15, Defense?

 8              MR. BROWN:  No, Your Honor.

 9              THE COURT:  Government?

10              MR. HAZEL:  No, Your Honor.

11              THE COURT:  16, Government?

12              MR. HAZEL:  No, Your Honor.

13              THE COURT:  Defense?

14              MR. BROWN:  Yes, Your Honor.

15              THE COURT:  Okay.

16              MR. BROWN:  The objection, Your Honor, is that, as

17      per the stipulation, we have agreed that, quote, Defendant was

18      legally prohibited from possessing a firearm, and we would

19      urge the Court to use that language rather than the language

20      that he was convicted of a crime punishable by imprisonment

21      for a term exceeding one year.

22              THE COURT:  Read the stipulation again to me.

23              MR. HAZEL:  I believe I passed it to counsel.

24              MR. BROWN:  Your Honor, I have it right here.  "It

25      is hereby stipulated and agreed by and between the United
```

1    States of America, by its attorney, and the Defendant, David

2    Braxton, by his attorney, as follows:  The Defendant, David

3    Braxton, was legally prohibited from possessing a firearm

4    prior to the time that the Defendant is alleged to have

5    possessed the firearm charged in the Indictment."

6            THE COURT:  Okay.  And how would you alter

7    Court's 16?

8            MR. BROWN:  I would replace the language right below

9    the Defendant's name with --

10           THE COURT:  You're rewriting the Indictment?

11           MR. HAZEL:  That's the Indictment, yeah.

12           MR. BROWN:  Well, Your Honor, we are not rewriting

13   the Indictment.

14           THE COURT:  You're rewriting the charge.

15           MR. BROWN:  We are asking the Court to change the

16   language used when this charge is read to the jury.

17           THE COURT:  Okay.  Government agree?

18           MR. HAZEL:  Your Honor, I do not agree to that

19   portion of what he's saying, so no.  The answer to your

20   question:  I don't agree with that.

21           THE COURT:  Which portion do you agree with?

22           MR. HAZEL:  I agree -- we do have an agreement

23   that -- it's more for Court's Instruction Number 17, which we

24   haven't reached yet, that the first element could be that he

25   was prohibited from or he was within the class of persons

```
 1    prohibited from possessing a weapon.  We agree to that, but we

 2    don't agree to rewriting what the Indictment says.

 3              THE COURT:  Okay.  You have your objection.

 4    Number 17?

 5              MR. BROWN:  And I'm sorry, Your Honor.  One more

 6    objection to Number 16.

 7              THE COURT:  Yes.

 8              MR. BROWN:  The inclusion of the purpose of the

 9    statute, we think that that is unnecessary to include as well,

10    so we object to that for the record.

11              THE COURT:  Government?  If you agree, we'll take it

12    out.

13              MR. HAZEL:  I'm sorry.  Which portion was that?

14              THE COURT:  If the Government agrees, the statutory

15    purpose --

16              MR. HAZEL:  The Government doesn't agree, no.

17              THE COURT:  Okay.  You have your objection.

18              Number 17, Defense?

19              MR. BROWN:  Yes.  We object to that as well, Your

20    Honor.

21              THE COURT:  Okay.  What portion would you change?

22              MR. BROWN:  In the second paragraph, again, it's the

23    same problem.

24              THE COURT:  What would you have it read?

25              MR. BROWN:  We would have it read, "First, the
```

```
 1        Defendant was legally prohibited from possessing a firearm."
 2               THE COURT:  Okay.  Does the Government have any
 3        objection to that?
 4               MR. HAZEL:  Government is fine with that, Your
 5        Honor.
 6               THE COURT:  Okay.  That would be the first element,
 7        that the Defendant was legally prohibited from possessing a
 8        firearm?
 9               MR. BROWN:  And also -- yes, and of course it would
10        not be necessary to continue the rest of that sentence
11        starting with, "and that --"
12               THE COURT:  Yes.  Good.  The entire first element
13        would be, first, that the Defendant was legally prohibited
14        from possessing a firearm.
15               MR. BROWN:  Correct, Your Honor.
16               THE COURT:  Okay.  Any further objection?
17               MR. HAZEL:  Not from the Government.
18               THE COURT:  We're still on Defense.
19               MR. HAZEL:  I'm sorry, Your Honor.  I apologize.
20               MR. BROWN:  No, Your Honor.
21               THE COURT:  Any further objection from the Defense?
22               MR. BROWN:  Not on that instruction, no, Your Honor.
23               THE COURT:  Any objection from the Government?
24               MR. HAZEL:  No, Your Honor.
25               THE COURT:  Number 18, Government?
```

```
 1              MR. HAZEL:  I guess this is just the same issue,
 2     that the first element would just simply be that the Defendant
 3     was legally prohibited from possessing a --
 4              THE COURT:  Do you have an objection, Defense, to
 5     Number 18?
 6              MR. BROWN:  Yes, I do, Your Honor.
 7              THE COURT:  Okay.  What is it?
 8              MR. BROWN:  The same thing that the Government just
 9     said.
10              THE COURT:  How should it read?
11              MR. BROWN:  That the Defendant was legally
12     prohibited from possessing a firearm.
13              MR. HAZEL:  And that's just to the first paragraph.
14              MR. BROWN:  Your Honor, I count four times where
15     that --
16              THE COURT:  Hold it.  I am not that fast in writing.
17     Please bear with me if you will.
18              MR. BROWN:  You are quite fast, though, Your Honor.
19              THE COURT:  "The Defendant was legally prohibited
20     from possessing a firearm"?
21              MR. BROWN:  Correct.
22              THE COURT:  Okay.  And then we would strike the
23     remainder of the first paragraph, so it would be, "The first
24     he element the Government must prove beyond a reasonable doubt
25     is that the Defendant was legally prohibited from possessing a
```

```
 1    firearm"?

 2              MR. BROWN:  Correct.

 3              THE COURT:  Okay.  Now, any further changes?

 4              MR. BROWN:  Yes, Your Honor.  Going down two

 5    paragraphs from that, "The parties have stipulated that --"

 6              THE COURT:  "The Defendant was legally prohibited

 7    from possessing a firearm"?

 8              MR. BROWN:  Correct, Your Honor.

 9              THE COURT:  Okay.  And then the remainder of the

10    paragraph would be struck?

11              MR. BROWN:  Correct.

12              THE COURT:  Okay.  Any further changes?

13              MR. BROWN:  Yes, Your Honor.  The following

14    paragraph, "I instruct you in this connection that the prior

15    conviction," again, we would correct that.

16              THE COURT:  Do you want the remainder of the

17    instruction struck?

18              MR. BROWN:  Yes, Your Honor.

19              THE COURT:  Government, any --

20              MR. HAZEL:  That's fine.

21              THE COURT:  Okay.  Court's Instruction 19, Defense?

22              MR. BROWN:  Yes, Your Honor, we do have an objection

23    to this.

24              THE COURT:  Okay.  What's the objection?

25              MR. BROWN:  The objection is that this instruction
```

 1    essentially instructs on constructive possession, which has

 2    never been alleged in any way by the Government.

 3              THE COURT:  What would you strike?

 4              MR. BROWN:  We would strike the third paragraph

 5    down, the definition of possession, and in its place, we would

 6    urge the Government to include the specific facts of this

 7    case.

 8              THE COURT:  Do you have proposed language?

 9              MR. BROWN:  Yes.  In the jury instructions that we

10    submitted to the Court --

11              THE COURT:  Hand it up.  You would change the third

12    paragraph of Court's 19 to the third paragraph of your

13    proposal; is that correct?

14              MR. BROWN:  Correct, Your Honor.

15              THE COURT:  Any objection from the Government?

16              MR. HAZEL:  Your Honor, I don't think I have that.

17    I have an objection, but I didn't have the actual language.

18    I -- beyond that, though, I like what's in here so far.

19              THE COURT:  I'll read it to you.  The third

20    paragraph would read, "To possess means to have something

21    within a person's control.  In this case, the Government has

22    alleged that Mr. Braxton actually possessed or physically held

23    the firearm charged in the Indictment.  Thus, the Government

24    must prove beyond a reasonable doubt that Mr. Braxton, in

25    fact, actually possessed or physically held the firearm in

1    order for you to convict him."

2         **MR. HAZEL:**  I don't agree with that, Your Honor.  I

3    think that the Court's definition is adequate.

4         **THE COURT:**  Is the Government relying on

5    constructive possession here?

6         **MR. HAZEL:**  We're not, but the definition of

7    "possess" is -- I mean, that's the legal definition of

8    "possession."

9         **THE COURT:**  Understandable, but I'm asking --

10        **MR. HAZEL:**  No, we're not.

11        **THE COURT:**  If you're not relying on it, how are you

12   harmed by removing the constructive possession language from

13   the instruction?

14        **MR. HAZEL:**  Your Honor, I guess I'm not suggesting a

15   harm, but I am just saying that this is the definition of

16   possession, and so I think it's appropriate to just -- I mean,

17   we don't know what the jury will -- how the jury will perceive

18   the facts.  It's --

19        **THE COURT:**  Do you believe the evidence supports a

20   conviction on the constructive possession theory?

21        **MR. HAZEL:**  The Court's indulgence.

22        No, Your Honor.

23        **THE COURT:**  No?

24        **MR. HAZEL:**  No.  I do not -- I cannot think of a

25   theory under which constructive possession would be the basis

1    for a conviction; nonetheless, it's still --

2         **THE COURT:**   Okay.  Now, if there is no evidence for

3    it, if it's not your theory, why would you instruct them on

4    something they don't need to know?

5         **MR. HAZEL:**   Very well, Your Honor.

6         **THE COURT:**   Other than that you're hoping that they

7    will somehow convict on that basis, which you're telling me

8    there is no basis for.

9         **MR. HAZEL:**   Understood, Your Honor.

10        **THE COURT:**   Okay.  "To possess means having

11   something within a person's control."  Then, if I strike the

12   second sentence, "As long as it was within his control, he

13   possesses it.  If you find that he had actual possession of

14   the firearm, you may find that the Government has proven

15   possession."  Okay.  The second paragraph would read, "To

16   possess means to have something within a person's control.  As

17   long as the firearm was within the Defendant's control, he

18   possesses it.  If you find that the Defendant had actual

19   possession of the firearm, you may find that the Government

20   has proven possession."

21        The Government is not alleging joint possession; is

22   that correct?

23        **MR. HAZEL:**   That's correct.

24        **THE COURT:**   Okay.  So I assume, then, the joint

25   possession is struck.  Do you want the line, "Proof of

```
 1        ownership is not required," to remain?
 2                  MR. HAZEL:  Yes, Your Honor.
 3                  THE COURT:  Okay.  Let's see.  Okay.  Knowing
 4        possession, I assume you both want?
 5                  MR. BROWN:  Yes, Your Honor.
 6                  MR. HAZEL:  Yes, Your Honor.
 7                  THE COURT:  And, "Possession cannot be found solely
 8        on the ground that he was near or close to," any objection?
 9                  MR. HAZEL:  No, Your Honor.
10                  MR. BROWN:  No, Your Honor.
11                  THE COURT:  Okay.
12                  Number 20, Government, any objections?
13                  MR. HAZEL:  No, Your Honor.
14                  THE COURT:  Defense?
15                  MR. BROWN:  No, Your Honor.
16                  THE COURT:  Number 21, Defense?
17                  MR. BROWN:  No, Your Honor.
18                  THE COURT:  Government?
19                  MR. HAZEL:  No, Your Honor.
20                  THE COURT:  Final instruction, Government?
21                  MR. HAZEL:  No problem, Your Honor.
22                  THE COURT:  Defense?
23                  MR. BROWN:  No, Your Honor.
24                  THE COURT:  Verdict form, Defense, objections?
25                  MR. BROWN:  No objections.
```

```
 1              THE COURT:  Government?

 2              MR. HAZEL:  None, Your Honor.

 3              THE COURT:  Okay.  Folks, see you at 2:00.  Thank

 4    you, Stephanie.  Government, how long will you be in

 5    closing -- opening close?

 6              MR. HAZEL:  Fifteen minutes or less.

 7              THE COURT:  Defense?

 8              MR. PROCTOR:  Judge, I'll say 30.  I'm not going to

 9    be that long, but I don't want you staring at the clock and

10    tapping your watch.

11              THE COURT:  Rebuttal?

12              MR. HAZEL:  Fifteen minutes.

13              THE COURT:  Okay.  Do you want a warning,

14    Government?  Two or five minutes?

15              MR. HAZEL:  Two minutes.

16              THE COURT:  Okay.  Defense, do you want a warning,

17    two or five?

18              MR. PROCTOR:  Two, please.

19              THE COURT:  Government, rebuttal, two or five?

20              MR. HAZEL:  Two minutes.

21              THE COURT:  Good.  See you at 2:00, folks.

22              MR. PROCTOR:  Thank you, Judge.

23              THE COURT:  Oh!  Have you had a chance to talk to --

24              MR. PROCTOR:  I have.

25              MR. HAZEL:  Actually, Your Honor, subtle change.  If
```

1  I can have a half an hour combined for both to be broken up

2  however --

3       **THE COURT:**  However you see fit?  Okay.  I'll say

4  that you've got 30 minutes on the first, and your rebuttal

5  will be whatever's left.

6       **MR. PROCTOR:**  Judge, just so you know, Ms. Parrott

7  is not answering her home phone or her cell phone.  She comes

8  on duty at 2 o'clock.  Her supervisor is going to send her

9  straight here.  So hopefully she'll be here at 2:00 or very

10  shortly thereafter.  I don't know why she's out of pocket, but

11  we're working on it.

12       **THE COURT:**  Okay.  Thanks.

13       **THE CLERK:**  Please rise.  This Honorable Court now

14  stands in recess.

15       (Recess taken, 12:15 p.m. - 2:00 p.m.)

16       **THE CLERK:**  Please rise.  This Honorable Court will

17  now resume in session.

18       **THE COURT:**  Good afternoon.  Please be seated.

19       Mr. Proctor, I gather you will be calling the next

20  witness?

21       **MR. PROCTOR:**  That would be correct, sir.

22       **THE COURT:**  Thank you.  What's the name of the next

23  witness?

24       **MR. PROCTOR:**  James Harris, Your Honor.

25       **THE COURT:**  How do you spell the last name.

1      THE WITNESS:  H-A-R-R-I-S.

2      THE COURT:  Good afternoon, Mr. Harris.

3      THE WITNESS:  Good afternoon, sir.

4      THE COURT:  Ready for the jury, folks?

5      MR. PROCTOR:  Yes, sir.

6      THE COURT:  Please.

7      THE CLERK:  Okay.

8      (Jury enters.)

9      THE COURT:  Good afternoon, ladies and gentlemen.

10      JURORS:  Good afternoon.

11      THE COURT:  Mr. Proctor, are you ready to proceed?

12      MR. PROCTOR:  I am.

13      THE COURT:  Please call your next witness.

14      MR. PROCTOR:  At this time, Your Honor, Mr. Braxton

15  would call James Harris.

16      THE COURT:  Mr. Harris, please stand for the oath.

17                  **JAMES HARRIS**

18      **WAS THEN DULY SWORN TO TELL THE TRUTH**

19      THE CLERK:  Please be seated.

20      MR. PROCTOR:  Good afternoon, Mr. Harris.

21      THE REPORTER:  One second.

22      THE WITNESS:  Good afternoon.

23      THE CLERK:  Would you please state your name for the

24  record, and spell your last name.

25      THE WITNESS:  Hi.  My name is James Harris,

1    H-A-R-R-I-S.

2                     **DIRECT EXAMINATION**

3    **BY MR. PROCTOR:**

4    Q.   Good afternoon, Mr. Harris.

5    A.   Good afternoon, sir.

6    Q.   Where did you sleep last night?

7    A.   At DOC, the Division of Corrections, MRDCC.

8    Q.   Okay.  And --

9             **THE COURT:**  Can you hear, members of the jury?

10            **JUROR:**  No.

11            **THE COURT:**  Sir, please talk into the microphone.

12   You can pull that microphone down so that it faces right

13   there.  Look at the ladies and gentlemen of the jury, and try

14   to keep your voice up as loud as you can.  Would you ask the

15   question again.  The members of the jury did not here.

16            **MR. PROCTOR:**  Certainly.

17   **BY MR. PROCTOR:**

18   Q.   Where did you sleep last night?

19   A.   MRDCC.

20   Q.   And that's a jail, right?

21   A.   Yes.

22   Q.   And I don't want you to go into the substance, but you're

23   currently awaiting trial, right?

24   A.   Yes.

25   Q.   Do you have a cousin named Demetrius Steppe?

1    A.   Yes, sir.

2    Q.   And you know why you're here today, right?

3    A.   Yes, sir.

4    Q.   Do you recall May, back in 2006, going for a ride with

5    your cousin?

6    A.   Yes, sir.

7    Q.   When did you first see your cousin that day?

8    A.   When he came by my house.

9    Q.   Okay.  And where were you staying at the time?

10   A.   On Bentalou Street.

11   Q.   Okay.  How would you describe that in Baltimore?

12   Northeast, west, south?

13   A.   South Baltimore.

14   Q.   Okay.  How far from this courthouse, ballpark?

15   A.   Probably like -- probably 25 minutes away from here.

16   Q.   Okay.  Why did he come by your house?

17   A.   To pick me up.

18   Q.   Where were you two going?

19   A.   We was on our way to hack.

20   Q.   Okay.  What do you mean by hacking?

21   A.   Like we were giving like --

22        **THE COURT:**  Keep your voice up, please.

23   A.   Like he was like a taxi driver, because he needed a

24   couple dollars.  He needed some money, some funds.

25   Q.   Now, that's a taxi driver without a license, right?

1    A.    Right.

2    Q.    And how do you know when someone is hacking?

3    A.    Because, when you -- when you ride past somebody on any

4    like median strip or any intersection or any block, and

5    they -- when you ride past them, they either have their arm

6    out like this, or they be saying, "Hack, hack, hack, hack."

7          **MR. PROCTOR:**  Okay.  And, so the record is clear,

8    Your Honor, the witness moved his right hand up and down in a

9    motion as if hailing a hack, which is how we always know it to

10   be.

11         **THE COURT:**  Pointing with an index finger, yes.

12         **MR. PROCTOR:**  Thank you, Judge.

13   **BY MR. PROCTOR:**

14   Q.    And do you know why Mr. Steppe wanted a hack?

15   A.    Yes.  He said he needed some gas money.

16   Q.    Okay.  So do you recall where you were hacking?

17   A.    Huh?

18   Q.    Like what area of the city?  Like near your house, or

19   somewhere else?

20   A.    We was just riding around trying to get some hack.

21   Q.    Okay.  Do you know this man seated to my left?

22   A.    No, sir.

23   Q.    Have you seen him before?

24   A.    No, sir.

25   Q.    Never seen him before a day in your life?

```
 1    A.    No, sir.

 2    Q.    To be clear, I'm pointing to the man in the blue shirt.

 3    You don't recognize him?

 4    A.    No, sir.

 5    Q.    That day, did you pick up any hacks?

 6    A.    Huh?

 7    Q.    Did you pick up any customers, you and your cousin?

 8    A.    Yes.

 9    Q.    And do you recall an incident when the police pulled you

10    over?

11    A.    Yes, sir.

12    Q.    Who was in the vehicle at the time?

13    A.    Me, him.

14    Q.    Who is "him"?

15    A.    Me, my little cousin, and him and another dude that --

16    Q.    I'm sorry.  Him, you're pointing to Mr. Braxton?

17    A.    Yes.

18    Q.    And you said a minute ago you didn't recognize him.  Do

19    you know that he was in the vehicle because he's here on trial

20    today, or you know it because now you remember his face?

21    A.    I knew it because he on trial today.

22    Q.    Okay.  So do you recall where Mr. Braxton was sitting?

23    A.    I was sitting behind my little cousin.

24           THE COURT:  Keep your voice up, please.

25           THE WITNESS:  I was sitting behind my little cousin.
```

```
 1      He was sitting in the -- I think passenger seat.  He was

 2      sitting in the passenger seat.

 3      BY MR. PROCTOR:

 4      Q.   Front passenger, or the rear?

 5      A.   Front.

 6      Q.   Okay.  Was Mr. Braxton the first hack you picked up that

 7      day?

 8      A.   Yes.

 9      Q.   Okay.  And who is sitting in the rear?

10      A.   Who was sitting in the rear?

11      Q.   You said, I believe -- I don't mean to put words in your

12      mouth.  I think you said there were four people in the car?

13      A.   Yeah.  I was sitting in the rear, and it was another dude

14      sitting in the rear.

15      Q.   And who is the other dude?

16      A.   It was the second dude we picked up.

17      Q.   Okay.  The person next to you in the rear seat, who was

18      that person, if you know?

19      A.   I don't know him.

20      Q.   Was he a hack, too?

21      A.   Yes.

22      Q.   Okay.  Did you pick him up before Mr. Braxton?

23      A.   Picked him up, I think at -- I don't recall.  I think --

24              THE COURT:  Keep your voice up, please, sir.

25              THE WITNESS:  I think we picked him up -- I think we
```

1    picked him up after.  I think we picked him up after.

2    **BY MR. PROCTOR:**

3    Q.   Okay.  Do you recall where you were going when you were

4    pulled over by the police?

5    A.   What direction we was going in?

6    Q.   Where you were headed to.  Someone's house, a business?

7    A.   We was going to drop one of them off.  We was on our way

8    to drop one of them off.

9    Q.   Do you recall which one?

10   A.   Uh-uh.

11   Q.   Okay.

12          **THE COURT:**  Please answer "yes" or "no."

13          **THE WITNESS:**  No, sir.

14   **BY MR. PROCTOR:**

15   Q.   Okay.  So the police pulled you over; is that true?

16   A.   Yes.

17   Q.   Do you recall where you were when the police pulled you

18   over?

19   A.   Yes.  On Martin Luther King and -- I don't recall the

20   other -- I don't know where the other street -- I don't know

21   the name of the other street.

22   Q.   Do you know if you were going north or south?

23   A.   We was going like towards downtown.

24   Q.   Okay.  And when did you first become aware that the

25   police were near your vehicle?

```
 1    A.    That's when we was just -- we was swarmed.  First, it was
 2    a police car behind us, but, I mean, everything -- everything
 3    was legit.  Like my cousin got a license and all that, you
 4    know what I mean, and we wasn't doing nothing to be worried
 5    about nothing, and then, next thing you know, two unmarked
 6    cars just swarmed us, like stopped us, like blocked us in, for
 7    real, like --
 8    Q.    Okay.  Hang on a second.
 9    A.    -- in the middle of traffic.
10    Q.    You said a few things, so let's try and break it up.
11    Your cousin, you said, is legit.  Did he have tags on the
12    vehicle?
13    A.    Yes, sir.
14    Q.    Do you know if they belonged to his vehicle?
15    A.    I'm not sure.  I guess they should be.
16    Q.    Okay.  And you said he has a license.  Do you know if he
17    had a full license or something else?
18    A.    I guess he got a license, because, when I was just up
19    town, he was even going to truck driving school.
20    Q.    Okay.  But, I mean, he never showed you a license?  You
21    don't know if it was a temporary one or a learner's or a full
22    license?  You don't know, right?
23    A.    I ain't sure, but I know that he -- I know that he was --
24    how he was wanting to drive the car because his parents ain't
25    going to buy him no car, you see what I'm saying, and have him
```

1    driving around the city without -- because his parents ain't

2    going to have him drive around a car without no license or

3    nothing like that.

4    Q.    Okay.  So you get pulled over, and you say the police

5    swarmed on you?

6    A.    It's like -- first, it was an unmarked car behind us -- a

7    marked car.  Then it was two unmarked cars that just --

8    basically just cut us off from angles in the middle of traffic

9    and everything.

10   Q.    Okay.  And then what happens?

11   A.    Then my little cousin pulled -- as they -- he stopped

12   himself from crashing into them, for real, and then he

13   pulled over to the --

14   Q.    I'm sorry.  For the record, when you say your little

15   cousin, you mean who?

16   A.    Demetrius Steppe.

17   Q.    Okay.  Carry on.

18   A.    Then he pulled over to the side and stopped, and then

19   they just swarmed the car with guns out --

20   Q.    Okay.

21   A.    -- because we was in the car with -- we was in the car

22   with tinted windows, so they really couldn't see who was in

23   the car, for real.

24   Q.    Okay.  Let me try and break that down.  You say they

25   swarmed the car.  Do you recall how many officers there were?

1   A.   Probably like -- it was one tall unmarked -- the one that

2   was the steel -- the police guy was in the regular police car,

3   he was a tall light-skinned dude.  He was a tall light-skinned

4   guy.  That's the one that was driving the marked police car.

5   Then there was like -- probably like three or four in each --

6   probably three or four officers in each unmarked car.

7   Q.   Okay.

8   A.   And they the ones that had plain clothes on.

9   Q.   So, after Mr. Steppe stops his vehicle, you say the

10  officers swarmed.  What happened next?

11  A.   That's when they -- they had their guns drawn at the car

12  telling us, "Don't move.  Let us see your hands.  Roll the

13  windows down."

14  Q.   And --

15  A.   And --

16  Q.   -- did people comply with that?

17  A.   Yes, sir.

18  Q.   Were the officers on both sides of the vehicle?

19  A.   Yes, sir, and in the back, and in front.  They was --

20  they had the whole car surrounded.

21  Q.   Okay.  And then did people get out of the car?  What

22  happens next?

23  A.   They asked Demetrius where his license at.  He gave them

24  his license.  Then they told us to -- they started reading his

25  license, and then they was talking to him, and then they was

1   like, "Everybody step out the vehicle --"

2   Q.   Okay.

3   A.   "-- with your hands showing."

4   Q.   Hang on a second.  Okay.  Thank you.

5        While this is happening, while Demetrius is talking

6   to the officers, what's Mr. Braxton doing?

7   A.   Just sitting there.

8   Q.   Just sitting there --

9   A.   Like -- everybody else was in the car just -- because we

10  couldn't move.  We made any sudden moves, they had their guns

11  drawn.  I mean, that -- they're telling us, let us see our

12  hands.  They're telling us, "Don't move."  The only person

13  that they're allowing to do anything is Demetrius, because

14  they're up on him like this.  They -- the one officer was up

15  on him like this, and the other officer was talking to him.

16  Q.   Okay.  And I should back up a little.  I'm sorry.  I

17  forgot to ask.  When Mr. Braxton got in the vehicle, do you

18  recall what he was wearing?

19  A.   I can't remember.

20  Q.   Do you remember if it was baggy or skintight, or you just

21  don't know?

22  A.   I just don't know.  I don't remember.

23  Q.   Did he have any bulges in any area of his body?

24  A.   Not that I know of.

25  Q.   Was he holding any part of his body?

1   A.   No, sir.

2   Q.   When he sat in the vehicle, did he cover up any part of

3   his body?

4   A.   No, sir.  Not that I know of.

5              **MR. PROCTOR:**  Could I?

6   Q.   I'm showing you -- and I'm just going to show it.  I'm

7   not going to hand it to you -- Government's Exhibit 4.  Did he

8   have any bulges, any marks that looked like an implement?

9   A.   No, sir.

10  Q.   Okay.  Now, you've seen this before, right?

11  A.   Uh-uh.  Not -- no.

12  Q.   You don't think so, or you're not sure?  Well, we'll get

13  to that in a minute.  Thank you.

14            So, after they asked Demetrius for his license, what

15  happens next?

16  A.   They had told him to step out the car.

17  Q.   Does he get out of the car?

18  A.   Yeah.  He steps out the car.

19  Q.   And then what?

20  A.   And then they kept -- then they kept making everybody

21  else get out the car real slow, telling us to keep our hands

22  in the air as we getting out, so --

23  Q.   Okay.  Now the car is a two-door?

24  A.   It's a two-door.  Two --

25  Q.   So, after Mr. Steppe, who gets out next?

1   A.   I got out behind him.  I got out on his side.

2   Q.   And did there come a time when Mr. Braxton got out the

3   vehicle?

4   A.   Yes.  Yes, sir.

5   Q.   Do you recall if he got out before or after you, or at

6   the same time?

7   A.   I think he got -- he got out -- he got out after me.

8   Q.   Okay.  What happens when you get out of the vehicle?

9   A.   They made me and Demetrius -- they made me and Demetrius

10   sit on the curb.

11   Q.   What happens when Mr. Braxton gets out of the vehicle?

12   A.   They made him walk all the way -- he walked all the way

13   around the car on the other side and sat on the curb, too.

14   Q.   Okay.  Did you see Mr. Braxton get into a tussle with any

15   law enforcement?

16   A.   No, sir.

17   Q.   Did you hear him -- did you hear any signs of scuffling?

18   A.   No, sir.

19   Q.   Did you hear anyone shout, "Gun"?

20   A.   Did anybody do what?

21   Q.   Shout, "Gun"?

22   A.   No.

23   Q.   When Mr. Braxton got out of the vehicle, do you recall if

24   he closed the car door or left it open?

25   A.   He left it open so the other dude could get out.

1    Q.   Okay.  And, when Mr. Braxton is getting out of the

2    vehicle, can you see him, or is your view obstructed by the

3    vehicle?

4    A.   I can see him.

5    Q.   So, again, remind -- so, when he gets out of the vehicle,

6    where does he go?

7    A.   He came around and sat on the side right there with us.

8    They had all of us sitting on the curb.

9    Q.   Okay.  Did he come around the rear of the vehicle, or the

10   front, or you don't recall?

11   A.   I think he came around the front.  I think he came around

12   the front.  I ain't sure.

13   Q.   Okay.

14   A.   I ain't going to --

15   Q.   You say you're sitting on the median, right?

16   A.   Yes.

17   Q.   The rear passenger, what happens to him?

18   A.   He came around the -- he got out, hands showing like

19   this.  Then they came around there.  They checked all of us.

20   Q.   Did he get out your side, or Mr. Braxton's side?

21   A.   He came out -- he came out Mr. Braxton's side.

22   Q.   Okay.  And he comes around to the median; is that

23   correct?

24   A.   Yes, sir.

25   Q.   Is anyone handcuffed at that point?

1    A.   No.   That's when all -- all the officers were still

2    standing -- see, when all the officers -- they was making us

3    all get out one at a time, and then they checked all us.   They

4    checked all us at the same time.   Then --

5    Q.   When you say, "checked all of us," you mean what?   Patted

6    you down?

7    A.   They searched us.   They frisked all of us at the same

8    time.   Then they still had us right there.   They was checking

9    in the car.

10   Q.   Did you see them frisk Mr. Braxton?

11   A.   Yes, sir.

12   Q.   Did they say anything while they were frisking

13   Mr. Braxton?

14   A.   No, sir.

15   Q.   Did you see them recover anything from Mr. Braxton's

16   body?

17   A.   No, sir.

18   Q.   So, then, am I hearing you say all four were sitting on

19   the curb?

20   A.   Yes.

21   Q.   What happens next with the officers?   You said they were

22   checking the vehicle?

23   A.   They was checking the vehicle, and then two of the

24   officers walked off -- walked over across Martin Luther King,

25   walked across from where they pulled us over, hopped over --

1    it's like a little wall right here.

2    Q.   Hang on a second.  We'll get to that.  Let's do it.  So

3    you said two officers.  Do you remember which two?

4    A.   It was a dark-skinned one.  It was a dark-skinned, kind

5    of stocky built a little bit.

6    Q.   Okay.  And you say --

7    A.   And it was a white -- a Caucasian dude.

8    Q.   Okay.  And you say they crossed over Martin Luther King

9    on the same side of Martin Luther King that you were on, or

10   the other side?

11   A.   The other side.  Right there -- see, it was like -- it

12   was like where they pulled us over at, it was like they was

13   waiting for -- they was like right there waiting for us to

14   pull right there, because they like boxed both -- they just

15   boxed the car -- I told you -- like when I told you we was

16   coming down Martin Luther King, they boxed the car in.  When

17   we was being followed by the marked police car, the two

18   unmarked cars basically boxed us in as we was walking -- as we

19   was coming down.

20   Q.   Okay.  So the two officers, you say, crossed Martin

21   Luther King, and you said something about a wall?

22   A.   It's like a little wall over there on the side of Martin

23   Luther King.  Where they pulled us over, it's like a wall

24   right there.

25   Q.   So why is the wall significant?  What did the officers

1    do, if anything?

2    A.   He hopped -- one of them hopped over the wall, and

3    then --

4    Q.   Do you remember which one?  The light-skinned one, the

5    White one, or the --

6    A.   The dark-skinned one.  The dark-skinned stocky one.

7    Q.   The dark-skinned stocky one?  Okay.  He hopped over the

8    wall, and then what?

9    A.   And then he came back -- the other one was still right

10   there, and then he hopped back over.  He came back over there

11   talking about he was charging all of us with a handgun.

12   Q.   Did you see a handgun?

13   A.   No, sir.

14   Q.   So did you ever see a handgun?

15   A.   Nope.  When we got down the station, we got -- they took

16   us down the station, because, as they was checking the car,

17   they found some beer, and they found an open bottle of beer in

18   the back of the car, and they took all of us down Central

19   District, and, when we was on our way -- when we got down

20   there, it was like the officer was acting like he knew

21   Mr. Braxton from somewhere or whatever.

22   Q.   I'm sorry.  You say, "the officer."  Which officer?

23   A.   The dark-skinned one.

24   Q.   Okay.  And then -- I'm sorry.  We'll get to the station

25   in a minute.  Let's try and keep it in a sequence.

1          So, after the officers come back from behind the

2    wall and say they're charging with a gun, at that point, are

3    you led down to the police station?

4    A.   Yeah.  They handcuffed all of us, and then they put all

5    of us in the wagon and took us down to the police station, the

6    one that's downtown.  I think it's Central District, the one

7    that's right there on the block.

8    Q.   Okay.  And what happens when you get there?

9    A.   They said they was -- they say they -- first they said

10   they was charging all of us with a handgun.

11   Q.   Okay.

12   A.   Then -- then they got to Mr. Braxton, because one of the

13   officers, the dark-skinned officer, kind of cocky one, said he

14   knew him from somewhere or whatever, and then they was going

15   back and forth, back and forth, back and forth, and then he

16   was like, "Well, I'm going to call the State's attorney and

17   see what the State's attorney going to say about you all being

18   charged with this gun."

19          So he get on the phone.  He calls somebody, and then

20   he was like -- he got off the phone.  He was like, "Oh, the

21   State's attorney said, since Mr. Braxton got off with his

22   mouth, we just going to charge him with the gun.  We are going

23   to give you all open container.  Mr. Steppe, you're going to

24   get some tickets."

25          So Mr. Steppe was like, "Give me tickets for what?"

```
 1            He was like, "You're going to get some tickets," and
 2   then he wrote me a citation, and they let me go.
 3   Q.   Okay.  Did anyone tell you what would happen if you came
 4   forward and told the truth?
 5   A.   Yeah.
 6   Q.   What was that?
 7   A.   They told me, if I say anything -- they told me, if I say
 8   anything, or my little cousin say anything, that they'll make
 9   it a way that we'll all be charged with a gun.
10   Q.   Okay.  Did you testify at the Grand Jury in this case?
11   A.   Yes.
12   Q.   Did you tell them what you're telling the members of the
13   jury here today?
14   A.   No, sir.
15   Q.   Why not?
16   A.   Because I was afraid that, from the remarks that I was --
17   my -- from -- the State's attorney, with the police officer
18   telling me that I be getting charged with something, I ain't
19   have nothing to do with it, but then I got familiar with the
20   law, you know what I mean, and I know --
21   Q.   Okay.
22   A.   -- I ain't have it, so I think it's the right thing for
23   me to come down here and explain the truth so nobody won't --
24   so a person won't go to jail for something that they didn't
25   have on them or have in their possession, something that was
```

 1     planted on them, so I came -- I couldn't live with me sitting

 2     there -- sitting, you see what I'm saying, and watching a

 3     brother go to jail for nothing.

 4     Q.   Well, let me ask you this:  How do you know Mr. Braxton

 5     didn't have a gun that day?

 6     A.   Because, when they -- we all sat right there and watched

 7     them.  We sat -- all us sat right there and watched them go

 8     over that wall and go get that gun from right over that wall

 9     and come back and said they was charging all of us with the

10     gun.

11     Q.   But I thought I heard you say you didn't see them with a

12     gun when they came back.

13     A.   I didn't.  I know I seen them go over there and come back

14     with something, and they said they had a gun.

15     Q.   Okay.  And am I clear in saying that, if the police had

16     removed the gun from Mr. Braxton when he got out of the

17     vehicle, you never lost sight of him, and you would have seen

18     that?

19     A.   We were -- I'd have seen it.

20     Q.   Okay.  And am I paying you to be here today?

21     A.   No, sir.

22     Q.   Did I promise you I'd help you out with your case?

23     A.   No, sir.

24     Q.   So why are you here?

25     A.   I come here because I couldn't live with the fact that,

1    you see what I'm saying, that I can come here and tell the

2    truth and let other people know what's going on other than,

3    you see what I'm saying, watching, you know what I mean,

4    brother go to jail, you see what I'm saying, for something

5    that he didn't have on him or didn't have at all.

6    Q.   Now, so the jury is clear, you've been convicted in the

7    past of some pretty serious crimes, right?

8    A.   Yes.

9    Q.   Attempted second-degree murder, right?

10   A.   Yes.  I took an Alford plea.

11   Q.   Okay.  Robbery with a deadly weapon, right?

12   A.   Yes.

13   Q.   And you say you took an Alford plea.  The jury won't know

14   what that means.  You pled guilty because you agreed the

15   State --

16             MR. HAZEL:  Objection.

17             THE COURT:  Sustained.  You get to ask the question.

18   He gets to answer.

19             MR. PROCTOR:  Okay.

20   BY MR. PROCTOR:

21   Q.   What does an Alford plea mean to you?

22             MR. HAZEL:  Objection.

23             THE COURT:  Overruled.  Overruled.

24             THE WITNESS:  An Alford plea means --

25             THE COURT:  What kind of plea did you enter?

1        THE WITNESS:  I took an Alford plea.

2        THE COURT:  What does that mean you did in court?

3        THE WITNESS:  The Alford plea means --

4        THE COURT:  No.  What did you do in court?

5        THE WITNESS:  I took the agreement -- I took the

6    plea agreement that they had from me.

7        THE COURT:  And that was?

8        THE WITNESS:  Huh?

9        THE COURT:  And that was?

10        THE WITNESS:  The Alford plea.

11        THE COURT:  Which was?

12        THE WITNESS:  A guilty plea.

13        THE COURT:  Okay.  Next question?

14        MR. PROCTOR:  Thank you, Judge.  So -- give me a

15    second, Judge, if I could, please.

16        That's all we have at this time.  Thank you, Judge.

17        THE COURT:  Cross?

18                    **CROSS-EXAMINATION**

19    **BY MR. HAZEL**:

20    Q.   So, just to be clear, you are the same James Davon Harris

21    who was convicted of attempted second-degree murder in

22    February 2001?

23    A.   Yes, sir.

24    Q.   And you are also the same James Davon Harris who was

25    convicted of robbery with a deadly weapon in October of 1999?

1    A.    Yes, sir.

2    Q.    Turning back to May 17th, 2006, you testified you were,

3    in fact, in a car with three other individuals, correct?

4    A.    Yes, sir.

5    Q.    And one of those individuals seemed like you didn't

6    remember at first, but then you did remember was the

7    Defendant, Mr. Braxton; is that correct?

8    A.    Yes, sir.

9    Q.    And Mr. Braxton was, in fact, sitting in the front

10   passenger seat; is that correct?

11   A.    Yes.

12   Q.    And Mr. Braxton, yourself, and the two other individuals

13   were all pulled over by the members of the Baltimore Police

14   Department that night, correct?

15   A.    Yes, sir.

16   Q.    Now, isn't it correct that, on May 17th, 2006, when the

17   officers pulled you over, you were drunk that night?

18             **MR. PROCTOR:**  Objection, Your Honor.

19             **THE WITNESS:**  No, sir.

20             **THE COURT:**  Overruled.

21             **MR. PROCTOR:**  May I state my basis at the bench?

22             **THE COURT:**  Come up.

23             **MR. PROCTOR:**  Well, I --

24             **THE COURT:**  Come up.  Come up.  Come up.  Carefully.

25   Don't injure yourself --

1          MR. PROCTOR:  I knew that was coming.

2          THE COURT:  -- or anyone else.  Wait a minute.

3          (Whereupon, the following conference was held at the

4     bench.)

5          MR. PROCTOR:  It's very basic, Judge.  I could have

6     stated it at the table.  You said you were drunk that night.

7     It was 4 o'clock in the afternoon.

8          THE COURT:  Okay.

9          MR. PROCTOR:  Thanks for the correction.

10         THE COURT:  Thank you.

11         (Whereupon, the bench conference was concluded.)

12         THE COURT:  No lives were lost, Mr. Proctor.

13    **BY MR. HAZEL:**

14    Q.   I stand corrected.  It was about 4:30.  At 4:30 p.m. on

15    May 17th, 2006, you were drunk, correct?

16    A.   No, sir.

17         THE COURT:  Please talk into the microphone, sir.

18         Mr. Harris, please move toward the microphone and

19    talk at it.

20    **BY MR. HAZEL:**

21    Q.   You mentioned to Mr. Proctor that you testified before

22    the Grand Jury.  Do you recall that?

23    A.   Yes, sir.

24    Q.   Do you recall testifying before the Grand Jury?

25    A.   Yes, sir.

1    Q.   And do you remember you making the statement, "They gave

2    me an open container charge.  I was gone.  I was drunk,"

3    referring to May 17th, 2006?

4    A.   Yes.

5    Q.   Do you remember making that statement?

6    A.   Yes.

7    Q.   And that statement was made in front of a Grand Jury,

8    correct?

9    A.   Yes.

10   Q.   And that statement was made under oath, correct?

11   A.   I don't know.

12   Q.   Okay.  Do you recall being told, "You have just been

13   sworn by the foreperson of the Grand Jury, and you have taken

14   an oath to testify truthfully.  Do you understand that?"  And

15   your answer was, "Yes, sir."

16            Do you recall that?

17   A.   I don't recall it.

18   Q.   And do you recall being told that you must give truthful

19   answers today in response to all of the questions put to you

20   either by me or by members of the Grand Jury?  "Do you

21   understand that?"

22            "Yes, sir?"

23   A.   Yes.

24   Q.   You recall that?  You recall that exchange?

25   A.   I don't recall it, but you say -- if it's there, it's

1    there.

2    Q.   Would you like to see a transcript to refresh your

3    recollection?

4    A.   Yes.

5    Q.   Sure.

6            **MR. PROCTOR:**   Your Honor, I would ask that just be

7    marked for identification purposes.

8            **MR. HAZEL:**   Sure.   Government's Exhibit Number 9?

9            **THE CLERK:**   Nine, yes.

10   **BY MR. HAZEL:**

11   Q.   And, beginning from Line 5 down to Line 25.

12           (Witness perusing document.)

13           **THE WITNESS:**   Line 5 to where?

14           **MR. HAZEL:**   To the end of the page.   Take your time

15   and just let me know when you're done.

16           **THE WITNESS:**   Yes.

17   **BY MR. HAZEL:**

18   Q.   Okay.   Now, again, does that refresh your recollection

19   you were asked first:   "This is a Grand Jury investigating

20   Mr. Braxton's possession of a firearm.   You are under legal

21   obligation to testify truthfully.   Do you understand that?"

22           Your answer was:   "Yes, sir?"

23   A.   Yes.

24   Q.   That was your answer?

25   A.   Yes.

1    Q.   And then you were asked, "You've been sworn --"

2    A.   Excuse me.  Can I elaborate?

3    Q.   Sure.  Please.

4    A.   Like I told -- like I told him, that the officers

5    threatened me not to say nothing.

6    Q.   So you went into the Grand Jury and knowingly lied; is

7    that what you're saying?

8    A.   Huh?

9    Q.   You went into the Grand Jury and knowingly did not tell

10   the truth; is that what you're saying?

11   A.   Because the officers threatened me.

12   Q.   You went into the Grand Jury and knowingly did not tell

13   the truth; is that correct?

14   A.   Yes, because the officers threatened me.

15   Q.   Right.  And then, lastly, you were asked, "If you should

16   lie or knowingly make a false statement in your testimony, you

17   could be prosecuted for the crimes of perjury or making a

18   false declaration.  If you are convicted of such an offense,

19   you could be sentenced to imprisonment and fined.  Do you

20   understand your obligation to testify truthfully?"

21          Your answer was:  "Yes, sir."

22          Is that correct?

23   A.   Yes.

24   Q.   Now, as I asked before, you testified in the Grand Jury

25   that you were drunk, correct?

1              **MR. PROCTOR:**  Objection, Your Honor.

2              **THE WITNESS:**  I only told --

3              **THE COURT:**  Overruled.  You may answer.

4              **THE WITNESS:**  I only told them that because I was

5    threatened by the officers not to say nothing.

6    **BY MR. HAZEL:**

7    Q.   It was a "yes" or "no" question, sir.  You testified in

8    the Grand Jury that you were drunk on May 17th, 2006, correct?

9    A.   Yes.

10   Q.   And you testified that you didn't remember much of what

11   happened on May 17th, 2006, correct?

12   A.   Yes.

13   Q.   And you testified before this Court today that you were

14   arrested on that night, correct?

15   A.   Yes.

16   Q.   Do you recall being asked in the Grand Jury and giving

17   this response:  "Do you remember the police stopping you that

18   night?"  I'm on Page 9, Line 22.  "I remember the police

19   stopping me, and then I remember the police waking me up,

20   telling me, 'Sign this ticket, and you can go ahead home.'"

21            Do you remember being asked that question and giving

22   that answer?

23   A.   I don't remember.

24   Q.   Can you turn to Page 9 of your transcript.  Page 9,

25   starting at Line 22, and then continuing onto the next page.

1    A.    Okay.

2    Q.    Do you recall giving that answer in the Grand Jury now?

3    A.    Yeah.  If it's in black and white, yeah.

4    Q.    Do you recall giving that answer in the Grand Jury?

5    A.    I don't recall giving the answer.

6    Q.    You don't deny that you gave that answer to the Grand

7    Jury?

8    A.    I don't deny giving it to them.  I'm not saying I gave it

9    to them, neither.

10   Q.    Now, you testified today you remember seeing Mr. Braxton

11   get arrested, correct?

12   A.    Yes.

13   Q.    But, in the Grand Jury, you testified that you did not

14   see Mr. Braxton get arrested; isn't that correct?

15   A.    Yes.

16   Q.    And, in fact, you testified in the Grand Jury you don't

17   remember seeing a David at all, because you were so drunk you

18   just don't remember; is that right?

19   A.    Right.

20   Q.    That was your testimony in the Grand Jury?

21   A.    And I told you why I said it, too, because I was

22   threatened by the officers.

23   Q.    But that was your testimony in the Grand Jury?

24   A.    Yes.

25   Q.    Now, you testified also in the Grand Jury that you didn't

1    remember what happened that night, correct?

2    A.    Right, because I told you why.  Because I was threatened

3    by the officers, and I told you I couldn't live with myself

4    knowing that -- you know what I mean -- knowing that me not

5    saying -- me not telling the truth, you see what I'm saying,

6    okay, you see what I'm saying, cannot help somebody and can

7    hurt somebody at the same time.

8    Q.    Now, going back to May 17th, 2006, you said you and your

9    cousin were hacking, correct?

10   A.    Yes.

11   Q.    And you know hacking is illegal, correct?

12   A.    No.

13   Q.    You didn't know hacking is illegal?

14   A.    No.

15   Q.    What is hacking?

16   A.    Hacking is, you know what I mean, it's like a cab.

17   Q.    It's like a cab, right?

18   A.    Yes.

19   Q.    Were you licensed to operate a cab?

20   A.    No.

21   Q.    Okay.  And so you don't think that's illegal to operate

22   an unlicensed cab?

23   A.    I'm -- I ain't sure.  I don't know about -- I don't know

24   about if you could be -- I don't know if it's illegal or not.

25   Q.    Okay.  But you and your cousin were hacking that night,

1  right?

2  A.  Because there is hack stands that you can call -- there

3  is hack stands that you can call, and they come and straight

4  give you a ride, and they ain't taxicabs.

5  Q.  But you weren't a taxicab, correct?

6  A.  No.

7  Q.  You were a hack, along with your cousin?

8  A.  If that's what you want to say.

9  Q.  Now, on May 17th, 2006, you say the officers surrounded

10  you, correct?

11  A.  They surrounded the whole car.

12  Q.  And what happened at that point?

13  A.  They had their guns drawn.

14  Q.  As soon as they got to the car, they had their guns

15  drawn?

16  A.  Yes, sir.

17  Q.  And who did they get out of the car first?

18  A.  Mr. Steppe.

19  Q.  Mr. Steppe was sitting in the driver's seat; is that

20  correct?

21  A.  Yes.

22  Q.  Okay.  So he was the one that got out first?

23  A.  Yes.

24  Q.  And where were you seated?

25  A.  I was behind Mr. Steppe.

1    Q.   And where is Mr. Braxton seated?

2    A.   In the front passenger seat.

3    Q.   Who got out second?

4    A.   I did.  I got out behind him.

5    Q.   You got out behind Mr. Steppe?

6    A.   Yes.

7    Q.   Okay.  Who got out after you got out?

8    A.   Mr. Braxton.

9    Q.   And then I guess the last person got out?

10   A.   Yes.

11   Q.   And so did each of you get out one at a time or sort of

12   all at the same time?

13   A.   One at a time, hands in the air like this.

14   Q.   And, as you were getting out, was anybody getting

15   frisked?

16   A.   We got frisked once they made all us sit on the curb.

17   Q.   So none of you got frisked as you were getting out of the

18   car?

19   A.   Yes.

20   Q.   You got removed from the car and put on the curb?

21   A.   No, sir, because, if any of us would have made any sudden

22   moves, the way they was -- the way they -- how they -- all

23   right.  We was in a Cadillac.  You know what kind of car we

24   was in?

25   Q.   Cadillac.

1    A.    A Cadillac, with tinted windows, a two-door Cadillac,

2    meaning that they couldn't see inside the car or nothing, so

3    meaning that, if any of us would have made any sudden move,

4    they'd have pulled --

5              **MR. HAZEL:**  Objection to speculation, Your Honor.

6              **THE COURT:**  Sustained.  Next question.

7    **BY MR. HAZEL:**

8    Q.    So you say Mr. Braxton was pulled out of the car and

9    brought to the curb?

10   A.    All of us was.

11   Q.    I'm asking you specifically about Mr. Braxton.  He was

12   pulled out and taken to the curb?

13   A.    He wasn't pulled out of car.

14   Q.    He got out of the car?

15   A.    He got out the car like this, and he came and sat on the

16   curb.

17   Q.    And so you never saw an officer frisk Mr. Braxton while

18   he was still right outside the car?

19   A.    No, sir.

20   Q.    You never saw Mr. Braxton wrestle or tussle, or have any

21   kind of physical exchange with an officer right outside the

22   car?

23   A.    No, sir.

24   Q.    When was the first time you saw an officer touch

25   Mr. Braxton at all?

1    A.    When all us got searched.

2    Q.    And when was that?

3    A.    Once we was sitting on the curb, they started searching

4    us, and then two of them walked off.

5    Q.    Okay.  And which two officers were that again?

6    A.    The cocky -- kind of cocky -- kind of cocky one, and the

7    white officer, Caucasian officer.

8    Q.    How many officers were there as they were pulling you

9    guys out and bringing you to the curb?

10   A.    Tall, light-skinned one that was driving the marked car,

11   and there was like three or four of them in each two unmarked

12   cars.  So it was probably like six.  Probably like six or

13   seven, or probably more than that.

14   Q.    And so you said two of them left where you gentlemen were

15   to go climb a wall or something, you said before?

16   A.    One of them did.  The cop -- two of them walked over

17   there to the wall.  The cocky one hopped over the wall, and

18   then he came back with a little -- with a bag or something

19   where he had a gun.

20              **THE REPORTER:**  With -- I'm sorry?

21              **THE WITNESS:**  He said he had a gun.

22              **THE REPORTER:**  You said he came over with a?

23              **THE WITNESS:**  A bag or something, talking about he

24   had a gun, and he was charging all of us with it.

25   **BY MR. HAZEL:**

1    Q.   So he hopped over the wall and came back?

2    A.   (Witness nodding head in the affirmative.)

3    Q.   How long was he over this wall?

4    A.   He wasn't over there that long.

5    Q.   And he came back, and did you see him with a gun in his

6    hand?

7    A.   No, sir.

8    Q.   What did you see him do, if anything?

9    A.   He just -- he said -- he said, "Put the cuffs --" he

10   lied.  He said, "Put cuffs on them.  We're locking them up,"

11   for charging us with a gun.

12   Q.   But you never actually saw this officer, correct, or this

13   officer with a gun?

14   A.   No.

15   Q.   So you didn't see him carry a gun back and put it on

16   anybody?

17   A.   No, sir.

18   Q.   Now, did you have a gun that night?

19   A.   No, sir.

20   Q.   Did you see any other guns in that car?

21   A.   No, sir.

22   Q.   Were you actually charged with a handgun that night?

23   A.   No, sir.

24   Q.   But you were told that you would be charged?

25   A.   Yep.

1   Q.   Do you recall who the officer was?

2   A.   Tall, light-skinned officer.

3   Q.   A tall, light-skinned officer told you -- what exactly

4   did he tell you?

5   A.   He told us that we say anything about -- if -- he said,

6   we say anything about him being charged with a gun, saying

7   that he ain't have it on him, we was going to get charged with

8   one.

9   Q.   And when exactly did he tell you that?

10  A.   That night, right there in his -- right there, before he

11  called the State's Attorney's Office -- before he called the

12  State's Attorney's Office and asked the State's Attorney -- he

13  asked him something on the phone, and next thing you know, he

14  said he was charging Mr. Braxton with the gun since he got a

15  loud mouth.

16          **MR. HAZEL:**  No further questions of this witness,

17  Your Honor.

18          **THE COURT:**  Redirect?

19          **MR. PROCTOR:**  Briefly, Judge.

20                **REDIRECT EXAMINATION**

21  **BY MR. PROCTOR:**

22  Q.   Do you recall the questions about when you were in the

23  Grand Jury, saying that you were drunk?  Do you remember those

24  questions?

25  A.   Yes.

1   Q.   Why did you tell them you were drunk?

2   A.   Because I ain't want to answer -- I ain't want them to

3   ask me no questions, because I was still under the influence

4   of the officers who threatened me, told me not to say nothing.

5   Q.   Were you drunk?

6   A.   No, sir.

7   Q.   Did you have a beer at all that day?

8   A.   No, sir.  It was just -- it was a whole -- it was a whole

9   twelve pack of beer in there, and one of them was opened, and

10  it was an empty bottle in there, so they charged all of us

11  with open container.

12  Q.   Okay.  And you recall the questions about what you said

13  at the Grand Jury.  Tell the jury why you didn't tell the

14  truth.

15  A.   Because the officer told us, don't say -- don't say

16  nothing or we will be charged with a gun.

17  Q.   And are you aware that being charged with a gun is a

18  serious offense?

19  A.   Yes, sir.

20  Q.   And that's not something you want?

21  A.   No, sir.

22  Q.   How would you describe when you went in the Grand Jury?

23  Were you scared?

24  A.   Yes, sir.

25  Q.   Do you remember the questions about Mr. Braxton not being

1    frisked when he got out of the vehicle?  Do you remember those

2    questions?

3    A.    Yes.

4    Q.    When Mr. Braxton got out of the vehicle, were there any

5    guns pointed at him?

6    A.    Yes, sir.

7    Q.    And did they continue to be pointed at him?

8    A.    Guns was pointed at all of us when we got out the car,

9    meaning that we -- we couldn't -- like this.  We had to get

10   out the car like this (indicating).

11   Q.    Okay.

12         **MR. PROCTOR:**  And I should -- for the purposes of

13   the record, Your Honor, he's holding his hands up, palms

14   facing forward.

15         **THE COURT:**  Okay.

16         **MR. PROCTOR:**  Can I have -- Mr. Wallner, please?

17   No.  No.  The bag -- the whole bag.

18   **BY MR. PROCTOR:**

19   Q.    You mentioned, when the officers came back from the wall,

20   they had a bag.  Do you remember what that bag looked like?

21   A.    No, sir.

22   Q.    Okay.

23   A.    It ain't look like --

24         **MR. PROCTOR:**  Is this marked, or just the contents?

25         **MR. HAZEL:**  The bag is not marked.

1    **MR. PROCTOR:** Okay.  I'm not going to mark it

2    because he doesn't recall anyway.

3    <u>**BY MR. PROCTOR:**</u>

4    Q.  You don't remember if it was a large bag, small bag,

5    clear, see-through?  You just don't know?

6    A.  It was a brown bag.

7    Q.  Okay.  Like a brown bag you get groceries in, or smaller?

8    A.  Like a little small brown bag.

9    Q.  Okay.  Would it have been, if you know, big enough to fit

10   Government's Exhibit 4 in?

11   A.  It probably would fit in there.

12   Q.  Do you recall if the bag was thin, or thick, or you don't

13   recall?

14   A.  I don't recall because, once he came back, like this, he

15   like, "Lock all of them up for -- all of them getting charged

16   with a gun."

17   Q.  Okay.  And last question:  Again, do you know David

18   Braxton?

19   A.  No, sir.

20        **MR. PROCTOR:**  That's all I have, Judge.

21        **THE COURT:**  Recross?

22        **MR. HAZEL:**  Nothing, Your Honor.

23        **THE COURT:**  Thank you.  Good day, sir.

24        (Witness excused.)

25        **THE COURT:**  Call your next witness.

```
 1              MR. PROCTOR:  One second, please, Judge.  If I may
 2    have a moment?
 3              THE COURT:  Yes.
 4              (Counsel conferring with the Defendant.)
 5              MR. PROCTOR:  May I just step out to retrieve my
 6    witness, Judge?
 7              THE COURT:  Yes.
 8              MR. PROCTOR:  Your Honor, at this time, the Defense
 9    would call Tiffani Parrott.
10              Your Honor, may we approach briefly?
11              THE COURT:  Yes.
12              (Whereupon, the following conference was held at the
13    bench.)
14              MR. HAZEL:  I apologize.  I meant to do this before
15    the jury came back in.  I do want to make the same objection
16    that I made before the motions hearing.  Ms. Parrott's
17    testimony is provably false.
18              THE COURT:  Then you will have a chance on
19    cross-examination to prove it.
20              MR. HAZEL:  I will, but it just serves no purpose
21    other than to confuse the jury, so I think it shouldn't even
22    be allowed.
23              THE COURT:  Well, I don't -- you know, I've never --
24    a hundred years ago when I was a trial lawyer, I never saw a
25    Judge exclude testimony preemptively based on a party's
```

```
1    prediction that it was going to be provably false.
2              MR. HAZEL:  But I think we know from the motions
3    hearing that this is a different situation.
4              THE COURT:  Well, it is arguable.
5              Also, would one of you all remind me at some point
6    to get Mr. Braxton on the record being advised of his right to
7    testify --
8              MR. HAZEL:  Sure.
9              THE COURT:  -- and then making that election.
10             MR. PROCTOR:  Sure.
11             THE COURT:  Thank you.
12             MR. HAZEL:  And just one thing --
13             THE COURT:  Your objection is overruled, by the way.
14             MR. HAZEL:  I understand.  Just while we're up
15   here --
16             THE COURT:  Yes.
17             MR. HAZEL:  -- Mr. Proctor has agreed not to object
18   to authenticity when I play the tape on cross.  I could
19   obviously just call Mr. Allen, but to save the time, which
20   is --
21             THE COURT:  That would be appreciated.  Very good.
22   Thank you.
23             MR. PROCTOR:  Thanks.
24             (Whereupon, the bench conference was concluded.)
25             THE CLERK:  Raise your right hand.
```

1          **__TIFFANI PARROTT__**

2      **__WAS THEN DULY SWORN TO TELL THE TRUTH__**

3          **THE CLERK:**  Please be seated.  Ma'am, please state

4    your name on the record, and spell your last name.

5          **THE WITNESS:**  Tiffani Parrott, P-A-R-R-O-T-T.

6          **THE REPORTER:**  And spell your first name, please,

7    too.

8          **THE WITNESS:**  Tiffani, T-I-F-F-A-N-I.

9          **THE REPORTER:**  Thank you.

10          **THE COURT:**  Thank you.  Ms. Parrott, that's

11    wonderful.  If you keep your voice just that high so everybody

12    can hear you.

13          **THE WITNESS:**  Okay.

14          **THE COURT:**  That's great.  Mr. Proctor?

15          **MR. PROCTOR:**  Thank you, Your Honor.

16              **__DIRECT EXAMINATION__**

17    __BY MR. PROCTOR:__

18    Q.   Good afternoon, Ms. Parrott.

19    A.   Good afternoon.

20    Q.   How are you today?

21    A.   Fine.

22    Q.   Now, do you work?

23    A.   Yes.

24    Q.   Where are you currently employed?

25    A.   Baltimore City Police Department.

1    Q.    Are you an officer?

2    A.    Dispatcher.

3    Q.    Okay.  I'm sorry.  I don't know the -- does that mean

4    you're a commissioned officer, or you're a civilian?

5    A.    Civilian worker.

6    Q.    Okay.  What does dispatcher mean?

7    A.    I dispatch calls for service.  I run tags, warrant

8    checks, check for validity of license and registration.

9    Q.    Okay.  When officers are out in the field and call on

10   their radio, are you the person on the other end?

11   A.    Yes.

12   Q.    So what is it you do for officers in the field?

13   A.    If they have a car stop or they stop someone, I'll run

14   that person to see if they have any active warrants, make sure

15   their license is valid, the vehicle they're driving is valid,

16   the tags are good, they have insurance.  I also dispatch calls

17   when people call 911 or 311.  I dispatch calls for service.

18   Q.    Okay.  Back in May of '06, is that also what you did for

19   a living?

20   A.    Yes.

21   Q.    Back on May 17th, 2006, were you working?

22   A.    Yes.

23   Q.    Would you tell the jury what a CAD is.

24   A.    CAD is Computer Aided Dispatch.  It keeps a track of

25   everything that we type into the computer, and you can print

1    it out, and also you can get a voice monitor -- a voice

2    recorded statement as well from that same system, what we say

3    on the radio.

4    Q.   Okay.  So say I'm Officer Frank Smith, and I come over

5    the radio, "Can you run a tag for me?"  Do you enter that in

6    the CAD?

7    A.   I first find out what your location is, and I put your

8    location in the computer, and then I get the tag number, and I

9    run the tag.

10   Q.   So, if I say, "I'm at 101 West Lombard," you put that in

11   the computer?

12   A.   Yes.

13   Q.   Do you put it in five minutes later, or the minute I say

14   it?

15   A.   The minute you say it.

16   Q.   Okay.  And I'm sorry.  How long have you been doing your

17   job?

18   A.   Six years.

19           **MR. PROCTOR:**  Madam Clerk, what's my next number,

20   please?

21           **THE CLERK:**  1.

22           **MR. PROCTOR:**  1?

23           **THE CLERK:**  Yes.

24           **MR. PROCTOR:**  Oh!  That's easy.  May I have a

25   sticker?  May I just have a moment, please, Judge.

1      **THE COURT:**  Yes.

2   **BY MR. PROCTOR:**

3   Q.   I'm showing you what has been previously marked as

4   Defendant's Exhibit 1 and ask if you recognize that?

5   A.   Yes.

6   Q.   What is it?

7   A.   That's a printout of a CAD of a call on the 17th of May

8   of 2006.

9   Q.   And do you see your name or call ID anywhere there?

10  A.   Yes.

11  Q.   And does that fairly and accurately reflect the CAD sheet

12  from that event?

13  A.   Yes.

14  Q.   Do you see the name -- well, actually, you won't.

15      **MR. PROCTOR:**  Your Honor, at this time, we would

16  move Defendant's Exhibit 1 into evidence.

17      **MR. HAZEL:**  Just --

18      **THE COURT:**  Defense 1 is admitted.

19      **MR. PROCTOR:**  Actually, you don't need to join me,

20  because I'm going to put it up on the ELMO.

21      **MR. HAZEL:**  Oh!  Good.

22  **BY MR. PROCTOR:**

23  Q.   Ms. Parrott, I'm going to try and use the ELMO, which --

24      **THE COURT:**  Members of the jury, are your monitors

25  on?

1    **JURORS:**  Yes.

2        **THE COURT:**  Thank you.  Is the monitor on the stand

3    on, Madam Clerk?

4        **THE CLERK:**  No.

5        **THE COURT:**  Good.  Now it is.  Thank you.

6    **BY MR. PROCTOR:**

7    Q.   Okay.  Ms. Parrott, forgive me.  Technology has never

8    been one of my fortes.  Let's just start off with:  Do you see

9    the caption there that ends with prior history?  Do you see,

10   it starts from prior history, and goes upwards?  Do you see

11   that?

12       **THE COURT:**  Why don't you point it out on there

13   since she'll see you pointing and the jurors will see it, too.

14   Q.   Do you see where my fingers are, and it kind of starts

15   with initiate, and it finishes with prior history?

16   A.   Uh-huh.  Yes.

17   Q.   Explain to the jury what the significance of that is.

18   A.   The initiate time is the --

19   Q.   I'm sorry.  Because you're talking away from the

20   microphone, it's hard for the jury to hear you.

21   A.   The initiate time is the time that the information was

22   entered into the computer at 16:35, and 8 seconds.

23       **MR. PROCTOR:**  Judge, with your permission, I promise

24   not to break anything.  If I can just move this so she can

25   talk into the microphone and look at it.

1          **THE COURT:**  Thank you.

2          **MR. PROCTOR:**  Is that better, Ms. Parrott?

3          **THE WITNESS:**  Thank you.

4          **MR. PROCTOR:**  And, Judge, if you could inquire of

5     the jury if they can all see, I'd appreciate it.

6          **THE COURT:**  Can you all, members of the jury?

7          **JURORS:**  Yes.

8          **THE COURT:**  Yes, they can.

9          **MR. PROCTOR:**  Thank you, Judge.

10    **BY MR. PROCTOR:**

11    Q.   Okay.  So the initiate is -- tell me again what that is,

12    please.

13    A.   It's --

14          **THE COURT:**  If you would point to that on your --

15          **MR. PROCTOR:**  Certainly, Judge.

16    **BY MR. PROCTOR:**

17    Q.   The initiate is what?  Sorry.

18    A.   The time information was entered into the computer.

19    Q.   And what time is that?

20    A.   16:35 and 8 seconds.

21    Q.   And that's 4:35 p.m., right, in military time?

22    A.   Yes.

23    Q.   And is there a date next to that?

24    A.   May the 17th, 2006.

25    Q.   Okay.  And what is the next thing that says "call

1    number"?

2    A.   That's the -- it's the 2,272nd call for the day.

3    Q.   Okay.  And the entry, what does that mean?

4    A.   The same time the call was initiated, what time the

5    information was entered into the computer.

6    Q.   And the dispatch?

7    A.   The dispatch time.  If it was a call, it will be the time

8    that I dispatched it to an officer.

9    Q.   Okay.  And the clear?

10   A.   The time that the call cleared.

11   Q.   Okay.  Which means the case is all -- it's done?  It's

12   put away?

13   A.   Yes.

14   Q.   The case number, what is that?

15   A.   The report number.

16   Q.   Okay.  And the primary unit, what's that?

17   A.   The unit number.  The officer's unit number.

18   Q.   Okay.  And, if I could ask you to look at the second line

19   down, do you see on that who the primary officer was?

20   A.   Yes.

21   Q.   Who is that?

22   A.   Officer Allen, 1 Charlie 33.

23   Q.   Okay.  Now, explain to the jury what you mean by

24   1 Charlie 33.

25   A.   The "1" stands for the district, which is the Central

1    District.  The "C" stands for the shift, which is the Charlie

2    shift.  That lasts usually from 3:00 to 11:00 or 4:00 to 12:00

3    and 33, the first 3 is the post -- it's the sector number,

4    which is Sector 3, and the car number, 3, is the last number.

5            **THE COURT:**  Perhaps you could use your pen again and

6    orient the members of the jury.

7            **MR. PROCTOR:**  Sure.  Right there (indicating).

8    **BY MR. PROCTOR:**

9    Q.   And am I pointing my pen in the right place?

10   A.   Yes.

11   Q.   Okay.  The next line down that starts off "870," what is

12   the significance of that, Ms. Parrott?

13   A.   That there was another call at that exact location, and

14   870 stands for a CDS call, which is a drug call, and they had

15   a call there, which was CAD 2264, which was a drug call at

16   that same location earlier.

17   Q.   So basically it's a completely unrelated case that

18   doesn't have --

19   A.   Yes.

20   Q.   -- anything to do with this one?

21           And the next line down, explain what that means.

22   A.   That's another unit added to the call, 1 Charlie 22, who

23   answered up to back up 1 Charlie 33.

24   Q.   Okay.  And can you see who 1 Charlie 22 is?

25   A.   Yes.  Officer Williams.

1    Q.    Okay.  The last line on the first page, what is the

2    significance of that line, if anything?

3    A.    It shows where 1 Charlie 33 changed his location to

4    Martin Luther King and Franklin Street.

5    Q.    Okay.  And the time on that is?

6    A.    16:35 and 35 seconds.

7    Q.    And that is how many minutes or seconds after the call

8    originated?

9    A.    Twenty-seven seconds.

10   Q.    Okay.  And, if I may, I'm going to turn to the second

11   page.  The first line on the second page, Ms. Parrott, what's

12   the significance of that page?

13   A.    1 Charlie 21 was added to back up 1 Charlie 33, so he was

14   also added to the call.

15   Q.    Okay.  And who is 1 Charlie 21, if you know?

16   A.    Officer Gillespie.

17   Q.    Okay.  And what do the next two lines mean?

18   A.    They called, "On scene," at the location where he was at.

19   Q.    Okay.  So the words, "on scene," next to it means they're

20   present?

21   A.    They're actually at that location.

22   Q.    And which we know from the first page is Martin Luther

23   King and Franklin?

24   A.    Yes.

25   Q.    Okay.  On the fifth line down, if you can see that -- and

1    let me just zoom in because I'm sure the jury is having a hard

2    time following -- it starts off with location.  What does that

3    line mean?

4    A.   It means that the location was changed from Martin Luther

5    King and Franklin to Pennsylvania and Martin Luther King.

6    Q.   Okay.

7    A.   I'm sorry.  From Martin Luther King and Pennsylvania to

8    Martin Luther King and Franklin.  I apologize.

9    Q.   No problem.  And what time was that at, if you know?

10   A.   16:41:28 seconds.

11   Q.   Okay.  So that's that, and then the next line -- I'm

12   going to zoom back, Judge.  This is way too difficult for me.

13   The next line down starts off, "Tag."  What does that line

14   mean?

15   A.   That's the tag number that the officer gave me to run to

16   see if the vehicle was stolen.

17   Q.   Okay.  And what time did he give you the tag number on

18   that?

19   A.   16:42 -- 41, and 43 seconds.

20   Q.   Okay.  And then what's the next line mean?

21   A.   1 Charlie 22 advised there was a gun in the vehicle.

22   Q.   Okay.  And then the line after that?

23   A.   That's information I input into the computer from what I

24   got from the packet cluster in reference to the tag number as

25   an '89 Ford.  That's the VIN number and the owner of the

1    vehicle and their address.

2    Q.   Okay.  So I'm clear, this report, it's produced in the

3    order it's entered; is that correct?

4    A.   Yes.

5    Q.   And so, if I read this, the first thing of significance

6    that happens is that the vehicle is pulled over at Franklin

7    and Martin Luther King?

8    A.   If they changed locations, the vehicle wasn't pulled over

9    yet.

10   Q.   Okay.

11   A.   That's where he -- that's the initial -- the initial call

12   is when he called out on the vehicle stop.  I can't remember

13   the actual call, but, if his location was changed, that mean

14   the vehicle didn't stop at that actual location that he called

15   out at first.

16   Q.   Okay.  So, when it says location here on the fifth line

17   down, does that mean the vehicle is still moving, or it's

18   stopped, or either?

19   A.   When I changed the location to Franklin and MLK, the

20   vehicle was stopped.

21   Q.   Okay.  So the sequence is the vehicle is stopped, the

22   officer gives you the tag number --

23   A.   Yes.

24   Q.   -- you're informed that a gun is recovered, and then the

25   tag comes back?

1    A.   Yes.  No.  The tag information may have come back.  It

2    takes time to enter it in the computer.  Once he gave me the

3    tag number, I have four computer monitors.  I have my Motorola

4    here, my two computers here, and the tag information is ran on

5    this side.  Once he gives me the information, I enter it in

6    the computer, then I turn to my right, and I run the tag.

7    Then that's when I was advised there was a gun in the car.  I

8    entered that in the computer.  At that time, information is

9    coming back.  I'm looking to my right, and I'm inputting it

10   into the computer.

11   Q.   Okay.

12        MR. PROCTOR:  Can I have one second, Judge?

13        THE COURT:  Yes.

14   BY MR. PROCTOR:

15   Q.   Ms. Parrott, one last question:  Can you tell from this

16   how long after the tag number was given to you was the gun

17   found?

18   A.   Less than a minute.  It was -- well, 15 -- 19 seconds.

19        MR. PROCTOR:  That's all I have, Judge.

20        THE COURT:  Cross?

21        MR. HAZEL:  Yes, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. HAZEL:

24   Q.   Good afternoon, Ms. Parrott.

25   A.   Good afternoon.

1   Q.   I just want to ask you one or two questions about the CAD

2   report to make sure I understand it.

3           Now, do I understand correctly that you're saying

4   the car is stopped at 16:41?

5   A.   Yes.

6   Q.   That's when the car is stopped, and so your testimony, or

7   at least your explanation of this CAD report, then, is that

8   the tag, "8BW T22," is not called in until after the car is

9   stopped; is that what you're saying?

10  A.   Yes.

11  Q.   And then, again, if I am following the CAD report

12  correctly, what you're saying is that an officer then says,

13  "Gun in car," immediately, or I guess less than a minute after

14  the tag is run, correct?

15  A.   Yes.

16  Q.   Is it possible that sometimes, as you are inputting these

17  things, they're not actually being inputted in real-time, or

18  are they?  Are you always doing this in real-time?

19  A.   When they tell me, I try to get in as soon as I get it.

20  Q.   But does it sometimes happen that things do not get down

21  in real-time and end up in the wrong order?

22  A.   If they're in a foot pursuit or things like that, I may

23  be trying to get other units with them, or I'm trying to get

24  information into the computer from on the other side of my

25  computer stand, and it's not put in at that exact time.

1    Q.   Okay.  And so sometimes can be put in out of order?

2    A.   Yes.

3    Q.   Now, you had mentioned earlier that the call actually

4    started at 16:35, and I guess I was actually also a little

5    confused about that.  What does that indicate there where it

6    says -- I thought that was subject stopped.  What does that

7    indicate?

8    A.   They had -- it's a -- like a -- I'll say like a slang

9    that they'll use.  They'll say, "I have one stopped," or, "I'm

10   going to have one stopped," and they'll say, "I'm going to

11   have one stopped at Martin Luther King and Pennsylvania

12   Avenue," so I'll just put in "FI" in the computer, which means

13   a field interview, and then I find out eventually, later on,

14   that the call -- that they have a vehicle stopped, and that's

15   when I put the tag number in, but, if it's a vehicle stop,

16   I'll say -- they'll say, "I have a vehicle stopped," I'll put

17   in "25," the unit number, and the location, and it will say,

18   "car stop," but sometimes they don't say that.  They'll say,

19   "I have one stopped."

20   Q.   Now, Ms. Parrott, it is true, of course, that these calls

21   to dispatch are actually recorded, correct?

22   A.   Yes.

23           **MR. HAZEL:**  I would ask Mr. Wallner if he could

24   play -- oh!  Actually, before I do that, Your Honor, I do have

25   the transcript for the jury.

1          THE COURT:  What's the number?

2          MR. HAZEL:  This will be Government's Exhibit 10 for

3    identification.

4          MR. PROCTOR:  Your Honor, before it's passed out, I

5    have an objection at the bench, please.

6          THE COURT:  Yes.  Come up.

7          (Whereupon, the following conference was held at the

8    bench.)

9          THE COURT:  Yes, sir?

10          MR. PROCTOR:  Judge, I had spoken to the Government

11    about this before.

12          MR. HAZEL:  It's the same one --

13          MR. PROCTOR:  I don't have a problem with the money

14    parts coming in, but there is a part at the end about, "I need

15    a paddy wagon to pick them up."

16          MR. HAZEL:  Oh!  I'm sorry.  It's still in there.

17          MR. PROCTOR:  It has no probative worth, and some

18    prejudicial effect.

19          THE COURT:  Where is it?

20          MR. HAZEL:  Where is that?

21          MR. PROCTOR:  It's the top of the last page, "When a

22    wagon come available, I'm going to need one right here."

23          THE COURT:  So, if you just pull this last sheet

24    off, would your objections be met?

25          MR. PROCTOR:  Well, yes, as long as it's taken back

1    from the jury afterwards and they don't --

2           **MR. HAZEL:**  I would have to do that 14 times, but I

3    can take a moment to do that if you like.

4           **THE COURT:**  Or we can have him do it.  Please take a

5    moment and do it.

6           **MR. HAZEL:**  Sure.

7           (Whereupon, the bench conference was concluded.)

8           **MR. HAZEL:**  The Court's indulgence while we make the

9    requested redaction.

10          **THE COURT:**  You could make it a community project,

11   shorten the time considerably.

12          Members of the jury, we're going to be giving you a

13   transcript of the tape that you're about to hear or recording

14   that you're about to hear.  Again, the evidence is the

15   recording itself.  It's what you hear.  The transcript is to

16   help you understand it.  If there is a difference between what

17   you hear and what you see on the transcript, again, the

18   evidence is what you hear.

19          Please stay out of the jury box, sir.  Please --

20   thank you.

21          Does every member of the jury have a transcript?

22          **MR. HAZEL:**  And I'd ask Mr. Wallner to play the

23   first few lines.  I'll tell you when to stop.

24          (Whereupon, an audio recording was played.)

25          **MR. HAZEL:**  Can you stop it right there?

1    **BY MR. HAZEL:**

2    Q.   Do you recognize your voice, ma'am?

3    A.   That's not my voice.

4    Q.   That's not your voice?

5    A.   (Witness shaking head in the negative.)

6         **MR. HAZEL:**  Play another line.

7         (Whereupon, an audio recording continued to be

8    played.)

9         **MR. HAZEL:**  Now, if you --

10        (Whereupon, an audio recording continued to be

11   played.)

12        **MR. HAZEL:**  Now, if you could stop it there,

13   Mr. Wallner.

14   **BY MR. HAZEL:**

15   Q.   If you look at the second page, what I have up on the

16   screen now, you see it says here, "1-C-33, Tag 8BW T22,"

17   correct?

18   A.   Yes.

19   Q.   Okay.  And so, if I'm reading that correctly, that would

20   be Unit 33 calling in Tag 8BW T22, correct?

21   A.   Yes.

22   Q.   Okay.  And, in the recording, I don't know if you could

23   hear that.  It was 33 playing or calling in 8BW T22.  Did you

24   hear that?

25   A.   Yes.

1    Q.   Okay.  But you're saying that wasn't you?

2    A.   No.

3    Q.   Okay.  So does that mean that you would not have been the

4    dispatcher on this call?

5    A.   I was the dispatcher on the call, but there was another

6    dispatcher that was sitting there before me.  That is

7    Ms. Hamilton, that voice on there.

8    Q.   Okay.  So --

9    A.   But a rolling stolen is not a car stop.  That's just a

10   car he's following, and he just asked her to run the tag.

11   Q.   Okay.  So, in terms of putting this CAD report together,

12   if it's Ms. -- did you say Ms. Ruffin?

13   A.   Hamilton.

14   Q.   Ms. Hamilton.  I'm sorry.  If it's Ms. Hamilton who took

15   the, "1-C-33, Tag 8BW T22," would she have been the one to

16   enter that in this CAD report?

17   A.   She would -- he was in a rolling stolen.  She wouldn't --

18   he didn't give a location, so she doesn't put anything in CAD.

19   She just run the tag to see if the vehicle comes back stolen.

20   If it comes back stolen, then he'll say, "Okay.  I'm going to

21   have it stopped," or if it doesn't come back stolen --

22          **THE REPORTER:**  A little bit slower.  A little bit

23   slower.

24          **THE WITNESS:**  -- he'll say, "I have it stopped now,

25   and this is the location."

1        **MR. HAZEL:**  I'll ask Mr. Wallner to play the rest of

2    the tape.

3            (Whereupon, an audio recording continued to be

4    played.)

5        **MR. HAZEL:**  Mr. Wallner, if you could stop it there.

6    **BY MR. HAZEL:**

7    Q.   Now, I don't know if -- are you able to hear that?

8    A.   Yes.

9    Q.   Now, am I correct that it sounds as if the tag has

10   already been called in, correct?

11   A.   Yes.

12   Q.   And he says there, "I'm at the traffic light right now.

13   The vehicle is going to be making a right, going south."

14   A.   Uh-huh.

15   Q.   Correct?

16   A.   Yes.

17   Q.   So it sounds as if he's called in the tags, but the car

18   was still moving, correct?

19   A.   Yes.  He gave her the tag number.  She just ran it.  She

20   didn't put him on anything, but then he said he's going to

21   have it stopped, the location that he's at.  That's why she

22   put him out at that location.

23   Q.   Okay.  So my question is:  The car is still moving while

24   he's calling in the tag?

25   A.   Yes.

1    Q.   So the tag --

2    A.   A rolling stolen is when they consider the vehicle still

3    driving, and they want you to run the tags to see if it's

4    stolen.

5    Q.   So the tag was called in before the vehicle stop?

6    A.   Yes.

7              **MR. HAZEL:**  Continue.

8              (Whereupon, an audio recording continued to be

9    played.)

10   **BY MR. HAZEL:**

11   Q.   Now, you're able to hear, correct?

12   A.   Yes.

13   Q.   Can you summarize what's going on at this point?

14   A.   That's when other units were coming to run to aid with

15   him in order to start the vehicle stop.  He doesn't have the

16   vehicle stopped yet.  He's at a red light.  Another unit

17   called out and said they were right behind him in a Impala --

18   unmarked Impala.

19             (Whereupon, an audio recording continued to be

20   played.)

21   **BY MR. HAZEL:**

22   Q.   Now, is that still Ms. Hamilton, or is that you now?

23   A.   That's Ms. Hamilton.

24   Q.   Okay.  At some point, do you take over in this process?

25   A.   Yes.

1   Q.   But we haven't reached that point yet?

2   A.   No.

3           (Whereupon, an audio recording continued to be

4   played.)

5   **BY MR. HAZEL:**

6   Q.   Now, that last voice saying, "gun in the vehicle," who is

7   that?

8   A.   That's Ms. Hamilton.

9   Q.   So that's not an officer saying, "There is a gun in the

10  vehicle"?

11  A.   No.

12  Q.   Okay.

13  A.   That's the dispatcher.

14  Q.   And you've been listening to this.  Did you hear any

15  officer say, "There is a gun in the vehicle"?

16  A.   Yes.

17  Q.   Where did you hear that?

18  A.   Right before she said it, the officer said, "I have a

19  gun."

20  Q.   Did you hear an officer say there was a gun in the

21  vehicle?

22  A.   No.  He said, "I have a gun."

23  Q.   And then the dispatcher says, "Gun in the vehicle"?

24  A.   "There is a gun in the vehicle."

25  Q.   And the dispatcher, of course, is not on the scene, just

1    to be clear?

2    A.   No.

3            MR. HAZEL:   Continue.

4            (Whereupon, an audio recording continued to be

5    played.)

6            MR. HAZEL:   Stop it.

7    BY MR. HAZEL:

8    Q.   Now, throughout that entire tape, did you ever hear your

9    voice?

10   A.   No.

11   Q.   So, that entire time, it was Ms. Hamilton?

12   A.   Yes.

13   Q.   Okay.  And maybe I misunderstood earlier.  Who did the

14   CAD report, then:  You, or Ms. Hamilton?

15   A.   She -- on the sheet, the last page, it shows her name

16   first.  She initiated the initial car stop, and then my name

17   comes in underneath of there, but I don't know why my voice is

18   not on there.  That's not my voice.

19   Q.   So you're not the dispatcher on the call that we just

20   heard?

21   A.   No.

22   Q.   Okay.

23           MR. HAZEL:   No further questions, Your Honor.

24           THE COURT:   Okay.  Redirect?

25           MR. PROCTOR:   Briefly, Judge.  Just briefly.

1          **REDIRECT EXAMINATION**

2     **BY MR. PROCTOR:**

3     Q.   Have you seen this transcript before today, Ms. Parrott?

4     A.   I haven't seen it at all.

5     Q.   Had you heard the tape before today?

6     A.   No.

7     Q.   Do you know:  Are there any time stamps anywhere on that

8     tape?

9     A.   No.

10    Q.   Are there any time stamps anywhere on this transcript?

11    A.   No.

12    Q.   Do you know when the transcript started and when the

13    transcript ended?

14    A.   No.

15    Q.   Let me ask you one thing.  This is a transcript -- if I

16    could just go to -- do you know who prepared this transcript?

17    A.   Detective Task Force Officer Edgar Allen.

18    Q.   Do you know Officer Allen?

19    A.   No.

20    Q.   Okay.  Officer Allen is the gentleman seated at counsel

21    table with the Government prosecutors.  Let me ask you one

22    thing.  The Government played this tape for you and -- hold on

23    one second so I can get the proper order.  This is halfway

24    down the second page.  Do you see that?

25    A.   Yes.

1   Q.   Do you see where it says right here -- why don't you just

2   read that line.

3   A.   "33.  Send more units over here.  Got a gun."

4   Q.   When it says, "33," what does "33" mean?

5   A.   The unit, 1 Charlie 33.

6   Q.   So, before you talk, you identify yourself so you know

7   who is speaking; is that correct?

8   A.   Yes.

9   Q.   I'm going to bring you back to the CAD.  Who is Unit 33?

10  A.   Richard Allen.

11  Q.   So, when it says in the transcript right here, "33.  Send

12  some more units.  He got a gun," that's identified as

13  Officer Williams, right?

14  A.   Yes.

15  Q.   And that's incorrect, right?

16  A.   Officer Williams is 1 Charlie 33.

17  Q.   I thought we said it was -- are you --

18  A.   Oh!  I'm sorry.  Officer Allen.  I'm sorry.  I apologize.

19  Q.   Okay.  So, when it says halfway down Page 2,

20  "Officer Williams:  33.  Send some more units over here.  He

21  got a gun," that's incorrect, correct?

22  A.   Yes.

23  Q.   That is Officer Allen speaking?

24  A.   Yes.

25          MR. PROCTOR:  One moment, please, Judge.

```
 1                    That's all I have.

 2            THE COURT:  Okay.  Recross?

 3            MR. HAZEL:  No, Your Honor.

 4            THE COURT:  Thank you.  You may step down,

 5     Ms. Parrott.

 6            (Witness excused.)

 7            THE COURT:  Members of the jury, we're going to take

 8     the afternoon break now.  I will call for you in 20 minutes.

 9     I will call for you at 3:35.  Please remember, don't discuss

10     the case among yourselves or with anyone else.  We'll see you

11     at 3:35.

12            (Jury excused.)

13            THE DEFENDANT:  Your Honor, may I address the Court?

14            MR. PROCTOR:  Wait one second.

15            THE COURT:  Mr. Proctor, do you have any additional

16     witnesses other than Mr. Braxton?

17            MR. PROCTOR:  No, sir.

18            THE COURT:  Please advise Mr. Braxton of his right

19     to testify.

20            MR. PROCTOR:  Mr. Braxton, you understand that you

21     have the right to testify, and you can discuss it with me, and

22     I'm happy to answer any of your questions, but that's a right

23     that you have.  Do you understand that?

24            THE DEFENDANT:  Yes.

25            MR. PROCTOR:  And you understand that, were you not
```

1  to testify, Judge Quarles would instruct the jury that they

2  can't hold that against you or consider it in any way in

3  deciding whether you're guilty or not guilty?

4          THE DEFENDANT:  Yes.

5          THE COURT:  That they cannot.

6          MR. PROCTOR:  They cannot.  I'm sorry if I misspoke.

7  And that it's your decision and your decision alone, although

8  obviously you can discuss it with your lawyer?

9          THE DEFENDANT:  Yes.

10          MR. PROCTOR:  And you also understand, if you

11  testify, amongst other things, the Government could bring up

12  your prior convictions?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Hold on for a moment.

15          Does the Government have impeachable convictions

16  that it would intend to use should Mr. Braxton take the stand?

17          MR. HAZEL:  Yes, Your Honor.

18          THE COURT:  What are they?

19          MR. HAZEL:  I apologize, Your Honor.  I was not

20  prepared for that question.  I know that he has a 2004

21  possession with intent to distribute CDS.

22          THE DEFENDANT:  That's incorrect.  I never been

23  convicted in 2004.  That's incorrect.  The case was stetted --

24  placed on the stet docket.

25          MR. PROCTOR:  I have the pre plea criminal history

1        here, Your Honor.

2                THE COURT:  Okay.  Can someone tell me what the

3        convictions that the Government would intend to impeach with.

4                THE DEFENDANT:  I got a January -- I got a January

5        '99 conviction.

6                THE COURT:  Hold on one second.  Mr. Braxton --

7                THE DEFENDANT:  -- a June '99 conviction, and a

8        November '99 conviction.

9                THE COURT:  Mr. Braxton?

10               THE DEFENDANT:  I don't have a conviction in --

11               THE COURT:  Hold on for a second.  They're supposed

12        to be doing the lifting on this part; not you.

13               THE DEFENDANT:  Because you people keep letting them

14        do stuff, and then --

15               THE COURT:  Hold on for a moment --

16               THE DEFENDANT:  I object.

17               THE COURT:  -- please, Mr. Braxton.

18        What convictions would the Government intend to

19        impeach him with should he testify?

20               MR. HAZEL:  Possession with intent to manufacture or

21        distribute --

22               THE COURT:  When is that?

23               MR. HAZEL:  From March 25th, 2000, or 1999.  I

24        apologize.

25               THE COURT:  March '99.  Okay.  Anything else?

1          **MR. HAZEL:**  Possession with intent -- unlawful

2     manufacture, possession with intent to distribute CDS

3     conviction on October 18th, 1999.

4          Possession with intent to distribute heroin

5     conviction on October 2nd, 2000, and that's it, Your Honor.

6          **THE COURT:**  Okay.  Please continue advising your

7     client.

8          **MR. PROCTOR:**  Have you reached a decision,

9     Mr. Braxton, as to whether you intend to testify or not?

10          **THE DEFENDANT:**  Yes.

11          **MR. PROCTOR:**  What is that decision?

12          **THE DEFENDANT:**  I do not wish to testify.

13          **THE REPORTER:**  I'm sorry, sir?

14          **THE DEFENDANT:**  I do not wish to testify.

15          **THE COURT:**  Okay.  Now, sir, you wish to make a

16     statement?

17          **THE DEFENDANT:**  Yes.

18          **THE COURT:**  Yes, sir?

19          **THE DEFENDANT:**  I just want to keep raising the fact

20     of gross ineffectiveness.  My counsel have been grossly

21     ineffective in defending this case, incompetence.  They're

22     incompetent.  They're not confrontational or nothing, nor is

23     they aggressively adversarial enough.  They ask elementary

24     questions.  Their defense is not well prepared.  Their defense

25     is incompetent, man, simple as that, and they letting them

1    object.  They let their -- they let that tape come in.  We

2    don't know the authentication of that tape.  Ain't no dates on

3    that tape.  Ain't no times on that tape.  The ATF officer

4    prepared the transcript for that tape.  The tape came

5    December 1st after 30-some months of this case, 20-some months

6    after this case been indicted federally, and he never even

7    objected to that.  That's gross ineffectiveness.  At best,

8    it's questionable --

9            **THE COURT:**  Very good.

10           **THE DEFENDANT:**  -- by coming in so late.

11           **THE COURT:**  Very good.

12           **THE DEFENDANT:**  Then, on top of that, I'm over here

13   to get the Indictment dismissed for the simple fact they ain't

14   taking this case on re-Indictment.  It never took place in

15   front of the Grand Jury for re-Indictment.  The Indictment got

16   dismissed September 17th and re-indicted September 17th.  I

17   got reason to believe this case was never taken -- placed in

18   front of the Grand Jury on re-Indictment.  That's

19   prosecutorial misconduct -- prosecutorial misconduct.  They

20   ain't take this case in front of the Grand Jury, Your Honor.

21           **THE COURT:**  Okay.  We will resume at 3:35.  You have

22   your objections --

23           **MR. PROCTOR:**  And, Judge.

24           **THE COURT:**  -- and they are overruled.  Yes?

25           **MR. PROCTOR:**  Judge, just so I'm clear, at 3:35, I

1    will rest on the record.

2              **THE COURT:**  Government will --

3              **MR. PROCTOR:**  Straight to closing?

4              **THE COURT:**  Does the Government have any rebuttal?

5              **MR. HAZEL:**  No, Your Honor.

6              **THE COURT:**  Straight to closings.

7              **MR. PROCTOR:**  And you instruct after closing?

8              **THE COURT:**  Yes.

9              **MR. PROCTOR:**  And, once the jury goes to deliberate,

10   at that point, Mr. CitaraManis would come in, and we would

11   litigate that motion?

12             **THE COURT:**  Yep.

13             **MR. PROCTOR:**  That's -- thank you.

14             **THE COURT:**  Sure.

15             **THE CLERK:**  Please rise.  This Honorable Court now

16   stands in recess.

17             (Recess taken, 3:20 p.m. - 3:36 p.m.)

18             **THE CLERK:**  Please rise.  This Honorable Court will

19   now resume in session.

20             **THE COURT:**  Counsel, for your planning purposes, I

21   will do the arguments today.  I will bring them in tomorrow

22   morning and instruct and begin the deliberations, and, after

23   your arguments, we will then proceed to the Mr. CitaraManis

24   matter.  It's kind of late in the day to begin the

25   deliberations, so we'll start deliberations tomorrow morning

1          with the instructions.

2                    Ready for the jury, folks?

3               **MR. HAZEL:**  Just one thing, Your Honor.  I wanted to

4          use the board briefly.  I didn't know where Your Honor would

5          like me to put it.

6               **THE COURT:**  Wherever you want to.

7               **MR. HAZEL:**  If I can just have a moment with

8          Mr. Wallner to figure out where to put it.

9                    Thank you, Your Honor.

10              **THE COURT:**  Thank you.  Ready?

11              **MR. HAZEL:**  Yes, Your Honor.

12              **THE COURT:**  Okay.  And, just for the record, when

13         they come back, you will rest.  You'll indicate no rebuttal,

14         and we'll begin.

15              **MR. PROCTOR:**  Oh!  You're right.  Judge, one second

16         before the jury comes in.  So that we don't have to approach,

17         in anticipation of me resting, to preserve it, I make a Motion

18         for Judgment of Acquittal.

19              **THE COURT:**  Okay.  Incorporating previous motions --

20              **MR. PROCTOR:**  Previous motions.

21              **THE COURT:**  -- previous arguments, and all prior

22         objections?

23              **MR. PROCTOR:**  And the witnesses called during the

24         Defense case specifically.

25              **THE COURT:**  Very good.  Motion is denied, or will

 1    be.

 2              (Jury enters.)

 3              THE COURT:  Please be seated.  Mr. Proctor?

 4              MR. PROCTOR:  At this time, the Defense would rest,

 5    Your Honor.

 6              THE COURT:  Renews --

 7              MR. PROCTOR:  Correct.

 8              THE COURT:  -- incorporating all previous grounds?

 9    Same result as previously.

10              Any rebuttal?

11              MR. HAZEL:  No rebuttal from the United States, Your

12    Honor.

13              THE COURT:  Thank you.

14              Members of the jury, we're now entering the next to

15    last phase of the trial.  This is when the attorneys will tell

16    you what they believe the evidence has proved.  Again,

17    remember that these are arguments.  This is not evidence.

18    Your decision is going to be based on the evidence, but the

19    attorneys, of course, have two views of the evidence which

20    they will present to you.

21              For your planning purposes, at the conclusion of the

22    arguments, you will be dismissed for the day.  Tomorrow

23    morning, I'll ask you again to be here at 9:30.  At 9:30, I

24    will instruct you on the law in the case.  Then the case will

25    be given to you for your deliberations.  So you should be

 1    getting the case sometime around 10:00, 10:15 tomorrow to

 2    begin your deliberations.

 3            Now, Mr. Hazel has told me he's not going to take

 4    more than a half an hour of your time, so I'm going to watch

 5    the clock for you.  Are you opening, Mr. Hazel?

 6            **MR. HAZEL:**  Yes, Your Honor, and I'm doing both,

 7    Your Honor.

 8            **THE COURT:**  Very good.  Okay.  Please give him your

 9    full time and attention.

10            (Whereupon, closing arguments were presented to the

11    jury.)

12            **THE COURT:**  Thank you, Mr. Hazel.

13            Members of the jury, we've reached the end of this

14    trial day.  Please remember, don't discuss the case among

15    yourselves or with anyone this evening, tomorrow morning; not

16    until you're back together as a jury and I tell you to

17    deliberate.  Good night, ladies and gentlemen.

18            Please be in place tomorrow morning at 9:25 so that

19    we can get started at 9:30.  At 9:30, I will instruct you on

20    the law.  After those instructions, the case will be given to

21    you for your decision.  Good night.

22            (Jury excused.)

23            **THE COURT:**  Mr. Proctor, Mr. CitaraManis is here.

24            **MR. PROCTOR:**  Okay.  I guess since he's here, let's

25    call him as a witness, Your Honor.

 1          THE COURT:  Let's do that.

 2          MR. PROCTOR:  At this time, the Defense would call

 3   Mr. CitaraManis.

 4          THE COURT:  Okay.

 5          MICHAEL CITARAMANIS, ESQUIRE

 6      WAS THEN DULY SWORN TO TELL THE TRUTH

 7          DIRECT EXAMINATION

 8   BY MR. PROCTOR:

 9   Q.   Good afternoon, sir.  We haven't met before, right?

10   A.   We have not met in person, but we spoke on the phone.

11   Q.   We have had the pleasure on the phone.  Who is this man

12   sitting next to me?

13   A.   That's Mr. David Braxton.

14   Q.   Did you previously represent him?

15   A.   Yes, I did.

16   Q.   Do you recall when it was you got appointed?

17   A.   Would have been sometime around October of 2007.

18   Q.   And I'm sorry.  Let's make the record clear.  Where do

19   you work?

20   A.   I work with the Federal Public Defender's Office.

21   Q.   And did there come a time when you were relieved of

22   representing Mr. Braxton?

23   A.   Yes.

24   Q.   And I was appointed in your stead?

25   A.   Yes.

1    Q.   Do you recall:  Was Mr. Hazel the original prosecutor in

2    this case?

3    A.   No.  Mr. Levin was.

4    Q.   Did there come a time when the Government made a plea

5    offer?

6    A.   There was at least two plea offers verbally extended to

7    myself and communicated to Mr. Braxton.

8    Q.   Do you recall when the first plea offer was made?

9    A.   Let me back up.  Originally, there had been some

10   discussion when Mr. Levin was prosecuting as to, if -- he had

11   basically said, if Mr. Braxton wanted to plead guilty, he

12   could.  There was some discussion about whether or not

13   Mr. Braxton was an armed career criminal, kind of general

14   discussions, and so, because of that, there was -- trial was

15   set in, and I think we were looking forward at some point to

16   his trial.  There then became -- kind of an issue arose, and

17   Mr. Levin then verbally offered a plea to Mr. Braxton to a

18   count of possession of a stolen firearm with a maximum term of

19   ten years.

20   Q.   So would that have been a (c) plea?

21   A.   No.  I don't believe -- well, it's a possibility that we

22   had discussion about it being a (c) plea, but I can't recall

23   100% whether that was the case.

24   Q.   As best you recall, there was a cap of ten years, and you

25   could ask for less?

1    A.    Perhaps.  Again, I can't recall specifically whether it

2    was a (c) plea to ten years or whether it was a plea to the

3    count and being able to argue within the context of the

4    guidelines.

5    Q.    And, as Mr. Braxton sits here today, what is he charged

6    with?

7    A.    He was charged with felon in possession of a firearm.

8    Q.    And, so the record is clear, possession of a stolen gun,

9    through your experience, is that an improvement on felon in

10    possession?

11    A.    Absolutely.

12    Q.    Why is that?

13    A.    Well, he would have made the mandatory minimum of 15

14    years and perhaps more than that on a conviction for felon in

15    possession, assuming the Court found him armed career

16    criminal, which we had that grave concern that he was, and, on

17    the possession charge of a stolen gun would be just the

18    maximum ten years and no mandatory minimum.

19    Q.    Did you convey this first plea offer to Mr. Braxton?

20    A.    Yes.

21    Q.    And what was Mr. Braxton's response?

22    A.    He turned it down.

23    Q.    Do you recall why he turned it down?  Well, I'm sorry.

24    Let me back up.  Are you familiar with the term CAD?

25    A.    Yes.

1    Q.   What is the CAD, and what is a CAD?

2    A.   A CAD is a record that the Baltimore City Police

3    Department keeps concerning communications between dispatcher

4    and police officers in the field.

5    Q.   And did you review the CAD in this case?

6    A.   Yes.

7    Q.   And did you compare it with the police reports in this

8    case?

9    A.   Yes.  We had discovery which included police reports,

10   yes.

11   Q.   And how did the CAD stack up with the police reports?

12   A.   Well, the CADs -- I mean, there was some issues with

13   respect to what the CAD sheet reflected that may have

14   contradicted where we thought the police officers would be

15   going in terms of their testimony.

16   Q.   Marked contradictions, correct?

17   A.   Yes.

18   Q.   And you shared those with Mr. Braxton?

19   A.   Yes.

20   Q.   And discussed the weakness in the Government's case with

21   Mr. Braxton?

22   A.   Discussed the issue.  I wouldn't necessarily characterize

23   it as a weakness.  I mean, we thought that there were some

24   areas that we could potentially take advantage of.

25   Q.   One of which was the CAD sheet?

1    A.    Yes.

2    Q.    So, when you said Mr. Braxton turned down the first plea

3    offer, did the CAD inconsistently factor into his thinking of

4    why he turned the plea down?

5              MR. HAZEL:  Objection.  Speculation.

6              THE COURT:  If he knows.  Overruled.

7              THE WITNESS:  Well, we had discussion about the CAD

8    sheet, and we had discussion about the merits of the Motion to

9    Suppress, and that certainly was part of our discussion in the

10   context of whether or not he should take the plea offer.

11   **BY MR. PROCTOR:**

12   Q.    You mentioned a second plea offer.

13   A.    Yes.  Subsequently -- and this arose in the context of

14   the Government having one of their witnesses -- a police

15   officer had been stationed in Iraq, and, as a consequence, was

16   unavailable, and, because of the circumstances, the Government

17   made a further -- this was through Mr. Hazel -- plea offer to

18   Mr. Braxton that, if he agreed to kick the case -- agreed to

19   plead guilty in State Court, the Government would refer the

20   matter back to the State Court and -- if he would take a

21   five-year sentence in State Court.

22   Q.    Okay.  Did you convey that offer to Mr. Braxton?

23   A.    Absolutely.

24   Q.    And what was Mr. Braxton's decision?

25   A.    At that time, Mr. Braxton's decision was to turn that

1    offer down.

2    Q.   And, again, did the CAD sheet factor into his thinking as

3    to why it was not an acceptable offer?

4             MR. HAZEL:   Same objection as before.

5             THE COURT:   Overruled.

6             THE WITNESS:   That particular conversation, a little

7    harder to say, because on that particular occasion, I

8    initially discussed it with Mr. Braxton over the telephone.

9    His position was at that time he wasn't going to take it, that

10   he was innocent, he wasn't going to -- basically didn't feel

11   it was fair that he would have to do any more time, and he

12   basically turned down the offer at that time.

13   **BY MR. PROCTOR:**

14   Q.   Now, did there come a time when the radio transcript

15   became available, sir?

16   A.   Yes.

17            THE WITNESS:   And if the Court would want me to

18   explain as to --

19            THE COURT:   Please do.

20            THE WITNESS:   -- the chronology?

21            THE COURT:   Yes.

22            THE WITNESS:   Initially, after I was assigned the

23   case -- and I can't recall how soon this happened, but I --

24   oh!  I do know in October I requested an investigator in our

25   office, and one of the things that I had requested that the

1    investigator do is to obtain the communications tape in

2    connection with the case.  We have a -- kind of a junior

3    investigator in the case who -- in the office who will many

4    times -- who will basically get a lot of our records from

5    Baltimore City Circuit, District Courts.  She will also get

6    things such as the CAD sheets and communications tape, so my

7    communications were directly with the investigator assigned

8    the case, but what he had been informed by the other

9    investigator was that the communications tape was unavailable,

10   no longer existed, and -- but she did then send me the CAD

11   sheet.

12   **BY MR. PROCTOR:**

13   Q.   Did you subpoena the tape -- KGA tape?

14   A.   At that time, I did not, no.

15   Q.   Did you send a written request to the Baltimore City

16   Police Department?

17   A.   I personally did not.  I do not recall whether or not the

18   investigator sent a written request or if it was a oral or

19   verbal request.

20   Q.   After I was appointed, isn't it true that, with very few

21   exceptions, you sent me your entire file?

22   A.   Yes.

23   Q.   And I recall the thing you didn't send me was the

24   Maryland case search printouts for Mr. Braxton; is that

25   correct?

1    A.    Maryland case --

2    Q.    Search printouts for Mr. Braxton's State cases?

3    A.    Okay.

4    Q.    So, if there is nothing in my file to reflect a request

5    for a KGA tape, is it fair to assume that it didn't happen?

6    A.    If there was no written request, I would say, more than

7    likely, you're correct.  Again, I did not make the written

8    request or did not make the request.  It would have been my

9    investigator, but I think, in the normal course of things, if

10   they had made a written request, it probably would have found

11   its way into the file.

12   Q.    And I don't mean to be rude to you, sir, but the buck

13   stops with you, right?

14   A.    Absolutely.

15   Q.    Your investigator is answerable to you?

16   A.    Absolutely.

17   Q.    This case, do you remember the date of the crime?

18   A.    (No response.)

19   Q.    If I say May 2006, does that sound about right?

20   A.    Okay.  Sure.

21   Q.    And you picked it up, I believe you said, October of

22   2007?

23   A.    Sometime in -- around that time frame in 2007.

24   Q.    So, ballpark, 16 months, it had been around before it

25   came into the Federal courthouse?

1    A.   Yes.

2    Q.   Are you aware that there was a State case that had been

3    pending until such time as it was indicted federally?

4    A.   Absolutely, yes.

5    Q.   Did you make any effort to get Mr. Braxton's file from

6    previous State counsel?

7    A.   I believe I did.  There -- at the time that I had the

8    case, Mr. Braxton actually had three State cases pending.  He

9    had a -- I believe one or two violations of probation.  He

10   also had a pending kidnapping and robbery case, which was set

11   for trial, and our original decision -- Mr. Braxton's decision

12   was kind of have our case trail that case to see what was

13   going to happen, and then there was the -- there had been the

14   gun case, too, that previously had originated in State Court.

15   I can't recall when that case had been disposed of, though --

16   the gun case itself.

17   Q.   Would you agree with me that nowhere in your file is the

18   discovery or any memos from the State Public Defender's

19   Office?

20   A.   I did request discovery from the Public Defender on

21   Mr. Braxton's kidnapping, robbery case, which I believe --

22   which did result in acquittal on all counts on Mr. Braxton in

23   the beginning of 2008, and there should be, in the file, a

24   folder with that discovery, and I remember specifically having

25   a couple of discussions with that attorney.  It is my

1    recollection that I also contacted his public defender on the

2    gun case.

3            I can't recall whether I had tried to make contact

4    with the public defender on the violation of probation matter,

5    but it would have been my normal course to try to make contact

6    with all the attorneys in either the gun case or the pending

7    cases.  It is my best recollection -- and, again, I am not

8    100% certain on this -- that I did have discussion or did

9    touch bases with the attorney in the State Public or in the

10   local Public Defender's Office in connection with the gun

11   case.  It would have been my normal practice, if I had talked

12   to the attorney, to have requested discovery.

13           Now, sometimes we will get different responses.

14   Sometimes we'll get told, "There isn't much.  There really is

15   very little there," or we, in fact, may get it, and I -- you

16   know, I've been trying to think about this as to whether or

17   not I had specifically spoken to the attorney.  I seem to have

18   recollection of speaking to a female attorney in the Baltimore

19   City Public Defender's Office, because I know the other

20   attorney that represented him in the pending kidnapping,

21   robbery case was a male attorney, and not -- but whether or

22   not there is discovery in the file, you know, bottom line is I

23   know I would have asked her for discovery, although, at that

24   early stage in the case, I probably would have just made a

25   general request, "Just, you know, fax me or send me what you

1   have," and I'm probably pretty certain I didn't ask her

2   specifically for a -- any copy of the communications tape at

3   that time.

4   Q.   Would you agree with me that there is no reason not to

5   get the State discovery?

6   A.   Right.  I mean, if we can, we will, and the bottom line

7   is --

8   Q.   Right.

9   A.   -- on occasion, they don't have much or, on occasion, you

10   know, sometimes we have trouble maybe reaching them, but --

11   Q.   But, on the occasions when they typically do have things

12   are cases that have languished in the State system for 14

13   months; is that right?

14   A.   Absolutely.

15   Q.   And you agree with me that, when you get them, sometimes

16   there are witness statements and the discovery in the State

17   side is a lot better than in the Federal side?  Sometimes it

18   helps?

19   A.   Sometimes it helps, sure.

20   Q.   And always no reason not to get it?

21   A.   Right.  At least try to get it, yes.

22        **MR. PROCTOR:**  Judge, I need to mark an exhibit for

23   the purposes of this hearing.

24        **THE COURT:**  Yes.

25        **MR. PROCTOR:**  Do you need a copy?

1          **MR. WALLNER:**  Identify it.  Is that ours?

2          **MR. PROCTOR:**  Madam Clerk, for the motions

3    hearing --

4          **THE CLERK:**  This is separate motions hearing?

5          **MR. PROCTOR:**  Yes.  Number 1 for the purposes of

6    this motions hearing.

7          **THE COURT:**  Might as well, then.

8          **MR. PROCTOR:**  And I apologize, Judge.  I don't have

9    a copy because I gave the Government both of mine.  Actually,

10   if Mr. Hazel will come and look over my shoulder, I'll pass

11   this one up.  That might be the easiest way to do it.

12   Mr. Wallner, can you come look over my shoulder so I can hand

13   this up.

14         **MR. WALLNER:**  I'm giving you this now.

15   **BY MR. PROCTOR:**

16   Q.   I'm showing you what's proffered as an identical copy of

17   Defendant's Exhibit 1.  What is this case captioned?

18   A.   Circuit Court for Baltimore City.

19   Q.   And the caption is the State of Maryland against David

20   Braxton?

21   A.   Yes.

22   Q.   And it is a document of --

23         **MR. PROCTOR:**  Your Honor had a copy?

24         **THE COURT:**  Yes.

25         **MR. PROCTOR:**  I'm going to turn to the page

1    entitled -- it's about halfway through, Judge -- District

2    Court of Maryland, Statement of Probable Cause.

3    **BY MR. PROCTOR:**

4    Q.  And I'm asking if you could just read that to yourself

5    and ask you if it rings any bells?

6    A.  Would you like me to read the whole statement?

7    Q.  No.  I guess my question boils down to:  Does this appear

8    to be the same Statement of Charges that Mr. Braxton later

9    became indicted in Federal Court?

10   A.  Yes.

11            **MR. PROCTOR:**  And, if I could, I'm going to point

12   your attention to the fourth page, Judge.

13   **BY MR. PROCTOR:**

14   Q.  And if you could just read into the record

15   Subparagraph C.

16   A.  It says, "The State of Maryland, pursuant to Maryland

17   Rules of Evidence 5-902(a)(11), hereby gives notice of intent

18   to rely on certified records of regularly-conducted business

19   activity without testimony of the custodian of records.  In

20   accordance with Maryland Rules of Evidence 5-902(a)(11), a

21   copy of --" there are spaces for 911 tape, telephone records,

22   other, and checked is "911 tape."  They say that is -- will be

23   available for inspection with advance notice appointment in

24   the office of the State's Attorney based in the Courthouse

25   East.

1    Q.   Thank you.  There was no 911 call in this case, correct?

2    A.   Correct.

3    Q.   And are you aware that frequently State's attorneys use

4    the term "911" and "KGA" interchangeably?

5    A.   I haven't practiced in State Court, so I don't know.

6    Q.   Okay.  Would you agree with me that, had --

7         MR. PROCTOR:  And I'll proffer to the Court, and

8    I've already discussed this with Mr. Hazel, that this is the

9    State's file from Mr. Braxton's charge in State Court on this.

10   Mr. Hazel agreed I could recover from the Public Defender's

11   Office, and he wouldn't dispute chain of custody, so this is

12   the file I recovered from the State Public Defender's Office.

13        THE COURT:  Defense 1.

14        MR. PROCTOR:  Defense 1.

15   **BY MR. PROCTOR:**

16   Q.   Would you agree with me that, had you called to get the

17   State Public Defender's Office discovery, you would have read

18   it?

19   A.   Yes.

20   Q.   And would you agree with me that, had you read it -- in

21   particular, Paragraph (c) -- alarm bells would have went off?

22   A.   If you're asking me if I had seen that and considered

23   whether or not there was a -- it was -- it would be possible

24   to obtain the tape from the Public Defender's Office, or the

25   State's Attorney's Office, actually, that, at that point, I --

1    you know, I would agree with you.

2    Q.   And you would agree with me there would be no tactical

3    reason not to go pursue it, right?

4    A.   Correct.

5    Q.   Lastly, what I want to touch on is you mentioned the

6    question of whether or not Mr. Braxton might be ACCA?

7    A.   Uh-huh.  Yes.

8    Q.   Which is armed career criminal?

9    A.   Yes.

10   Q.   Which everyone in this room, I believe, knows subjects

11   you to much higher penalties.

12   A.   Correct.

13   Q.   Are you familiar with the practice in this district of

14   ordering a pre-plea criminal history?

15   A.   I am aware of that practice.  I've done it myself.

16   Q.   Is there any tactical reason not to get a pre-plea

17   criminal history for Mr. Braxton?

18   A.   There was in this case, as in some cases, a judgment made

19   on my part not to do so.

20   Q.   Well, surely it would help, before Mr. Braxton could

21   accept or reject the plea, to know what he's facing after a

22   trial?

23   A.   True, but there are some cases where, once we get the

24   records in the case ourselves, which I did in this case -- we

25   got hard copies of his prior convictions.  We obtained

1   transcripts of his prior convictions.  Sometimes we don't need

2   to get a pre-plea report.  We can tell pretty certain or very

3   certain whether or not a person is ACC or not, and there are

4   some times when it might be, for instance -- different

5   circumstances, but a prosecutor who maybe doesn't recognize a

6   person's ACC or there is some possibility that they may not be

7   totally attuned to certain issues that we don't want to

8   telegraph to them that the person might be ACC, and, even

9   though we might be pretty certain ourselves in our own mind,

10  we might not want to, again, telegraph that to the Government

11  and have a determination made beforehand by Probation that the

12  person is, in which instance sometimes it's possible, you

13  know, to work out a plea to something, even to a felon in

14  possession charge, without anybody recognizing the person is

15  ACC.

16  Q.   Maybe I misunderstood you, but I thought I heard you to

17  say that whether Mr. Braxton was ACC was debatable?

18  A.   Well, it was one of the -- no.  We had discussed it, and

19  I had discussed it with -- at one early stage with Mr. Levin,

20  and Mr. Levin -- I'm not sure if he had expressed it in very

21  certain terms or not, but was aware of the possibility

22  certainly.  I was certain in my mind that he was based on the

23  review of the records and the transcript.

24  Q.   Last couple of questions, if I may, sir.  You've heard

25  the tape, right?

1    A.    Yes, I have.

2    Q.    Would you agree that Mr. Braxton's case got markedly

3    worse following the discovery of that tape?

4    A.    Absolutely.

5    Q.    Would you agree that, had you had it in an earlier

6    juncture, the plea discussion would have been much different?

7    A.    That would have been something that would have entered

8    into our discussion, absolutely.

9    Q.    Certainly the picture you painted would have been a lot

10   less rosy after the discovery of the tape?

11   A.    It would have certainly solidified in my mind what

12   Mr. Braxton's choice or decision should have been.

13   Q.    And it would have solidified it in his, too?

14           **MR. HAZEL:**  Objection.  Speculation.

15           **THE COURT:**  Sustained.

16           **MR. PROCTOR:**  That's all I have, Judge.

17           **THE COURT:**  Cross?

18           **MR. HAZEL:**  Very briefly.

19                    **CROSS-EXAMINATION**

20   **BY MR. HAZEL:**

21   Q.    Good afternoon, Mr. CitaraManis.

22   A.    Mr. Hazel.

23   Q.    You were counsel for Mr. Braxton throughout his first

24   three trial dates in this case, correct?

25   A.    Correct.

1    Q.   And so, in effect, you would have had to prepare for

2    trial in this case three separate times, correct?

3    A.   Yeah.  It -- it's -- somewhat.  Yeah.  Some level of

4    preparation.

5    Q.   Perhaps the second and third, a lot of the State work is

6    already done, but still getting ready for trial?

7    A.   Yes.

8    Q.   During that process of getting ready for trial, did you

9    investigate this case?

10   A.   I had an investigator who did do various tasks in the

11   case, yes.

12   Q.   To the extent you could recall, could you share with the

13   Court some of the investigative steps that you or your

14   investigator took in this case?

15   A.   Well, I had, one, of course, requested records, which we

16   did get, ordered transcripts.  I had asked him to find and

17   interview the three other or the driver and the two other

18   passengers in the vehicle, and I know he made repeated trips

19   to the residence of one passenger, probably about seven or

20   eight times, left messages trying to find that person.

21          We ultimately determined that, at some later point

22   in time closer to trial, the person was in custody.  He did, I

23   think, make an attempt to interview the person.  There was

24   another person who we could not find because basically the

25   name or could not initially find because the name he had given

1    was an alias.  We ultimately did track him down.  Again, he

2    was incarcerated at a later time closer to the ultimate trial

3    date in this case.  He was interviewed, refused to talk to the

4    investigator, and then he -- my investigator did interview the

5    driver of the vehicle in terms of, you know, his knowledge of

6    the events.

7    Q.   And -- I'm sorry.  I didn't mean to interrupt you.

8    A.   There was also other efforts which we typically make to

9    investigate the police officers in the case in terms of

10   their -- any record that they might have for criminal

11   prosecutions, traffic offenses, civil matters, if they've ever

12   been sued in connection with their, you know, police duties.

13   Q.   And, in fact, you sent me a letter asking for such

14   records?

15   A.   Right.  And I had requested any Internal Affairs records

16   from you.

17   Q.   Now, as you investigate a case for trial, you're also

18   doing it for plea discussion purposes --

19   A.   Correct.

20   Q.   -- is that correct?

21        You need to learn more about the case in order to

22   advise your client?

23   A.   Correct.

24   Q.   So, to the extent that you took all those steps, it

25   wasn't just to prepare for trial, but also to be in a position

1    to provide your client with advice or whether he should plead

2    guilty or not?

3    A.   Right.  To overall assess the case.

4    Q.   Yes, sir.  In the preparation for the first trial date,

5    which I guess was back in July of last year, somewhere in that

6    neighborhood, how many times did you see Mr. Braxton to

7    prepare for that trial -- you, or someone at your direction?

8    A.   It's hard to -- I mean, in terms of the actual

9    preparation for trial versus over the course of time from the

10   beginning to up to that point, I would have to say -- all I

11   could say is it was a handful.  I do know that my

12   investigator, Mr. McAllister, did meet with Mr. Braxton on two

13   or three occasions separate from myself.

14   Q.   And you said, for yourself, it was a handful; is that --

15   A.   Yes.

16   Q.   Now, I'd like to talk about the first plea offer that was

17   conveyed to you by Mr. Levin, the one that related to the

18   possession of stolen firearm.  Did Mr. Levin convey to you the

19   reason why he was extending that offer?

20   A.   I can't say for certain, or can't recall for certain.

21   Q.   Well, did you know at that time that there was an issue

22   with one of our officers being in Iraq?

23   A.   Right.  I'm trying to remember whether it was right

24   around that same time, or whether it concerned the issue of

25   the officer in Iraq or not.  Yes.  It -- my best recollection

1    would be I believe it was in connection with that issue.

2    Q.   And did you discuss that issue with your client in

3    discussing the plea offer?

4    A.   Yes.

5    Q.   How many discussions did you have with your client, to

6    the extent you recall, specifically about that first plea

7    offer?

8    A.   I'd say maybe two.

9    Q.   And I have to say, having never been a defense lawyer, I

10   honestly don't know how this works, and did you provide -- but

11   I am curious in the sense of this hearing.  Did you provide

12   Mr. Braxton with any advice one way or the other?

13   A.   I advised he take the offer.

14   Q.   And that was the first offer to the possession of the

15   stolen firearm?

16   A.   Yes.  Yes.

17   Q.   And what was his response?

18   A.   No.  He didn't want to take it.

19   Q.   And did he state a reason?

20   A.   My best recollection is he thought that it would be too

21   much time.

22            **THE DEFENDANT:**  Tell him what I told you to go up

23   there and get -- five years.  I told you to ask the prosecutor

24   to get me five years.

25   **BY MR. HAZEL:**

1    Q.   So, just to be clear, the reason he turned that down, as

2    far as you understood, was that he felt like eight years was

3    just too much time?

4    A.   Yes.

5    Q.   Now, moving to the second plea offer, the one that was

6    five years back in State Court --

7    A.   Right.

8    Q.   -- how many times did you meet with your client to

9    discuss that plea offer?

10   A.   We discussed it on the phone initially --

11            **THE DEFENDANT:**  For two minutes.

12            **THE WITNESS:**  -- and Mr. Braxton was very adamant at

13   that point that he would not accept it.

14   **BY MR. HAZEL:**

15   Q.   And that was the five-year deal?

16   A.   That was the five-year deal.

17   Q.   And, in that discussion, did the CAD report come up?

18   A.   In that -- I really can't recall whether it came up in

19   that discussion.

20   Q.   Was it the focus of that conversation?

21   A.   Well, the focus of the conversation was the plea offer.

22   I mean, that was as far as I was concerned.  And, again, it

23   was a relatively short conversation, because we were on the

24   phone, but he turned it down at that time.  I believe I had a

25   subsequent visit with Mr. Braxton where we discussed it, and I

1    believe I had at that point proposed, you know, of course

2    revisiting the issue of going back to you to discuss that

3    offer again, but I can't recall whether or not -- whether I

4    had actually -- I think Mr. Braxton's decision was he just --

5    he wasn't going to accept it.

6            **THE DEFENDANT:**  You ain't never talk to any of that

7    with me.

8            **THE COURT:**  Mr. Braxton --

9            **THE DEFENDANT:**  I ain't --

10           **THE COURT:**  Quiet, please.  You'll get a chance

11   to --

12           **THE DEFENDANT:**  Judge, I --

13           **THE COURT:**  You will get a chance to testify.  What

14   you won't get a chance to do is disrupt the proceeding.  Sit

15   there, and your lawyer and you can discuss, after he's

16   testified, whether you want to take the stand and, under oath,

17   testify yourself.  You'll get a chance to be heard.  You just

18   have to be heard at the right time.

19           Next question.

20   **BY MR. HAZEL:**

21   Q.   During discussions relating to the second plea offer, do

22   you recall if the issue of Officer Allen being in Iraq came up

23   in those conversations?

24   A.   I believe, yes, it did come up with him being in Iraq,

25   yes.

1    Q.   And what was the context of that coming up?

2    A.   I think Mr. Braxton questioned whether or not the officer

3    would be coming back, and I informed him that you've got to

4    assume that he's going to be coming back.

5    Q.   But it was Mr. Braxton's belief, or I should say:  Was it

6    Mr. Braxton's belief that the Government might not be able to

7    get this officer back and the case would therefore just go

8    away on its own if he didn't take the plea?

9    A.   That came up.  You know, whether or not that was kind of

10   the reason or focal point of his decision, I -- I really can't

11   say that.

12   Q.   If you can say it -- you might not be able to, but was

13   the issue involving the officer in Iraq more of a focal point

14   of that conversation than the CAD report was?

15   A.   Again, with that particular conversation, in terms of

16   discussion about the five-year offer in State Court, I truly

17   cannot honestly say I recall discussing the issue of the CAD

18   sheet in communications with Mr. Braxton in the context of

19   that discussion, that particular offer.

20   Q.   Now, you may have answered this question before, but I

21   wasn't sure I understood you.  As to the second plea offer,

22   the five-year plea offer --

23   A.   Right.

24   Q.   -- did you ultimately provide your advice as to whether

25   or not the Defendant should take the plea?

1    A.   Yes.

2    Q.   And what was your advice?

3    A.   I advised him to take it.

4    Q.   Just a couple of questions on your efforts in regards to

5    this KGA tape.  I believe you said that you first got the case

6    in -- was it October 2007?

7    A.   I believe around that time, yes.

8    Q.   And, as Mr. Proctor I think correctly proffered, the

9    event took place in May 2006?

10   A.   Yes.

11   Q.   Let me ask you:  How long have you been at Federal Public

12   Defender in Maryland?

13   A.   Since October -- end of October 1988.  I'm sorry.  '87.

14   '87.

15   Q.   And, in that time, have there been other occasions that

16   you've been told that, because a request hadn't been made for

17   some period of time, a KGA tape no longer existed?

18   A.   Right.  There is -- after a certain passage of time, the

19   KGA recordings are destroyed.  At least that's what we've been

20   led to believe.

21   Q.   And so it would be correct, would it not, that, if your

22   investigator would have come back to you and said, "I

23   requested the tape.  It's been over a year.  They've told me

24   the tape no longer exists," that's not something that would

25   have surprised you?

1    A.   No.

2         THE WITNESS:  Your Honor, might I add one other

3    thing?

4         MR. HAZEL:  I have no objection if he wants to

5    answer.

6         THE WITNESS:  Okay.  I had discussion with

7    Mr. Hazel, too, and specifically asked him if he had a copy of

8    the tape and could acquire it, too.

9    BY MR. HAZEL:

10   Q.   And do you recall what my response was?

11   A.   Your response was that you were told that the tape didn't

12   exist.

13   Q.   Now, one last point.  I believe this is my final point.

14   You had referred to tactical reasons for not getting the

15   pre-plea done, and you said sometimes you were able to get

16   hard copies of transcripts.  One thing I want to be clear of.

17   Were you speaking generally, or did you do those things in

18   this case?

19   A.   Oh!  I did that in this case.  I got hard copies of his

20   records of his prior convictions, and transcripts of the

21   guilty pleas.

22   Q.   So you made a strategic decision as a defense lawyer not

23   to order the pre-plea investigation?

24   A.   Yes.

25         MR. HAZEL:  Nothing further.

1          **THE COURT:**  Mr. CitaraManis, just for my background,

2    was Mr. Braxton detained on the kidnapping, robbery case?

3          **THE WITNESS:**  He remained in custody.  Whether or

4    not there was a high bond he couldn't make or whether he was

5    actually detained, but he was in custody, I believe, on that

6    matter.

7          **THE COURT:**  And when was he acquitted on that

8    charge?

9          **THE WITNESS:**  If I'm correct, around -- beginning

10   maybe February, March of 2008.

11         **THE COURT:**  Okay.  Thank you.  Counsel?

12         **MR. PROCTOR:**  Briefly.

13                   <u>**REDIRECT EXAMINATION**</u>

14   <u>BY MR. PROCTOR:</u>

15   Q.   Mr. CitaraManis, you mentioned that the KGA tapes are

16   destroyed over a certain period of time, right?

17   A.   Yes.

18   Q.   I think we're all hazy on the number, but it's like 60 or

19   90 days, or something like that.  Does that sound about right?

20   A.   Yes.

21   Q.   But it's also true, if someone requests it within that

22   60- or 90-day period, it's kept forever, right?

23   A.   My understanding -- again, I don't quite understand it --

24   is that obviously if someone requests it and receives it,

25   whether it be a State's Attorney or Public Defender, it may be

1    in their file or should be in their file, but that, once it's

2    requested, there is a master tape that is set aside.  It may

3    not be kept in the same place as the regular tapes, but that

4    there is a master tape that is kept.

5    Q.   Right.  And, were I to request the KGA on this case

6    today, it would still be sitting on a master tape somewhere?

7    A.    Right.  And I will say I only learned of kind of this

8    master tape being kept as a result of this case, in our

9    experience, and how that tape was produced was just right

10   before the trial date in December.

11         **THE COURT:**  Just so that we're clear, how did the

12   KGA tape --

13         **MR. HAZEL:**  I was going to ask that.

14         **THE COURT:**  -- get produced in December?

15         **THE WITNESS:**  Well, Your Honor, what happened was --

16   and I don't know what -- I -- we had issued -- gotten a

17   subpoena for the CAD sheet in the case, and a person to bring

18   the CAD sheet, because I wanted a live witness to testify

19   about the -- the dispatcher, basically, and then, at the same

20   time, we had subpoenaed the communications tape with the

21   expectation at that point that I needed someone in there to

22   testify about the absence of the tape and why it no longer

23   existed.  At the same time -- and my investigator I guess

24   ultimately found out shortly before trial that the tape

25   existed, and, at the same time, Mr. -- I'm sorry.

1          **MR. HAZEL:**   Hazel.

2          **THE WITNESS:**   Mr. Hazel had informed me that an

3     officer had come to court with the tape.  So it was kind of

4     like it seems like we were both being told the same thing at

5     that point for the first time that there was the tape.

6          **THE COURT:**   Thank you.

7     **BY MR. PROCTOR:**

8     Q.   So we're clear, the first time you ever saw a tape was

9     December 1st, 2008?

10    A.   That day, yes.

11    Q.   And you may have learned about it the night before, but

12    not earlier than that?

13    A.   I think it was that day.  I think it was that morning.

14    Q.   So November 30th, 2008, you're thinking there is a CAD

15    sheet, but nothing else?

16    A.   Right.

17    Q.   The pleas you mentioned, the first plea and the second

18    plea, were they ever written down?

19    A.   No.  Those were verbal offers.

20    Q.   I mean, in your professional life, you know both

21    Mr. Levin and Mr. Hazel?

22    A.   Yes.

23    Q.   And you have no doubt in your mind that, had Mr. Braxton

24    said, "I do," they would have completed the --

25    A.   They would have reduced it to writing and would have sent

1  that to me, sure.

2  Q.   Okay.

3          **MR. PROCTOR:**  That's all I have, Judge.

4          **THE COURT:**  Recross?

5          **MR. HAZEL:**  None, Your Honor.

6          **THE COURT:**  Thank you.  You may step down.

7          (Witness excused.)

8          **MR. PROCTOR:**  Judge, at this time, we would call

9  David Braxton.

10         **THE COURT:**  Okay.  Mr. Braxton, take the stand.

11                  **DAVID BRAXTON**

12    **WAS THEN DULY SWORN TO TELL THE TRUTH**

13                **DIRECT EXAMINATION**

14  **BY MR. PROCTOR:**

15  Q.   Good afternoon, Mr. Braxton.

16  A.   Good afternoon.

17  Q.   I guess, so the record is clear, you were in the

18  courtroom throughout Mr. CitaraManis' testimony, right?

19  A.   Yes.

20  Q.   You heard his testimony about the first plea offer?

21  A.   Yes.

22  Q.   Did you learn of the existence of the CAD sheet before

23  the plea offer was made?

24  A.   I learned of the CAD sheet on July 17th, 2008, my court

25  date.

1    Q.    Your court date in State Court, or in Federal Court?

2    A.    Federal Court, the same day I learned of the CAD sheet.

3    Q.    And was that the first time you met Mr. CitaraManis?

4    A.    No.

5    Q.    When was the first time it was brought to your attention

6    that the CAD sheet was inconsistent with the police report?

7    A.    On that -- on that day, after he notified me that --

8    after the -- about the plea.

9    Q.    Let's talk about who "he" is.

10   A.    Mr. CitaraManis.

11   Q.    So the first discussion you had with him was both about

12   the CAD sheet and about the plea?

13   A.    Yes.

14   Q.    When did you first learn that a necessary witness was in

15   Iraq?

16   A.    After I learned about the CAD sheet.

17   Q.    Same day?

18   A.    Yes.

19   Q.    Is Mr. CitaraManis correct that you declined the plea

20   offer?

21   A.    Yes.  Under the understanding that --

22   Q.    Well, let's talk about that.

23   A.    Yes.

24   Q.    The first plea offer, is Mr. CitaraManis also correct

25   that it was plea to possession of a stolen gun?

1    A.    Yes.  70 to 84 months, yes.

2    Q.    70 do 84 months, that was your understanding of what the

3    offer was?

4    A.    Yes.

5    Q.    What went into your thinking to say "no" to that plea

6    offer?

7    A.    Well -- oh!  And, actually, every time I meet with

8    Mr. CitaraManis, I take the ear.  I take the listening

9    approach.  Actually, I learned that from just previous

10   meetings with him, so he -- I learned everything

11   simultaneously.

12   Q.    Why did you say "no" to 70 to 84 months?

13   A.    Oh!  Because -- well, my answer wasn't, "No."  Excuse me.

14   Let me back up.  My answer wasn't, "No."  My answer originally

15   was, "No, but go up there and see if you can get it down to

16   five years, because I've got a feeling I'm going to get the

17   top end.  If I get the top --" I conveyed to him that, if I

18   get the top end, that would be, I think, seven years and two

19   months.  I just had a child that I never touched.  I was

20   calculating the time, but, if I get it down to five years, I

21   can possibly be home and spend some time.

22   Q.    So there came a time when there was another plea offer;

23   is that correct?

24   A.    Yes.

25   Q.    And that was five years in State Court?

1    A.    Yes.

2    Q.    And I think I just heard your testimony to be that

3    originally the plea offer you wanted was five years?

4    A.    Yes.

5    Q.    So, when the five-year offer came along, why did you say

6    "no"?

7    A.    At that time -- at that time, from talking to

8    Mr. CitaraManis on July 17th in court, this is the first time

9    I ever seen this man like pumped up, ecstatic about

10   confronting this case.  I mean, he had gained so much

11   confidence from that CAD sheet.

12           I learned -- I don't know what a CAD sheet is.  I

13   mean, I've -- I asked him specifically, as you -- as

14   Mr. Proctor, you probably know every time I'm confronted with

15   something, I ask you to tell me what does that mean?  How far

16   can we get with that?  I've got to -- I got in the habit of

17   asking people like that about everything.  So I asked him like

18   exactly what that mean?  How far can we get with it?  He was

19   ecstatic.  He said that his -- his specific words was, I'm

20   glad -- I'm kind of glad you ain't taking the time.  To my

21   understanding, the Government is on the run right now.  With

22   this CAD sheet, it was constitutional violations, and he

23   pointed out to me on the CAD sheet where it say tag, gun in

24   car, then the tag information given back.  He explained to me

25   that they made the stop -- they made the stop, retrieved the

1     gun, and before they even had the information about whether

2     the tags was proper or improper.

3     Q.   So, in your mind, because of that CAD sheet, you were

4     going home?

5     A.   In my mind, I was confident that, at that point,

6     Mr. CitaraManis was willing -- he put in my mind that, yes.

7     Q.   Yeah.  You're going to beat the charge, right?

8     A.   It was constitutional -- it was hands-down constitutional

9     violations, and there was no way the Government could get

10    around that.  That was my understanding.

11    Q.   Now, you've seen the transcript of the KGA, right?

12    A.   Yes.

13    Q.   Do you agree with me and everyone else in the room

14    that --

15    A.   Devastating.

16    Q.   -- your case became a lot worse?

17    A.   Devastating.

18    Q.   Devastating?

19    A.   Yes.

20    Q.   When was the first time you saw that transcript?

21    A.   Transcript?  The actual tape?

22    Q.   Yeah.  It was yesterday, right?

23    A.   Yeah.  The actual transcript, yesterday.

24    Q.   But certainly Mr. CitaraManis, on December 1st, told you

25    what it said?

1    A.   Yes.  Verbally, yes.

2    Q.   Had you talked to Mr. CitaraManis before that date about

3    getting a copy of the actual radio?

4    A.   No.

5    Q.   Why not?

6    A.   It didn't exist.

7    Q.   Who told you it didn't exist?

8    A.   He did.  I asked -- I asked him about this on State side.

9    I been asking about the KGA tape, and I had previous knowledge

10   with another -- with a person that somebody that I know -- a

11   guy named Jerome, who in the State Court, just had -- was

12   found not guilty due -- depending on the KGA tape.  It was

13   constitutional violations, but they found out it was

14   constitutional violations because of the KGA tape, and he got

15   found --

16   Q.   Mr. CitaraManis told you it didn't exist?

17   A.   Yes.

18   Q.   More than one occasion?

19   A.   Yes.

20   Q.   Let me ask you a hypothetical.  You agreed that your case

21   became a lot worse when that tape came along?

22   A.   That's an understatement.

23   Q.   When you were made the five-year plea to State Court, if

24   you had known what the tape said, would you have accepted it?

25   A.   Of course.

1  Q.   If you had known what the tape said when you were made

2  the offer of 70 to 84 months, would you have accepted it?

3  A.   Of course.  Without a doubt.

4  Q.   Now, you also understand that, in order to plead guilty

5  in either Federal or State Court, you have to get up there and

6  say, "I did it"?

7  A.   Yes.

8  Q.   Is that something you would have been willing to do --

9  A.   With my bells on.

10  Q.   You wouldn't have walked into the courtroom; you would

11  have run?

12  A.   I'm 20 -- I'm 26 years old, sir.  I've been out there two

13  and a half years at the time.  At that time, I was out there

14  two years.  Of course I would.

15  Q.   If Judge Quarles ordered the Government to send the case

16  back to State Court tomorrow for a five-year plea, are you

17  pleading?

18  A.   Sir, I'd do somersaults, sir.

19  Q.   If Judge Quarles orders the Government to let you plead

20  to a sentencing range of 70 to 84 months, are you pleading?

21  A.   Yes, I am.

22  Q.   Any doubt about that in your mind?

23  A.   No.

24  Q.   Is the reason you're pleading is because you've seen the

25  trial, and you ain't liking how it goes?

1    A.    No.

2    Q.    Are you pleading because of the KGA tape?

3    A.    That's exactly why I'm pleading, because of the KGA tape.

4    Q.    Now, the Government talked a little about Mr. Levin and

5    the officer being in Iraq.

6    A.    Uh-huh.

7    Q.    And I believe Mr. CitaraManis said, in part, the plea was

8    offered because the officer was in Iraq.  Did you hear that?

9    A.    Yes.

10   Q.    My question is:  Was the plea declined because the

11   officer was in Iraq?

12   A.    It was four officers involved in this case.  He was only

13   one.  No, that wasn't the reason.  He wouldn't -- that don't

14   mean nothing, because he was only one officer.

15   Q.    So why did you say "no" to the two pleas?

16   A.    Constitutional violations.  Mr. CitaraManis had put it in

17   my head, and as the Court -- the record might reflect,

18   sometime during and after that, I started filing my own Fourth

19   Amendment *pro se* motions.

20   Q.    When you say "constitutional violations," which one?

21   A.    Fourth Amendment, search and seizure.  Illegal search and

22   seizure.  He made a stop -- he put it in my head that they

23   made the stop unlawfully, and the CAD sheet proved that.

24   That's why it was --

25   Q.    So, when you say Fourth Amendment, what you're saying is

 1    the CAD sheet suggests the stop was not legal?

 2    A.   Yes.

 3    Q.   You thought you were going home because of the CAD sheet?

 4    A.   I thought my Fourth Amendment violations -- I thought it

 5    was certain that my Fourth Amendment constitutional rights was

 6    violated, and I thought -- and I was taught to believe that

 7    that CAD sheet was -- reflected that.  That's the only reason

 8    I had --

 9    Q.   And the tape, which you've heard at least twice today and

10    read a transcript of, is devastating, and I think those are

11    your words, right?

12    A.   Totally.

13              MR. PROCTOR:  That's all I have, Judge.

14              THE COURT:  Thank you.  Cross?

15              MR. HAZEL:  Just two questions, Your Honor.

16              THE COURT:  Two?  Okay.  First question.

17              MR. HAZEL:  There might be follow-ups to each, Your

18    Honor.

19              THE COURT:  So it's not two questions?

20              MR. HAZEL:  With subparts.

21              MR. PROCTOR:  Objection.

22              THE COURT:  Sustained.

23                        **CROSS-EXAMINATION**

24    **BY MR. HAZEL:**

25    Q.   I don't mean to make light, Mr. Braxton.

1              In regards to the first plea, the one to the

2      possession of a stolen firearm, it's correct, isn't it,

3      Mr. CitaraManis ultimately told you his advice was that you

4      should take that plea, correct?

5      A.   He never said that.

6      Q.   You're saying he never said that?

7      A.   His -- Mr. CitaraManis' only advice was it's my duty as

8      your attorney to let you know that this is the plea.  I told

9      you -- he told me everything simultaneously.  That was first.

10     He told me -- his exact words was, "Good morning.  Good

11     afternoon.  First, it's been an interesting week, and we just

12     got the CAD sheet," and I don't mean to drag it out -- okay.

13     Go ahead.

14     Q.   Did he ever say to you either, "You should take this

15     deal," or, "No, you should not take this deal"?

16     A.   He never advised me not to.  I'm not going to say that.

17     He never said, "You shouldn't."

18     Q.   As to the second plea offer, the five without as it's

19     commonly known in State Court, did he specifically give you

20     advice whether or not you should or should not take that plea

21     offer?

22     A.   He did -- he did say that he thought it was an

23     interesting plea.  He thought it was interesting that the

24     Government was offering me five years to send it back to the

25     State.  I've -- you've got to understand that I talked to

1    Mr. CitaraManis at 2:50.  I remember this so vividly.  I was

2    Talbot County Detention Center.  I don't mean to draw this

3    out.  I was in Talbot County Detention Center.  I called

4    Mr. CitaraManis to randomly ask my court date.  It was the

5    first or second week of October.  I just came to court July

6    17th, and it was the first or second week of October.  I

7    wanted to know my next court date.

8              I called Mr. CitaraManis.  It was 2:58.  We lock in

9    at 3 o'clock, police officers and everything on my back.  Mind

10   you, he never used to come to see me, so I always used to have

11   to speak to Mr. Michael Chamble, or John Chamble, the branch

12   manager of the office.  So I always get a hard way to go, so,

13   when they always hear my name, they don't always pick up.

14             Finally, when I got to Mr. CitaraManis, it was 2:58.

15   3 o'clock, they was hitting the lights on as a -- that's when

16   they letting you know that it's time to lock in.  He said,

17   "But I'm glad that you called, Mr. Braxton.  By the way, it's

18   interesting that you know that the State's offering to kick

19   the State -- kick the case back to the State, but he wants you

20   to plead to five years."

21             I said, "What about the CAD sheet?"

22             He said, "All that is still --"

23             I said, "What about you -- what, they got some new

24   evidence or something?"

25             He said, "No.  This is their offer."

```
 1              I'm like, "Man, like you for real, man?  You for
 2     real?"
 3              He like, "As you know, as your attorney, I have
 4     to -- I have to notify you."
 5              I'm like, "What about all that we talked about, the
 6     CAD sheet?"
 7              "That's still standing.  They violated -- your
 8     constitutional rights have been violated, but that still
 9     stand, but, as your attorney, I have to let you know.  All
10     right.  I'll mail it to you."
11              He never mailed it to me or nothing.
12     Q.   Okay.  But my question -- and I didn't want to interrupt
13     you, sir, but my question was:  Did he advise you that it was
14     a good deal, and you should take it?
15     A.   That wasn't his exact words, no.
16     Q.   Did he advise you that you should turn it down?
17     A.   No.  I ain't never -- nothing, no.
18              MR. HAZEL:  Nothing further.
19              THE COURT:  Okay.  Redirect?
20              MR. PROCTOR:  No, sir.
21              THE COURT:  Thank you.  You may step down, sir.
22              (Defendant excused from the witness stand.)
23              THE COURT:  Anything else, folks?
24              MR. PROCTOR:  Brief argument, Judge.  I realize the
25     hour, but I'll be three minutes.
```

1          **THE COURT:**  Something you haven't said in your

2     papers?

3          **MR. PROCTOR:**  Correct.

4          **THE COURT:**  Okay.

5          **MR. PROCTOR:**  I don't know what they are, Your

6     Honor.  That's the problem with the CJA.

7          **THE COURT:**  New stuff.  Okay.

8          **MR. PROCTOR:**  I have an incentive to keep talking.

9          You heard from the testimony of Mr. CitaraManis,

10    and, Judge, I think I stated this.  Defense Exhibit 1, which I

11    would ask to be admitted for the purposes of this motion, I --

12          **THE COURT:**  And it is.

13          **MR. PROCTOR:**  I called the Public Defender's

14    Office -- I have a buddy who works there -- on Friday

15    afternoon, said, "Can you look up this State case for me?

16    Give me a call."  He calls me Saturday morning, says, "I got

17    the file.  Do you want to come by?"  I'm driving over there to

18    get it.  Initially, we thought there was a tape in there.

19    There was a tape in there, but it was the wrong one, and

20    Mr. Hazel was being kept in the loop at every turn.

21          So I get there.  I get it.  My experience -- and

22    I've done this a hundred times -- the last case I had before

23    Your Honor was Theodore Parker in August last year.

24    Mr. Ravenell was his lawyer on the State side.  Same sort of

25    thing.  Couple of postponements, then he gets indicted

1    federally.  I called Mr. Ravenell, said, "I want to copy your

2    file."  He said, "Come on over."  I went to the World Trade

3    Center.  I picked up his file.  There is a copy place across

4    the street.  Made a copy, gave him back his original, walked

5    over.  There were two witness statements in there.

6            There is frankly, Judge, no tactical reason not to

7    get prior file from State counsel.  Mr. CitaraManis agreed to

8    that.  Had he got it -- and I achieved it in twelve hours with

9    a phone call -- he would have seen that there was a box ticked

10   that said, "911 tape is available for discovery and

11   inspection."

12           Now, there is no 911 call in this tape, and my

13   Public Defender buddy tells me that they used the term --

14   there is no box that says, "KGA," so, when they tick that,

15   they mean there is a tape of some sort of discussion.  "911,

16   what is your emergency," or, "This is Officer 25," whatever it

17   is.  So that box means there is something there.  That puts

18   Mr. CitaraManis on reasonable notice that there is something

19   there, and, Your Honor, as Mr. CitaraManis agreed, he gave me

20   his entire file other than a couple of minor things.

21           There is no subpoena back in the day when this case

22   first originated or even before the first or second trial date

23   to the Communications Division asking for the KGA tape, none.

24   There is no written request asking for a copy of the KGA tape,

25   and he proffered that what he gave me was his entire file.

1    Again, Your Honor sees enough Rule 17 subpoenas from me.  It's

2    ten minutes on a computer.  It goes to the Court.  The Court

3    signs it.  Most of the time, when you're FPD, you can have

4    your investigator or the Marshal serve it.  It's routine.

5         Mr. CitaraManis testified not in so many words, but

6    his investigator dropped the ball.  He asked his investigator

7    to get it.  It was a junior investigator helping a senior

8    investigator.  For want of a better term, someone didn't get

9    it.  Mr. CitaraManis agreed the buck stops with him, which was

10   a very candid admission, Judge.  So it was never requested.

11   We have a situation where, the third trial date, the officer

12   walks in with it.  Everyone in this room is going to agree

13   that that tape is devastating -- Mr. Braxton's word --

14   markedly deleterious to his interests of going home after

15   trial.  I cited cases in my motion.  I won't regurgitate them

16   here, but there is ample precedent for the position that, if a

17   defendant would have accepted a plea but for the

18   ineffectiveness of counsel, the case law says giving him back

19   his pretrial rights won't always, often don't make him whole.

20        **THE COURT:**  Can you raise an ineffective assistance

21   of counsel claim before your conviction?

22        **MR. PROCTOR:**  Yes, you can, and the case law I

23   cited -- and, if Your Honor wants to take the night to read

24   it, certainly you'd have no objection from Defense counsel.

25   Some of them were in this posture, Judge.  You can, and having

1    him convicted, affirmed on direct appeal, and coming back here

2    for 2255, that will take several years.  Clearly it's harmful

3    to my client's right as he sits in jail.  We've had all the

4    testimony --

5            **THE COURT:**  Except that we should certainly first

6    wait for the verdict since he could be acquitted, and I assume

7    that, if he were acquitted, he wouldn't want the plea offer.

8            **THE DEFENDANT:**  I don't even want to exercise that

9    right.

10           **MR. PROCTOR:**  Mr. Braxton has just spoken and said

11   he doesn't want to exercise -- Judge, before we picked the

12   jury, Your Honor talked about how there is no prejudice to

13   Mr. Braxton waiting.  I'm worried, should we wait until a

14   guilty verdict, Mr. Hazel is going to say, "He double dipped.

15   He had two chances."  We are telling you, tomorrow morning,

16   before the jury comes in and gets jury instructions, we'll

17   take the 70 to 84.  Tomorrow morning, before the jury comes

18   in --

19           **THE COURT:**  Again, if he's acquitted, whatever

20   Mr. Hazel says on double dipping makes no difference, because

21   he's acquitted.  He certainly can't be convicted, even on a

22   plea, after he's been acquitted.  Double jeopardy.

23           **MR. PROCTOR:**  Right.  I agree.  My point is I

24   believe he should have accepted it back then were he furnished

25   with competent counsel who have made efforts to get the KGA

1    tape.  He'll accept it tonight, tomorrow morning, after the

2    jury comes back with a guilty verdict, a week from next

3    Sunday.

4              THE COURT:  Okay.  Good to know.  Government?

5              MR. HAZEL:  Very briefly, Your Honor.  Only to sort

6    of put into context what we learned today.

7              THE COURT:  Can anyone raise an ineffectiveness of

8    counsel claim before conviction?

9              MR. HAZEL:  Your Honor, I think it's certainly

10   unusual.  I didn't -- and I read Mr. Proctor's cases.  I

11   didn't see a case directly on point, but I certainly did see

12   at least some language suggesting that, in some

13   circumstances -- and the circumstance didn't come up in any of

14   the cases he cited --

15             THE COURT:  Have you seen the circumstance?

16             MR. HAZEL:  I've not seen the circumstance, but

17   there was enough *dicta* to suggest that some circuit somewhere

18   might decide that enforcing a plea agreement is something that

19   could be done.  Again, there was no case that Mr. Proctor

20   cited, none that I found that actually did that, but there was

21   *dicta* that suggested it, so that's sort of the best I can say

22   to that.

23             THE COURT:  So I get a chance to make some law here?

24             MR. HAZEL:  If Your Honor was so inclined, although

25   the Government is not so inclined.

1          **THE COURT:**  Right.

2          **MR. HAZEL:**  Just very briefly, Your Honor, there has

3    to be two showings.  First, that the attorney's performance

4    fell below sort of a reasonable standard for a competent

5    attorney.  Second, that there was some prejudice that came as

6    a result.

7          **THE COURT:**  The usual form of prejudice being a

8    conviction of some sort?

9          **MR. HAZEL:**  That's usually how it works.

10          **THE COURT:**  A conviction that is worse than the

11    plea?

12          **MR. HAZEL:**  Correct.  Correct.  And, focusing on the

13    first half of that, Your Honor, you heard testimony from

14    Mr. CitaraManis.  He made many efforts to get the tape.  He,

15    more generally, as to the case in total, his investigation was

16    thorough.  He interviewed witnesses, many of the witnesses we

17    ended up hearing from today.  He had his investigator working

18    on this case.  He had his investigator trying to find the

19    tape.  He was told, as I was -- and I'll proffer that to the

20    Court.  I was also told that the tape no longer existed, so it

21    certainly doesn't surprise me to hear that Mr. CitaraManis was

22    told that.  Given his experience in this courthouse, knowing

23    that usually tapes disappear after a certain period of time,

24    it's certainly reasonable that he would have thought at that

25    point that the tape no longer --

1          **THE COURT:**  By "disappear," usually there is a

2    retention policy, isn't it, that is a fairly short one with

3    the City?

4          **MR. HAZEL:**  I think it's 60 to 90 days, and --

5          **THE COURT:**  Ah!

6          **MR. HAZEL:**  Frankly, I learned probably at the exact

7    same time Mr. CitaraManis learned --

8          **THE COURT:**  In the ordinary course of business, the

9    tapes are erased, aren't they, or reused?

10         **MR. HAZEL:**  Correct.  That's my understanding, and

11   so it's certainly not surprising that, having been told that

12   that's what happened in this case, based on his experience, he

13   would assume that to be the case.  The fact that he ended up

14   being wrong is frankly not enough to find him to have not been

15   competent counsel.

16         And one point that I want to make -- and I applaud

17   Mr. Proctor since I think he's been very honest in this fact,

18   but I want to make it clear to the Court.  Mr. Proctor himself

19   has not actually been able to get -- unless I'm mistaken, get

20   the KGA tape from either the State PD or the State's

21   Attorney's Office.  What he was able to do is he got a file,

22   there was a tape in it, and we were in constant contact on

23   Saturday, and what he ultimately found out was that it was a

24   different tape, a robbery, having to do with another case.

25         Now, there was this box checked saying, "911 tape;"

1    however, for all we know -- in fact, it seems almost likely

2    that that was referring to the tape that was in the file,

3    because that's what was there when he actually pulled the

4    file, was this robbery tape.  So it's speculation at best to

5    even say that, had Mr. CitaraManis ordered this file, he would

6    have even have gotten the tape.  So, for all those reasons,

7    Your Honor, I don't think Mr. CitaraManis' efforts in here

8    fall below any standards.

9            And then, just finally, the last point:

10   Mr. CitaraManis said that, in both cases, he advised the

11   Defendant to take the plea.  He told him that that would be in

12   his best interests.  Mr. Braxton, in both cases, felt that the

13   time being offered was too much, and, from Mr. CitaraManis'

14   testimony, that seemed to be the biggest issue, the fact that

15   Mr. Braxton just didn't like the numbers that were being

16   thrown out.  So, given that, Your Honor, I don't think that

17   the motion should be granted and that the plea should be

18   enforced.

19           **THE COURT:**  Mr. Proctor, you get the last word.

20           **MR. PROCTOR:**  Thank you, Judge.  The Government

21   calls Mr. CitaraManis' efforts thorough.  He didn't subpoena

22   it.  He didn't write a letter.  He didn't follow up with his

23   investigator to say, "Any joy on the tape?"  He just -- and we

24   all are guilty of it from time to time, Judge.  We assume.

25   Case has been around 16 months.  It's not provided in

1    discovery with the Government.  It doesn't exist.  We assume.

2    Nine times out of ten, we're right, and we're all fallible.

3    This time, he was wrong.  It did exist.  Had he bothered to

4    get the State's file, State Public Defender's file, which I

5    did with just a phone call, again, Judge --

6         **THE COURT:**  Was the tape in the State Public

7    Defender file?

8         **MR. PROCTOR:**  The wrong tape was in the State Public

9    Defender --

10        **THE COURT:**  I guess that's the point I'm missing.

11   If he had gotten the State Public Defender file, he would have

12   gotten the wrong tape?

13        **MR. HAZEL:**  Right.

14        **MR. PROCTOR:**  There would have been a box checked

15   saying that the 911 tape was available for inspection, which

16   would have put him on notice that maybe the KGA hadn't been

17   destroyed.  Even without notice of it, I think you're still

18   required to go get it.  Again, in the Theodore Parker case I

19   had before Your Honor, I subpoenaed the pole cameras, I

20   subpoenaed the CAD, I subpoenaed the KGA tape.  It takes me

21   two minutes sitting at my desk to do that.  There was no

22   downside to getting it.  Your Honor signed those subpoenas.

23   We do it as a matter of course.

24             He didn't do it in this case.  He put two and two

25   together with the inflection of time and made fail.  It fell

1    below, and I'm sure he's a fine lawyer, and I'm sure he's been

2    doing a great job for many years.  Once in a while, we all

3    screw up.  His mistake was assuming it didn't exist when it

4    was there for all to see and just would have taken a one-page

5    Federal subpoena that could have been cranked out in 45

6    seconds.

7         **THE COURT:**  Thank you.  Good night, folks.  See you

8    tomorrow morning at 9:30.

9         **MR. HAZEL:**  Good night, Your Honor.

10        **THE CLERK:**  Please rise.  This Honorable Court

11   stands in adjourned.

12             (Proceedings adjourned.)

13

14

15   I, Martin J. Giordano, Registered Merit Reporter and Certified

16   Realtime Reporter, certify that the foregoing is a correct

17   transcript from the record of proceedings in the

18   above-entitled matter.

19

20   _____        _____

21     Martin J. Giordano, RMR, CRR                Date

22

23

24

25

```
 1                              INDEX

 2               UNITED STATES v. DAVID BRAXTON

 3              TRIAL - VOL II - MARCH 17, 2009

 4

 5

 6                                                     PAGE
     COMMENCEMENT OF PROCEEDINGS........................... 251
 7
     WITNESSES FOR
 8     THE GOVERNMENT:

 9   JAMES L. WAGSTER
             Sworn........................................ 252
10           Direct Examination by MR. WALLNER............ 252
             Cross-Examination by MR. PROCTOR............. 259
11           Witness Excused.............................. 259

12   PATRICK FERNANDEZ
             Sworn........................................ 260
13           Direct Examination by MR. HAZEL............... 260
             Cross-Examination by MR. PROCTOR............. 265
14           Redirect Examination by MR. HAZEL............ 269
             Witness Excused.............................. 270
15

16   WITNESSES BY
       THE DEFENSE:
17
     DEMETRIUS STEPPE, JR.
18           Sworn........................................ 278
             Direct Examination by MR. PROCTOR............ 278
19           Cross-Examination by MR. WALLNER............. 288
             Redirect Examination by MR. PROCTOR.......... 303
20           Witness Excused.............................. 306

21   INSTRUCTIONS CONFERENCE............................... 308

22   JAMES HARRIS
             Sworn........................................ 323
23           Direct Examination by MR. PROCTOR............ 324
             Cross-Examination by MR. HAZEL............... 344
24           Redirect Examination by MR. PROCTOR.......... 358
             Witness Excused.............................. 361
25
```

TIFFANI PARROTT
        Sworn............................................... 364
        Direct Examination by MR. PROCTOR................ 364
        Cross-Examination by MR. HAZEL................... 375
        Redirect Examination by MR. PROCTOR............. 386
        Witness Excused................................. 388

MOTIONS HEARING........................................ 396

MOTIONS HEARING WITNESSES:

  WITNESSES FOR
        THE DEFENSE:

  MICHAEL CITARAMANIS, ESQUIRE
        Sworn............................................. 397
        Direct Examination by MR. PROCTOR............... 397
        Cross-Examination by MR. HAZEL.................. 413
        Redirect Examination by MR. PROCTOR............ 423
        Witness Excused................................. 426

  DAVID BRAXTON
        Sworn............................................. 426
        Direct Examination by MR. PROCTOR............... 426
        Cross-Examination by MR. HAZEL.................. 434
        Witness Excused................................. 437

PROCEEDINGS ADJOURNED.................................. 447

## $

**$10** [2] - 282:23, 282:24

## '

**'06** [1] - 365:18
**'87** [2] - 421:13, 421:14
**'89** [1] - 373:25
**'92** [1] - 252:13
**'99** [4] - 390:5, 390:7, 390:8, 390:25
**'Sign** [1] - 350:20

## 1

**1** [23] - 366:21, 366:22, 367:4, 367:16, 367:18, 370:22, 370:24, 370:25, 371:22, 371:23, 371:24, 372:3, 372:13, 372:15, 373:21, 387:5, 387:16, 408:5, 408:17, 410:13, 410:14, 438:10
**1-C-33** [2] - 380:16, 381:15
**10** [2] - 272:16, 310:8, 378:2
**100%** [2] - 398:23, 406:8
**101** [2] - 250:24, 366:10
**10:00** [3] - 273:4, 273:7, 396:1
**10:10** [1] - 273:5
**10:15** [2] - 275:25, 396:1
**10:20** [3] - 273:6, 274:5
**11** [2] - 310:12, 310:16
**11:00** [1] - 371:2
**11:01** [1] - 274:21
**11:33** [1] - 308:10
**12** [2] - 310:20, 310:22
**12:00** [2] - 308:10, 371:2
**12:15** [1] - 322:15
**13** [1] - 310:24
**14** [2] - 311:3, 379:2, 407:12
**15** [3] - 311:7, 375:18, 399:13
**16** [5] - 311:11, 312:7, 313:6, 404:24, 445:25
**16:35** [4] - 368:22, 369:20, 372:6, 377:4
**16:41** [1] - 376:4
**16:41:28** [1] - 373:10
**16:42** [1] - 373:19
**17** [8] - 250:9, 251:1, 288:12, 312:23, 313:4, 313:18, 440:1, 448:3
**17th** [16] - 345:2, 345:16, 346:15, 347:3, 350:8, 350:11, 352:8, 353:9, 365:21, 367:7, 369:24, 392:16, 426:24, 429:8, 436:6
**18** [2] - 314:25, 315:5
**18th** [1] - 391:3
**19** [3] - 316:21, 317:12, 375:18
**1970s** [1] - 268:11
**1972** [1] - 252:13
**1988** [2] - 282:1, 421:13

**1989** [1] - 303:21
**1999** [3] - 344:25, 390:23, 391:3
**1:30** [1] - 276:22
**1st** [3] - 392:5, 425:9, 430:24

## 2

**2** [3] - 308:25, 322:8, 387:19
**2,272nd** [1] - 370:2
**20** [5] - 273:3, 288:10, 320:12, 388:8, 432:12
**20-some** [1] - 392:5
**2000** [2] - 390:23, 391:5
**2001** [1] - 344:22
**2004** [2] - 389:20, 389:23
**2006** [16] - 279:20, 288:11, 325:4, 345:2, 345:16, 346:15, 347:3, 350:8, 350:11, 352:8, 353:9, 365:21, 367:8, 369:24, 404:19, 421:9
**2007** [4] - 397:17, 404:22, 404:23, 421:6
**2008** [5] - 405:23, 423:10, 425:9, 425:14, 426:24
**2009** [3] - 250:9, 251:1, 448:3
**21** [3] - 320:16, 372:13, 372:15
**21201** [1] - 250:24
**22** [5] - 350:18, 350:25, 371:22, 371:24, 373:21
**2255** [1] - 441:2
**2264** [1] - 371:15
**25** [4] - 325:15, 348:11, 377:17, 439:16
**251** [1] - 448:6
**252** [2] - 448:9, 448:10
**259** [2] - 448:10, 448:11
**25th** [1] - 390:23
**26** [1] - 432:12
**260** [2] - 448:12, 448:13
**265** [1] - 448:13
**269** [1] - 448:14
**270** [1] - 448:14
**278** [2] - 448:18, 448:18
**288** [1] - 448:19
**2:00** [13] - 276:11, 276:18, 306:16, 306:20, 307:11, 307:15, 307:16, 308:2, 308:4, 321:3, 321:21, 322:9, 322:15
**2:30** [1] - 306:23
**2:50** [1] - 436:1
**2:58** [2] - 436:8, 436:14
**2nd** [1] - 391:5

## 3

**3** [6] - 309:5, 371:3, 371:4, 436:9, 436:15
**30** [3] - 263:24, 321:8, 322:4
**30-some** [1] - 392:5
**303** [1] - 448:19
**306** [1] - 448:20

**308** [1] - 448:21
**30th** [1] - 425:14
**311** [1] - 365:17
**323** [1] - 448:22
**324** [1] - 448:23
**33** [16] - 370:22, 370:24, 371:3, 371:23, 372:3, 372:13, 380:20, 380:23, 387:3, 387:4, 387:5, 387:9, 387:11, 387:16, 387:20
**3318** [1] - 250:23
**344** [1] - 448:23
**35** [1] - 372:6
**358** [1] - 448:24
**361** [1] - 448:24
**364** [2] - 449:1, 449:2
**37** [1] - 260:21
**375** [1] - 449:2
**386** [1] - 449:3
**388** [1] - 449:3
**396** [1] - 449:4
**397** [2] - 449:8, 449:9
**3:00** [2] - 308:3, 371:2
**3:20** [1] - 393:17
**3:35** [4] - 388:9, 388:11, 392:21, 392:25
**3:36** [1] - 393:17

## 4

**4** [11] - 254:1, 263:11, 263:12, 264:24, 283:15, 283:16, 301:18, 309:9, 334:7, 346:7, 361:10
**41** [1] - 373:19
**410** [1] - 253:10
**410-962-4504** [1] - 250:25
**413** [1] - 449:9
**423** [1] - 449:10
**426** [3] - 449:10, 449:12, 449:12
**43** [1] - 373:19
**434** [1] - 449:13
**437** [1] - 449:13
**447** [1] - 449:14
**45** [1] - 447:5
**4:00** [2] - 308:7, 371:2
**4:30** [2] - 346:14
**4:35** [1] - 369:21

## 5

**5** [5] - 263:11, 264:25, 309:13, 348:11, 348:13
**5-902(a)(11** [2] - 409:17, 409:20
**5:26** [1] - 250:9

## 6

**6** [1] - 309:17
**60** [3] - 423:18, 423:22, 444:4

## 7

**7** [1] - 309:21
**70** [6] - 428:1, 428:2, 428:12, 432:2, 432:20, 441:17

## 8

**8** [6] - 255:9, 255:13, 256:5, 309:25, 368:22, 369:20
**84** [6] - 428:1, 428:2, 428:12, 432:2, 432:20, 441:17
**870** [2] - 371:11, 371:14
**8BW** [5] - 376:8, 380:16, 380:20, 380:23, 381:15

## 9

**9** [5] - 310:4, 348:8, 350:18, 350:24
**90** [3] - 277:13, 423:19, 444:4
**90-day** [1] - 423:22
**911** [10] - 365:17, 409:21, 409:22, 410:1, 410:4, 439:10, 439:12, 439:15, 444:25, 446:15
**9:25** [1] - 396:18
**9:30** [5] - 395:23, 396:19, 447:8
**9:31** [1] - 250:9
**9:58** [1] - 274:21
**9mm** [1] - 255:2

## A

**a.m** [3] - 274:21, 308:10
**ability** [4] - 266:3, 267:7, 268:3, 268:23
**able** [11] - 263:15, 264:6, 271:15, 382:7, 383:11, 399:3, 420:6, 420:12, 422:15, 444:19, 444:21
**ABOVE** [1] - 250:10
**above-entitled** [1] - 447:18
**ABOVE-ENTITLED** [1] - 250:10
**absence** [1] - 424:22
**absolutely** [8] - 399:11, 401:23, 404:14, 404:16, 405:4, 407:14, 413:4, 413:8
**absorbs** [1] - 256:8
**Academy** [1] - 261:23
**ACC** [5] - 412:3, 412:6, 412:8, 412:15, 412:17
**ACCA** [1] - 411:6
**accept** [4] - 411:21, 418:13, 419:5, 442:1
**acceptable** [1] - 402:3
**accepted** [4] - 431:24, 432:2, 440:17, 441:24
**accordance** [1] - 409:20
**according** [1] - 263:14
**account** [1] - 268:15
**accounts** [1] - 262:3

**accurately** [1] - 367:11
**achieved** [1] - 439:8
**acquire** [1] - 422:8
**acquit** [1] - 273:25
**acquittal** [3] - 272:22, 272:24, 405:22
**Acquittal** [2] - 273:12, 394:18
**acquitted** [6] - 423:7, 441:6, 441:7, 441:19, 441:21, 441:22
**acting** [4] - 285:10, 285:12, 287:1, 339:20
**action** [1] - 258:17
**active** [1] - 365:14
**activity** [1] - 409:19
**actual** [9] - 317:17, 319:13, 319:18, 374:13, 374:14, 416:8, 430:21, 430:23, 431:3
**adamant** [1] - 418:12
**add** [1] - 422:2
**added** [3] - 371:22, 372:13, 372:14
**additional** [1] - 388:15
**address** [2] - 374:1, 388:13
**adequate** [1] - 318:3
**adjourned** [2] - 447:11, 447:12
**ADJOURNED**.................................. [1] - 449:14
**administer** [1] - 260:18
**admission** [1] - 440:10
**admitted** [2] - 367:18, 438:11
**advance** [1] - 409:23
**advantage** [1] - 400:24
**adversarial** [1] - 391:23
**advice** [7] - 416:1, 417:12, 420:24, 421:2, 435:3, 435:7, 435:20
**advise** [5] - 274:13, 388:18, 415:22, 437:13, 437:16
**advised** [8] - 253:19, 363:6, 373:21, 375:7, 417:13, 421:3, 435:16, 445:10
**advising** [1] - 391:6
**Affairs** [1] - 415:15
**affect** [2] - 267:8, 267:9
**affirmed** [1] - 441:1
**afraid** [1] - 341:16
**afternoon** [23] - 277:7, 277:12, 322:18, 323:2, 323:3, 323:9, 323:10, 323:20, 323:22, 324:4, 324:5, 346:7, 364:18, 364:19, 375:24, 375:25, 388:8, 397:9, 413:21, 426:15, 426:16, 435:11, 438:15
**afterwards** [2] - 292:23, 379:1
**agent** [1] - 276:3
**aggressive** [3] - 287:2, 287:3
**aggressively** [1] - 391:23
**ago** [5] - 261:24, 276:3, 301:22, 327:18, 362:24
**agree** [29] - 266:19, 268:13, 271:18, 271:21, 276:22, 282:19, 312:17, 312:18, 312:20, 312:21, 312:22, 313:1, 313:2, 313:11, 313:16, 318:2, 405:17, 407:4, 407:15, 410:6, 410:16,

410:20, 411:1, 411:2, 413:2, 413:5, 430:13, 440:12, 441:23
**agreed** [14] - 271:2, 271:22, 271:24, 311:17, 311:25, 343:14, 363:17, 401:18, 410:10, 431:20, 439:7, 439:19, 440:9
**agreement** [5] - 271:18, 312:22, 344:5, 344:6, 442:18
**agrees** [1] - 313:14
**ahead** [3] - 276:24, 350:20, 435:13
**aid** [1] - 383:14
**Aided** [1] - 365:24
**ain't** [22] - 330:23, 330:24, 331:1, 336:12, 336:14, 341:18, 341:22, 352:23, 353:4, 358:7, 359:2, 360:23, 392:2, 392:3, 392:13, 392:20, 419:6, 419:9, 429:20, 432:25, 437:17
**air** [2] - 334:22, 354:13
**alarm** [1] - 410:21
**Alford** [7] - 343:10, 343:13, 343:21, 343:24, 344:1, 344:3, 344:10
**alias** [1] - 415:1
**alleged** [4] - 272:3, 312:4, 317:2, 317:22
**alleging** [1] - 319:21
**Allen** [10] - 250:19, 363:19, 370:22, 386:17, 386:18, 386:20, 387:10, 387:18, 387:23, 419:22
**allowed** [1] - 362:22
**allowing** [1] - 333:13
**almost** [1] - 445:1
**alone** [1] - 389:7
**alter** [1] - 312:6
**AM** [1] - 250:9
**Amendment** [5] - 433:19, 433:21, 433:25, 434:4, 434:5
**America** [2] - 271:24, 312:1
**AMERICA** [1] - 250:4
**ammunition** [3] - 254:13, 254:15, 255:2
**ample** [1] - 440:16
**analyze** [1] - 252:22
**angles** [1] - 331:8
**answer** [22] - 266:25, 269:16, 284:18, 312:19, 329:12, 343:18, 347:15, 348:22, 348:24, 349:21, 350:3, 350:22, 351:2, 351:4, 351:5, 351:6, 359:2, 388:22, 422:5, 428:13, 428:14
**answerable** [1] - 404:15
**answered** [4] - 258:19, 266:23, 298:22, 298:24, 371:23, 420:20
**answering** [1] - 322:7
**answers** [1] - 347:19
**anticipate** [1] - 307:11
**anticipation** [1] - 394:17
**anyway** [1] - 361:2
**apart** [1] - 252:25
**apologize** [7] - 261:3, 263:5, 284:4, 290:5, 314:19, 362:14, 373:8, 387:18, 389:19, 390:24, 408:8
**appeal** [1] - 441:1
**appear** [6] - 283:8, 283:10, 283:19,

283:24, 284:1, 409:7
**applaud** [1] - 444:16
**appointed** [3] - 397:16, 397:24, 403:20
**appointment** [1] - 409:23
**appreciate** [1] - 369:5
**appreciated** [1] - 363:21
**apprenticeship** [1] - 252:23
**approach** [9] - 257:14, 261:15, 270:13, 272:10, 284:20, 306:6, 362:10, 394:16, 428:9
**appropriate** [1] - 318:16
**area** [5] - 261:8, 261:22, 284:1, 326:18, 333:23
**areas** [1] - 400:24
**arguable** [2] - 274:2, 363:4
**argue** [1] - 399:3
**argument** [1] - 437:24
**arguments** [6] - 393:21, 393:23, 394:21, 395:17, 395:22, 396:10
**arm** [1] - 326:5
**armed** [3] - 398:13, 399:15, 411:8
**arose** [2] - 398:16, 401:13
**arrested** [3] - 350:14, 351:11, 351:14
**arrived** [1] - 263:23
**arrives** [1] - 275:8
**Asha** [1] - 263:20
**aside** [1] - 424:2
**assembly** [1] - 279:9
**assess** [1] - 416:3
**assigned** [5] - 252:18, 263:25, 264:2, 402:22, 403:7
**assistance** [2] - 276:17, 440:20
**Assistant** [2] - 250:14, 250:15
**assume** [5] - 272:20, 319:24, 320:4, 404:5, 420:4, 441:6, 444:13, 445:24, 446:1
**assuming** [3] - 276:23, 399:15, 447:3
**ATF** [1] - 392:3
**attempt** [1] - 414:23
**attempted** [3] - 261:5, 343:9, 344:21
**attention** [5] - 263:11, 264:22, 396:9, 409:12, 427:5
**attitude** [1] - 286:21
**Attorney** [5] - 250:14, 250:15, 358:12, 409:24, 423:25
**attorney** [18] - 271:25, 312:1, 312:2, 340:16, 340:17, 340:21, 341:17, 405:25, 406:9, 406:12, 406:17, 406:18, 406:20, 406:21, 435:8, 437:3, 437:9, 443:5
**Attorney's** [5] - 358:11, 358:12, 410:25, 444:21
**attorney's** [1] - 443:3
**attorneys** [5] - 271:25, 395:15, 395:19, 406:6, 410:3
**attuned** [1] - 412:7
**audio** [8] - 379:24, 380:7, 380:10, 382:3, 383:8, 383:19, 384:3, 385:4
**August** [1] - 438:23

**aunt's** [1] - 280:21
**authentication** [1] - 392:2
**authenticity** [1] - 363:18
**automatic** [2] - 267:14, 301:14
**available** [6] - 269:2, 378:22, 402:15, 409:23, 439:10, 446:15
**Avenue** [3] - 292:11, 292:13, 377:12
**awaiting** [1] - 324:23
**aware** [7] - 276:18, 329:24, 359:17, 405:2, 410:3, 411:15, 412:21

**B**

**background** [1] - 423:1
**bad** [1] - 296:6
**bag** [16] - 267:19, 268:22, 269:6, 356:18, 356:23, 360:17, 360:20, 360:25, 361:4, 361:6, 361:7, 361:8, 361:12
**baggy** [2] - 283:5, 333:20
**balancing** [1] - 258:6
**ball** [1] - 440:6
**ballpark** [1] - 261:4, 325:14, 404:24
**Baltimore** [23] - 250:8, 250:24, 252:10, 252:17, 253:6, 253:7, 254:20, 256:12, 260:13, 260:24, 261:11, 261:20, 325:11, 325:13, 345:13, 364:25, 400:2, 403:5, 403:15, 406:18, 408:18
**Barnum** [1] - 268:7
**barrel** [1] - 254:12
**based** [9] - 256:21, 257:10, 258:15, 273:16, 362:25, 395:18, 409:24, 412:22, 444:12
**bases** [1] - 406:9
**basic** [1] - 346:5
**basis** [5] - 274:2, 318:25, 319:7, 319:8, 345:21
**battery** [1] - 276:5
**Bay** [1] - 268:17
**bear** [1] - 315:17
**bearing** [1] - 266:2
**beat** [1] - 430:7
**became** [5] - 398:16, 402:15, 409:9, 430:16, 431:21
**become** [1] - 329:24
**beer** [4] - 339:17, 359:7, 359:9
**BEFORE** [1] - 250:11
**beforehand** [2] - 269:4, 412:11
**begin** [4] - 393:22, 393:24, 394:14, 396:2
**beginning** [4] - 348:11, 405:23, 416:10, 423:9
**behalf** [2] - 250:13, 250:16
**behind** [14] - 297:6, 300:7, 300:8, 304:20, 327:23, 327:25, 330:2, 331:6, 335:1, 340:1, 353:25, 354:4, 354:5, 383:17
**belief** [2] - 420:5, 420:6
**bells** [3] - 409:5, 410:21, 432:9

**belong** [2] - 282:15, 303:20
**belonged** [1] - 330:14
**below** [4] - 312:8, 443:4, 445:8, 447:1
**bench** [18] - 257:17, 258:13, 261:18, 262:12, 270:16, 271:9, 272:13, 273:1, 306:9, 307:7, 345:21, 346:4, 346:11, 362:13, 363:24, 378:5, 378:8, 379:7
**benefit** [1] - 307:9
**Bentalou** [3] - 280:20, 280:21, 325:10
**best** [10] - 303:7, 307:15, 392:7, 398:24, 406:7, 416:25, 417:20, 442:21, 445:4, 445:12
**better** [4] - 284:17, 369:2, 407:17, 440:8
**between** [6] - 271:18, 271:24, 296:22, 311:25, 379:16, 400:3
**beyond** [2] - 315:24, 317:18, 317:24
**big** [2] - 256:7, 361:9
**biggest** [1] - 445:14
**bit** [3] - 338:5, 381:22
**black** [1] - 351:3
**block** [5] - 290:13, 326:4, 340:7
**blocked** [4] - 292:21, 293:4, 293:8, 330:6
**blue** [3] - 271:19, 271:20, 327:2
**board** [1] - 394:4
**body** [4] - 284:2, 333:23, 333:25, 334:3, 337:16
**boils** [1] - 409:7
**bond** [1] - 423:4
**bothered** [1] - 446:3
**bottle** [2] - 339:17, 359:10
**bottom** [4] - 256:8, 268:16, 406:22, 407:6
**bought** [1] - 291:4
**Boulevard** [2] - 292:14, 292:17
**box** [7] - 256:7, 379:19, 439:9, 439:14, 439:17, 444:25, 446:14
**boxed** [8] - 284:9, 284:13, 284:14, 284:20, 338:14, 338:15, 338:16, 338:18
**branch** [1] - 436:11
**BRAXTON** [4] - 250:7, 426:11, 448:2, 449:11
**Braxton** [131] - 271:25, 272:1, 273:17, 273:25, 278:3, 280:9, 281:13, 281:22, 282:19, 283:2, 283:19, 284:5, 285:5, 285:15, 285:25, 286:2, 286:13, 286:16, 287:18, 288:3, 291:18, 292:4, 292:6, 294:1, 294:18, 295:7, 295:18, 296:6, 296:22, 298:16, 299:6, 299:14, 299:25, 300:14, 300:24, 301:4, 303:9, 304:19, 305:3, 305:9, 312:2, 312:3, 317:22, 317:24, 323:14, 327:16, 327:22, 328:6, 328:22, 333:6, 333:17, 335:2, 335:11, 335:14, 335:23, 336:1, 337:10, 337:13, 339:21, 340:12, 340:21, 342:4, 342:16, 345:7, 345:9, 345:12, 351:10, 351:14, 354:1, 354:8, 355:8, 355:11, 355:17, 355:20, 355:25, 358:14, 359:25, 360:4,

361:18, 363:6, 388:16, 388:18, 388:20, 389:16, 390:6, 390:9, 390:17, 391:9, 397:13, 397:22, 398:7, 398:11, 398:13, 398:17, 399:5, 399:19, 400:18, 400:21, 401:2, 401:18, 401:22, 402:8, 403:24, 405:8, 405:22, 408:20, 409:8, 411:6, 411:17, 411:20, 412:17, 413:23, 416:6, 416:12, 417:12, 418:12, 418:25, 419:8, 420:2, 420:18, 423:2, 425:23, 426:9, 426:10, 426:15, 434:25, 436:17, 441:10, 441:13, 445:12, 445:15
**Braxton's** [19] - 305:21, 336:20, 336:21, 337:15, 348:20, 399:21, 401:24, 401:25, 404:2, 405:5, 405:11, 405:21, 410:9, 413:2, 413:12, 419:4, 420:5, 420:6, 440:13
**break** [6] - 277:6, 307:9, 330:10, 331:24, 368:24, 388:8
**breath** [1] - 260:18
**brief** [3] - 272:21, 273:3, 437:24
**briefly** [15] - 258:24, 261:15, 269:19, 273:15, 287:25, 303:13, 358:19, 362:10, 385:25, 394:4, 413:18, 423:12, 442:5, 443:2
**bring** [5] - 290:8, 387:9, 389:11, 393:21, 424:17
**bringing** [1] - 356:9
**broken** [1] - 322:1
**brother** [2] - 342:3, 343:4
**brought** [4] - 306:13, 306:14, 355:9, 427:5
**brown** [7] - 272:23, 273:13, 273:24, 308:14, 361:6, 361:7, 361:8
**Brown** [1] - 250:17
**BROWN** [58] - 273:11, 273:15, 308:15, 308:19, 308:24, 309:2, 309:6, 309:12, 309:14, 309:20, 309:22, 310:3, 310:5, 310:11, 310:14, 310:17, 310:23, 310:25, 311:6, 311:8, 311:14, 311:16, 311:24, 312:8, 312:12, 312:15, 313:5, 313:8, 313:19, 313:22, 313:25, 314:9, 314:15, 314:20, 314:22, 315:6, 315:8, 315:11, 315:14, 315:18, 315:21, 316:2, 316:4, 316:8, 316:11, 316:13, 316:18, 316:22, 316:25, 317:4, 317:9, 317:14, 320:5, 320:10, 320:15, 320:17, 320:23, 320:25
**buck** [2] - 404:12, 440:9
**bucks** [1] - 281:10
**buddy** [2] - 438:14, 439:13
**built** [1] - 338:5
**bulge** [1] - 283:20
**bulges** [4] - 283:8, 283:24, 333:23, 334:8
**bullet** [5] - 255:23, 256:8, 258:16, 259:14
**bullets** [4] - 253:1, 254:14, 254:16, 254:22
**business** [4] - 303:25, 329:6, 409:18,

444:8
**buy** [1] - 330:25
**BY** [80] - 252:7, 253:24, 255:11, 256:20, 256:25, 257:5, 258:14, 259:2, 260:8, 262:24, 265:22, 266:24, 268:1, 269:21, 278:19, 279:10, 286:25, 288:2, 288:7, 290:15, 293:11, 297:9, 298:25, 302:24, 303:15, 304:18, 305:2, 324:3, 324:17, 326:13, 328:3, 329:2, 329:14, 343:20, 344:19, 346:13, 346:20, 348:10, 348:17, 350:6, 355:7, 356:25, 358:21, 360:18, 361:3, 364:17, 367:2, 367:22, 368:6, 369:10, 369:16, 371:8, 375:14, 375:23, 380:1, 380:14, 382:6, 383:10, 383:21, 384:5, 385:7, 386:2, 397:8, 401:11, 402:13, 403:12, 408:15, 409:3, 409:13, 410:15, 413:20, 417:25, 418:14, 419:20, 422:9, 423:14, 425:7, 426:14, 434:24, 448:16

## C

**cab** [9] - 281:6, 281:8, 294:24, 295:16, 352:16, 352:17, 352:19, 352:22
**CAD** [52] - 365:23, 365:24, 366:6, 367:7, 367:11, 371:15, 376:1, 376:7, 376:11, 381:11, 381:16, 381:18, 385:14, 387:9, 399:24, 400:1, 400:2, 400:5, 400:11, 400:13, 400:25, 401:3, 401:7, 402:2, 403:6, 403:10, 418:17, 420:14, 420:17, 424:17, 424:18, 425:14, 426:22, 426:24, 427:2, 427:6, 427:12, 427:16, 429:11, 429:12, 429:22, 429:23, 430:3, 433:23, 434:1, 434:3, 434:7, 435:12, 436:21, 437:6, 446:20
**Cadillac** [15] - 282:1, 289:13, 289:20, 289:22, 290:12, 290:23, 291:14, 296:18, 299:4, 303:17, 303:19, 354:23, 354:25, 355:1
**CADs** [1] - 400:12
**calculating** [1] - 428:20
**calm** [1] - 285:11
**camera** [1] - 274:11
**cameras** [1] - 446:19
**candid** [1] - 440:10
**candor** [1] - 306:12
**cannot** [6] - 318:24, 320:7, 352:6, 389:5, 389:6, 420:17
**cap** [1] - 398:24
**capable** [2] - 258:16, 297:5
**capacity** [1] - 260:15
**caption** [2] - 368:9, 408:19
**captioned** [1] - 408:17
**car** [124] - 280:8, 281:25, 282:7, 284:8, 284:15, 284:16, 284:22, 284:24, 287:13, 288:17, 289:5, 289:8, 289:9, 289:11, 289:12, 289:18, 289:23, 290:2, 290:3, 290:4, 290:7, 290:8,

290:9, 290:11, 291:4, 291:7, 291:12, 292:24, 293:1, 293:4, 293:7, 293:9, 293:21, 294:10, 294:11, 295:22, 295:24, 296:6, 297:12, 297:24, 298:5, 298:8, 298:15, 299:9, 299:10, 299:11, 299:16, 302:7, 302:13, 303:25, 304:4, 304:5, 304:11, 304:13, 304:17, 328:12, 330:2, 330:24, 330:25, 331:2, 331:6, 331:7, 331:19, 331:21, 331:23, 331:25, 332:2, 332:4, 332:6, 332:11, 332:20, 332:21, 333:9, 334:16, 334:17, 334:18, 334:21, 334:23, 335:13, 335:24, 337:9, 338:15, 338:16, 338:17, 339:16, 339:18, 345:3, 353:11, 353:14, 353:17, 354:18, 354:20, 354:23, 355:2, 355:8, 355:13, 355:14, 355:15, 355:18, 355:22, 356:10, 357:20, 360:8, 360:10, 365:13, 371:4, 375:7, 376:4, 376:6, 376:8, 376:13, 377:18, 381:9, 381:10, 382:17, 382:23, 385:16, 429:24
**career** [3] - 398:13, 399:15, 411:8
**carefully** [1] - 345:24
**carry** [2] - 331:17, 357:15
**carrying** [1] - 308:14
**cars** [5] - 304:2, 330:6, 331:7, 338:18, 356:12
**cartridge** [6] - 253:1, 254:14, 254:16, 254:22, 255:23, 265:1
**case** [108] - 253:21, 255:23, 261:21, 262:6, 262:21, 271:21, 273:4, 274:3, 276:3, 276:4, 276:11, 276:21, 278:1, 307:13, 317:7, 317:21, 341:10, 342:22, 370:11, 370:14, 371:17, 388:10, 389:23, 391:21, 392:5, 392:6, 392:14, 392:17, 392:20, 394:24, 395:24, 396:1, 396:14, 396:20, 398:2, 398:23, 400:5, 400:8, 400:20, 401:18, 402:23, 403:2, 403:3, 403:8, 403:24, 404:1, 404:17, 405:2, 405:8, 405:10, 405:12, 405:14, 405:15, 405:16, 405:21, 406:2, 406:6, 406:11, 406:21, 406:24, 408:17, 410:1, 411:18, 411:24, 413:2, 413:24, 414:2, 414:9, 414:11, 414:14, 415:3, 415:9, 415:17, 415:21, 416:3, 420:7, 421:5, 422:18, 422:19, 423:2, 424:5, 424:8, 424:17, 429:10, 430:16, 431:20, 432:15, 433:12, 436:19, 438:15, 438:22, 439:21, 440:18, 440:22, 442:11, 442:19, 443:15, 443:18, 444:12, 444:13, 444:24, 445:25, 446:18, 446:24
**cases** [17] - 253:1, 254:14, 254:16, 254:22, 255:5, 276:24, 404:2, 405:8, 406:7, 407:12, 411:18, 411:23, 440:15, 442:10, 442:14, 445:10, 445:12
**Caucasian** [2] - 338:7, 356:7

**CC** [2] - 263:12, 263:14
**CDS** [3] - 371:14, 389:21, 391:2
**cell** [4] - 275:21, 276:4, 277:12, 322:7
**Center** [3] - 436:2, 436:3, 439:3
**Central** [3] - 339:18, 340:6, 370:25
**certain** [14] - 406:8, 407:1, 412:2, 412:3, 412:7, 412:9, 412:21, 412:22, 416:20, 421:18, 423:16, 434:5, 443:23
**certainly** [17] - 265:20, 308:8, 324:16, 369:15, 401:9, 412:22, 413:9, 413:11, 430:24, 440:24, 441:5, 441:21, 442:9, 442:11, 443:21, 443:24, 444:11
**certainty** [1] - 256:22
**Certified** [1] - 447:15
**certified** [1] - 409:18
**certify** [1] - 447:16
**chain** [1] - 410:11
**chains** [1] - 306:13
**chamber** [1] - 259:15
**Chamble** [2] - 436:11
**chance** [7] - 321:23, 362:18, 419:10, 419:13, 419:14, 419:17, 442:23
**chances** [1] - 441:15
**change** [4] - 312:15, 313:21, 317:11, 321:25
**changed** [5] - 372:3, 373:4, 374:8, 374:13, 374:19
**changes** [2] - 316:3, 316:12
**characterize** [1] - 400:22
**charge** [9] - 312:14, 312:16, 340:22, 347:2, 399:17, 410:9, 412:14, 423:8, 430:7
**charged** [20] - 272:3, 287:4, 301:25, 303:4, 303:9, 312:5, 317:23, 340:18, 341:9, 341:18, 357:22, 357:24, 358:6, 358:7, 359:10, 359:16, 359:17, 361:15, 399:5, 399:7
**Charges** [1] - 409:8
**charging** [7] - 339:11, 340:2, 340:10, 342:9, 356:24, 357:11, 358:14
**Charlie** [13] - 370:22, 370:24, 371:1, 371:22, 371:23, 371:24, 372:3, 372:13, 372:15, 373:21, 387:5, 387:16
**check** [3] - 251:15, 277:13, 365:8
**checked** [7] - 336:19, 337:3, 337:4, 337:5, 409:22, 444:25, 446:14
**checking** [4] - 337:8, 337:22, 337:23, 339:16
**checks** [1] - 365:8
**Chesapeake** [1] - 268:16
**child** [1] - 428:19
**choice** [2] - 276:8, 413:12
**chronology** [1] - 402:20
**circuit** [1] - 442:17
**Circuit** [3] - 261:10, 261:20, 403:5, 408:18
**circumstance** [3] - 442:13, 442:15, 442:16
**circumstances** [4] - 269:2, 401:16, 412:5, 442:13

**CITARAMANIS** [2] - 397:5, 449:8
**CitaraManis** [37] - 276:16, 308:1, 393:10, 393:23, 396:23, 397:3, 413:21, 423:1, 423:15, 427:3, 427:10, 427:19, 427:24, 428:8, 429:8, 430:6, 430:24, 431:2, 431:16, 433:7, 433:16, 435:3, 436:1, 436:4, 436:8, 436:14, 438:9, 439:7, 439:18, 439:19, 440:5, 440:9, 443:14, 443:21, 444:7, 445:5, 445:10
**CitaraManis'** [5] - 426:18, 435:7, 445:7, 445:13, 445:21
**citation** [1] - 341:2
**citations** [4] - 302:4, 302:6, 302:9, 303:2
**cited** [5] - 268:6, 440:15, 440:23, 442:14, 442:20
**City** [14] - 252:10, 253:6, 254:20, 256:12, 260:13, 260:24, 280:5, 364:25, 400:2, 403:5, 403:15, 406:19, 408:18, 444:3
**city** [2] - 326:18, 331:1
**civil** [1] - 415:11
**civilian** [6] - 263:2, 263:4, 365:4, 365:5
**CJA** [1] - 438:6
**claim** [3] - 296:21, 440:21, 442:8
**claimed** [1] - 291:18
**class** [1] - 312:25
**clean** [1] - 264:11
**clear** [21] - 269:16, 287:17, 289:20, 326:7, 327:2, 342:15, 343:6, 344:20, 361:5, 370:9, 374:2, 385:1, 392:25, 397:18, 399:8, 418:1, 422:16, 424:11, 425:8, 426:17, 444:18
**cleared** [1] - 370:10
**clearly** [2] - 276:5, 441:2
**CLERK** [28] - 251:2, 251:24, 252:3, 255:10, 259:25, 260:3, 274:7, 274:18, 274:22, 277:19, 278:5, 278:9, 308:11, 322:13, 322:16, 323:7, 323:19, 323:23, 348:9, 363:25, 364:3, 366:21, 366:23, 368:4, 393:15, 393:18, 408:4, 447:10
**Clerk** [4] - 255:7, 366:19, 368:3, 408:2
**client** [6] - 391:7, 415:22, 416:1, 417:2, 417:5, 418:8
**client's** [1] - 441:3
**climb** [1] - 356:15
**Clive** [1] - 268:7
**clock** [2] - 321:9, 396:5
**close** [3] - 304:19, 320:8, 321:5
**closed** [1] - 335:24
**closer** [2] - 414:22, 415:2
**closing** [4] - 321:5, 393:3, 393:7, 396:10
**closings** [1] - 393:6
**clothes** [2] - 298:11, 332:8
**clothing** [3] - 283:3, 283:8, 283:20
**cluster** [1] - 373:24
**cocky** [5] - 340:13, 356:6, 356:17
**Code** [3] - 256:17, 257:1, 258:8

**coffee** [1] - 272:16
**coherent** [1] - 277:8
**coherently** [1] - 276:11
**cold** [4] - 266:12, 266:14, 266:20, 269:10
**combined** [1] - 322:1
**coming** [13] - 293:20, 308:1, 338:16, 338:19, 346:1, 375:9, 378:14, 383:14, 392:10, 420:1, 420:3, 420:4, 441:1
**COMMENCEMENT** [1] - 448:6
**commissioned** [1] - 365:4
**committed** [1] - 302:16
**committing** [1] - 303:4
**commonly** [1] - 435:19
**communicated** [1] - 398:7
**Communications** [1] - 439:23
**communications** [8] - 400:3, 403:1, 403:6, 403:7, 403:9, 407:2, 420:18, 424:20
**community** [1] - 379:10
**Company** [1] - 279:3
**compare** [1] - 400:7
**competent** [3] - 441:25, 443:4, 444:15
**complaint** [2] - 263:16
**completed** [1] - 425:24
**completely** [2] - 276:21, 371:17
**complicate** [1] - 276:19
**complicated** [1] - 276:20
**comply** [1] - 332:16
**components** [1] - 254:16
**composed** [2] - 263:8, 264:19
**Computer** [1] - 365:24
**computer** [16] - 365:25, 366:8, 366:11, 368:22, 369:18, 370:5, 373:23, 375:2, 375:3, 375:6, 375:8, 375:10, 376:24, 376:25, 377:12, 440:2
**computers** [1] - 375:4
**concern** [1] - 399:16
**concerned** [2] - 416:24, 418:22
**concerning** [1] - 400:3
**concluded** [8] - 258:13, 262:12, 271:9, 273:1, 307:7, 346:11, 363:24, 379:7
**conclusion** [1] - 395:21
**conditions** [1] - 265:13
**conducted** [2] - 257:6, 409:18
**conference** [10] - 257:16, 258:13, 261:17, 262:12, 270:15, 271:9, 272:12, 273:1, 306:8, 307:7, 346:3, 346:11, 362:12, 363:24, 378:7, 379:7
**CONFERENCE.............................** [1] - 448:21
**conferring** [2] - 271:10, 362:4
**confidence** [1] - 429:11
**confident** [1] - 430:5
**confrontational** [1] - 391:22
**confronted** [2] - 296:5, 429:14
**confronting** [1] - 429:10
**confuse** [1] - 362:21
**confused** [2] - 290:16, 377:5

**connection** [5] - 316:14, 403:2, 406:10, 415:12, 417:1
**consequence** [1] - 401:15
**consider** [4] - 253:19, 262:20, 383:2, 389:2
**considerably** [1] - 379:11
**considered** [2] - 261:19, 410:22
**constant** [1] - 444:22
**constitutional** [9] - 429:22, 430:8, 431:13, 431:14, 433:16, 433:20, 434:5, 437:8
**constructive** [5] - 317:1, 318:5, 318:12, 318:20, 318:25
**contact** [3] - 406:3, 406:5, 444:22
**contacted** [1] - 406:1
**container** [4] - 287:11, 340:23, 347:2, 359:11
**containers** [1] - 302:6
**contents** [3] - 255:14, 255:22, 360:24
**context** [6] - 399:3, 401:10, 401:13, 420:1, 420:18, 442:6
**continue** [5] - 314:10, 360:7, 383:7, 385:3, 391:6
**continued** [7] - 380:7, 380:10, 382:3, 383:8, 383:19, 384:3, 385:4
**CONTINUED** [1] - 250:10
**continuing** [1] - 350:25
**contradicted** [1] - 400:14
**contradictions** [1] - 400:16
**control** [6] - 297:12, 317:21, 319:11, 319:12, 319:16, 319:17
**conversation** [6] - 402:6, 418:20, 418:21, 418:23, 420:14, 420:15
**conversations** [1] - 419:23
**convey** [3] - 399:19, 401:22, 416:18
**conveyed** [2] - 416:17, 428:17
**convict** [2] - 318:1, 319:7
**convicted** [8] - 311:20, 343:6, 344:21, 344:25, 349:18, 389:23, 441:1, 441:21
**conviction** [14] - 316:15, 318:20, 319:1, 390:5, 390:7, 390:8, 390:10, 391:3, 391:5, 399:14, 440:21, 442:8, 443:8, 443:10
**convictions** [7] - 389:12, 389:15, 390:3, 390:18, 411:25, 412:1, 422:20
**cop** [1] - 356:16
**copies** [4] - 307:20, 411:25, 422:16, 422:19
**copy** [12] - 407:2, 407:25, 408:9, 408:16, 408:23, 409:21, 422:7, 431:3, 439:1, 439:3, 439:4, 439:24
**core** [1] - 255:23
**corner** [2] - 295:8, 295:13
**correct** [145] - 254:13, 255:19, 256:14, 256:17, 259:5, 262:5, 266:3, 266:10, 266:16, 267:7, 267:17, 267:21, 269:12, 273:24, 283:22, 287:9, 288:14, 288:20, 289:16, 289:24, 290:24, 290:25, 291:19, 291:20, 292:10, 292:11, 292:14, 292:17, 292:20, 292:21, 293:24, 293:25, 294:7, 294:8, 294:16, 294:18, 295:22, 296:3, 296:7, 296:8, 296:20, 296:22, 297:6, 297:19, 297:20, 298:2, 298:7, 298:9, 298:10, 298:20, 299:1, 299:6, 299:14, 299:23, 300:4, 300:11, 300:25, 301:1, 301:3, 301:7, 301:8, 301:25, 302:7, 302:8, 302:16, 302:17, 303:9, 303:10, 304:9, 304:12, 304:24, 305:8, 314:15, 315:21, 316:2, 316:8, 316:11, 316:15, 317:13, 317:14, 319:22, 319:23, 322:21, 336:23, 345:3, 345:7, 345:10, 345:14, 345:16, 346:15, 347:8, 347:10, 349:13, 349:22, 349:25, 350:8, 350:11, 350:14, 351:11, 351:14, 352:1, 352:9, 352:11, 353:5, 353:10, 353:20, 357:12, 374:3, 376:14, 377:21, 380:17, 380:20, 382:9, 382:10, 382:15, 382:18, 383:11, 387:7, 387:21, 395:7, 400:16, 403:25, 404:7, 410:1, 410:2, 411:4, 411:12, 413:24, 413:25, 414:2, 415:19, 415:20, 415:23, 421:21, 423:9, 427:19, 427:24, 428:23, 435:2, 435:4, 438:3, 443:12, 444:10, 447:16
**corrected** [1] - 346:14
**correction** [1] - 346:9
**Corrections** [1] - 324:7
**correctly** [4] - 376:3, 376:12, 380:19, 421:8
**counsel** [22] - 251:6, 251:8, 271:6, 272:4, 272:5, 278:17, 307:16, 307:19, 311:23, 386:20, 391:20, 393:20, 405:6, 413:23, 423:11, 439:7, 440:18, 440:21, 440:24, 441:25, 442:8, 444:15
**Counsel** [2] - 271:10, 362:4
**count** [3] - 315:14, 398:18, 399:3
**counts** [1] - 405:22
**County** [7] - 252:17, 253:6, 253:7, 261:20, 436:2, 436:3
**couple** [7] - 261:24, 325:24, 405:25, 412:24, 421:4, 438:25, 439:20
**course** [17] - 268:18, 270:25, 273:25, 314:9, 377:20, 384:25, 395:19, 404:9, 406:5, 414:15, 416:9, 419:1, 431:25, 432:3, 432:14, 444:8, 446:23
**court** [13] - 261:7, 261:19, 279:11, 284:18, 344:2, 344:4, 425:3, 426:24, 427:1, 429:8, 436:4, 436:5, 436:7
**Court** [49] - 251:3, 253:7, 261:10, 261:11, 261:20, 273:23, 274:7, 274:22, 308:11, 311:19, 312:15, 317:10, 322:13, 322:16, 350:13, 388:13, 393:15, 393:18, 399:15, 401:19, 401:20, 401:21, 402:17, 405:14, 408:18, 409:2, 409:9, 410:5, 410:7, 410:9, 414:13, 418:6, 420:16, 427:1, 427:2, 428:25, 431:11, 431:23, 432:5, 432:16, 433:17, 435:19, 440:2, 443:20, 444:18, 447:10
**COURT** [376] - 250:1, 251:5, 251:10, 251:17, 251:19, 253:14, 253:17, 255:9, 256:19, 257:2, 257:13, 257:15, 257:20, 257:25, 258:6, 258:10, 258:20, 258:23, 259:18, 259:20, 259:24, 261:16, 261:25, 262:3, 262:8, 262:11, 262:13, 266:17, 266:23, 267:25, 269:18, 270:7, 270:9, 270:12, 270:14, 270:19, 270:24, 271:4, 271:8, 271:11, 271:16, 272:6, 272:9, 272:11, 272:18, 272:20, 272:25, 273:2, 273:9, 273:13, 273:21, 273:24, 274:9, 274:11, 274:15, 274:17, 274:19, 274:24, 275:4, 275:12, 275:14, 275:18, 276:8, 276:15, 277:1, 277:5, 277:14, 277:18, 277:20, 277:24, 278:12, 279:5, 279:8, 286:23, 287:22, 287:24, 290:13, 297:8, 298:21, 298:23, 302:21, 303:12, 304:15, 304:25, 306:2, 306:4, 306:7, 306:10, 306:13, 306:19, 306:24, 307:3, 307:6, 307:19, 307:22, 308:4, 308:6, 308:9, 308:13, 308:17, 308:20, 308:23, 308:25, 309:3, 309:5, 309:7, 309:9, 309:11, 309:13, 309:15, 309:17, 309:19, 309:21, 309:23, 309:25, 310:2, 310:4, 310:6, 310:8, 310:10, 310:12, 310:16, 310:18, 310:20, 310:22, 310:24, 311:1, 311:3, 311:5, 311:7, 311:9, 311:11, 311:13, 311:15, 311:22, 312:6, 312:10, 312:14, 312:17, 312:21, 313:3, 313:7, 313:11, 313:14, 313:17, 313:21, 313:24, 314:2, 314:6, 314:12, 314:16, 314:18, 314:21, 314:23, 314:25, 315:4, 315:7, 315:10, 315:16, 315:19, 315:22, 316:3, 316:6, 316:9, 316:12, 316:16, 316:19, 316:21, 316:24, 317:3, 317:8, 317:11, 317:15, 317:19, 318:4, 318:9, 318:11, 318:19, 318:23, 319:2, 319:6, 319:10, 319:24, 320:3, 320:7, 320:11, 320:14, 320:16, 320:18, 320:20, 320:22, 320:24, 321:1, 321:3, 321:7, 321:11, 321:13, 321:16, 321:19, 321:21, 321:23, 322:3, 322:12, 322:18, 322:22, 322:25, 323:2, 323:4, 323:6, 323:9, 323:11, 323:13, 323:16, 324:9, 324:11, 325:22, 326:11, 327:24, 328:24, 329:12, 343:17, 343:23, 343:25, 344:2, 344:4, 344:7, 344:9, 344:11, 344:13, 344:17, 345:20, 345:22, 345:24, 346:2, 346:8, 346:10, 346:12, 346:17, 350:3, 355:6, 358:18, 360:15, 361:21, 361:23, 361:25, 362:3, 362:7, 362:11, 362:18, 362:23, 363:4, 363:9, 363:11, 363:13, 363:16, 363:21, 364:10, 364:14, 367:1, 367:18, 367:24, 368:2, 368:5, 368:12, 369:1, 369:6, 369:8, 369:14, 371:5,

375:13, 375:20, 378:1, 378:6, 378:9, 378:19, 378:23, 379:4, 379:10, 385:24, 388:2, 388:4, 388:7, 388:15, 388:18, 389:5, 389:14, 389:18, 390:2, 390:6, 390:9, 390:11, 390:15, 390:17, 390:22, 390:25, 391:6, 391:15, 391:18, 392:9, 392:11, 392:21, 392:24, 393:2, 393:4, 393:6, 393:8, 393:12, 393:14, 393:20, 394:6, 394:10, 394:12, 394:19, 394:21, 394:25, 395:3, 395:6, 395:8, 395:13, 396:8, 396:12, 396:23, 397:1, 397:4, 401:6, 402:5, 402:19, 402:21, 407:24, 408:7, 408:24, 410:13, 413:15, 413:17, 419:8, 419:10, 419:13, 423:1, 423:7, 423:11, 424:11, 424:14, 425:6, 426:4, 426:6, 426:10, 434:14, 434:16, 434:19, 434:22, 437:19, 437:21, 437:23, 438:1, 438:4, 438:7, 438:12, 440:20, 441:5, 441:19, 442:4, 442:7, 442:15, 442:23, 443:1, 443:7, 443:10, 444:1, 444:5, 444:8, 445:19, 446:6, 446:10, 447:7
**Court's** [17] - 308:25, 309:5, 309:9, 309:13, 309:17, 309:21, 309:25, 310:4, 310:8, 310:12, 312:7, 312:23, 316:21, 317:12, 318:3, 318:21, 379:8
**Courthouse** [2] - 250:23, 409:24
**courthouse** [3] - 325:14, 404:25, 443:22
**courtroom** [4] - 276:25, 281:19, 426:18, 432:10
**Courts** [1] - 403:5
**cousin** [20] - 280:15, 280:20, 291:22, 294:25, 300:6, 324:25, 325:5, 325:7, 327:7, 327:15, 327:23, 327:25, 330:3, 330:11, 331:11, 331:15, 341:8, 352:9, 352:25, 353:7
**cousin's** [1] - 280:17
**cover** [1] - 334:2
**cranked** [1] - 447:5
**crashing** [1] - 331:12
**CRAWFORD** [1] - 251:12
**created** [1] - 299:6
**Crime** [3] - 252:18, 260:13, 263:20
**crime** [12] - 260:17, 261:8, 261:13, 262:18, 288:19, 288:23, 289:1, 291:16, 301:25, 303:4, 311:20, 404:17
**crimes** [4] - 259:12, 287:4, 343:7, 349:17
**criminal** [7] - 389:25, 398:13, 399:16, 411:8, 411:14, 411:17, 415:10
**Criminal** [1] - 250:6
**Cross** [7] - 448:10, 448:13, 448:19, 448:23, 449:2, 449:9, 449:13
**cross** [9] - 258:23, 265:17, 287:24, 344:17, 362:19, 363:18, 375:20, 413:17, 434:14
**CROSS** [7] - 259:1, 265:21, 288:1, 344:18, 375:22, 413:19, 434:23
**Cross-Examination** [7] - 448:10,

448:13, 448:19, 448:23, 449:2, 449:9, 449:13
**CROSS-EXAMINATION** [7] - 259:1, 265:21, 288:1, 344:18, 375:22, 413:19, 434:23
**cross-examination** [1] - 362:19
**crossed** [2] - 338:8, 338:20
**Crown** [3] - 303:21, 303:22, 304:7
**CRR** [2] - 250:23, 447:21
**cuffs** [2] - 357:9, 357:10
**cup** [1] - 272:16
**curb** [12] - 285:22, 335:10, 335:13, 336:8, 337:19, 354:16, 354:20, 355:9, 355:12, 355:16, 356:3, 356:9
**curious** [1] - 417:11
**custodian** [1] - 409:19
**custody** [4] - 410:11, 414:22, 423:3, 423:5
**customers** [1] - 327:7
**cut** [1] - 331:8

# D

**dark** [7] - 338:4, 339:6, 339:7, 339:23, 340:13
**dark-skinned** [7] - 338:4, 339:6, 339:7, 339:23, 340:13
**Darrell** [1] - 268:7
**Date** [1] - 447:21
**date** [13] - 288:10, 369:23, 404:17, 415:3, 416:4, 424:10, 426:25, 427:1, 431:2, 436:4, 436:7, 439:22, 440:11
**dates** [2] - 392:2, 413:24
**DAVID** [4] - 250:7, 426:11, 448:2, 449:11
**David** [9] - 271:25, 272:1, 312:1, 312:2, 351:17, 361:17, 397:13, 408:19, 426:9
**Davon** [5] - 280:18, 291:24, 291:25, 344:20, 344:24
**days** [2] - 423:19, 444:4
**days'** [1] - 263:24
**deadly** [2] - 343:11, 344:25
**deal** [5] - 418:15, 418:16, 435:15, 437:14
**debatable** [1] - 412:17
**December** [5] - 392:5, 424:10, 424:14, 425:9, 430:24
**decide** [1] - 442:18
**deciding** [1] - 389:3
**decision** [15] - 257:23, 389:7, 391:8, 391:11, 395:18, 396:21, 401:24, 401:25, 405:11, 413:12, 419:4, 420:10, 422:22
**declaration** [1] - 349:18
**declared** [1] - 261:7
**declined** [2] - 427:19, 433:10
**defendant** [2] - 269:23, 440:17
**DEFENDANT** [24] - 388:13, 388:24, 389:4, 389:9, 389:13, 389:22, 390:4,

390:7, 390:10, 390:13, 390:16, 391:10, 391:12, 391:14, 391:17, 391:19, 392:10, 392:12, 417:22, 418:11, 419:6, 419:9, 419:12, 441:8
**Defendant** [27] - 250:7, 250:16, 268:21, 269:3, 271:25, 272:1, 272:2, 272:5, 310:13, 311:17, 312:1, 312:2, 312:4, 314:1, 314:7, 314:13, 315:2, 315:11, 315:19, 315:25, 316:6, 319:18, 345:7, 362:4, 420:25, 437:22, 445:11
**Defendant's** [5] - 312:9, 319:17, 367:4, 367:16, 408:17
**defender** [2] - 406:1, 406:4
**Defender** [7] - 405:20, 421:12, 423:25, 439:13, 446:7, 446:9, 446:11
**Defender's** [10] - 397:20, 405:18, 406:10, 406:19, 410:10, 410:12, 410:17, 410:24, 438:13, 446:4
**defending** [1] - 391:21
**defense** [5] - 277:7, 391:24, 417:9, 422:22
**Defense** [42] - 251:8, 269:22, 270:22, 271:15, 278:1, 308:23, 309:1, 309:5, 309:11, 309:13, 309:19, 309:21, 310:2, 310:4, 310:10, 310:12, 310:16, 310:22, 310:24, 311:5, 311:7, 311:13, 313:18, 314:18, 314:21, 315:4, 316:21, 320:14, 320:16, 320:22, 320:24, 321:7, 321:16, 362:8, 367:18, 394:24, 395:4, 397:2, 410:13, 410:14, 438:10, 440:24
**DEFENSE** [2] - 448:16, 449:7
**define** [1] - 257:25
**definition** [10] - 256:16, 256:23, 257:11, 257:20, 257:21, 317:5, 318:3, 318:6, 318:7, 318:15
**degree** [3] - 256:22, 343:9, 344:21
**delay** [1] - 276:23
**deleterious** [1] - 440:14
**deliberate** [2] - 393:9, 396:17
**deliberations** [6] - 271:20, 393:22, 393:25, 395:25, 396:2
**demeanor** [1] - 285:10
**Demetrius** [10] - 278:4, 278:11, 324:25, 331:16, 332:23, 333:5, 333:13, 334:14, 335:9
**DEMETRIUS** [2] - 278:7, 448:17
**denied** [2] - 261:20, 274:4, 394:25
**deny** [2] - 351:6, 351:8
**Department** [7] - 252:11, 260:14, 260:25, 345:14, 364:25, 400:3, 403:16
**describe** [4] - 281:25, 287:1, 325:11, 359:22
**desk** [1] - 446:21
**destination** [2] - 280:25, 294:19
**destroy** [1] - 264:20
**destroyed** [3] - 421:19, 423:16, 446:17
**detained** [2] - 423:2, 423:5
**detective** [2] - 252:17, 386:17
**Detention** [2] - 436:2, 436:3

**determination** [2] - 258:5, 412:11
**determine** [1] - 271:20
**determined** [1] - 414:21
**devastating** [5] - 430:15, 430:17, 430:18, 434:10, 440:13
**developed** [1] - 263:9
**dicta** [2] - 442:17, 442:21
**difference** [2] - 379:16, 441:20
**different** [8] - 276:21, 285:12, 285:25, 363:3, 406:13, 412:4, 413:6, 444:24
**difficult** [7] - 265:6, 265:7, 270:3, 270:5, 284:18, 373:12
**diminish** [1] - 267:7
**dipped** [1] - 441:14
**dipping** [1] - 441:20
**dire** [3] - 253:14, 262:7, 262:13
**DIRECT** [7] - 252:6, 260:7, 278:18, 324:2, 364:16, 397:7, 426:13
**direct** [4] - 264:3, 264:5, 277:3, 441:1
**Direct** [7] - 448:10, 448:13, 448:18, 448:23, 449:2, 449:9, 449:12
**direction** [2] - 329:5, 416:7
**directly** [8] - 267:11, 267:19, 268:21, 269:3, 278:13, 300:8, 403:7, 442:11
**disappear** [2] - 443:23, 444:1
**discern** [1] - 263:15
**discovery** [14] - 400:9, 405:18, 405:20, 405:24, 406:12, 406:22, 406:23, 407:5, 407:16, 410:17, 413:3, 413:10, 439:10, 446:1
**discuss** [11] - 271:7, 273:4, 307:13, 388:9, 388:21, 389:8, 396:14, 417:2, 418:9, 419:2, 419:15
**discussed** [8] - 400:20, 400:22, 402:8, 410:8, 412:18, 412:19, 418:10, 418:25
**discussing** [2] - 417:3, 420:17
**discussion** [18] - 306:25, 398:10, 398:12, 398:22, 401:7, 401:8, 401:9, 406:8, 413:6, 413:8, 415:18, 418:17, 418:19, 420:16, 420:19, 422:6, 427:11, 439:15
**discussions** [4] - 398:14, 405:25, 417:5, 419:21
**dismissed** [3] - 392:13, 392:16, 395:22
**Dispatch** [1] - 365:24
**dispatch** [6] - 365:7, 365:16, 365:17, 370:6, 370:7, 377:21
**dispatched** [1] - 370:8
**dispatcher** [11] - 365:2, 365:6, 381:4, 381:5, 381:6, 384:13, 384:23, 384:25, 385:19, 400:3, 424:19
**disposed** [1] - 405:15
**disposition** [1] - 276:23
**dispute** [1] - 410:11
**disputed** [1] - 271:1
**disrupt** [1] - 419:14
**distribute** [4] - 389:21, 390:21, 391:2, 391:4
**DISTRICT** [2] - 250:1, 250:1
**District** [8] - 251:2, 251:3, 253:7,

339:19, 340:6, 371:1, 403:5, 409:1
**district** [2] - 370:25, 411:13
**Division** [3] - 260:14, 324:7, 439:23
**DIVISION** [1] - 250:2
**DOC** [1] - 324:7
**docket** [1] - 389:24
**Docket** [1] - 250:6
**document** [2] - 348:12, 408:22
**dollars** [1] - 325:24
**Don** [2] - 252:20, 252:24
**done** [9] - 251:11, 260:20, 348:15, 370:11, 411:15, 414:6, 422:15, 438:22, 442:19
**door** [12] - 275:5, 282:1, 289:22, 299:16, 299:17, 304:20, 304:22, 334:23, 334:24, 335:24, 355:1
**Dorado** [5] - 282:1, 289:22, 296:19, 299:4, 304:8
**double** [1] - 441:14, 441:20, 441:22
**doubt** [5] - 315:24, 317:24, 425:23, 432:3, 432:22
**down** [53] - 262:6, 270:9, 280:20, 283:24, 285:19, 285:20, 295:22, 306:4, 306:22, 316:4, 317:5, 324:12, 326:8, 331:24, 332:13, 337:6, 338:16, 338:19, 339:15, 339:16, 339:18, 339:19, 340:3, 340:5, 341:23, 348:11, 370:19, 371:11, 371:21, 372:25, 373:13, 374:17, 376:20, 386:24, 387:19, 388:4, 399:22, 399:23, 401:2, 401:4, 402:1, 402:12, 409:7, 415:1, 418:1, 418:24, 425:18, 426:6, 428:15, 428:20, 430:8, 437:16, 437:21
**downside** [1] - 446:22
**downtown** [2] - 329:23, 340:6
**drag** [1] - 435:12
**draw** [1] - 436:2
**drawn** [5] - 284:23, 332:11, 333:11, 353:13, 353:15
**drive** [5] - 280:25, 288:17, 294:14, 330:24, 331:2
**driver** [4] - 325:23, 325:25, 414:17, 415:5
**driver's** [6] - 296:14, 296:17, 298:5, 305:14, 305:15, 353:19
**driving** [14] - 288:16, 289:19, 289:20, 292:10, 296:2, 297:12, 297:17, 330:19, 331:1, 332:4, 356:10, 365:15, 383:3, 438:17
**drop** [3] - 281:11, 329:7, 329:8
**dropped** [1] - 440:6
**drug** [2] - 371:14, 371:15
**drunk** [10] - 345:17, 346:6, 346:15, 347:2, 349:25, 350:8, 351:17, 358:23, 359:1, 359:5
**dry** [1] - 264:11
**dude** [7] - 327:15, 328:13, 328:15, 328:16, 332:3, 335:25, 338:7
**due** [1] - 431:12
**dueling** [1] - 270:18

**DULY** [7] - 252:2, 260:2, 278:8, 323:18, 364:2, 397:6, 426:12
**during** [5] - 301:24, 394:23, 414:8, 419:21, 433:18
**duties** [2] - 260:15, 415:12
**duty** [2] - 322:8, 435:7

# E

**E-R-N-A-N-D-E-Z** [1] - 260:6
**ear** [1] - 428:8
**earliest** [1] - 308:4
**early** [4] - 276:10, 307:9, 406:24, 412:19
**easiest** [1] - 408:11
**East** [1] - 409:25
**easy** [2] - 265:6, 366:24
**ecstatic** [2] - 429:9, 429:19
**Edgar** [2] - 250:19, 386:17
**education** [1] - 260:22
**effect** [2] - 378:18, 414:1
**effort** [1] - 405:5
**efforts** [6] - 415:8, 421:4, 441:25, 443:14, 445:7, 445:21
**eight** [3] - 260:16, 414:20, 418:2
**either** [9] - 297:18, 300:23, 326:5, 347:20, 374:18, 406:6, 432:5, 435:14, 444:20
**El** [4] - 282:1, 289:22, 296:19, 299:4
**elaborate** [1] - 349:2
**election** [1] - 363:9
**element** [5] - 312:24, 314:6, 314:12, 315:2, 315:24
**elementary** [1] - 391:23
**ELMO** [3] - 274:10, 367:20, 367:23
**emergency** [1] - 439:16
**employed** [5] - 252:9, 252:10, 252:12, 260:12, 364:24
**employees** [1] - 260:17
**empty** [1] - 359:10
**encountered** [1] - 305:24
**end** [8] - 348:14, 365:10, 376:21, 378:14, 396:13, 421:13, 428:17, 428:18
**ended** [5] - 282:11, 290:9, 386:13, 443:17, 444:13
**ends** [1] - 368:9
**enforced** [1] - 445:18
**enforcement** [3] - 296:5, 299:5, 335:15
**enforcing** [1] - 442:18
**enter** [5] - 343:25, 366:5, 375:2, 375:5, 381:16
**entered** [6] - 368:22, 369:18, 370:5, 374:3, 375:8, 413:7
**entering** [1] - 395:14
**enters** [4] - 251:18, 277:23, 323:8, 395:2
**entire** [6] - 314:12, 385:8, 385:11, 403:21, 439:20, 439:25
**entitled** [2] - 409:1, 447:18
**ENTITLED** [1] - 250:10

entry [1] - 370:3
envelope [4] - 255:3, 255:14, 255:15, 255:22
envisage [1] - 269:1
equipment [1] - 251:7
erased [1] - 444:9
especially [1] - 267:14
ESQUIRE [2] - 397:5, 449:8
Esquire [2] - 250:17, 250:17
essentially [2] - 258:2, 317:1
estimate [2] - 253:8, 261:4
estimated [1] - 251:10
etched [1] - 254:5
evaporate [4] - 266:10, 266:11, 266:16, 266:18
evening [1] - 396:15
event [2] - 367:12, 421:9
events [1] - 415:6
eventually [2] - 296:1, 377:13
everywhere [1] - 284:14
evidence [24] - 253:20, 254:1, 255:16, 256:4, 262:21, 267:19, 268:22, 269:6, 273:16, 273:20, 273:25, 274:1, 277:6, 307:12, 318:19, 319:2, 367:16, 379:14, 379:18, 395:16, 395:17, 395:18, 395:19, 436:24
Evidence [2] - 409:17, 409:20
exact [5] - 371:13, 376:25, 435:10, 437:15, 444:6
exactly [6] - 267:9, 299:21, 358:3, 358:9, 429:18, 433:3
examination [2] - 253:13, 362:19
Examination [19] - 448:10, 448:10, 448:13, 448:13, 448:14, 448:18, 448:19, 448:19, 448:23, 448:23, 448:24, 449:2, 449:2, 449:3, 449:9, 449:9, 449:10, 449:12, 449:13
EXAMINATION [19] - 252:6, 259:1, 260:7, 265:21, 269:20, 278:18, 288:1, 303:14, 324:2, 344:18, 358:20, 364:16, 375:22, 386:1, 397:7, 413:19, 423:13, 426:13, 434:23
examined [1] - 254:11
examiner [2] - 252:10, 252:19
examining [1] - 253:3
example [1] - 271:18
exceeding [1] - 311:21
except [3] - 258:5, 302:15, 441:5
exceptions [1] - 403:21
exchange [3] - 304:4, 347:24, 355:21
exclude [1] - 362:25
excuse [7] - 252:13, 252:14, 275:3, 277:22, 288:6, 349:2, 428:13
excused [12] - 259:20, 259:21, 270:11, 273:8, 306:5, 307:18, 361:24, 386:6, 388:12, 396:22, 426:7, 437:22
Excused.................................. [7] - 448:11, 448:14, 448:20, 448:24, 449:3, 449:10, 449:13
exercise [2] - 441:8, 441:11

exhibit [2] - 255:8, 407:22
Exhibit [16] - 254:1, 255:13, 256:5, 263:11, 264:24, 264:25, 283:14, 301:18, 334:7, 348:8, 361:10, 367:4, 367:16, 378:2, 408:17, 438:10
exist [7] - 422:12, 431:6, 431:7, 431:16, 446:1, 446:3, 447:3
existed [3] - 403:10, 421:17, 424:23, 424:25, 443:20
existence [1] - 426:22
exists [1] - 421:24
exit [4] - 293:24, 296:1, 296:15, 300:20
expectation [1] - 424:21
expelling [1] - 258:16
experience [10] - 252:15, 256:21, 257:10, 258:16, 263:24, 399:9, 424:9, 438:21, 443:22, 444:12
expert [12] - 253:2, 253:9, 253:12, 253:18, 253:19, 258:4, 258:7, 261:7, 261:10, 261:13, 262:18, 262:23
expert's [1] - 253:20
expertise [1] - 261:22
explain [11] - 254:8, 254:25, 256:1, 264:15, 294:22, 295:10, 341:23, 368:17, 370:23, 371:21, 402:18
explained [1] - 429:24
explanation [1] - 376:7
explosion [1] - 258:17
expressed [1] - 412:20
extended [1] - 398:6
extending [1] - 416:19
extent [3] - 414:12, 415:24, 417:6

**F**

face [2] - 278:12, 327:20
faces [1] - 324:12
facing [4] - 299:10, 299:11, 360:14, 411:21
fact [13] - 317:25, 342:25, 345:3, 345:9, 351:16, 391:19, 392:13, 406:15, 415:13, 444:13, 444:17, 445:1, 445:14
factor [2] - 401:3, 402:2
factors [2] - 266:2, 267:12
facts [3] - 271:1, 317:6, 318:18
fail [2] - 257:18, 446:25
failure [2] - 273:17, 287:9
fair [2] - 402:11, 404:5
fairly [2] - 367:11, 444:2
fall [1] - 445:8
fallible [1] - 446:2
false [4] - 349:16, 349:18, 362:17, 363:1
familiar [7] - 256:16, 268:7, 281:2, 301:18, 341:19, 399:24, 411:13
far [7] - 317:18, 325:14, 418:2, 418:22, 429:15, 429:18
fast [2] - 315:16, 315:18
fax [1] - 406:25
FBI [1] - 260:25

February [2] - 344:22, 423:10
Federal [12] - 258:3, 258:8, 261:11, 397:20, 404:25, 407:17, 409:9, 421:11, 427:1, 427:2, 432:5, 447:5
federally [3] - 392:6, 405:3, 439:1
fee [1] - 282:19
fell [2] - 443:4, 446:25
felon [4] - 399:7, 399:9, 399:14, 412:13
felt [2] - 418:2, 445:12
female [1] - 406:18
Fernandez [7] - 259:22, 260:5, 261:13, 262:18, 262:25, 263:5, 265:25, 270:10
FERNANDEZ [2] - 260:1, 448:12
few [6] - 269:22, 281:10, 308:16, 330:10, 379:23, 403:20
FI [1] - 377:12
field [5] - 261:13, 365:9, 365:12, 377:13, 400:4
fifteen [2] - 321:6, 321:12
fifth [2] - 372:25, 374:16
figure [2] - 276:5, 394:8
file [25] - 403:21, 404:4, 404:11, 405:5, 405:17, 405:23, 406:22, 410:9, 410:12, 424:1, 438:17, 439:2, 439:3, 439:7, 439:20, 439:25, 444:21, 445:2, 445:4, 445:5, 446:4, 446:7, 446:11
filing [1] - 433:18
final [2] - 320:20, 422:13
finally [2] - 436:14, 445:9
fine [6] - 278:24, 295:2, 314:4, 316:20, 364:21, 447:1
fined [1] - 349:19
fines [1] - 302:11
finger [2] - 295:12, 326:11
fingerprint [13] - 260:20, 261:8, 261:14, 262:18, 264:10, 264:13, 264:18, 265:6, 266:9, 266:18, 267:9, 269:2, 270:4
fingerprints [12] - 260:19, 260:23, 261:21, 264:9, 266:3, 267:7, 267:20, 268:4, 268:16, 268:20, 268:24, 273:18
fingers [1] - 368:14
finishes [1] - 368:15
fire [3] - 254:11, 255:15, 256:3
firearm [42] - 254:5, 254:6, 254:9, 254:23, 255:1, 255:4, 256:3, 256:13, 256:16, 256:23, 257:6, 257:11, 258:16, 263:13, 265:19, 272:2, 272:3, 301:6, 301:25, 303:5, 303:9, 311:18, 312:3, 312:5, 314:1, 314:8, 314:14, 315:12, 315:20, 316:1, 316:7, 317:23, 317:25, 319:14, 319:17, 319:19, 348:20, 398:18, 399:7, 416:18, 417:15, 435:2
firearms [9] - 252:10, 252:19, 252:22, 253:2, 253:12, 253:18, 263:17, 264:2, 268:10
fired [11] - 254:13, 254:15, 254:17, 255:2, 255:23, 255:24, 256:6, 259:9, 259:14, 267:6

**fires** [1] - 256:10
**firing** [4] - 252:25, 254:18, 266:17
**First** [1] - 313:25
**first** [102] - 254:11, 259:4, 265:9, 270:23, 274:14, 275:6, 278:2, 282:7, 284:7, 284:16, 285:6, 285:7, 285:15, 286:9, 289:2, 289:8, 289:9, 289:18, 289:23, 290:7, 292:25, 294:10, 294:11, 294:12, 295:1, 295:4, 296:2, 296:24, 297:4, 297:13, 297:15, 297:16, 297:18, 297:21, 297:23, 297:24, 299:25, 304:13, 304:17, 308:20, 312:24, 314:6, 314:12, 314:13, 315:2, 315:13, 315:23, 322:4, 325:7, 328:6, 329:24, 330:1, 331:6, 340:9, 345:6, 348:19, 353:17, 353:22, 355:24, 364:6, 366:7, 371:3, 372:1, 372:11, 372:22, 374:5, 374:15, 379:23, 385:16, 398:8, 399:19, 401:2, 413:23, 416:4, 416:16, 417:6, 417:14, 421:5, 425:5, 425:8, 425:17, 426:20, 427:3, 427:5, 427:11, 427:14, 427:24, 429:8, 430:20, 434:16, 435:1, 435:9, 435:11, 436:5, 436:6, 439:22, 441:5, 443:3, 443:13
**fit** [3] - 322:3, 361:9, 361:11
**fitting** [1] - 283:5
**five** [24] - 307:10, 307:15, 321:14, 321:17, 321:19, 366:13, 401:21, 417:23, 417:24, 418:6, 418:15, 418:16, 420:16, 420:22, 428:16, 428:20, 428:25, 429:3, 429:5, 431:23, 432:16, 435:18, 435:24, 436:20
**five-year** [8] - 401:21, 418:15, 418:16, 420:16, 420:22, 429:5, 431:23, 432:16
**flag** [1] - 308:14
**flagging** [3] - 295:8, 295:10, 295:12
**flee** [1] - 297:5
**fleeing** [1] - 297:5
**Floor** [2] - 252:20, 252:24
**focal** [2] - 420:10, 420:13
**FOCR** [1] - 250:23
**focus** [2] - 418:20, 418:21
**focusing** [2] - 260:19, 443:12
**folder** [1] - 405:24
**folks** [6] - 321:3, 321:21, 323:4, 394:2, 437:23, 447:7
**follow** [2] - 434:17, 445:22
**follow-ups** [1] - 434:17
**followed** [1] - 338:17
**following** [14] - 257:16, 261:17, 270:15, 272:12, 277:8, 306:8, 316:13, 346:3, 362:12, 373:2, 376:11, 378:7, 381:10, 413:3
**follows** [2] - 272:1, 312:2
**foot** [1] - 376:22
**FOR** [4] - 250:1, 250:10, 448:7, 449:6
**force** [3] - 256:8, 264:20, 271:4
**Force** [1] - 386:17
**Ford** [2] - 303:21, 373:25

**foregoing** [1] - 447:16
**foreperson** [1] - 347:13
**forever** [1] - 423:22
**forgive** [1] - 368:7
**forgot** [1] - 333:17
**form** [4] - 263:17, 286:23, 320:24, 443:7
**formal** [1] - 272:20
**fortes** [1] - 368:8
**forth** [3] - 340:15
**forward** [5] - 299:19, 300:2, 341:4, 360:14, 398:15
**four** [9] - 299:16, 315:14, 328:12, 332:5, 332:6, 337:18, 356:11, 375:3, 433:12
**four-door** [1] - 299:16
**fourth** [1] - 409:12
**Fourth** [5] - 433:18, 433:21, 433:25, 434:4, 434:5
**FPD** [1] - 440:3
**frame** [2] - 270:3, 404:23
**Francisco** [1] - 268:10
**Frank** [2] - 260:6, 366:4
**Franklin** [6] - 372:4, 372:23, 373:5, 373:8, 374:6, 374:19
**frankly** [4] - 306:17, 439:6, 444:6, 444:14
**freeze** [3] - 266:12, 266:13, 266:14
**frequently** [1] - 410:3
**Friday** [1] - 438:14
**frisk** [2] - 337:10, 355:17
**frisked** [5] - 337:7, 354:15, 354:16, 354:17, 360:1
**frisking** [1] - 337:12
**front** [16] - 276:22, 281:24, 299:19, 300:1, 328:4, 328:5, 332:19, 336:10, 336:11, 336:12, 345:9, 347:7, 354:2, 392:15, 392:18, 392:20
**full** [3] - 330:17, 330:21, 396:9
**funds** [1] - 325:24
**furnished** [1] - 441:24

## G

**gained** [1] - 429:10
**Gary** [1] - 250:17
**gas** [4] - 281:10, 282:12, 295:5, 326:15
**gather** [1] - 322:19
**general** [2] - 398:13, 406:25
**generally** [3] - 264:10, 422:17, 443:15
**gentleman** [1] - 386:20
**gentlemen** [17] - 252:8, 252:14, 254:8, 254:25, 255:21, 256:2, 260:11, 263:1, 289:23, 294:22, 295:11, 297:21, 299:7, 323:9, 324:13, 356:14, 396:17
**George** [1] - 250:14
**Gillespie** [1] - 372:16
**Giordano** [3] - 250:23, 447:15, 447:21
**given** [9] - 258:10, 289:9, 375:16, 395:25, 396:20, 414:25, 429:24, 443:22, 445:16

**glad** [3] - 429:20, 436:17
**GOVERNMENT** [1] - 448:8
**Government** [87] - 250:13, 251:21, 251:22, 255:9, 259:22, 261:12, 265:19, 270:12, 270:17, 271:14, 271:17, 272:4, 272:7, 272:14, 273:9, 273:22, 277:25, 308:21, 309:3, 309:7, 309:9, 309:15, 309:17, 309:23, 309:25, 310:6, 310:8, 310:18, 310:20, 311:1, 311:3, 311:9, 311:11, 312:17, 313:11, 313:14, 313:16, 314:2, 314:4, 314:17, 314:23, 314:25, 315:8, 315:24, 316:19, 317:2, 317:6, 317:15, 317:21, 317:23, 318:4, 319:14, 319:19, 319:21, 320:12, 320:18, 320:20, 321:1, 321:4, 321:14, 321:19, 378:10, 386:21, 386:22, 389:11, 389:15, 390:3, 390:18, 393:2, 393:4, 398:4, 401:14, 401:16, 401:19, 408:9, 412:10, 420:6, 429:21, 430:9, 432:15, 432:19, 433:4, 435:24, 442:4, 442:25, 445:20, 446:1
**Government's** [15] - 254:1, 255:7, 255:13, 256:4, 263:11, 263:12, 264:24, 264:25, 283:14, 301:18, 334:7, 348:8, 361:10, 378:2, 400:20
**grab** [5] - 272:15, 286:14, 287:19, 298:2, 299:5
**grabbed** [7] - 285:19, 285:21, 286:4, 286:5, 297:25, 298:1, 298:3
**Grand** [27] - 341:10, 346:22, 346:24, 347:7, 347:13, 347:20, 348:19, 349:6, 349:9, 349:12, 349:24, 350:8, 350:16, 351:2, 351:4, 351:6, 351:13, 351:16, 351:20, 351:23, 351:25, 358:23, 359:13, 359:22, 392:15, 392:18, 392:20
**granted** [1] - 445:17
**grasping** [1] - 268:15
**grave** [1] - 399:16
**great** [2] - 364:14, 447:2
**green** [1] - 251:20
**Greenbelt** [1] - 253:7
**Grimm** [1] - 276:22
**Grimm's** [1] - 276:24
**groceries** [1] - 361:7
**gross** [2] - 391:20, 392:7
**grossly** [1] - 391:20
**ground** [10] - 299:11, 299:13, 300:17, 300:22, 300:24, 302:3, 303:8, 305:10, 305:18, 320:8
**grounds** [1] - 395:8
**group** [1] - 264:2
**guard** [1] - 254:4
**guess** [18] - 267:10, 270:18, 297:2, 297:11, 297:15, 315:1, 318:14, 330:15, 330:18, 354:9, 376:13, 377:4, 396:24, 409:7, 416:5, 424:23, 426:17, 446:10
**guessing** [1] - 288:21

**guidelines** [1] - 399:4
**guilt** [1] - 258:2
**guilty** [13] - 343:14, 344:12, 389:3, 398:11, 401:19, 416:2, 422:21, 431:12, 432:4, 441:14, 442:2, 445:24
**Gun** [6] - 285:23, 285:24, 335:19, 335:21, 376:13, 384:23
**gun** [76] - 254:3, 254:17, 255:15, 256:10, 257:25, 263:19, 263:22, 264:5, 264:6, 265:9, 265:10, 265:13, 266:17, 266:18, 267:5, 267:14, 267:19, 268:2, 268:13, 268:19, 270:2, 286:6, 286:13, 286:14, 286:18, 296:9, 300:15, 300:25, 301:17, 340:2, 340:18, 340:22, 341:9, 342:5, 342:8, 342:10, 342:12, 342:14, 342:16, 356:19, 356:21, 356:24, 357:5, 357:11, 357:13, 357:15, 357:18, 358:6, 358:14, 359:16, 359:17, 361:16, 373:21, 374:24, 375:7, 375:16, 384:6, 384:9, 384:15, 384:19, 384:20, 384:22, 384:24, 387:3, 387:12, 387:21, 399:8, 399:17, 405:14, 405:16, 406:2, 406:6, 406:10, 427:25, 429:23, 430:1
**guns** [17] - 252:25, 264:2, 264:3, 264:22, 265:5, 267:12, 284:23, 301:12, 331:19, 332:11, 333:10, 353:13, 353:14, 357:20, 360:5, 360:8
**guy** [4] - 293:3, 332:2, 332:4, 431:11
**guys** [1] - 356:9

# H

**H-A-R-R-I-S** [2] - 323:1, 324:1
**habit** [1] - 429:16
**hack** [17] - 294:9, 294:25, 295:9, 295:10, 295:12, 325:19, 326:6, 326:9, 326:14, 326:20, 328:6, 328:20, 353:2, 353:3, 353:7
**Hack** [1] - 326:6
**hacked** [2] - 279:24, 294:12
**hacking** [18] - 281:3, 281:5, 282:11, 288:19, 294:23, 296:3, 296:6, 302:5, 302:6, 325:20, 326:2, 326:16, 352:9, 352:11, 352:13, 352:15, 352:16, 352:25
**hacks** [1] - 327:5
**hailing** [3] - 294:24, 295:16, 326:9
**half** [4] - 322:1, 396:4, 432:13, 443:13
**halfway** [3] - 386:23, 387:19, 409:1
**Hamilton** [9] - 381:7, 381:13, 381:14, 383:22, 383:23, 384:8, 385:11, 385:14
**hand** [16] - 251:24, 259:25, 264:16, 267:20, 267:21, 269:3, 278:6, 283:13, 317:11, 326:8, 334:7, 357:6, 363:25, 408:12
**handcuffed** [2] - 336:25, 340:4
**handful** [2] - 416:11, 416:14

**handgun** [7] - 254:21, 256:14, 339:11, 339:12, 339:14, 340:10, 357:22
**handguns** [1] - 256:6
**handle** [1] - 260:17
**handled** [3] - 265:11, 267:16, 269:23
**handling** [1] - 268:21
**hands** [8] - 332:12, 333:3, 333:12, 334:21, 336:18, 354:13, 360:13, 430:8
**hands-down** [1] - 430:8
**hang** [5] - 280:1, 284:17, 330:8, 333:4, 338:2
**happy** [1] - 388:22
**Harbor** [1] - 280:5
**hard** [7] - 368:20, 373:1, 411:25, 416:8, 422:16, 422:19, 436:12
**harder** [1] - 402:7
**Harford** [1] - 253:6
**harm** [2] - 305:24, 318:15
**harmed** [1] - 318:12
**harmful** [1] - 441:2
**HARRIS** [2] - 323:17, 448:22
**Harris** [13] - 280:18, 291:24, 291:25, 322:24, 323:2, 323:15, 323:16, 323:20, 323:25, 324:4, 344:20, 344:24, 346:18
**HAZEL** [172] - 251:13, 259:22, 260:8, 261:12, 262:24, 265:16, 265:20, 266:21, 269:19, 269:21, 270:6, 270:13, 270:17, 270:21, 271:2, 271:6, 271:14, 271:23, 272:7, 273:10, 273:23, 276:13, 276:16, 283:15, 306:22, 308:22, 309:4, 309:8, 309:10, 309:16, 309:18, 309:24, 310:1, 310:7, 310:9, 310:19, 310:21, 311:2, 311:4, 311:10, 311:12, 311:23, 312:11, 312:18, 312:22, 313:13, 313:16, 314:4, 314:17, 314:19, 314:24, 315:1, 315:13, 316:20, 317:16, 318:2, 318:6, 318:10, 318:14, 318:21, 318:24, 319:5, 319:9, 319:23, 320:2, 320:6, 320:9, 320:13, 320:19, 320:21, 321:2, 321:6, 321:12, 321:15, 321:20, 321:25, 343:16, 343:22, 344:19, 346:13, 346:20, 348:8, 348:10, 348:14, 348:17, 350:6, 355:5, 355:7, 356:25, 358:16, 360:25, 361:22, 362:14, 362:20, 363:2, 363:8, 363:12, 363:14, 363:17, 367:17, 367:21, 375:21, 375:23, 377:23, 378:2, 378:12, 378:16, 378:20, 379:2, 379:6, 379:8, 379:22, 379:25, 380:1, 380:6, 380:9, 380:12, 380:14, 382:1, 382:5, 382:6, 383:7, 383:10, 383:21, 384:5, 385:3, 385:6, 385:7, 385:23, 388:3, 389:17, 389:19, 390:20, 390:23, 391:1, 393:5, 394:3, 394:7, 394:11, 395:11, 396:6, 401:5, 402:4, 413:14, 413:18, 413:20, 417:25, 418:14, 419:20, 422:4, 422:9, 422:25, 424:13, 425:1, 426:5, 434:15, 434:17, 434:20,

434:24, 437:18, 442:5, 442:9, 442:16, 442:24, 443:2, 443:9, 443:12, 444:4, 444:6, 444:10, 446:13, 447:9
**Hazel** [19] - 250:14, 275:25, 276:21, 396:3, 396:5, 396:12, 398:1, 401:17, 408:10, 410:8, 410:10, 413:22, 422:7, 425:1, 425:2, 425:21, 438:20, 441:14, 441:20
**HAZEL** ................ [1] - 448:14
**HAZEL** ................. [1] - 448:13
**HAZEL** ................ [4] - 448:23, 449:2, 449:9, 449:13
**hazy** [1] - 423:18
**head** [4] - 357:2, 380:5, 433:17, 433:22
**headed** [1] - 329:6
**hear** [31] - 278:16, 279:13, 280:12, 285:3, 285:23, 293:6, 298:21, 303:22, 304:4, 324:9, 335:17, 335:19, 364:12, 368:20, 379:13, 379:14, 379:15, 379:17, 379:18, 380:23, 380:24, 382:7, 383:11, 384:14, 384:17, 384:20, 385:8, 433:8, 436:13, 443:21
**heard** [16] - 272:17, 273:14, 273:18, 273:22, 342:11, 385:20, 386:5, 412:16, 412:24, 419:17, 419:18, 426:20, 429:2, 434:9, 438:9, 443:13
**HEARING** [1] - 449:5
**hearing** [10] - 276:22, 337:18, 362:16, 363:3, 407:23, 408:3, 408:4, 408:6, 417:11, 443:17
**HEARING** ...................................... [1] - 449:4
**height** [1] - 266:15
**held** [11] - 257:16, 261:17, 270:15, 272:12, 279:14, 306:8, 317:22, 317:25, 346:3, 362:12, 378:7
**help** [8] - 269:4, 269:7, 269:12, 306:22, 342:22, 352:6, 379:16, 411:20
**helping** [1] - 440:7
**helps** [2] - 407:18, 407:19
**hereby** [3] - 271:23, 311:25, 409:17
**heroin** [1] - 391:4
**hi** [1] - 323:25
**hide** [1] - 287:18
**high** [5] - 256:9, 280:3, 280:4, 364:11, 423:4
**high-tech** [1] - 256:9
**higher** [1] - 411:11
**highlights** [1] - 262:1
**himself** [2] - 331:12, 444:18
**history** [6] - 368:9, 368:10, 368:15, 389:25, 411:14, 411:17
**hits** [1] - 255:5
**hitting** [1] - 436:15
**hold** [9] - 252:16, 308:17, 315:16, 386:22, 389:2, 389:14, 390:6, 390:11, 390:15
**holding** [4] - 283:10, 284:1, 333:25, 360:13
**holdup** [1] - 251:9

**home** [7] - 290:10, 322:7, 350:20,
428:21, 430:4, 434:3, 440:14
**honest** [1] - 444:17
**honestly** [2] - 417:10, 420:17
**Honor** [172] - 251:8, 251:12, 251:15,
251:22, 253:11, 256:18, 256:24,
257:4, 257:14, 257:18, 258:4, 258:8,
258:22, 258:24, 259:19, 261:12,
262:2, 265:18, 270:13, 270:18,
271:14, 271:23, 272:8, 272:16,
273:10, 273:11, 273:15, 275:17,
276:13, 276:20, 277:17, 277:22,
278:3, 287:25, 288:4, 290:14, 297:7,
298:19, 302:20, 303:13, 306:3,
308:15, 308:22, 308:24, 309:2, 309:4,
309:6, 309:8, 309:10, 309:12, 309:14,
309:16, 309:18, 309:20, 309:22,
309:24, 310:1, 310:3, 310:5, 310:7,
310:9, 310:11, 310:15, 310:17,
310:19, 310:21, 310:23, 310:25,
311:2, 311:4, 311:6, 311:8, 311:10,
311:12, 311:14, 311:16, 311:24,
312:12, 312:18, 313:5, 313:20, 314:5,
314:15, 314:19, 314:20, 314:22,
314:24, 315:6, 315:14, 315:18, 316:4,
316:8, 316:13, 316:18, 316:22,
317:14, 317:16, 318:2, 318:14,
318:22, 319:5, 319:9, 320:2, 320:5,
320:6, 320:9, 320:10, 320:13, 320:15,
320:17, 320:19, 320:21, 320:23,
321:2, 321:25, 322:24, 323:14, 326:8,
345:18, 348:6, 350:1, 355:5, 358:17,
360:13, 361:22, 362:8, 362:10,
364:15, 367:15, 375:21, 377:24,
378:4, 385:23, 388:3, 388:13, 389:17,
389:19, 390:1, 391:5, 392:20, 393:5,
394:3, 394:4, 394:9, 394:11, 395:5,
395:12, 396:6, 396:7, 396:25, 408:23,
422:2, 424:15, 426:5, 434:15, 434:18,
438:6, 438:23, 439:19, 440:1, 440:23,
441:12, 442:5, 442:9, 442:24, 443:2,
443:13, 445:7, 445:16, 446:19,
446:22, 447:9
**HONORABLE** [1] - 250:11
**Honorable** [9] - 251:4, 274:7, 274:22,
308:11, 322:13, 322:16, 393:15,
393:18, 447:10
**hopefully** [3] - 276:6, 306:20, 322:9
**hoping** [1] - 319:6
**hopped** [7] - 337:25, 339:2, 339:7,
339:10, 356:17, 357:1
**hot** [5] - 266:9, 266:11, 266:15, 266:20,
269:10
**hour** [4] - 294:4, 322:1, 396:4, 437:25
**hours** [1] - 439:8
**house** [5] - 280:23, 325:8, 325:16,
326:18, 329:6
**houses** [1] - 280:21
**Howard** [1] - 253:6
**hundred** [2] - 362:24, 438:22

**hurt** [1] - 352:7
**hypothesis** [1] - 268:19
**hypothetical** [1] - 431:20
**hypotheticals** [1] - 269:22

**I**

**ID** [1] - 367:9
**ideal** [1] - 269:1
**identical** [1] - 408:16
**identification** [5] - 253:18, 264:21,
271:12, 348:7, 378:3
**identified** [1] - 387:12
**identify** [2] - 387:6, 408:1
**identifying** [1] - 253:1
**II** [2] - 250:6, 448:3
**illegal** [5] - 352:11, 352:13, 352:21,
352:24, 433:21
**immediate** [1] - 264:1
**immediately** [1] - 376:13
**Impala** [2] - 383:17, 383:18
**impeach** [2] - 390:3, 390:19
**impeachable** [1] - 389:15
**impeding** [1] - 305:3
**implement** [1] - 334:8
**important** [1] - 278:16
**impounded** [1] - 287:13
**impression** [1] - 259:4
**imprisonment** [2] - 311:20, 349:19
**improper** [1] - 430:2
**improvement** [1] - 399:9
**IN** [1] - 250:1
**in-service** [1] - 260:25
**inadvertent** [1] - 264:20
**incarcerated** [1] - 415:2
**incentive** [1] - 438:8
**incident** [3] - 288:11, 296:19, 327:9
**inclined** [2] - 442:24, 442:25
**include** [2] - 313:9, 317:6
**included** [1] - 400:9
**including** [1] - 269:22
**inclusion** [1] - 313:8
**incompetence** [1] - 391:21
**incompetent** [2] - 391:22, 391:25
**inconsistent** [1] - 427:6
**inconsistently** [1] - 401:3
**incorporating** [2] - 394:19, 395:8
**incorrect** [4] - 387:15, 387:21, 389:22,
389:23
**index** [1] - 326:11
**INDEX** [1] - 448:1
**indicate** [3] - 377:5, 377:7, 394:13
**indicated** [2] - 256:12, 263:12
**indicating** [2] - 360:10, 371:7
**indicted** [5] - 392:6, 392:16, 405:3,
409:9, 438:25
**Indictment** [12] - 272:4, 312:5, 312:10,
312:11, 312:13, 313:2, 317:23,
392:13, 392:14, 392:15, 392:18

**individual** [3] - 268:14, 292:2, 294:6
**individuals** [4] - 300:5, 345:3, 345:5,
345:12
**indulgence** [2] - 318:21, 379:8
**ineffective** [3] - 276:17, 391:21, 440:20
**ineffectiveness** [4] - 391:20, 392:7,
440:18, 442:7
**inflection** [1] - 446:25
**influence** [1] - 359:3
**information** [13] - 255:18, 282:10,
368:21, 369:18, 370:5, 373:23, 375:1,
375:4, 375:5, 375:8, 376:24, 429:24,
430:1
**informed** [4] - 374:24, 403:8, 420:3,
425:2
**initial** [3] - 374:11, 385:16
**initials** [1] - 254:4
**initiate** [5] - 368:15, 368:18, 368:21,
369:11, 369:17
**initiated** [2] - 370:4, 385:16
**injure** [1] - 345:25
**innocence** [1] - 258:2
**innocent** [1] - 402:10
**input** [1] - 373:23
**inputted** [1] - 376:17
**inputting** [2] - 375:9, 376:16
**inquire** [1] - 369:4
**inside** [1] - 355:2
**inspected** [1] - 255:18
**inspection** [3] - 409:23, 439:11, 446:15
**instance** [3] - 265:13, 412:4, 412:12
**instruct** [7] - 316:14, 319:3, 389:1,
393:7, 393:22, 395:24, 396:19
**instructed** [1] - 299:3
**instruction** [6] - 308:20, 314:22, 316:17,
316:25, 318:13, 320:20
**Instruction** [2] - 312:23, 316:21
**INSTRUCTIONS** [1] - 448:21
**instructions** [7] - 307:1, 307:20, 308:16,
317:9, 394:1, 396:20, 441:16
**instructs** [1] - 317:1
**insufficiency** [1] - 273:16
**insurance** [2] - 282:9, 365:16
**intend** [4] - 389:16, 390:3, 390:18,
391:9
**intent** [6] - 389:21, 390:20, 391:1,
391:2, 391:4, 409:17
**interchangeably** [1] - 410:4
**interesting** [4] - 435:11, 435:23, 436:18
**interests** [2] - 440:14, 445:12
**Internal** [1] - 415:15
**interrupt** [3] - 261:3, 307:24, 415:7,
437:12
**interruption** [1] - 274:16
**intersection** [1] - 326:4
**interview** [5] - 377:13, 414:17, 414:23,
415:4
**interviewed** [2] - 415:3, 443:16
**investigate** [3] - 414:9, 415:9, 415:17

**investigating** [1] - 348:19
**investigation** [2] - 422:23, 443:15
**investigative** [1] - 414:13
**investigator** [23] - 402:24, 403:1, 403:3, 403:7, 403:9, 403:18, 404:9, 404:15, 414:10, 414:14, 415:4, 416:12, 421:22, 424:23, 440:4, 440:6, 440:7, 440:8, 443:17, 443:18, 445:23
**involved** [1] - 433:12
**involvement** [1] - 263:21
**involving** [1] - 420:13
**Iraq** [10] - 401:15, 416:22, 416:25, 419:22, 419:24, 420:13, 427:15, 433:5, 433:8, 433:11
**issue** [15] - 271:3, 276:17, 277:10, 315:1, 398:16, 400:22, 416:21, 416:24, 417:1, 417:2, 419:2, 419:22, 420:13, 420:17, 445:14
**issued** [6] - 261:23, 302:4, 302:6, 302:9, 303:2, 424:16
**issues** [2] - 400:12, 412:7
**item** [2] - 254:2, 264:19
**items** [1] - 264:24
**itself** [2] - 379:15, 405:16

---

**J**

**jacket** [1] - 255:24
**jail** [5] - 324:20, 341:24, 342:3, 343:4, 441:3
**James** [8] - 250:15, 251:22, 252:5, 322:24, 323:15, 323:25, 344:20, 344:24
**JAMES** [4] - 252:1, 323:17, 448:9, 448:22
**January** [2] - 390:4
**jeopardy** [1] - 441:22
**Jerome** [1] - 431:11
**job** [7] - 261:2, 263:23, 263:24, 277:11, 279:14, 366:17, 447:2
**John** [1] - 436:11
**join** [1] - 367:19
**joint** [2] - 319:21, 319:24
**jointly** [2] - 270:24, 270:25
**journey** [1] - 280:19
**joy** [1] - 445:23
**Jr** [3] - 251:4, 278:4, 278:11
**JR** [3] - 250:11, 278:7, 448:17
**Judge** [69] - 257:12, 259:17, 261:15, 261:19, 261:21, 262:11, 267:24, 269:14, 274:12, 275:1, 275:7, 276:22, 276:24, 279:11, 287:21, 287:23, 306:1, 306:6, 306:11, 307:21, 307:24, 321:8, 321:22, 322:6, 326:12, 344:14, 344:15, 344:16, 346:5, 358:19, 361:20, 362:1, 362:6, 362:25, 366:25, 368:23, 369:4, 369:9, 369:15, 373:12, 375:12, 375:19, 378:10, 385:25, 387:25, 389:1, 392:23, 392:25,

394:15, 407:22, 408:8, 409:1, 409:12, 413:16, 419:12, 426:3, 426:8, 432:15, 432:19, 434:13, 437:24, 438:10, 439:6, 440:10, 440:25, 441:11, 445:20, 445:24, 446:5
**judgment** [3] - 272:22, 272:23, 411:18
**Judgment** [2] - 273:12, 394:18
**July** [4] - 416:5, 426:24, 429:8, 436:5
**juncture** [1] - 413:6
**June** [1] - 390:7
**junior** [2] - 403:2, 440:7
**JUROR** [1] - 324:10
**jurors** [1] - 368:13
**JURORS** [3] - 323:10, 368:1, 369:7
**JURY** [1] - 250:11
**jury** [81] - 251:6, 251:17, 252:9, 252:15, 253:17, 255:1, 255:22, 256:2, 257:22, 259:3, 260:12, 262:17, 263:1, 271:13, 271:16, 272:21, 273:2, 273:25, 274:3, 277:18, 277:24, 277:25, 278:13, 279:12, 281:25, 282:5, 284:13, 289:23, 290:13, 294:22, 295:11, 297:21, 299:8, 306:25, 307:8, 307:10, 307:14, 308:2, 308:16, 312:16, 317:9, 318:17, 323:4, 324:9, 324:13, 324:15, 341:13, 343:6, 343:13, 359:13, 362:15, 362:21, 365:23, 367:24, 368:17, 368:20, 369:5, 369:6, 370:23, 371:6, 373:1, 377:25, 379:1, 379:12, 379:19, 379:21, 388:7, 389:1, 393:9, 394:2, 394:16, 395:14, 396:11, 396:13, 396:16, 441:12, 441:16, 441:17, 442:2
**Jury** [35] - 251:18, 273:8, 277:23, 307:18, 323:8, 341:10, 346:22, 346:24, 347:7, 347:13, 347:20, 348:19, 349:6, 349:9, 349:12, 349:24, 350:8, 350:16, 351:2, 351:4, 351:7, 351:13, 351:16, 351:20, 351:23, 351:25, 358:23, 359:13, 359:22, 388:12, 392:15, 392:18, 392:20, 395:2, 396:22
**Justin** [1] - 250:17
**Juvenile** [1] - 261:11

---

**K**

**keep** [12] - 265:10, 279:5, 324:14, 325:22, 327:24, 328:24, 334:21, 339:25, 364:11, 390:13, 391:19, 438:8
**keeping** [1] - 308:3
**keeps** [2] - 365:24, 400:3
**kept** [7] - 334:20, 423:22, 424:3, 424:4, 424:8, 438:20
**KGA** [22] - 403:13, 404:5, 410:4, 421:5, 421:17, 421:19, 423:15, 424:5, 424:12, 430:11, 431:9, 431:12, 431:14, 433:2, 433:3, 439:14, 439:23, 439:24, 441:25, 444:20, 446:16,

446:20
**kick** [3] - 401:18, 436:18, 436:19
**kidnapping** [4] - 405:10, 405:21, 406:20, 423:2
**kind** [20] - 264:8, 275:25, 287:7, 338:4, 340:13, 343:25, 354:23, 355:21, 356:6, 368:14, 393:24, 398:13, 398:16, 403:2, 405:12, 420:9, 424:7, 425:3, 429:20
**King** [17] - 292:14, 292:17, 329:19, 337:24, 338:8, 338:9, 338:16, 338:21, 338:23, 372:4, 372:23, 373:5, 373:7, 373:8, 374:7, 377:11
**Klasey** [1] - 268:7
**knowing** [4] - 320:3, 352:4, 443:22
**knowingly** [4] - 349:6, 349:9, 349:12, 349:16
**knowledge** [6] - 256:21, 257:10, 258:15, 303:7, 415:5, 431:9
**known** [3] - 431:24, 432:1, 435:19
**knows** [3] - 302:22, 401:6, 411:10

---

**L**

**Lab** [4] - 252:18, 260:13, 260:14, 263:20
**ladies** [16] - 252:8, 252:14, 254:8, 254:25, 255:21, 256:2, 260:11, 262:25, 289:22, 294:22, 295:10, 297:21, 299:7, 323:9, 324:13, 396:17
**language** [8] - 311:19, 312:8, 312:16, 317:8, 317:17, 318:12, 442:12
**languished** [1] - 407:12
**large** [1] - 361:4
**largely** [1] - 273:16
**last** [26] - 252:4, 260:4, 275:24, 278:10, 322:25, 323:24, 324:6, 324:18, 354:9, 361:17, 364:4, 371:4, 372:1, 375:15, 378:21, 378:23, 384:6, 385:15, 395:15, 412:24, 416:5, 422:13, 438:22, 438:23, 445:9, 445:19
**lastly** [4] - 268:2, 270:2, 349:15, 411:5
**lasts** [1] - 371:2
**late** [2] - 392:10, 393:24
**latent** [3] - 263:6, 263:7, 263:17
**law** [9] - 296:5, 299:5, 335:15, 341:20, 395:24, 396:20, 440:18, 440:22, 442:23
**lawyer** [7] - 362:24, 389:8, 417:9, 419:15, 422:22, 438:24, 447:1
**Layne** [2] - 263:20, 263:23
**leading** [1] - 304:25
**learn** [4] - 415:21, 426:22, 427:14
**learned** [12] - 284:7, 424:7, 425:11, 426:24, 427:2, 427:16, 428:9, 428:10, 429:12, 442:6, 444:6, 444:7
**learner's** [1] - 288:13, 330:21
**learning** [1] - 252:22
**least** [6] - 376:7, 398:6, 407:21, 421:19, 434:9, 442:12

**leave** [6] - 264:8, 264:13, 276:12, 277:1, 277:9, 307:16
**led** [2] - 340:3, 421:20
**left** [12] - 259:14, 263:7, 270:17, 279:16, 280:22, 300:10, 322:5, 326:21, 335:24, 335:25, 356:14, 414:20
**legal** [6] - 257:20, 257:21, 318:7, 348:20, 434:1
**legally** [11] - 272:1, 311:18, 312:3, 314:1, 314:7, 314:13, 315:3, 315:11, 315:19, 315:25, 316:6
**legit** [2] - 330:3, 330:11
**lent** [1] - 277:12
**less** [10] - 263:24, 265:14, 270:3, 276:25, 277:13, 321:6, 375:18, 376:13, 398:25, 413:10
**less-than-perfect** [1] - 265:14
**letter** [2] - 415:13, 445:22
**letting** [3] - 390:13, 391:25, 436:16
**level** [1] - 414:3
**Levin** [9] - 398:3, 398:10, 398:17, 412:19, 412:20, 416:17, 416:18, 425:21, 433:4
**license** [18] - 282:2, 284:25, 293:17, 293:19, 325:25, 330:3, 330:16, 330:17, 330:18, 330:20, 330:22, 331:2, 332:23, 332:24, 332:25, 334:14, 365:8, 365:15
**licensed** [1] - 288:17, 352:19
**lie** [1] - 349:16
**lied** [2] - 349:6, 357:10
**life** [2] - 326:25, 425:20
**lift** [2] - 261:5, 264:6
**lifting** [1] - 260:23, 390:12
**light** [9] - 332:3, 339:4, 356:10, 358:2, 358:3, 382:12, 383:16, 434:25
**light-skinned** [6] - 332:3, 339:4, 356:10, 358:2, 358:3
**lights** [2] - 292:20, 436:15
**likely** [7] - 266:10, 267:6, 267:20, 268:15, 268:20, 404:7, 445:1
**Line** [4] - 348:11, 350:18, 350:25
**line** [22] - 262:6, 279:9, 319:25, 348:13, 370:18, 371:11, 371:21, 372:1, 372:2, 372:11, 372:25, 373:3, 373:11, 373:13, 373:20, 373:22, 374:16, 380:6, 387:2, 406:22, 407:6
**lines** [2] - 372:17, 379:23
**Lisa** [1] - 272:16
**listening** [2] - 384:14, 428:8
**litigate** [1] - 393:11
**live** [4] - 342:1, 342:25, 352:3, 424:18
**lives** [1] - 346:12
**living** [1] - 365:19
**loaded** [1] - 254:13
**local** [1] - 406:10
**location** [19] - 294:20, 366:7, 366:8, 371:13, 371:16, 372:3, 372:18, 372:21, 373:2, 373:4, 374:13, 374:14, 374:16, 374:19, 377:17, 381:18,

381:25, 382:21, 382:22
**locations** [1] - 374:8
**Lock** [1] - 361:15
**lock** [2] - 436:8, 436:16
**locking** [1] - 357:10
**Lombard** [2] - 250:24, 366:10
**look** [9] - 301:18, 324:13, 360:23, 368:25, 370:18, 380:15, 408:10, 408:12, 438:15
**looked** [4] - 285:13, 286:4, 334:8, 360:20
**looking** [2] - 375:9, 398:15
**looks** [2] - 265:13, 281:25
**loop** [1] - 438:20
**lost** [3] - 276:4, 342:17, 346:12
**loud** [2] - 279:5, 324:14, 358:15
**lubricated** [1] - 265:10
**lunch** [2] - 276:10, 307:9
**Luther** [17] - 292:13, 292:16, 329:19, 337:24, 338:8, 338:9, 338:16, 338:21, 338:23, 372:4, 372:22, 373:4, 373:5, 373:7, 373:8, 374:7, 377:11

## M

**ma'am** [2] - 364:3, 380:2
**machine** [1] - 274:18
**Madam** [4] - 255:7, 366:19, 368:3, 408:2
**magazine** [1] - 264:25
**mail** [2] - 276:2, 437:10
**mailed** [1] - 437:11
**main** [1] - 267:13
**male** [1] - 406:21
**man** [12] - 259:5, 279:16, 279:24, 280:6, 280:24, 306:18, 326:21, 327:2, 391:25, 397:11, 429:9, 437:1
**Man** [1] - 437:1
**manager** [1] - 436:12
**mandatory** [2] - 399:13, 399:18
**manufacture** [2] - 390:20, 391:2
**MARCH** [2] - 251:1, 448:3
**March** [4] - 250:9, 390:23, 390:25, 423:10
**mark** [5] - 253:3, 253:12, 253:18, 361:1, 407:22
**marked** [16] - 254:1, 255:12, 263:10, 268:3, 283:13, 292:19, 292:22, 331:7, 332:4, 338:17, 348:7, 356:10, 360:24, 360:25, 367:3, 400:16
**markedly** [2] - 413:2, 440:14
**marks** [1] - 334:8
**MARSHAL** [1] - 275:9
**Marshal** [1] - 440:4
**Marshals** [1] - 275:7
**Martin** [20] - 250:23, 292:13, 292:16, 329:19, 337:24, 338:8, 338:9, 338:16, 338:20, 338:22, 372:4, 372:22, 373:4, 373:5, 373:7, 373:8, 374:7, 377:11, 447:15, 447:21

**MARYLAND** [1] - 250:1
**Maryland** [15] - 250:8, 250:24, 251:3, 252:18, 252:20, 256:13, 290:16, 403:24, 404:1, 408:19, 409:2, 409:16, 409:20, 421:12
**master** [4] - 424:2, 424:4, 424:6, 424:8
**matched** [1] - 254:17
**matches** [1] - 263:16
**matter** [8] - 259:11, 270:22, 393:24, 401:20, 406:4, 423:6, 446:23, 447:18
**MATTER** [1] - 250:10
**matters** [1] - 415:11
**maximum** [2] - 398:18, 399:18
**McAllister** [1] - 416:12
**McCormick** [2] - 279:3, 279:4
**mean** [69] - 261:3, 265:10, 268:6, 269:24, 281:5, 281:6, 285:11, 285:13, 285:20, 285:22, 287:2, 287:3, 288:6, 292:20, 294:11, 295:4, 295:6, 297:2, 297:12, 298:4, 318:7, 318:16, 325:20, 328:11, 330:2, 330:4, 330:20, 331:15, 333:11, 337:5, 341:20, 343:3, 343:21, 344:2, 352:4, 352:16, 365:3, 365:6, 370:3, 370:23, 372:17, 373:3, 373:14, 373:20, 374:13, 374:17, 381:3, 387:4, 400:12, 400:23, 404:12, 407:6, 415:7, 416:8, 418:22, 425:20, 429:10, 429:13, 429:15, 429:18, 433:14, 434:25, 435:12, 436:2, 439:15
**meaning** [3] - 355:2, 355:3, 360:9
**means** [15] - 267:5, 295:11, 299:22, 317:20, 319:10, 319:16, 343:14, 343:24, 344:3, 370:11, 371:21, 372:19, 373:4, 377:12, 439:17
**meant** [4] - 263:1, 263:5, 264:23, 362:14
**median** [4] - 284:15, 326:4, 336:15, 336:22
**meet** [4] - 257:11, 416:12, 418:8, 428:7
**meetings** [1] - 428:10
**meets** [3] - 256:23, 257:21, 257:23
**member** [1] - 379:21
**members** [21] - 253:17, 262:17, 271:16, 273:2, 277:24, 277:25, 278:13, 279:12, 307:8, 324:9, 324:15, 341:12, 345:13, 347:20, 367:24, 369:6, 371:6, 379:12, 388:7, 395:14, 396:13
**memos** [1] - 405:18
**mention** [1] - 267:10
**mentioned** [16] - 256:1, 266:2, 267:2, 267:5, 267:16, 269:22, 279:11, 286:6, 300:5, 346:21, 360:19, 377:3, 401:12, 411:5, 423:15, 425:17
**Merit** [1] - 447:15
**merits** [1] - 401:8
**messages** [1] - 414:20
**met** [5] - 259:5, 378:24, 397:9, 397:10, 427:3
**MICHAEL** [2] - 397:5, 449:8
**Michael** [1] - 436:11
**microphone** [9] - 278:14, 279:8, 324:11,

324:12, 346:17, 346:18, 368:20, 368:25

**mid** [1] - 268:23

**mid-May** [1] - 268:23

**midday** [1] - 266:15

**middle** [4] - 266:19, 269:9, 330:9, 331:8

**might** [21] - 274:14, 280:16, 285:2, 286:11, 287:12, 292:22, 298:12, 408:7, 408:11, 411:6, 412:4, 412:8, 412:9, 412:10, 415:10, 420:6, 420:12, 422:2, 433:17, 434:17, 442:18

**military** [1] - 369:21

**mind** [10] - 308:3, 412:9, 412:22, 413:11, 425:23, 430:3, 430:5, 430:6, 432:22, 436:9

**mine** [1] - 408:9

**minimum** [2] - 399:13, 399:18

**minor** [1] - 439:20

**minute** [11] - 280:1, 283:18, 294:4, 327:18, 334:13, 339:25, 346:2, 366:13, 366:15, 375:18, 376:13

**minutes** [22] - 273:3, 273:6, 276:3, 276:25, 277:4, 277:6, 307:10, 307:15, 321:6, 321:12, 321:14, 321:15, 321:20, 322:4, 325:15, 366:13, 372:7, 388:8, 418:11, 437:25, 440:2, 446:21

**mirror** [1] - 284:10

**misconduct** [2] - 392:19

**misleading** [1] - 259:3

**missing** [1] - 446:10

**misspoke** [1] - 389:6

**mistake** [1] - 447:3

**mistaken** [1] - 444:19

**misunderstood** [2] - 385:13, 412:16

**MLK** [1] - 374:19

**Mobile** [1] - 260:14

**moisture** [1] - 266:13

**moment** [10] - 251:15, 271:7, 362:2, 366:25, 379:3, 379:5, 387:25, 389:14, 390:15, 394:7

**momentarily** [3] - 275:8, 275:12, 275:15

**money** [10] - 279:23, 281:11, 282:10, 282:12, 294:15, 294:25, 295:5, 325:24, 326:15, 378:13

**monitor** [2] - 366:1, 368:2

**monitors** [2] - 367:24, 375:3

**month** [1] - 287:16

**months** [11] - 392:5, 404:24, 407:13, 428:1, 428:2, 428:12, 428:19, 432:2, 432:20, 445:25

**morning** [22] - 251:5, 251:19, 251:20, 255:18, 260:9, 260:10, 265:23, 265:24, 278:20, 278:21, 281:20, 393:22, 393:25, 395:23, 396:15, 396:18, 425:13, 435:10, 438:16, 441:15, 441:17, 442:1, 447:8

**most** [3] - 268:20, 297:5, 440:3

**mostly** [1] - 266:13

**mother** [2] - 282:11, 282:12

**mother's** [1] - 280:23

**motion** [8] - 272:20, 274:3, 326:9, 393:11, 394:25, 438:11, 440:15, 445:17

**Motion** [3] - 273:11, 394:17, 401:8

**motions** [8] - 362:16, 363:2, 394:19, 394:20, 408:2, 408:4, 408:6, 433:19

**MOTIONS** [2] - 449:4, 449:5

**Motorola** [1] - 375:3

**mouth** [4] - 278:15, 328:12, 340:22, 358:15

**move** [12] - 272:21, 272:23, 273:11, 299:19, 300:1, 332:12, 333:10, 333:12, 346:18, 355:3, 367:16, 368:24

**moved** [1] - 326:8

**moves** [3] - 261:13, 333:10, 354:22

**moving** [8] - 264:17, 287:8, 302:4, 302:15, 374:17, 382:18, 382:23, 418:5

**MR** [495] - 251:7, 251:13, 251:14, 251:22, 252:7, 253:11, 253:16, 253:23, 253:24, 255:7, 255:11, 256:18, 256:20, 256:24, 256:25, 257:4, 257:5, 257:12, 257:14, 257:18, 257:24, 258:3, 258:7, 258:12, 258:14, 258:19, 258:22, 258:24, 259:2, 259:17, 259:19, 259:22, 260:8, 261:12, 261:15, 261:19, 262:1, 262:5, 262:10, 262:15, 262:24, 265:16, 265:18, 265:20, 265:22, 266:21, 266:24, 267:24, 268:1, 269:14, 269:19, 269:21, 270:6, 270:8, 270:13, 270:17, 270:21, 271:2, 271:6, 271:14, 271:23, 272:7, 272:10, 272:14, 272:19, 272:23, 273:10, 273:11, 273:15, 273:23, 274:10, 274:12, 274:20, 275:1, 275:5, 275:10, 275:13, 275:16, 275:19, 276:13, 276:16, 276:19, 277:4, 277:10, 277:16, 277:22, 278:3, 278:19, 279:10, 283:15, 286:22, 286:24, 286:25, 287:21, 287:23, 287:25, 288:2, 288:4, 288:6, 288:7, 290:14, 290:15, 293:11, 297:7, 297:9, 298:19, 298:22, 298:25, 302:20, 302:22, 302:24, 303:11, 303:13, 303:15, 304:14, 304:18, 304:23, 305:1, 305:2, 306:1, 306:3, 306:6, 306:11, 306:16, 306:20, 306:22, 306:23, 306:25, 307:5, 307:21, 307:24, 308:5, 308:8, 308:15, 308:19, 308:22, 308:24, 309:2, 309:4, 309:6, 309:8, 309:10, 309:12, 309:14, 309:16, 309:18, 309:20, 309:22, 309:24, 310:1, 310:3, 310:5, 310:7, 310:9, 310:11, 310:14, 310:17, 310:19, 310:21, 310:23, 310:25, 311:2, 311:4, 311:6, 311:8, 311:10, 311:12, 311:14, 311:16, 311:23, 311:24, 312:8, 312:11, 312:12, 312:15, 312:18, 312:22, 313:5, 313:8, 313:13, 313:16, 313:19, 313:22, 313:25, 314:4, 314:9, 314:15, 314:17,

314:19, 314:20, 314:22, 314:24, 315:1, 315:6, 315:8, 315:11, 315:13, 315:14, 315:18, 315:21, 316:2, 316:4, 316:8, 316:11, 316:13, 316:18, 316:20, 316:22, 316:25, 317:4, 317:9, 317:14, 317:16, 318:2, 318:6, 318:10, 318:14, 318:21, 318:24, 319:5, 319:9, 319:23, 320:2, 320:5, 320:6, 320:9, 320:10, 320:13, 320:15, 320:17, 320:19, 320:21, 320:23, 320:25, 321:2, 321:6, 321:8, 321:12, 321:15, 321:18, 321:20, 321:22, 321:24, 321:25, 322:6, 322:21, 322:24, 323:5, 323:12, 323:14, 323:20, 324:3, 324:16, 324:17, 326:7, 326:12, 326:13, 328:3, 329:2, 329:14, 334:5, 343:16, 343:19, 343:20, 343:22, 344:14, 344:19, 345:18, 345:21, 345:23, 346:1, 346:5, 346:9, 346:13, 346:20, 348:6, 348:8, 348:10, 348:14, 348:17, 350:1, 350:6, 355:5, 355:7, 356:25, 358:16, 358:19, 358:21, 360:12, 360:16, 360:18, 360:24, 360:25, 361:1, 361:3, 361:20, 361:22, 362:1, 362:5, 362:8, 362:14, 362:20, 363:2, 363:8, 363:10, 363:12, 363:14, 363:17, 363:23, 364:15, 364:17, 366:19, 366:22, 366:24, 367:2, 367:15, 367:17, 367:19, 367:21, 367:22, 368:6, 368:23, 369:2, 369:4, 369:9, 369:10, 369:15, 369:16, 371:7, 371:8, 375:12, 375:14, 375:19, 375:21, 375:23, 377:23, 378:2, 378:4, 378:10, 378:12, 378:13, 378:16, 378:17, 378:20, 378:21, 378:25, 379:2, 379:6, 379:8, 379:22, 379:25, 380:1, 380:6, 380:9, 380:12, 380:14, 382:1, 382:5, 382:6, 383:7, 383:10, 383:21, 384:5, 385:3, 385:6, 385:7, 385:23, 385:25, 386:2, 387:25, 388:3, 388:14, 388:17, 388:20, 388:25, 389:6, 389:10, 389:17, 389:19, 389:25, 390:20, 390:23, 391:1, 391:8, 391:11, 392:23, 392:25, 393:3, 393:5, 393:7, 393:9, 393:13, 394:3, 394:7, 394:11, 394:15, 394:20, 394:23, 395:4, 395:7, 395:11, 396:6, 396:24, 397:2, 397:8, 401:5, 401:11, 402:4, 402:13, 403:12, 407:22, 407:25, 408:1, 408:2, 408:5, 408:8, 408:14, 408:15, 408:23, 408:25, 409:3, 409:11, 409:13, 410:7, 410:14, 410:15, 413:14, 413:16, 413:18, 413:20, 417:25, 418:14, 419:20, 422:4, 422:9, 422:25, 423:12, 423:14, 424:13, 425:1, 425:7, 426:3, 426:5, 426:8, 426:14, 434:13, 434:15, 434:17, 434:20, 434:21, 434:24, 437:18, 437:20, 437:24, 438:3, 438:5, 438:8, 438:13, 440:22, 441:10, 441:23, 442:5, 442:9, 442:16, 442:24,

443:2, 443:9, 443:12, 444:4, 444:6, 444:10, 445:20, 446:8, 446:13, 446:14, 447:9, 448:10, 448:10, 448:13, 448:13, 448:14, 448:18, 448:19, 448:19, 448:23, 448:23, 448:24, 449:2, 449:2, 449:3, 449:9, 449:9, 449:10, 449:12, 449:13
**MRDCC** [2] - 324:7, 324:19
**MS** [1] - 251:12
**multiple** [1] - 270:2
**murder** [2] - 343:9, 344:21
**must** [3] - 315:24, 317:24, 347:18

## N

**name** [30] - 252:4, 255:17, 259:7, 259:8, 260:4, 278:10, 280:17, 289:16, 290:21, 291:2, 312:9, 322:22, 322:25, 323:23, 323:24, 323:25, 329:21, 364:4, 364:6, 367:9, 367:14, 385:15, 385:16, 414:25, 436:13
**named** [2] - 324:25, 431:11
**National** [1] - 261:22
**natural** [2] - 265:9, 265:10
**near** [3] - 320:8, 326:18, 329:25
**nearly** [1] - 276:20
**necessarily** [1] - 400:22
**necessary** [2] - 314:10, 427:14
**need** [11] - 254:21, 262:7, 307:25, 319:4, 367:19, 378:14, 378:22, 407:22, 407:25, 412:1, 415:21
**needed** [8] - 279:23, 294:25, 295:5, 295:7, 325:23, 325:24, 326:15, 424:21
**negative** [1] - 380:5
**neighborhood** [1] - 416:6
**never** [40] - 259:5, 290:8, 291:3, 291:5, 291:12, 291:18, 293:12, 294:19, 295:20, 296:9, 296:11, 300:15, 301:24, 302:2, 303:22, 317:2, 326:25, 330:20, 342:17, 355:17, 355:20, 357:12, 362:23, 362:24, 368:7, 389:22, 392:6, 392:14, 392:17, 417:9, 419:6, 428:19, 435:5, 435:6, 435:16, 435:17, 436:10, 437:11, 437:17, 440:10
**new** [3] - 260:17, 436:23, 438:7
**newspaper** [1] - 262:3
**next** [37] - 251:21, 255:7, 257:3, 259:22, 283:22, 285:18, 294:6, 322:19, 322:22, 323:13, 328:17, 330:5, 332:10, 332:22, 334:15, 334:25, 337:21, 344:13, 350:25, 355:6, 358:13, 361:25, 366:19, 369:23, 369:25, 371:11, 371:21, 372:17, 372:19, 373:11, 373:13, 373:20, 395:14, 397:12, 419:19, 436:7, 442:2
**night** [19] - 275:25, 324:6, 324:18, 345:14, 345:17, 346:6, 350:14, 350:18, 352:1, 352:25, 357:18,

357:22, 358:10, 396:17, 396:21, 425:11, 440:23, 447:7, 447:9
**nine** [2] - 348:9, 446:2
**nobody** [1] - 341:23
**none** [5] - 321:2, 354:17, 426:5, 439:23, 442:20
**nonetheless** [1] - 319:1
**noon** [3] - 307:3, 307:19, 308:1
**Nora** [1] - 274:17
**normal** [3] - 404:9, 406:5, 406:11
**normally** [2] - 267:1, 297:3
**north** [1] - 329:22
**northeast** [1] - 325:12
**NORTHERN** [1] - 250:2
**note** [2] - 261:22, 307:16
**nothing** [25] - 258:22, 259:19, 270:6, 302:15, 303:11, 305:5, 330:4, 330:5, 331:3, 341:19, 342:3, 349:5, 350:5, 355:2, 359:4, 359:16, 361:22, 391:22, 404:4, 422:25, 425:15, 433:14, 437:11, 437:17, 437:18
**notice** [5] - 409:17, 409:23, 439:18, 446:16, 446:17
**noticed** [1] - 284:10
**notified** [1] - 427:7
**notify** [1] - 437:4
**November** [2] - 390:8, 425:14
**nowhere** [2] - 285:14, 405:17
**number** [25] - 253:8, 254:3, 255:15, 255:16, 263:14, 263:16, 263:17, 275:21, 282:4, 366:8, 366:19, 370:1, 370:14, 370:15, 370:17, 371:3, 371:4, 373:15, 373:17, 373:24, 373:25, 374:22, 375:3, 375:16, 377:15, 377:17, 378:1, 382:19, 423:18
**Number** [14] - 254:1, 255:13, 256:5, 301:18, 312:23, 313:4, 313:6, 313:18, 314:25, 315:5, 320:12, 320:16, 348:8, 408:5
**numbers** [2] - 263:12, 445:15

## O

**o'clock** [4] - 322:8, 346:7, 436:9, 436:15
**oath** [4] - 323:16, 347:10, 347:14, 419:16
**object** [6] - 263:7, 313:10, 313:19, 363:17, 390:16, 392:1
**objected** [1] - 392:7
**objecting** [1] - 261:21
**objection** [49] - 256:18, 256:24, 257:3, 257:12, 258:11, 258:19, 262:8, 262:16, 266:21, 286:22, 288:4, 297:7, 298:19, 302:20, 304:14, 304:23, 308:23, 308:25, 309:3, 310:16, 311:16, 313:3, 313:6, 313:17, 314:3, 314:16, 314:21, 314:23, 315:4, 316:22, 316:24, 316:25, 317:15, 317:17, 320:8, 343:16, 343:22,

345:18, 350:1, 355:5, 362:15, 363:13, 378:5, 401:5, 402:4, 413:14, 422:4, 434:21, 440:24
**objections** [8] - 308:16, 308:20, 320:12, 320:24, 320:25, 378:24, 392:22, 394:22
**obligation** [2] - 348:21, 349:20
**observe** [1] - 263:25
**observed** [1] - 297:22
**obstructed** [1] - 336:2
**obstructions** [1] - 254:12
**obtain** [3] - 270:4, 403:1, 410:24
**obtained** [1] - 411:25
**obviously** [4] - 275:6, 363:19, 389:8, 423:24
**occasion** [4] - 402:7, 407:9, 431:18
**occasions** [3] - 407:11, 416:13, 421:15
**occupants** [1] - 291:21
**occurred** [2] - 294:2, 296:19
**October** [11] - 344:25, 391:3, 391:5, 397:17, 402:24, 404:21, 421:6, 421:13, 436:5, 436:6
**OF** [4] - 250:1, 250:4, 251:1, 448:6
**offense** [2] - 349:18, 359:18
**offenses** [1] - 415:11
**offer** [40] - 398:5, 398:8, 399:19, 401:3, 401:10, 401:12, 401:17, 401:22, 402:1, 402:3, 402:12, 416:16, 416:19, 417:3, 417:7, 417:13, 417:14, 418:5, 418:9, 418:21, 419:3, 419:21, 420:16, 420:19, 420:21, 420:22, 426:20, 426:23, 427:20, 427:24, 428:3, 428:6, 428:22, 429:3, 429:5, 432:2, 435:18, 435:21, 436:25, 441:7
**offered** [3] - 398:17, 433:8, 445:13
**offering** [2] - 435:24, 436:18
**offers** [2] - 398:6, 425:19
**office** [4] - 255:4, 256:11, 402:25, 403:3, 409:24, 436:12
**Office** [13] - 358:11, 358:12, 397:20, 405:19, 406:10, 406:19, 410:11, 410:12, 410:17, 410:24, 410:25, 438:14, 444:21
**officer** [54] - 262:25, 284:20, 292:21, 293:12, 293:15, 293:20, 298:8, 298:11, 298:14, 299:4, 300:14, 301:9, 333:14, 333:15, 339:20, 339:22, 340:13, 341:17, 355:17, 355:21, 355:24, 356:7, 357:12, 357:13, 358:1, 358:2, 358:3, 359:15, 365:1, 365:4, 370:8, 370:19, 372:16, 373:15, 374:22, 376:12, 384:9, 384:15, 384:18, 384:20, 392:3, 401:15, 416:25, 420:2, 420:7, 420:13, 425:3, 433:5, 433:8, 433:11, 433:14, 440:11
**Officer** [13] - 366:4, 370:22, 371:25, 386:17, 386:18, 386:20, 387:13, 387:16, 387:18, 387:20, 387:23, 419:22, 439:16
**officer's** [1] - 370:17

**officers** [46] - 285:23, 286:1, 286:21, 287:1, 292:16, 296:5, 296:22, 298:2, 299:5, 305:20, 305:24, 331:25, 332:6, 332:10, 332:18, 333:6, 337:1, 337:2, 337:21, 337:24, 338:3, 338:20, 338:25, 340:1, 340:13, 345:17, 349:4, 349:11, 349:14, 350:5, 351:22, 352:3, 353:9, 356:5, 356:8, 359:4, 360:19, 365:9, 365:12, 400:4, 400:14, 415:9, 416:22, 433:12, 436:9

**official** [1] - 260:15

**often** [2] - 294:9, 440:19

**oil** [6] - 263:8, 264:19, 265:9, 267:6, 267:8, 267:12

**oiled** [1] - 267:13

**oils** [3] - 265:10, 267:2

**old** [5] - 271:12, 288:3, 288:8, 288:10, 432:12

**ON** [1] - 250:10

**on-the-job** [1] - 261:2

**once** [12] - 254:9, 276:14, 279:19, 354:16, 356:3, 361:14, 375:2, 375:5, 393:9, 411:23, 424:1, 447:2

**one** [135] - 255:3, 256:10, 261:20, 264:3, 266:5, 267:4, 267:12, 267:13, 267:16, 268:6, 268:8, 268:16, 268:20, 268:22, 270:22, 270:23, 270:24, 270:25, 272:15, 274:14, 275:3, 275:6, 275:7, 276:9, 276:11, 277:8, 280:15, 280:21, 284:10, 284:17, 285:6, 285:7, 285:15, 287:10, 287:12, 288:25, 289:19, 290:23, 291:4, 291:22, 292:20, 292:21, 297:5, 297:6, 300:5, 303:16, 304:4, 305:15, 311:21, 313:5, 323:21, 329:7, 329:8, 329:9, 330:21, 332:1, 332:4, 333:14, 337:3, 338:4, 339:2, 339:4, 339:5, 339:6, 339:7, 339:9, 339:23, 340:6, 340:12, 340:13, 345:5, 353:22, 354:11, 354:13, 356:6, 356:10, 356:16, 356:17, 358:8, 359:9, 362:1, 363:5, 363:12, 368:8, 371:20, 375:12, 375:16, 376:1, 377:9, 377:10, 377:11, 377:19, 378:12, 378:22, 381:15, 386:15, 386:21, 386:23, 387:25, 388:14, 390:6, 394:3, 394:15, 400:25, 401:14, 402:25, 405:9, 408:11, 412:18, 412:19, 414:15, 414:19, 416:17, 416:22, 417:12, 418:5, 422:2, 422:13, 422:16, 431:18, 433:13, 433:14, 433:20, 435:1, 438:19, 444:2, 444:16, 447:4

**one-page** [1] - 447:4

**ones** [2] - 305:21, 332:8

**open** [11] - 255:5, 255:21, 287:11, 302:6, 304:22, 335:24, 335:25, 339:17, 340:23, 347:2, 359:11

**opened** [1] - 359:9

**opening** [2] - 321:5, 396:5

**operable** [4] - 256:13, 257:8, 257:23, 258:8

**operate** [2] - 352:19, 352:21

**operates** [1] - 267:14

**opinion** [4] - 256:22, 257:22, 258:1, 258:4

**opinions** [3] - 253:21, 262:20, 262:22

**opposed** [1] - 294:24

**opposite** [3] - 296:18, 298:17, 299:4

**optimum** [1] - 268:23

**oral** [1] - 403:18

**order** [12] - 256:13, 299:18, 299:20, 318:1, 374:3, 376:21, 377:1, 383:15, 386:23, 415:21, 422:23, 432:4

**ordered** [3] - 414:16, 432:15, 445:5

**ordering** [1] - 411:14

**orders** [1] - 432:19

**ordinary** [1] - 444:8

**orient** [1] - 371:6

**original** [3] - 398:1, 405:11, 439:4

**originally** [3] - 398:9, 428:14, 429:3

**originated** [2] - 372:8, 405:14, 439:22

**otherwise** [1] - 284:19

**ourselves** [2] - 411:24, 412:9

**outside** [6] - 272:15, 275:5, 275:6, 279:13, 355:18, 355:21

**overall** [1] - 416:3

**overruled** [17] - 257:2, 258:20, 262:9, 266:23, 297:8, 298:24, 302:21, 304:15, 343:23, 345:20, 350:3, 363:13, 392:24, 401:6, 402:5

**own** [3] - 412:9, 420:8, 433:18

**owned** [1] - 282:17

**owner** [1] - 373:25

**ownership** [1] - 320:1

**P**

**P-A-R-R-O-T-T** [1] - 364:5

**p.m** [8] - 307:16, 308:10, 322:15, 346:14, 369:21, 393:17

**pack** [1] - 359:9

**packet** [1] - 373:24

**paddy** [1] - 378:15

**pads** [1] - 307:17

**page** [14] - 348:14, 350:25, 372:1, 372:11, 372:12, 372:22, 378:21, 380:15, 385:15, 386:24, 408:25, 409:12, 447:4

**PAGE** [1] - 448:6

**Page** [4] - 350:18, 350:24, 387:19

**painted** [1] - 413:9

**palms** [1] - 360:13

**papers** [1] - 438:2

**paragraph** [10] - 313:22, 315:13, 315:23, 316:10, 316:14, 317:4, 317:12, 317:20, 319:15

**Paragraph** [1] - 410:21

**paragraphs** [1] - 316:5

**parents** [2] - 330:24, 331:1

**Parker** [2] - 438:23, 446:18

**Parrott** [18] - 272:16, 275:20, 306:21, 322:6, 362:9, 364:5, 364:10, 364:18, 367:23, 368:7, 369:2, 371:12, 372:11, 375:15, 375:24, 377:20, 386:3, 388:5

**PARROTT** [2] - 364:1, 449:1

**Parrott's** [1] - 362:16

**part** [7] - 333:25, 334:2, 378:14, 390:12, 401:9, 411:19, 433:7

**particular** [12] - 254:2, 256:4, 263:12, 265:5, 265:13, 267:14, 284:1, 402:6, 402:7, 410:21, 420:15, 420:19

**particularly** [2] - 255:1, 265:6

**parties** [2] - 271:18, 316:5

**parts** [1] - 378:14

**party's** [1] - 362:25

**pass** [1] - 408:10

**passage** [1] - 421:18

**passed** [3] - 267:20, 311:23, 378:4

**passenger** [11] - 293:3, 293:4, 293:7, 293:8, 328:1, 328:2, 328:4, 336:17, 345:10, 354:2, 414:19

**passenger's** [2] - 305:14, 305:16

**passengers** [7] - 299:18, 300:2, 300:19, 302:19, 305:7, 305:10, 414:18

**past** [3] - 326:3, 326:5, 343:7

**Patrick** [3] - 259:22, 260:5, 261:13

**PATRICK** [2] - 260:1, 448:12

**Patrick's** [1] - 278:20

**patted** [1] - 337:5

**pause** [1] - 271:11

**Pause** [1] - 277:15

**pay** [1] - 302:11

**paying** [1] - 342:20

**PD** [1] - 444:20

**pen** [2] - 371:5, 371:9

**penalties** [1] - 411:14

**pending** [5] - 405:3, 405:8, 405:10, 406:6, 406:20

**Pennsylvania** [5] - 292:11, 292:13, 373:5, 373:7, 377:11

**people** [13] - 260:16, 270:2, 280:8, 280:14, 281:10, 294:14, 328:12, 332:16, 332:21, 343:2, 365:17, 390:13, 429:17

**per** [1] - 311:17

**perceive** [1] - 318:17

**perfect** [1] - 265:14

**performance** [1] - 443:3

**perhaps** [5] - 278:21, 371:5, 399:1, 399:14, 414:5

**period** [5] - 276:7, 421:17, 423:16, 423:22, 443:23

**perjury** [1] - 349:17

**permission** [1] - 368:23

**permit** [3] - 273:25, 274:3, 288:13

**person** [26] - 264:8, 264:12, 264:16, 292:25, 295:4, 299:13, 300:23, 303:8, 328:17, 328:18, 333:12, 341:24, 354:9, 365:10, 365:14, 397:10, 412:3, 412:8, 412:12, 412:14, 414:20,

414:22, 414:23, 414:24, 424:17, 431:10
**person's** [4] - 317:21, 319:11, 319:16, 412:6
**personally** [1] - 403:17
**persons** [1] - 312:25
**perused** [1] - 262:1
**perusing** [1] - 348:12
**phase** [1] - 395:15
**phone** [14] - 275:21, 276:4, 277:12, 322:7, 340:19, 340:20, 358:13, 397:10, 397:11, 418:10, 418:24, 439:9, 446:5
**physical** [1] - 355:21
**physically** [2] - 317:22, 317:25
**pick** [14] - 279:12, 282:10, 284:19, 292:4, 294:14, 294:23, 295:2, 295:18, 325:17, 327:5, 327:7, 328:22, 378:15, 436:13
**picked** [19] - 279:24, 280:6, 280:9, 280:20, 280:22, 280:23, 280:24, 281:2, 292:6, 295:5, 328:6, 328:16, 328:23, 328:25, 329:1, 404:21, 439:3, 441:11
**picture** [1] - 413:9
**piece** [1] - 256:9
**pieces** [1] - 256:4
**pistol** [1] - 267:15
**place** [7] - 317:5, 371:9, 392:14, 396:18, 421:9, 424:3, 439:3
**placed** [3] - 268:22, 389:24, 392:17
**places** [1] - 294:15
**plain** [2] - 298:11, 332:8
**planning** [2] - 393:20, 395:21
**planted** [1] - 342:1
**play** [5] - 363:18, 377:24, 379:22, 380:6, 382:1
**played** [9] - 379:24, 380:8, 380:11, 382:4, 383:9, 383:20, 384:4, 385:5, 386:22
**playing** [1] - 380:23
**plea** [74] - 343:10, 343:13, 343:21, 343:24, 343:25, 344:1, 344:3, 344:6, 344:10, 344:12, 389:25, 398:4, 398:6, 398:8, 398:17, 398:20, 398:22, 399:2, 399:19, 401:2, 401:4, 401:10, 401:12, 401:17, 411:14, 411:16, 411:21, 412:2, 412:13, 413:6, 415:18, 416:16, 417:3, 417:6, 418:5, 418:9, 418:21, 419:21, 420:8, 420:21, 420:22, 420:25, 422:15, 422:23, 425:17, 425:18, 426:20, 426:23, 427:8, 427:12, 427:19, 427:24, 427:25, 428:5, 428:22, 429:3, 431:23, 432:16, 433:7, 433:10, 435:1, 435:4, 435:8, 435:18, 435:20, 435:23, 440:17, 441:7, 441:22, 442:18, 443:11, 445:11, 445:17
**plead** [6] - 398:11, 401:19, 416:1, 432:4, 432:19, 436:20

**pleading** [5] - 432:17, 432:20, 432:24, 433:2, 433:3
**pleas** [3] - 422:21, 425:17, 433:15
**pleasure** [1] - 397:11
**pled** [1] - 343:14
**PM** [1] - 250:9
**pocket** [1] - 322:10
**point** [35] - 251:9, 272:7, 286:7, 292:11, 293:23, 336:25, 340:2, 353:12, 363:5, 368:12, 369:14, 383:13, 383:24, 384:1, 393:10, 398:15, 409:11, 410:25, 414:21, 416:10, 418:13, 419:1, 420:10, 420:13, 422:13, 424:21, 425:5, 430:5, 441:23, 442:11, 443:25, 444:16, 445:9, 446:10
**pointed** [5] - 278:15, 360:5, 360:7, 360:8, 429:23
**pointing** [5] - 326:11, 327:2, 327:16, 368:13, 371:9
**pole** [1] - 446:19
**Police** [10] - 251:11, 252:17, 252:18, 252:21, 260:14, 260:24, 345:13, 364:25, 400:2, 403:16
**police** [38] - 268:15, 279:25, 283:17, 284:8, 287:18, 292:16, 292:20, 292:21, 301:6, 301:9, 327:9, 329:4, 329:15, 329:17, 329:25, 330:2, 331:4, 332:2, 332:4, 338:17, 340:3, 340:5, 341:17, 342:15, 350:17, 350:18, 350:19, 400:4, 400:7, 400:9, 400:11, 400:14, 401:14, 415:9, 415:12, 427:6, 436:9
**policy** [1] - 444:2
**portion** [4] - 312:19, 312:21, 313:13, 313:21
**position** [4] - 252:16, 402:9, 415:25, 440:16
**positive** [1] - 265:7
**possess** [4] - 317:20, 318:7, 319:10, 319:16
**possessed** [4] - 272:3, 312:5, 317:22, 317:25
**possesses** [2] - 319:13, 319:18
**possessing** [12] - 272:2, 311:18, 312:3, 313:1, 314:1, 314:7, 314:14, 315:3, 315:12, 315:20, 315:25, 316:7
**possession** [35] - 273:17, 303:5, 317:1, 317:5, 318:5, 318:8, 318:12, 318:16, 318:20, 318:25, 319:13, 319:15, 319:19, 319:20, 319:21, 319:25, 320:4, 341:25, 348:20, 389:21, 390:20, 391:1, 391:2, 391:4, 398:18, 399:7, 399:8, 399:10, 399:15, 399:17, 412:14, 416:18, 417:14, 427:25, 435:2
**Possession** [1] - 320:7
**possibility** [4] - 266:6, 398:21, 412:6, 412:21
**possible** [5] - 264:12, 264:15, 376:16, 410:23, 412:12
**possibly** [2] - 264:20, 428:21

**post** [1] - 371:3
**postponements** [1] - 438:25
**posture** [1] - 440:25
**pot** [1] - 276:14
**potentially** [1] - 400:24
**practice** [3] - 406:11, 411:13, 411:15
**practiced** [1] - 410:5
**pre** [6] - 389:25, 411:14, 411:16, 412:2, 422:15, 422:23
**pre-plea** [5] - 411:14, 411:16, 412:2, 422:15, 422:23
**precedent** [1] - 440:16
**prediction** [1] - 363:1
**preemptively** [1] - 362:25
**prefer** [3] - 270:22, 270:24, 270:25
**prefers** [1] - 270:22
**prejudice** [3] - 441:12, 443:5, 443:7
**prejudicial** [1] - 378:18
**preparation** [3] - 414:4, 416:4, 416:9
**prepare** [3] - 414:1, 415:25, 416:7
**prepared** [4] - 386:16, 389:20, 391:24, 392:4
**present** [8] - 250:18, 271:17, 276:11, 277:5, 277:7, 277:16, 372:20, 395:20
**presented** [2] - 273:20, 396:10
**preserve** [3] - 262:6, 267:20, 394:17
**presiding** [1] - 251:4
**pretend** [1] - 279:13
**pretrial** [1] - 440:19
**pretty** [5] - 261:23, 343:7, 407:1, 412:2, 412:9
**previous** [8] - 253:10, 394:19, 394:20, 394:21, 395:8, 405:6, 428:9, 431:9
**previously** [9] - 253:25, 261:7, 262:15, 263:10, 269:23, 367:3, 395:9, 397:14, 405:14
**primary** [2] - 370:16, 370:19
**print** [6] - 263:6, 263:7, 263:9, 264:6, 269:25, 365:25
**printout** [1] - 367:7
**printouts** [2] - 403:24, 404:2
**prints** [3] - 261:5, 265:11, 265:15
**pro** [1] - 433:19
**Probable** [1] - 409:2
**probation** [2] - 405:9, 406:4
**Probation** [1] - 412:11
**probative** [1] - 378:17
**problem** [5] - 313:23, 320:21, 373:9, 378:13, 438:6
**problems** [1] - 306:17
**proceed** [2] - 323:11, 393:23
**proceeding** [1] - 419:14
**Proceedings** [1] - 447:12
**PROCEEDINGS** [2] - 251:1, 449:14
**proceedings** [1] - 447:17
**PROCEEDINGS............................** [1] - 448:6
**process** [5] - 264:2, 300:13, 301:24, 383:24, 414:8

**processed** [4] - 263:8, 263:19, 264:3, 264:5
**processing** [6] - 261:8, 261:9, 261:14, 262:19, 263:18, 263:21
**Proctor** [1] - 250:17
**PROCTOR** [208] - 251:14, 253:16, 256:18, 256:24, 257:12, 258:7, 258:12, 258:19, 258:24, 259:2, 259:17, 261:15, 261:19, 262:1, 262:5, 262:10, 262:15, 265:18, 265:22, 266:24, 267:24, 268:1, 269:14, 270:8, 272:10, 272:14, 272:19, 272:23, 274:12, 274:20, 275:1, 275:5, 275:10, 275:13, 275:16, 275:19, 276:19, 277:4, 277:10, 277:16, 277:22, 278:3, 278:19, 279:10, 286:24, 286:25, 287:21, 287:23, 288:4, 297:7, 298:19, 298:22, 302:20, 303:13, 303:15, 304:18, 305:1, 305:2, 306:1, 306:6, 306:11, 306:16, 306:20, 306:23, 306:25, 307:5, 307:21, 307:24, 308:5, 308:8, 321:8, 321:18, 321:22, 321:24, 322:6, 322:21, 322:24, 323:5, 323:12, 323:14, 323:20, 324:3, 324:16, 324:17, 326:7, 326:12, 326:13, 328:3, 329:2, 329:14, 334:5, 343:19, 343:20, 344:14, 345:18, 345:21, 345:23, 346:1, 346:5, 346:9, 348:6, 350:1, 358:19, 358:21, 360:12, 360:16, 360:18, 360:24, 361:1, 361:3, 361:20, 362:1, 362:5, 362:8, 363:10, 363:23, 364:15, 364:17, 366:19, 366:22, 366:24, 367:2, 367:15, 367:19, 367:22, 368:6, 368:23, 369:2, 369:4, 369:9, 369:10, 369:15, 369:16, 371:7, 371:8, 375:12, 375:14, 375:19, 378:4, 378:10, 378:13, 378:17, 378:21, 378:25, 385:25, 386:2, 387:25, 388:14, 388:17, 388:20, 388:25, 389:6, 389:10, 389:25, 391:8, 391:11, 392:23, 392:25, 393:3, 393:7, 393:9, 393:13, 394:15, 394:20, 394:23, 395:4, 395:7, 396:24, 397:2, 397:8, 401:11, 402:13, 403:12, 407:22, 407:25, 408:2, 408:5, 408:8, 408:15, 408:23, 408:25, 409:3, 409:11, 409:13, 410:7, 410:14, 410:15, 413:16, 423:12, 423:14, 425:7, 426:3, 426:8, 426:14, 434:13, 434:21, 437:20, 437:24, 438:3, 438:5, 438:8, 438:13, 440:22, 441:10, 441:23, 445:20, 446:8, 446:14
**proctor** [21] - 253:14, 262:14, 274:25, 278:2, 293:16, 301:17, 322:19, 323:11, 346:12, 346:21, 363:17, 364:14, 388:15, 395:3, 396:23, 421:8, 429:14, 442:19, 444:17, 444:18, 445:19
**proctor's** [1] - 442:10
**PROCTOR** [4] - 448:19, 448:24,
449:3, 449:10
**PROCTOR** [5] - 448:18, 448:23, 449:2, 449:9, 449:12
**PROCTOR** [2] - 448:10, 448:13
**produced** [3] - 374:2, 424:9, 424:14
**professional** [1] - 425:20
**proffer** [2] - 410:7, 443:19
**proffered** [3] - 408:16, 421:8, 439:25
**program** [1] - 260:18
**prohibited** [13] - 272:1, 311:18, 312:3, 312:25, 313:1, 314:1, 314:7, 314:13, 315:3, 315:12, 315:19, 315:25, 316:6
**project** [1] - 379:10
**promise** [2] - 342:22, 368:23
**promptly** [1] - 268:22
**Proof** [1] - 319:25
**proper** [3] - 255:2, 386:23, 430:2
**property** [1] - 255:16
**proposal** [1] - 317:13
**proposed** [2] - 317:8, 419:1
**prosecuted** [1] - 349:17
**prosecuting** [1] - 398:10
**prosecutions** [1] - 415:11
**prosecutor** [3] - 398:1, 412:5, 417:23
**prosecutorial** [2] - 392:19
**prosecutors** [1] - 386:21
**provably** [2] - 362:17, 363:1
**prove** [4] - 273:17, 315:24, 317:24, 362:19
**proved** [2] - 395:16, 433:23
**proven** [2] - 319:14, 319:20
**provide** [4] - 416:1, 417:10, 417:11, 420:24
**provided** [1] - 445:25
**public** [2] - 406:1, 406:4
**Public** [18] - 397:20, 405:18, 405:20, 406:9, 406:10, 406:19, 410:10, 410:12, 410:17, 410:24, 421:11, 423:25, 438:13, 439:13, 446:4, 446:6, 446:8, 446:11
**pull** [5] - 278:14, 295:18, 324:12, 338:14, 378:23
**pulled** [27] - 279:25, 281:1, 286:18, 287:17, 292:16, 292:23, 296:1, 327:9, 329:4, 329:15, 329:17, 331:4, 331:11, 331:13, 331:18, 337:25, 338:12, 338:23, 345:13, 345:17, 355:4, 355:8, 355:12, 355:13, 374:6, 374:8, 445:3
**pulling** [1] - 356:8
**pumped** [1] - 429:9
**pun** [2] - 275:3, 277:22
**punishable** [1] - 311:20
**purpose** [5] - 254:18, 254:19, 313:8, 313:15, 362:20
**purposes** [10] - 254:20, 271:21, 348:7, 360:12, 393:20, 395:21, 407:23, 408:5, 415:18, 438:11
**pursuant** [1] - 409:16
**pursue** [1] - 411:3
**pursuit** [1] - 376:22
**put** [38] - 255:3, 266:11, 267:19, 276:9, 277:2, 285:25, 290:23, 291:3, 291:5, 291:14, 295:12, 305:9, 328:11, 340:4, 347:19, 354:20, 357:15, 366:7, 366:10, 366:13, 367:20, 370:12, 376:25, 377:1, 377:12, 377:15, 377:16, 381:18, 382:20, 382:22, 394:5, 394:8, 430:6, 433:16, 433:22, 442:6, 446:16, 446:24
**Put** [2] - 357:9, 357:10
**puts** [1] - 439:17
**putting** [1] - 381:11
**putty** [1] - 256:9

**Q**

**qualifications** [2] - 253:15, 262:14
**qualified** [4] - 253:2, 253:9, 258:7, 262:23
**QUARLES** [1] - 250:17
**Quarles** [4] - 251:4, 389:1, 432:15, 432:19
**questionable** [1] - 392:8
**questioned** [1] - 420:2
**questions** [23] - 265:16, 273:23, 284:17, 303:16, 304:10, 305:6, 305:17, 347:19, 358:16, 358:22, 358:24, 359:3, 359:12, 359:25, 360:2, 376:1, 385:23, 388:22, 391:24, 412:24, 421:4, 434:15, 434:19
**quiet** [1] - 419:10
**quite** [2] - 315:18, 423:23
**quote** [1] - 311:17

**R**

**radio** [5] - 365:10, 366:3, 366:5, 402:14, 431:3
**raining** [2] - 269:11, 269:12
**raise** [7] - 251:24, 259:25, 278:5, 278:15, 363:25, 440:20, 442:7
**raising** [1] - 391:19
**ran** [2] - 375:4, 382:19
**randomly** [1] - 436:4
**range** [1] - 432:20
**rather** [4] - 265:7, 306:2, 306:16, 311:19
**Ravenell** [2] - 438:24, 439:1
**re** [4] - 392:14, 392:15, 392:16, 392:18
**re-indicted** [1] - 392:16
**re-Indictment** [3] - 392:14, 392:15, 392:18
**reach** [1] - 271:15
**reached** [4] - 312:24, 384:1, 391:8, 396:13
**reaching** [1] - 407:10
**read** [20] - 261:25, 262:3, 311:22, 312:16, 313:24, 313:25, 315:10,

317:19, 317:20, 319:15, 374:5, 387:2, 409:4, 409:6, 409:14, 410:17, 410:20, 434:10, 440:23, 442:10
**reading** [2] - 332:24, 380:19
**ready** [8] - 251:6, 306:23, 323:4, 323:11, 394:2, 394:10, 414:6, 414:8
**real** [10] - 287:3, 330:7, 331:12, 331:23, 334:21, 376:17, 376:18, 376:21, 437:1, 437:2
**real-time** [3] - 376:17, 376:18, 376:21
**realize** [1] - 347:9
**really** [7] - 266:11, 271:12, 276:21, 331:22, 406:14, 418:18, 420:10
**Realtime** [1] - 447:16
**rear** [11] - 300:10, 302:18, 305:6, 328:4, 328:9, 328:10, 328:13, 328:14, 328:17, 336:9, 336:17
**rearview** [1] - 284:10
**reason** [13] - 392:17, 407:4, 407:20, 411:3, 411:16, 416:19, 417:19, 418:1, 420:10, 432:24, 433:13, 434:7, 439:6
**reasonable** [6] - 256:22, 315:24, 317:24, 439:18, 443:4, 443:24
**reasons** [3] - 267:13, 422:14, 445:6
**rebuttal** [7] - 321:11, 321:19, 322:4, 393:4, 394:13, 395:10, 395:11
**receives** [1] - 423:24
**recently** [2] - 267:6, 279:15
**recess** [6] - 272:21, 273:3, 274:6, 274:8, 322:14, 393:16
**Recess** [4] - 274:21, 308:10, 322:15, 393:17
**recognize** [7] - 254:2, 255:13, 327:3, 327:18, 367:4, 380:2, 412:5
**recognized** [1] - 253:12
**recognizing** [1] - 412:14
**recollection** [7] - 348:3, 348:18, 406:1, 406:7, 406:18, 416:25, 417:20
**record** [21] - 252:4, 260:4, 278:10, 307:25, 313:10, 323:24, 326:7, 331:14, 360:13, 363:6, 364:4, 393:1, 394:12, 397:18, 399:8, 400:2, 409:14, 415:10, 426:17, 433:17, 447:17
**recorded** [2] - 366:2, 377:21
**recording** [11] - 379:13, 379:15, 379:24, 380:7, 380:10, 380:22, 382:3, 383:8, 383:19, 384:3, 385:4
**recordings** [1] - 421:19
**records** [10] - 403:4, 409:18, 409:19, 409:21, 411:24, 412:23, 414:15, 415:14, 415:19, 422:20
**recover** [5] - 266:3, 268:3, 268:23, 337:15, 410:10
**recovered** [8] - 254:14, 268:2, 268:10, 268:14, 273:19, 286:13, 374:24, 410:12
**recross** [5] - 270:7, 306:2, 361:21, 388:2, 426:4
**red** [1] - 383:16
**redaction** [1] - 379:9

**redirect** [7] - 259:18, 269:18, 303:12, 306:2, 358:18, 385:24, 437:19
**REDIRECT** [5] - 269:20, 303:14, 358:20, 386:1, 423:13
**Redirect** [5] - 448:14, 448:19, 448:24, 449:3, 449:10
**reduced** [1] - 425:25
**refer** [1] - 401:19
**reference** [3] - 271:12, 271:13, 373:24
**referred** [1] - 422:14
**referring** [2] - 347:3, 445:2
**reflect** [3] - 367:11, 404:4, 433:17
**reflected** [1] - 400:13, 434:7
**refresh** [2] - 348:2, 348:18
**refused** [1] - 415:3
**regarding** [1] - 308:15
**regards** [2] - 421:4, 435:1
**Registered** [1] - 447:15
**registered** [6] - 288:25, 289:1, 289:6, 289:16, 290:21, 291:2
**registration** [5] - 284:25, 287:9, 293:17, 293:20, 365:8
**regular** [4] - 294:24, 295:16, 332:2, 424:3
**regularly** [1] - 409:18
**regularly-conducted** [1] - 409:18
**regurgitate** [1] - 440:15
**reject** [1] - 411:21
**related** [1] - 416:17
**relates** [1] - 265:5
**relating** [2] - 260:23, 419:21
**relatively** [1] - 418:23
**relieved** [1] - 397:21
**rely** [1] - 409:18
**relying** [2] - 318:4, 318:11
**remain** [1] - 320:1
**remainder** [3] - 315:23, 316:9, 316:16
**remained** [1] - 423:3
**remarks** [1] - 341:16
**remember** [70] - 273:4, 276:16, 282:3, 285:24, 286:3, 286:10, 286:11, 286:12, 292:3, 292:5, 292:6, 292:9, 292:22, 292:23, 293:3, 293:7, 293:10, 293:14, 293:15, 293:18, 293:19, 293:20, 293:22, 294:5, 295:25, 296:11, 298:12, 300:21, 300:22, 301:19, 301:20, 302:10, 303:3, 303:6, 304:10, 307:13, 327:20, 333:19, 333:20, 333:22, 338:3, 339:4, 345:6, 347:1, 347:5, 350:10, 350:17, 350:18, 350:19, 350:21, 350:23, 351:10, 351:17, 351:18, 352:1, 358:23, 359:25, 360:1, 360:20, 361:4, 374:12, 388:9, 395:17, 396:14, 404:17, 405:24, 416:23, 436:1
**remind** [2] - 336:5, 363:5
**removed** [3] - 268:21, 342:16, 354:20
**removing** [1] - 318:12
**renews** [1] - 395:6
**repeat** [2] - 268:25, 290:5

**repeated** [1] - 414:18
**replace** [1] - 312:8
**report** [16] - 254:15, 261:23, 261:25, 262:4, 370:15, 374:2, 376:2, 376:7, 376:11, 381:11, 381:16, 385:14, 412:2, 418:17, 420:14, 427:6
**report's** [1] - 255:6
**Reported** [1] - 250:22
**REPORTER** [10] - 269:15, 293:6, 307:23, 323:21, 356:20, 356:22, 364:6, 364:9, 381:22, 391:13
**reporter** [2] - 279:12, 284:18
**Reporter** [2] - 447:15, 447:16
**reports** [2] - 400:7, 400:9, 400:11
**represent** [1] - 397:14
**represented** [1] - 406:20
**representing** [1] - 397:22
**req** [1] - 263:16
**request** [14] - 263:17, 403:15, 403:18, 403:19, 404:4, 404:6, 404:8, 404:10, 405:20, 406:25, 421:16, 424:5, 439:24
**requested** [9] - 379:9, 402:24, 402:25, 406:12, 414:15, 415:15, 421:23, 424:2, 440:10
**requests** [2] - 423:21, 423:24
**require** [1] - 274:1
**required** [2] - 320:1, 446:18
**residence** [1] - 414:19
**resolve** [1] - 276:14
**respect** [2] - 262:11, 400:13
**response** [7] - 347:19, 350:17, 399:21, 404:18, 417:17, 422:10, 422:11
**responses** [1] - 406:13
**rest** [8] - 273:19, 285:21, 306:23, 314:10, 382:1, 393:1, 394:13, 395:4
**rested** [2] - 272:14, 273:9, 277:25
**resting** [1] - 394:17
**rests** [1] - 272:7
**result** [8] - 265:3, 265:4, 274:2, 287:4, 395:9, 405:22, 424:8, 443:6
**results** [1] - 265:7
**resume** [6] - 274:23, 276:10, 277:6, 322:17, 392:21, 393:19
**resumes** [1] - 308:12
**retention** [1] - 444:2
**retrieve** [3] - 256:3, 265:19, 362:5
**retrieved** [2] - 256:9, 429:25
**reused** [1] - 444:9
**review** [2] - 400:5, 412:23
**revisiting** [1] - 419:2
**revolver** [1] - 301:14
**rewriting** [4] - 312:10, 312:12, 312:14, 313:2
**Richard** [1] - 387:10
**ride** [5] - 295:7, 325:4, 326:3, 326:5, 353:4
**riding** [1] - 326:20
**rights** [3] - 434:5, 437:8, 440:19
**rings** [2] - 276:4, 409:5

**rise** [10] - 251:2, 274:7, 274:22, 307:23, 308:11, 322:13, 322:16, 393:15, 393:18, 447:10
**RMR** [2] - 250:23, 447:21
**road** [1] - 294:15
**robbery** [8] - 343:11, 344:25, 405:10, 405:21, 406:21, 423:2, 444:24, 445:4
**roll** [1] - 332:12
**rolling** [3] - 381:9, 381:17, 383:2
**Room** [1] - 250:23
**room** [5] - 307:10, 307:15, 411:10, 430:13, 440:12
**Rose** [1] - 261:21
**rosy** [1] - 413:10
**round** [1] - 272:24
**routine** [1] - 440:4
**rub** [1] - 265:11
**rude** [1] - 404:12
**Ruffin** [1] - 381:12
**Ruger** [1] - 255:3
**Rule** [1] - 440:1
**rules** [1] - 262:19
**Rules** [3] - 258:3, 409:17, 409:20
**ruling** [1] - 258:10
**run** [16] - 255:4, 279:7, 279:9, 365:7, 365:13, 366:5, 366:9, 373:15, 375:6, 376:14, 381:10, 381:19, 383:3, 383:14, 429:21, 432:11
**running** [1] - 288:22
**rusty** [1] - 265:14

## S

**S-T-E-P-P-E** [1] - 278:11
**safe** [1] - 254:11
**San** [1] - 268:10
**sat** [9] - 252:23, 281:23, 334:2, 335:13, 336:7, 342:6, 342:7, 355:15
**save** [1] - 363:19
**Saturday** [2] - 438:16, 444:23
**saw** [16] - 283:21, 286:9, 295:4, 296:9, 296:11, 298:3, 300:15, 301:10, 301:15, 355:17, 355:20, 355:24, 357:12, 362:24, 425:8, 430:20
**scared** [1] - 359:23
**scathing** [1] - 261:23
**scene** [10] - 261:8, 261:14, 262:18, 286:11, 286:21, 296:9, 300:25, 372:18, 372:19, 384:25
**scenes** [1] - 260:17
**scheduled** [1] - 277:11
**school** [6] - 279:23, 280:2, 280:3, 280:4, 282:9, 330:19
**schools** [1] - 252:19
**Sciences** [1] - 261:23
**scratched** [1] - 254:4
**screen** [1] - 380:16
**screw** [1] - 447:3
**scuffling** [1] - 335:17

**se** [1] - 433:19
**sealed** [1] - 255:16
**search** [4] - 403:24, 404:2, 433:21
**searched** [2] - 337:7, 356:1
**searching** [1] - 356:3
**seat** [15] - 275:6, 281:23, 281:24, 299:18, 300:2, 300:10, 300:19, 302:18, 305:6, 328:1, 328:2, 328:17, 345:10, 353:19, 354:2
**seated** [18] - 251:5, 252:3, 260:3, 274:24, 277:24, 278:9, 279:16, 294:6, 300:6, 308:13, 322:18, 323:19, 326:21, 353:24, 354:1, 364:3, 386:20, 395:3
**seats** [3] - 251:19, 299:19, 300:1
**second** [41] - 251:12, 267:24, 275:7, 280:1, 284:17, 287:21, 313:22, 319:12, 319:15, 323:21, 328:16, 330:8, 333:4, 338:2, 343:9, 344:15, 344:21, 354:3, 362:1, 370:18, 372:10, 372:11, 375:12, 380:15, 386:23, 386:24, 388:14, 390:6, 390:11, 394:15, 401:12, 414:5, 418:5, 419:21, 420:21, 425:17, 435:18, 436:5, 436:6, 439:22, 443:5
**second-degree** [2] - 343:9, 344:21
**seconds** [10] - 277:13, 368:22, 369:20, 372:6, 372:7, 372:9, 373:10, 373:19, 375:18, 447:6
**sector** [1] - 371:3
**Sector** [1] - 371:4
**see** [83] - 251:15, 254:17, 255:5, 257:18, 273:5, 273:6, 274:5, 285:5, 285:12, 286:13, 286:14, 286:15, 286:17, 296:21, 297:3, 298:1, 299:5, 304:22, 307:19, 320:3, 321:3, 321:21, 322:3, 325:7, 330:25, 331:22, 332:12, 333:11, 335:14, 336:2, 336:4, 337:2, 337:10, 337:15, 338:11, 339:12, 339:14, 340:17, 342:2, 342:11, 343:1, 343:3, 343:4, 348:2, 351:14, 352:5, 352:6, 355:2, 357:5, 357:8, 357:15, 357:20, 361:5, 365:14, 367:9, 367:14, 368:8, 368:9, 368:10, 368:13, 368:14, 369:5, 370:19, 371:24, 372:25, 373:16, 379:17, 380:16, 381:19, 383:3, 386:24, 387:1, 388:10, 405:12, 416:6, 428:15, 436:10, 442:11, 447:4, 447:7
**see-through** [1] - 361:5
**seeing** [6] - 296:11, 296:12, 300:24, 301:6, 351:10, 351:17
**seem** [1] - 406:17
**sees** [1] - 440:1
**seizure** [2] - 433:21, 433:22
**send** [12] - 277:18, 306:14, 322:8, 387:3, 387:11, 387:20, 403:10, 403:15, 403:23, 406:25, 432:15, 435:24
**senior** [1] - 440:7

**sense** [1] - 417:11
**sensitive** [1] - 264:18
**sent** [4] - 403:18, 403:21, 415:13, 425:25
**sentence** [3] - 314:10, 319:12, 401:21
**sentenced** [1] - 349:19
**sentencing** [1] - 432:20
**separate** [3] - 408:4, 414:2, 416:13
**separated** [1] - 255:24
**September** [3] - 252:13, 392:16
**sequence** [3] - 304:11, 339:25, 374:21
**serial** [1] - 254:3
**serious** [2] - 343:7, 359:18
**serve** [1] - 440:4
**serves** [1] - 362:20
**service** [3] - 260:25, 365:7, 365:17
**session** [5] - 251:3, 274:23, 308:12, 322:17, 393:19
**set** [4] - 269:1, 398:15, 405:10, 424:2
**seven** [4] - 356:13, 372:9, 414:19, 428:18
**seventeen** [1] - 288:13
**several** [2] - 266:2, 441:2
**shakes** [1] - 262:6
**shaking** [1] - 380:5
**share** [1] - 414:12
**shared** [1] - 400:18
**sheet** [30] - 367:11, 378:23, 385:15, 400:13, 400:25, 401:8, 402:2, 403:11, 420:18, 424:17, 424:18, 425:15, 426:22, 426:24, 427:2, 427:6, 427:12, 427:16, 429:11, 429:12, 429:22, 429:23, 430:3, 433:23, 434:1, 434:3, 434:7, 435:12, 436:21, 437:6
**sheets** [1] - 403:6
**shift** [2] - 371:1, 371:2
**shirt** [1] - 327:2
**short** [6] - 270:3, 271:11, 276:7, 276:22, 418:23, 444:2
**shorten** [1] - 379:11
**shortly** [2] - 322:10, 424:24
**shoulder** [2] - 408:10, 408:12
**shout** [2] - 335:19, 335:21
**show** [10] - 253:25, 255:12, 255:21, 263:10, 283:12, 287:9, 301:9, 301:10, 308:6, 334:6
**showed** [3] - 283:17, 301:17, 330:20
**showing** [8] - 283:12, 286:10, 286:12, 333:3, 334:6, 336:18, 367:3, 408:16
**showings** [1] - 443:3
**shows** [2] - 372:3, 385:15
**side** [43] - 293:1, 293:4, 293:5, 293:8, 293:12, 293:21, 294:15, 295:13, 296:13, 296:14, 296:15, 296:17, 296:18, 298:5, 298:8, 298:15, 299:4, 300:10, 300:14, 300:15, 305:14, 305:15, 305:16, 305:21, 331:18, 335:1, 335:13, 336:7, 336:20, 336:21, 338:9, 338:10, 338:11, 338:22, 375:5, 376:24, 407:17, 431:8, 438:24

**sides** [3] - 284:15, 298:17, 332:18
**sight** [1] - 342:17
**signed** [2] - 272:4, 446:22
**significance** [5] - 368:17, 371:12, 372:2, 372:12, 374:5
**significant** [1] - 338:25
**signs** [2] - 335:17, 440:3
**silver** [2] - 301:19, 301:20
**simple** [2] - 391:25, 392:13
**simply** [1] - 315:2
**simultaneously** [5] - 297:1, 297:19, 299:23, 428:11, 435:9
**sinks** [1] - 256:8
**sirens** [1] - 292:20
**sit** [4] - 285:22, 335:10, 354:16, 419:14
**sits** [3] - 295:22, 399:5, 441:3
**sitting** [26] - 283:22, 283:24, 286:15, 327:22, 327:23, 327:25, 328:1, 328:2, 328:9, 328:10, 328:13, 328:14, 333:7, 333:8, 336:8, 336:15, 337:18, 342:1, 342:2, 345:9, 353:19, 356:3, 381:6, 397:12, 424:6, 446:21
**situation** [4] - 269:23, 282:12, 363:3, 440:11
**six** [4] - 252:24, 356:12, 366:18
**skinned** [13] - 332:3, 338:4, 339:4, 339:6, 339:7, 339:23, 340:13, 356:10, 358:2, 358:3
**skintight** [1] - 333:20
**sky** [2] - 271:19, 271:20
**slammed** [3] - 285:19, 285:20, 297:25
**slang** [1] - 377:8
**sleep** [2] - 324:6, 324:18
**slow** [1] - 334:21
**slower** [2] - 381:22, 381:23
**small** [2] - 361:4, 361:8
**smaller** [1] - 361:7
**Smith** [1] - 366:4
**smooth** [1] - 264:11
**solely** [1] - 320:7
**solidified** [2] - 413:11, 413:13
**someone** [10] - 281:11, 293:8, 326:2, 365:13, 390:2, 416:7, 423:21, 423:24, 424:21, 440:8
**somersaults** [1] - 432:18
**sometime** [4] - 396:1, 397:17, 404:23, 433:18
**sometimes** [13] - 376:16, 376:20, 377:1, 377:18, 406:13, 406:14, 407:10, 407:15, 407:17, 407:19, 412:1, 412:12, 422:15
**somewhat** [1] - 414:3
**somewhere** [7] - 282:20, 326:19, 339:21, 340:14, 416:5, 424:6, 442:17
**soon** [3] - 353:14, 376:19, 402:23
**sorry** [36] - 255:8, 263:3, 263:5, 266:25, 273:6, 289:11, 290:5, 290:14, 293:6, 295:10, 307:24, 313:5, 313:13, 314:19, 327:16, 331:14, 333:16, 339:22, 339:24, 356:20, 365:3,

366:16, 368:19, 369:17, 373:7, 378:16, 381:14, 387:18, 389:6, 391:13, 397:18, 399:23, 415:7, 421:13, 424:25
**sort** [9] - 276:9, 304:11, 354:11, 438:24, 439:15, 442:5, 442:21, 443:4, 443:8
**Souder** [1] - 262:11
**sound** [2] - 404:19, 423:19
**sounds** [2] - 382:9, 382:17
**south** [4] - 325:12, 325:13, 329:22, 382:13
**spaces** [1] - 409:21
**speaking** [6] - 264:10, 293:15, 387:7, 387:23, 406:18, 422:17
**special** [1] - 251:20
**specialized** [2] - 252:15, 260:22
**specific** [2] - 317:6, 429:19
**specifically** [11] - 264:22, 355:11, 394:24, 399:1, 405:24, 406:17, 407:2, 417:6, 422:7, 429:13, 435:19
**speculation** [4] - 355:5, 401:5, 413:14, 445:4
**spell** [7] - 252:4, 260:4, 278:10, 322:25, 323:24, 364:4, 364:6
**spelled** [1] - 260:5
**spend** [1] - 428:21
**spoken** [3] - 378:10, 406:17, 441:10
**St** [1] - 278:20
**stack** [1] - 400:11
**stage** [2] - 406:24, 412:19
**stamps** [3] - 386:7, 386:10
**stand** [12] - 259:23, 259:24, 295:13, 323:16, 346:14, 368:2, 376:25, 389:16, 419:16, 426:10, 437:9, 437:22
**standard** [1] - 443:4
**standards** [1] - 445:8
**standing** [3] - 295:8, 337:2, 437:7
**stands** [9] - 274:8, 322:14, 353:2, 353:3, 370:25, 371:1, 371:14, 393:16, 447:11
**staring** [1] - 321:9
**start** [4] - 280:19, 368:8, 383:15, 393:25
**started** [10] - 252:24, 277:2, 279:15, 307:16, 332:24, 356:3, 377:4, 386:12, 396:19, 433:18
**starting** [2] - 314:11, 350:25
**starts** [5] - 368:10, 368:14, 371:11, 373:2, 373:13
**state** [5] - 252:4, 253:3, 256:12, 260:3, 278:10, 323:23, 345:21, 364:3, 417:19
**State** [44] - 252:18, 252:21, 343:15, 401:19, 401:20, 401:21, 404:2, 405:2, 405:6, 405:8, 405:14, 405:18, 406:9, 407:5, 407:12, 407:16, 408:19, 409:16, 410:5, 410:9, 410:12, 410:17, 414:5, 418:6, 420:16, 427:1, 428:25, 431:8, 431:11, 431:23, 432:5, 432:16, 435:19, 435:25, 436:19, 438:15, 438:24, 439:7, 444:20, 446:4, 446:6, 446:8, 446:11
**State's** [15] - 340:16, 340:17, 340:21,

341:17, 358:11, 358:12, 409:24, 410:3, 410:9, 410:25, 423:25, 436:18, 444:20, 446:4
**statement** [8] - 347:1, 347:5, 347:7, 347:10, 349:16, 366:2, 391:16, 409:6
**Statement** [2] - 409:2, 409:8
**statements** [2] - 407:16, 439:5
**States** [6] - 251:2, 256:17, 257:1, 271:24, 312:1, 395:11
**STATES** [3] - 250:1, 250:4, 448:2
**station** [9] - 271:11, 283:17, 286:12, 301:7, 339:15, 339:16, 339:24, 340:3, 340:5
**stationed** [1] - 401:15
**status** [1] - 274:13
**statute** [1] - 313:9
**statutory** [1] - 313:14
**stay** [3] - 255:4, 256:11, 379:19
**staying** [1] - 325:9
**stead** [1] - 397:24
**steel** [1] - 332:2
**step** [14] - 258:11, 270:9, 272:25, 275:2, 275:4, 277:20, 306:4, 307:6, 333:1, 334:16, 362:5, 388:4, 426:6, 437:21
**Stephanie** [1] - 307:20, 321:4
**Steppe** [21] - 275:2, 277:3, 277:10, 277:16, 278:4, 278:11, 278:12, 278:20, 288:5, 288:6, 324:25, 326:14, 331:16, 332:9, 334:25, 340:23, 340:25, 353:18, 353:19, 353:25, 354:5
**STEPPE** [2] - 278:7, 448:17
**steps** [3] - 334:18, 414:13, 415:24
**stet** [1] - 389:24
**stetted** [1] - 389:23
**stick** [1] - 256:9
**sticker** [1] - 366:25
**still** [23] - 258:6, 291:3, 305:10, 305:12, 314:18, 319:1, 337:1, 337:8, 339:9, 355:18, 359:3, 374:17, 378:16, 382:18, 382:23, 383:2, 383:22, 414:6, 424:6, 436:22, 437:7, 437:8, 446:17
**stipulate** [1] - 271:19
**stipulated** [3] - 271:23, 311:25, 316:5
**stipulation** [7] - 270:20, 270:25, 271:5, 271:17, 311:17, 311:22
**stipulations** [2] - 270:18, 271:15
**stocky** [3] - 338:5, 339:6, 339:7
**stolen** [15] - 373:16, 381:9, 381:17, 381:19, 381:20, 381:21, 383:2, 383:4, 398:18, 399:8, 399:17, 416:18, 417:15, 427:25, 435:2
**stop** [20] - 365:13, 374:12, 374:14, 377:15, 377:18, 379:23, 379:25, 380:12, 381:9, 382:5, 383:5, 383:15, 385:6, 385:16, 429:25, 433:22, 433:23, 434:1
**stopped** [20] - 330:6, 331:11, 331:18, 374:18, 374:20, 374:21, 376:4, 376:6, 376:9, 377:6, 377:9, 377:10, 377:11, 377:14, 377:16, 377:19, 381:21,

381:24, 382:21, 383:16
**stopping** [2] - 350:17, 350:19
**stops** [3] - 332:9, 404:13, 440:9
**straight** [7] - 269:6, 276:2, 304:22, 322:9, 353:3, 393:3, 393:6
**strain** [1] - 266:8
**strategic** [1] - 422:22
**Street** [4] - 250:24, 280:21, 325:10, 372:4
**street** [3] - 329:20, 329:21, 439:4
**strike** [4] - 315:22, 317:3, 317:4, 319:11
**strip** [1] - 326:4
**struck** [3] - 316:10, 316:17, 319:25
**study** [2] - 268:6, 268:10
**studying** [1] - 280:2
**stuff** [2] - 390:14, 438:7
**subject** [3] - 262:19, 265:12, 377:6
**subjects** [1] - 411:10
**submit** [1] - 273:19
**submitted** [2] - 254:10, 317:10
**Subparagraph** [1] - 409:15
**subparts** [1] - 434:20
**subpoena** [5] - 403:13, 424:17, 439:21, 445:21, 447:5
**subpoenaed** [4] - 424:20, 446:19, 446:20
**subpoenas** [2] - 440:1, 446:22
**subsequent** [1] - 418:25
**subsequently** [2] - 287:15, 401:13
**substance** [1] - 324:22
**subtle** [1] - 321:25
**sudden** [3] - 333:10, 354:21, 355:3
**sued** [1] - 415:12
**sufficient** [1] - 274:2
**suggest** [1] - 442:17
**suggested** [1] - 442:21
**suggesting** [2] - 318:14, 442:12
**suggests** [1] - 434:1
**summarize** [1] - 383:13
**summer** [1] - 266:15
**Sunday** [1] - 442:3
**supervise** [2] - 260:16, 263:25
**supervision** [2] - 264:4, 264:6
**Supervisor** [1] - 260:13
**supervisor** [3] - 264:1, 276:6, 322:8
**supports** [1] - 318:19
**suppose** [1] - 271:1
**supposed** [3] - 290:2, 294:19, 390:11
**Suppress** [1] - 401:9
**surely** [1] - 411:20
**surface** [5] - 263:7, 264:11, 264:12, 264:17, 265:15
**surfaces** [1] - 264:8
**surprise** [1] - 443:21
**surprised** [2] - 285:14, 421:25
**surprising** [1] - 444:11
**surrounded** [3] - 332:20, 353:9, 353:11
**sustain** [1] - 286:23
**sustained** [11] - 256:19, 257:2, 257:3,

257:13, 304:25, 343:17, 355:6, 413:15, 434:22
**sustaining** [1] - 257:19
**swarmed** [7] - 284:14, 330:1, 330:6, 331:5, 331:19, 331:25, 332:10
**sweating** [1] - 264:16
**switch** [1] - 282:9
**switching** [1] - 288:25
**SWORN** [7] - 252:2, 260:2, 278:8, 323:18, 364:2, 397:6, 426:12
**sworn** [2] - 347:13, 349:1
**Sworn** ...................................... [7] - 448:9, 448:12, 448:18, 448:22, 449:1, 449:8, 449:12
**system** [3] - 255:5, 366:2, 407:12

# T

**T-I-F-F-A-N-I** [1] - 364:8
**T22** [5] - 376:8, 380:16, 380:20, 380:23, 381:15
**table** [2] - 346:6, 386:21
**tactical** [4] - 411:2, 411:16, 422:14, 439:6
**tag** [28] - 282:2, 282:3, 303:16, 366:5, 366:8, 366:9, 373:15, 373:17, 373:24, 374:22, 374:25, 375:1, 375:3, 375:4, 375:6, 375:16, 376:8, 376:14, 377:15, 381:10, 381:19, 382:9, 382:19, 382:24, 383:1, 383:5, 429:23, 429:24
**Tag** [4] - 373:13, 380:16, 380:20, 381:15
**tags** [24] - 282:3, 282:4, 282:5, 282:9, 282:14, 287:9, 288:25, 289:3, 289:6, 289:15, 290:17, 291:1, 291:4, 291:5, 291:10, 296:6, 303:20, 304:7, 330:11, 365:7, 365:16, 382:17, 383:3, 430:2
**Talbot** [2] - 436:2, 436:3
**tall** [4] - 332:1, 332:3, 356:10, 358:2, 358:3
**tank** [3] - 255:25, 256:1, 256:7
**tape** [80] - 363:18, 379:13, 382:2, 385:8, 386:5, 386:8, 386:22, 392:1, 392:2, 392:3, 392:4, 403:1, 403:6, 403:9, 403:13, 404:5, 407:2, 409:21, 409:22, 410:24, 412:25, 413:3, 413:10, 421:5, 421:17, 421:23, 421:24, 422:8, 422:11, 424:2, 424:4, 424:6, 424:8, 424:9, 424:12, 424:20, 424:22, 424:24, 425:3, 425:5, 425:8, 430:21, 431:9, 431:12, 431:14, 431:21, 431:24, 432:1, 433:2, 433:3, 434:9, 438:18, 438:19, 439:10, 439:12, 439:15, 439:23, 439:24, 440:13, 442:1, 443:14, 443:19, 443:20, 443:25, 444:20, 444:22, 444:24, 444:25, 445:2, 445:4, 445:6, 445:23, 446:6, 446:8, 446:12, 446:15, 446:20
**tapes** [4] - 423:15, 424:3, 443:23, 444:9
**tapping** [1] - 321:10

**Task** [1] - 386:17
**tasks** [1] - 414:10
**taught** [1] - 434:6
**taxi** [2] - 325:23, 325:25
**taxicab** [2] - 288:23, 353:5
**taxicabs** [1] - 353:4
**Taylor** [1] - 274:13
**teach** [1] - 252:20
**tech** [1] - 256:9
**Technician** [2] - 260:13, 263:20
**technology** [1] - 368:7
**telegraph** [2] - 412:8, 412:10
**Telephone** [1] - 274:16
**telephone** [2] - 402:8, 409:21
**TELL** [7] - 252:2, 260:2, 278:8, 323:18, 364:2, 397:6, 426:12
**temperature** [2] - 266:5, 266:6
**temperatures** [1] - 266:17
**temporary** [1] - 330:21
**ten** [10] - 276:3, 276:25, 277:4, 277:5, 398:19, 398:24, 399:2, 399:18, 440:2, 446:2
**term** [7] - 281:3, 311:21, 398:18, 399:24, 410:4, 439:13, 440:8
**terms** [8] - 268:19, 381:11, 400:15, 412:21, 415:5, 415:9, 416:8, 420:15
**test** [10] - 252:25, 254:13, 254:14, 254:20, 254:22, 255:2, 255:15, 255:24, 256:10, 257:6
**tested** [1] - 265:1
**testified** [15] - 261:10, 275:20, 275:21, 345:2, 346:21, 349:24, 350:7, 350:10, 350:13, 351:10, 351:13, 351:16, 351:25, 419:16, 440:5
**testify** [18] - 310:13, 341:10, 347:14, 348:21, 349:20, 363:7, 388:19, 388:21, 389:1, 389:11, 390:19, 391:9, 391:12, 391:14, 419:13, 419:17, 424:18, 424:22
**testifying** [2] - 310:14, 346:24
**testimony** [20] - 253:20, 253:21, 262:19, 262:20, 305:23, 349:16, 351:20, 351:23, 362:17, 362:25, 376:6, 400:15, 409:19, 426:18, 426:20, 429:2, 438:9, 441:4, 443:13, 445:14
**testing** [1] - 260:18
**tests** [2] - 254:9, 255:3
**text** [1] - 275:7
**TFO** [1] - 250:19
**THE** [502] - 250:1, 250:1, 250:10, 250:11, 251:2, 251:5, 251:10, 251:17, 251:19, 251:24, 252:2, 252:3, 252:5, 253:14, 253:17, 255:9, 255:10, 256:19, 257:2, 257:13, 257:15, 257:20, 257:25, 258:6, 258:10, 258:20, 258:21, 258:23, 259:18, 259:20, 259:24, 259:25, 260:2, 260:3, 260:5, 261:16, 261:25, 262:3, 262:8, 262:11, 262:13, 262:17, 265:17, 266:22, 266:23, 267:25, 269:15,

269:17, 269:18, 270:7, 270:9, 270:12,
270:14, 270:19, 270:24, 271:4, 271:8,
271:11, 271:16, 272:6, 272:9, 272:11,
272:18, 272:20, 272:25, 273:2, 273:9,
273:13, 273:21, 273:24, 274:7, 274:9,
274:11, 274:15, 274:17, 274:18,
274:19, 274:22, 274:24, 275:4, 275:9,
275:12, 275:14, 275:18, 276:8,
276:15, 277:1, 277:5, 277:14, 277:18,
277:19, 277:20, 277:24, 278:5, 278:8,
278:9, 278:11, 278:12, 279:5, 279:7,
279:8, 279:9, 286:23, 287:22, 287:24,
290:13, 293:6, 293:7, 297:8, 298:21,
298:23, 302:21, 302:23, 303:12,
304:15, 304:16, 304:24, 304:25,
306:2, 306:4, 306:7, 306:10, 306:13,
306:19, 306:24, 307:3, 307:6, 307:8,
307:19, 307:22, 307:23, 308:4, 308:6,
308:9, 308:11, 308:13, 308:17,
308:20, 308:23, 308:25, 309:3, 309:5,
309:7, 309:9, 309:11, 309:13, 309:15,
309:17, 309:19, 309:21, 309:23,
309:25, 310:2, 310:4, 310:6, 310:8,
310:10, 310:12, 310:16, 310:18,
310:20, 310:22, 310:24, 311:1, 311:3,
311:5, 311:7, 311:9, 311:11, 311:13,
311:15, 311:22, 312:6, 312:10,
312:14, 312:17, 312:21, 313:3, 313:7,
313:11, 313:14, 313:17, 313:21,
313:24, 314:2, 314:6, 314:12, 314:16,
314:18, 314:21, 314:23, 314:25,
315:4, 315:7, 315:10, 315:16, 315:19,
315:22, 316:3, 316:6, 316:9, 316:12,
316:16, 316:19, 316:21, 316:24,
317:3, 317:8, 317:11, 317:15, 317:19,
318:4, 318:9, 318:11, 318:19, 318:23,
319:2, 319:6, 319:10, 319:24, 320:3,
320:7, 320:11, 320:14, 320:16,
320:18, 320:20, 320:22, 320:24,
321:1, 321:3, 321:7, 321:11, 321:13,
321:16, 321:19, 321:21, 321:23,
322:3, 322:12, 322:13, 322:16,
322:18, 322:22, 322:25, 323:1, 323:2,
323:3, 323:4, 323:6, 323:7, 323:9,
323:11, 323:13, 323:16, 323:18,
323:19, 323:21, 323:22, 323:23,
323:25, 324:9, 324:11, 325:22,
326:11, 327:24, 327:25, 328:24,
328:25, 329:12, 329:13, 343:17,
343:23, 343:24, 343:25, 344:1, 344:2,
344:3, 344:4, 344:5, 344:7, 344:8,
344:9, 344:10, 344:11, 344:12,
344:13, 344:17, 345:19, 345:20,
345:22, 345:24, 346:2, 346:8, 346:10,
346:12, 346:17, 346:18, 348:13,
348:16, 350:2, 350:3, 350:4, 355:6,
356:20, 356:21, 356:22, 356:23,
358:18, 360:15, 361:21, 361:23,
361:25, 362:3, 362:7, 362:11, 362:18,
362:23, 363:4, 363:9, 363:11, 363:13,
363:16, 363:21, 363:25, 364:2, 364:3,

364:5, 364:6, 364:8, 364:9, 364:10,
364:13, 364:14, 366:21, 366:23,
367:1, 367:18, 367:24, 368:2, 368:4,
368:5, 368:12, 369:1, 369:3, 369:6,
369:8, 369:14, 371:5, 375:13, 375:20,
378:1, 378:6, 378:9, 378:19, 378:23,
379:4, 379:10, 381:22, 381:24,
385:24, 388:2, 388:4, 388:7, 388:13,
388:15, 388:18, 388:24, 389:4, 389:5,
389:9, 389:13, 389:14, 389:18,
389:22, 390:2, 390:4, 390:6, 390:7,
390:9, 390:10, 390:11, 390:13,
390:15, 390:16, 390:17, 390:22,
390:25, 391:6, 391:10, 391:12,
391:13, 391:14, 391:15, 391:17,
391:18, 391:19, 392:9, 392:10,
392:11, 392:12, 392:21, 392:24,
393:2, 393:4, 393:6, 393:8, 393:12,
393:14, 393:15, 393:18, 393:20,
394:6, 394:10, 394:12, 394:19,
394:21, 394:25, 395:3, 395:6, 395:8,
395:13, 396:8, 396:12, 396:23, 397:1,
397:4, 397:6, 401:6, 401:7, 402:5,
402:6, 402:17, 402:19, 402:20,
402:21, 402:22, 407:24, 408:4, 408:7,
408:24, 410:13, 413:15, 413:17,
417:22, 418:11, 418:12, 419:6, 419:8,
419:9, 419:10, 419:12, 419:13, 422:2,
422:6, 423:1, 423:3, 423:7, 423:9,
423:11, 424:11, 424:14, 424:15,
425:2, 425:6, 426:4, 426:6, 426:10,
426:12, 434:14, 434:16, 434:19,
434:22, 437:19, 437:21, 437:23,
438:1, 438:4, 438:7, 438:12, 440:20,
441:5, 441:8, 441:19, 442:4, 442:7,
442:15, 442:23, 443:1, 443:7, 443:10,
444:1, 444:5, 444:8, 445:19, 446:6,
446:10, 447:7, 447:10, 448:8, 448:16,
449:7
**THEN** [7] - 252:2, 260:2, 278:8, 323:18,
364:2, 397:6, 426:12
**Theodore** [2] - 438:23, 446:18
**theory** [4] - 270:21, 318:20, 318:25,
319:3
**thereafter** [2] - 268:22, 322:10
**therefore** [1] - 420:7
**they've** [2] - 415:11, 421:23
**thick** [1] - 361:12
**thin** [1] - 361:12
**thinking** [5] - 268:19, 401:3, 402:2,
425:14, 428:5
**third** [8] - 275:13, 275:19, 317:4,
317:11, 317:12, 317:19, 414:5, 440:11
**thorough** [2] - 443:16, 445:21
**thousands** [1] - 261:6
**threatened** [7] - 349:5, 349:11, 349:14,
350:5, 351:22, 352:2, 359:4
**three** [15] - 275:1, 276:23, 280:10,
301:22, 306:18, 332:5, 332:6, 345:3,
356:11, 405:8, 413:24, 414:2, 414:17,

416:13, 437:25
**throughout** [3] - 385:8, 413:23, 426:18
**throw** [2] - 276:13, 276:18
**thrown** [10] - 299:11, 299:13, 300:17,
300:22, 300:23, 302:2, 303:8, 305:9,
305:17, 445:16
**tick** [1] - 439:14
**ticked** [1] - 439:9
**ticket** [1] - 350:20
**tickets** [5] - 287:6, 287:7, 340:24,
340:25, 341:1
**Tiffani** [3] - 362:9, 364:5, 364:8
**TIFFANI** [2] - 364:1, 449:1
**tight** [2] - 283:5, 283:6
**tinted** [2] - 331:22, 355:1
**TO** [7] - 252:2, 260:2, 278:8, 323:18,
364:2, 397:6, 426:12
**today** [20] - 278:23, 305:23, 307:12,
325:2, 327:20, 327:21, 341:13,
342:20, 347:19, 350:13, 351:10,
364:20, 386:3, 386:5, 393:21, 399:5,
424:6, 434:9, 442:6, 443:17
**together** [6] - 253:20, 262:21, 297:14,
381:11, 396:16, 446:25
**tomorrow** [11] - 393:21, 393:25, 395:22,
396:1, 396:15, 396:18, 432:16,
441:15, 441:17, 442:1, 447:8
**tonight** [1] - 442:1
**took** [17] - 284:16, 290:23, 291:1,
291:10, 339:15, 339:18, 340:5,
343:10, 343:13, 344:1, 344:5, 381:14,
392:14, 414:14, 415:24, 421:9
**tool** [3] - 253:3, 253:12, 253:18
**top** [6] - 278:21, 378:21, 392:12, 428:17,
428:18
**tossed** [1] - 265:12
**total** [3] - 253:10, 443:15
**totally** [2] - 412:7, 434:12
**touch** [4] - 264:12, 355:24, 406:9, 411:5
**touched** [2] - 270:2, 428:19
**toward** [1] - 346:18
**towards** [1] - 329:23
**town** [3] - 330:19
**track** [3] - 306:22, 365:24, 415:1
**Trade** [1] - 439:2
**traffic** [4] - 330:9, 331:8, 382:12, 415:11
**trail** [1] - 405:12
**train** [2] - 252:19, 260:17
**trained** [2] - 252:20, 260:24
**training** [8] - 252:15, 256:21, 257:10,
258:15, 260:22, 260:25, 261:2, 261:25
**transcript** [23] - 348:2, 350:24, 377:25,
379:13, 379:15, 379:17, 379:21,
386:3, 386:10, 386:12, 386:13,
386:15, 386:16, 387:11, 392:4,
402:14, 412:23, 430:11, 430:20,
430:21, 430:23, 434:10, 447:17
**transcripts** [4] - 412:1, 414:16, 422:16,
422:20
**trial** [27] - 324:23, 327:19, 327:21,

362:24, 395:15, 396:14, 398:14,
398:16, 405:11, 411:22, 413:24,
414:2, 414:6, 414:8, 414:22, 415:2,
415:17, 415:25, 416:4, 416:7, 416:9,
424:10, 424:24, 432:25, 439:22,
440:11, 440:15
**TRIAL** [2] - 250:11, 448:3
**tried** [2] - 276:2, 406:3
**trigger** [1] - 254:4
**trips** [1] - 414:18
**trouble** [1] - 407:10
**truck** [1] - 330:19
**true** [3] - 268:2, 329:15, 377:20, 403:20,
411:23, 423:21
**truly** [1] - 420:16
**TRUTH** [7] - 252:2, 260:2, 278:8,
323:18, 364:2, 397:6, 426:12
**truth** [7] - 341:4, 341:23, 343:2, 349:10,
349:13, 352:5, 359:14
**truthful** [1] - 347:18
**truthfully** [3] - 347:14, 348:21, 349:20
**try** [12] - 272:24, 276:5, 287:18, 307:15,
324:13, 330:10, 331:24, 339:25,
367:23, 376:19, 406:5, 407:21
**trying** [9] - 251:7, 269:1, 326:20,
376:23, 406:16, 414:20, 416:23,
443:18
**turn** [9] - 275:22, 278:1, 350:24, 372:10,
375:6, 401:25, 408:25, 437:16, 438:20
**turned** [8] - 292:13, 399:22, 399:23,
401:2, 401:4, 402:12, 418:1, 418:24
**turning** [3] - 263:11, 264:22, 345:2
**tussle** [7] - 285:25, 286:1, 296:21,
297:22, 299:6, 335:14, 355:20
**tussling** [3] - 286:3, 286:4, 298:4
**twelve** [3] - 260:16, 359:9, 439:8
**twenty** [3] - 273:6, 288:9, 372:9
**twenty-seven** [1] - 372:9
**twice** [1] - 434:9
**two** [60] - 254:20, 255:4, 256:11, 264:23,
280:10, 280:12, 280:14, 282:1,
289:22, 297:24, 299:16, 299:17,
316:4, 321:14, 321:15, 321:17,
321:18, 321:19, 321:20, 325:18,
330:5, 331:7, 334:23, 334:24, 337:23,
338:3, 338:17, 338:20, 345:12, 355:1,
356:4, 356:5, 356:11, 356:14, 356:16,
372:17, 375:4, 376:1, 395:19, 398:6,
405:9, 414:17, 416:12, 417:8, 418:11,
428:18, 432:12, 432:14, 433:15,
434:15, 434:16, 434:19, 439:5,
441:15, 443:3, 446:21, 446:24
**two-door** [4] - 282:1, 289:22, 299:16,
334:23, 334:24, 355:1
**type** [3] - 252:23, 303:19, 365:25
**typically** [4] - 266:20, 268:6, 407:11,
415:8

# U

**U.S** [4] - 250:14, 250:15, 250:23, 253:7
**ultimate** [2] - 258:5, 415:2
**ultimately** [7] - 303:8, 414:21, 415:1,
420:24, 424:24, 435:3, 444:23
**unavailable** [2] - 401:16, 403:9
**uncle** [6] - 282:8, 289:12, 290:4, 291:6,
303:25
**uncles** [1] - 291:4
**under** [8] - 264:3, 264:5, 318:25,
347:10, 348:20, 359:3, 419:16, 427:21
**underneath** [1] - 385:17
**understandable** [1] - 318:9
**understatement** [1] - 431:22
**understood** [3] - 319:9, 418:2, 420:21
**uniform** [3] - 298:11, 298:12, 298:14
**uniformed** [2] - 293:12, 293:15
**Unit** [3] - 260:14, 380:20, 387:9
**unit** [11] - 292:19, 292:22, 292:25,
370:16, 370:17, 371:22, 377:17,
383:16, 387:5
**United** [6] - 251:2, 256:17, 257:1,
271:24, 311:25, 395:11
**UNITED** [3] - 250:1, 250:4, 448:2
**units** [5] - 376:23, 383:14, 387:3,
387:12, 387:20
**unlawful** [1] - 391:1
**unlawfully** [1] - 433:23
**unless** [2] - 273:23, 444:19
**unlicensed** [2] - 281:8, 288:23, 352:22
**unmarked** [7] - 292:19, 330:5, 331:6,
331:7, 332:1, 332:6, 338:18, 356:11,
383:18
**unnecessary** [1] - 313:9
**unrelated** [1] - 371:17
**unshackled** [1] - 306:15
**unsuitable** [1] - 264:21
**unusual** [1] - 442:10
**up** [103] - 252:25, 255:21, 257:15,
259:24, 261:16, 266:13, 270:14,
272:11, 272:24, 276:12, 277:9,
278:14, 279:5, 279:12, 279:24, 280:6,
280:9, 280:20, 280:22, 280:24, 281:2,
282:10, 282:11, 284:19, 290:9, 292:4,
292:6, 292:25, 294:14, 294:23, 295:3,
295:5, 295:18, 306:7, 308:6, 317:11,
322:1, 324:14, 325:17, 325:22, 326:8,
327:5, 327:7, 327:24, 328:6, 328:16,
328:22, 328:23, 328:24, 328:25,
329:1, 330:10, 330:18, 333:14,
333:16, 334:2, 345:22, 345:24,
350:19, 357:10, 360:13, 361:15,
363:14, 367:20, 371:23, 372:13,
376:21, 378:6, 378:15, 380:15,
389:11, 398:9, 399:24, 400:11,
404:21, 408:11, 408:13, 416:10,
417:22, 418:17, 418:18, 419:22,
419:24, 420:1, 420:9, 428:14, 428:15,

429:9, 432:5, 436:13, 438:15, 439:3,
442:13, 443:17, 444:13, 445:22, 447:3
**ups** [1] - 434:17
**upwards** [1] - 368:10
**urge** [2] - 311:19, 317:6
**usual** [1] - 443:7

# V

**valid** [2] - 365:15
**validity** [1] - 365:8
**value** [2] - 253:22, 262:22
**various** [1] - 414:10
**vehicle** [102] - 281:22, 282:6, 282:14,
282:17, 283:2, 283:20, 284:8, 284:21,
285:1, 285:3, 285:5, 285:9, 285:16,
288:16, 289:1, 289:2, 289:15, 290:19,
290:23, 291:1, 291:2, 291:21, 293:2,
293:13, 293:24, 294:1, 294:7, 296:2,
296:13, 296:15, 296:16, 296:24,
297:13, 298:6, 298:15, 298:18, 299:3,
300:5, 300:11, 300:13, 300:14,
302:19, 303:17, 303:20, 304:19,
305:7, 305:10, 305:12, 305:13,
305:21, 327:12, 327:19, 329:25,
330:12, 330:14, 332:9, 332:18, 333:1,
333:17, 334:2, 335:3, 335:8, 335:11,
335:23, 336:2, 336:3, 336:5, 336:9,
337:22, 337:23, 342:17, 360:1, 360:4,
365:15, 373:16, 373:21, 374:1, 374:6,
374:8, 374:12, 374:14, 374:17,
374:20, 374:21, 377:14, 377:15,
377:16, 381:19, 382:13, 383:2, 383:5,
383:15, 383:16, 384:6, 384:10,
384:15, 384:21, 384:23, 384:24,
414:18, 415:5
**verbal** [2] - 403:19, 425:19
**verbally** [3] - 398:6, 398:17, 431:1
**verdict** [4] - 320:24, 441:6, 441:14,
442:2
**versus** [1] - 416:7
**Vic** [2] - 303:22, 304:7
**vicinity** [1] - 284:8
**Victoria** [1] - 303:21
**view** [2] - 305:3, 336:2
**views** [1] - 395:19
**VIN** [1] - 373:25
**violated** [3] - 434:6, 437:7, 437:8
**violation** [3] - 254:21, 256:14, 406:4
**violations** [11] - 287:8, 302:4, 302:16,
405:9, 429:22, 430:9, 431:13, 431:14,
433:16, 433:20, 434:4
**Virginia** [4] - 282:8, 290:8, 291:3, 291:8
**visible** [1] - 263:9
**visit** [1] - 418:25
**vividly** [1] - 436:1
**voice** [18] - 276:2, 279:5, 279:13,
324:14, 325:22, 327:24, 328:24,
364:11, 366:1, 380:2, 380:3, 380:4,

381:7, 384:6, 385:9, 385:17, 385:18
**voir** [3] - 253:14, 262:7, 262:13
**VOL** [1] - 448:3
**Volume** [1] - 250:6

# W

**W-A-G-S-T-E-R** [1] - 252:5
**wagon** [3] - 340:5, 378:15, 378:22
**Wagster** [9] - 251:23, 252:5, 252:8, 253:11, 253:17, 253:25, 255:12, 257:6, 258:15
**WAGSTER** [2] - 252:1, 448:9
**waist** [1] - 287:19
**waistband** [2] - 268:14, 283:10
**wait** [5] - 276:10, 346:2, 388:14, 441:6, 441:13
**waiting** [4] - 308:3, 338:13, 441:13
**waking** [1] - 350:19
**walk** [1] - 335:12
**walked** [9] - 281:19, 335:12, 337:24, 337:25, 356:4, 356:16, 432:10, 439:4
**walking** [1] - 338:18
**walks** [1] - 440:12
**wall** [16] - 338:1, 338:21, 338:22, 338:23, 338:25, 339:2, 339:8, 340:2, 342:8, 356:15, 356:17, 357:1, 357:3, 360:19
**Wallner** [10] - 250:15, 290:13, 360:16, 377:23, 379:22, 380:13, 382:1, 382:5, 394:8, 408:12
**WALLNER** [38] - 251:7, 251:22, 252:7, 253:11, 253:23, 253:24, 255:7, 255:11, 256:20, 256:25, 257:4, 257:5, 257:14, 257:18, 257:24, 258:3, 258:14, 258:22, 259:19, 274:10, 286:22, 287:25, 288:2, 288:6, 288:7, 290:14, 290:15, 293:11, 297:9, 298:25, 302:22, 302:24, 303:11, 304:14, 304:23, 306:3, 408:1, 408:14
**WALLNER...............** [1] - 448:10
**WALLNER................** [1] - 448:19
**wants** [3] - 422:4, 436:19, 440:23
**warning** [2] - 321:13, 321:16
**warrant** [1] - 365:7
**warrants** [1] - 365:14
**WAS** [7] - 252:2, 260:2, 278:8, 323:18, 364:2, 397:6, 426:12
**watch** [3] - 263:25, 321:10, 396:4
**watched** [2] - 342:6, 342:7
**watching** [2] - 342:2, 343:3
**water** [8] - 255:24, 256:1, 256:7, 263:8, 264:19, 266:13
**WDQ-08-0444** [1] - 250:6
**weakness** [2] - 400:20, 400:23
**weapon** [7] - 254:18, 259:9, 273:18, 273:19, 313:1, 343:11, 344:25
**wearing** [2] - 283:3, 333:18
**weather** [1] - 265:12

**week** [4] - 435:11, 436:5, 436:6, 442:2
**weeks** [1] - 261:24
**weight** [2] - 253:22, 262:22
**west** [1] - 325:12
**West** [2] - 250:24, 366:10
**wet** [1] - 264:17
**whatever's** [1] - 322:5
**wheel** [1] - 297:6
**white** [3] - 338:7, 351:3, 356:7
**White** [1] - 339:5
**whole** [8] - 277:8, 332:20, 353:11, 359:8, 360:17, 409:6, 440:19
**WILLIAM** [1] - 250:11
**William** [1] - 251:4
**Williams** [4] - 371:25, 387:13, 387:16, 387:20
**willing** [2] - 430:6, 432:8
**windows** [3] - 331:22, 332:13, 355:1
**windy** [1] - 264:18
**wish** [8] - 253:14, 262:13, 273:13, 273:22, 277:7, 391:12, 391:14, 391:15
**witness** [25] - 251:13, 251:16, 251:21, 259:24, 272:15, 274:14, 275:19, 276:9, 276:12, 277:8, 278:2, 306:11, 322:20, 322:23, 323:13, 326:8, 358:16, 361:25, 362:6, 396:25, 407:16, 424:18, 427:14, 437:22, 439:5
**Witness** [16] - 259:21, 270:11, 306:5, 348:12, 357:2, 361:24, 380:5, 388:6, 426:7, 448:11, 448:14, 448:20, 448:24, 449:3, 449:10, 449:13
**WITNESS** [50] - 252:5, 258:21, 260:5, 266:22, 269:17, 278:11, 279:7, 279:9, 293:7, 302:23, 304:16, 304:24, 323:1, 323:3, 323:22, 323:25, 327:25, 328:25, 329:13, 343:24, 344:1, 344:3, 344:5, 344:8, 344:10, 344:12, 345:19, 348:13, 348:16, 350:2, 350:4, 356:21, 356:23, 364:5, 364:8, 364:13, 369:3, 381:24, 401:7, 402:6, 402:17, 402:20, 402:22, 418:12, 422:2, 422:6, 423:3, 423:9, 424:15, 425:2
**WITNESSES** [4] - 448:7, 448:16, 449:5, 449:6
**witnesses** [8] - 272:24, 275:1, 308:2, 388:16, 394:23, 401:14, 443:16
**wonderful** [1] - 364:11
**word** [3] - 278:16, 440:13, 445:19
**words** [9] - 270:19, 306:18, 328:11, 372:19, 429:19, 434:11, 435:10, 437:15, 440:5
**worker** [1] - 365:5
**works** [5] - 254:12, 284:17, 417:10, 438:14, 443:9
**World** [1] - 439:2
**worried** [2] - 330:4, 441:13
**worse** [4] - 413:3, 430:16, 431:21, 443:10
**worth** [1] - 378:17
**wrapping** [1] - 307:11

**wrestle** [1] - 355:20
**write** [1] - 445:22
**writing** [2] - 315:16, 425:25
**written** [9] - 254:15, 255:6, 403:15, 403:18, 404:6, 404:7, 404:10, 425:18, 439:24
**wrote** [1] - 341:2

# Y



**year** [12] - 311:21, 401:21, 416:5, 418:15, 418:16, 420:16, 420:22, 421:23, 429:5, 431:23, 432:16, 438:23
**years** [26] - 252:24, 260:21, 301:22, 362:24, 366:18, 398:19, 398:24, 399:2, 399:14, 399:18, 417:23, 417:24, 418:2, 418:6, 428:16, 428:18, 428:20, 428:25, 429:3, 432:12, 432:13, 432:14, 435:24, 436:20, 441:2, 447:2
**yell** [1] - 285:23
**yelling** [1] - 285:24
**yesterday** [6] - 253:19, 272:17, 272:19, 275:20, 430:22, 430:23
**young** [2] - 279:24, 280:24
**yourself** [7] - 280:11, 345:12, 345:25, 387:6, 409:4, 416:14, 419:17
**yourselves** [4] - 273:5, 307:14, 388:10, 396:15

# Z

**zoom** [2] - 373:1, 373:12